# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAFETY BRAKING CORPORATION, a Delaware corporation, MAGNETAR TECHNOLOGIES CORP., a Nevada corporation, and G&T CONVEYOR CO., a Florida corporation, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| SIX FLAGS, INC., a Delaware corporation, SIX FLAGS THEME PARKS INC., a Delaware corporation, SF PARTNERSHIP, a Delaware partnership, TIERCO MARYLAND, INC., a Delaware corporation, BUSCH ENTERTAINMENT CORP., a Delaware corporation, CEDAR FAIR LP, a Delaware limited partnership, PARAMOUNT PARKS, INC., a Delaware corporation, NBC UNIVERSAL, INC., a Delaware corporation, UNIVERSAL STUDIOS, INC., a Delaware corporation, BLACKSTONE GROUP L.P., a Delaware limited partnership, THE WALT DISNEY CO., a Delaware corporation, and WALT DISNEY PARKS AND RESORTS, LLC, a Florida company, | **JURY TRIAL  DEMANDED** |
| Defendants. | |

## COMPLAINT FOR PATENT INFRINGEMENT

NOW COME the Plaintiffs, Safety Braking Corporation ("Safety Braking"), a Delaware corporation, Magnetar Technologies Corp. ("Magnetar"), a Nevada corporation, and G&T Conveyor Co. ("G&T"), a Florida corporation, by and through their attorneys, Connolly Bove Lodge & Hutz LLP, and hereby complain against the Defendants, stating as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

## THE PARTIES

### Plaintiffs

3.      Plaintiff Safety Braking is a Delaware corporation headquartered at 500 Newport Center Drive, 7th Floor, Newport Beach, CA 92660.

4.      Plaintiff Magnetar is a Nevada corporation headquartered at 4825 Hazelnut Avenue, Seal Beach, CA 90740.

5.      Plaintiff G&T is a Florida corporation with a primary address of 476 Southridge Industrial Drive, Tavares, FL 32778-9118.

### Defendants

6.      Defendant Six Flags, Inc. ("Six Flags") is a Delaware corporation headquartered at 1540 Broadway, 15th Floor; New York, NY 10036.  The Delaware registered agent for Six Flags, Inc. is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  Six Flags is an amusement park owner and operator in the United States, with parks including Six Flags Great Adventure in Jackson, New Jersey; Six Flags Magic Mountain in Valencia, California; Six Flags Elitch Gardens in Denver, Colorado; Six Flags Darien Lake in Darien Center, New York; Six Flags America in Largo, Maryland; Six Flags New England in Agawam, Massachusetts; Six Flags Great America in Gurnee, Illinois; Six Flags Over Georgia in

-2-

Austell, Georgia; Six Flags Over Texas in Arlington, Texas; Six Flags Kentucky Kingdom in Louisville, Kentucky; and Six Flags Saint Louis in Eureka, Missouri.

7.     Defendant Six Flags Theme Parks Inc. ("Six Flags Theme Parks") is a Delaware corporation.  The Delaware registered agent for Six Flags Theme Parks is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  Six Flags Theme Parks is a subsidiary of Six Flags, and is an amusement park owner and operator in the United States, with parks including Six Flags Elitch Gardens in Denver, Colorado; Six Flags Darien Lake In Darien Center, New York; Six Flags Great Adventure in Jackson, New Jersey; Six Flags Magic Mountain in Valencia, California; Six Flags America in Largo, Maryland; Six Flags New England in Agawam, Massachusetts; and Six Flags Great America in Gurnee, Illinois.

8.     Defendant SF Partnership ("SF") is a Delaware partnership that, upon information and belief, has its principal address at 1540 Broadway, 15th Floor, New York, NY 10036.  SF's general partner is Six Flags Theme Parks.  SF is a subsidiary of Six Flags Theme Parks and owns and/or operates amusement parks including Six Flags Great Adventure in Jackson, New Jersey, and Six Flags Magic Mountain in Valencia, California.

9.     Tierco Maryland, Inc. ("Tierco") is a Delaware corporation headquartered in Mitchellville, Maryland.   The Delaware registered agent for Tierco is The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  Tierco is a subsidiary of Six Flags Theme Parks, and owns and/or operates Six Flags America in Largo, Maryland.

10.    Defendant Busch Entertainment Corp. ("Busch") is a Delaware corporation headquartered in Saint Louis, Missouri.  The Delaware registered agent for Busch is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE

19801. Busch is an amusement park owner and operator in the United States, with parks including Busch Gardens Africa in Tampa Bay, Florida; Busch Gardens Europe in Williamsburg, Virginia; and Sesame Place in Langhorne, Pennsylvania.

11.    Defendant Cedar Fair L.P. ("Cedar Fair") is a Delaware limited partnership headquartered at One Cedar Point Drive, Sandusky, Ohio 44870-5259. The Delaware registered agent for Cedar Fair is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Cedar Fair is a publicly traded partnership, and is an amusement park owner and operator in the United States, with parks including Cedar Point in Sandusky, Ohio; Knott's Berry Farm in Buena Park, California; Valley Fair in Shakopee, Minnesota; Geauga Lake in Aurora, Ohio; Worlds of Fun in Kansas City, Missouri; Paramount King's Dominion in Doswell, Virginia; and Paramount King's Island in Mason, Ohio. In 2006, Cedar Fair announced that it signed an agreement to acquire Paramount Parks, Inc.

12.    Defendant Paramount Parks, Inc. ("Paramount") is a Delaware corporation. The Delaware registered agent for Paramount is The Prentice-Hall Corporation System, Inc., 2711 Centerville Rd., Suite 400, Wilmington, Delaware 19808. Paramount is an amusement park owner and operator in the United States, with parks including Paramount's King's Island in Mason, Ohio; and Paramount's King's Dominion in Doswell, Virginia.

13.    Defendant NBC Universal, Inc. ("NBC Universal") is a Delaware corporation headquartered at 30 Rockefeller Plaza, New York, NY 10112. The Delaware registered agent for NBC Universal is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. NBC Universal is a media and entertainment company, with television stations, a motion picture company, television production companies, and several amusement parks in the United States, including Universal Studios Hollywood in Los Angeles,

California; and Universal Islands of Adventure and Universal Studios Florida in Orlando, Florida.

14.    Defendant Universal Studios, Inc. ("Universal") is a Delaware corporation headquartered at 100 Universal City Plaza, Universal City, CA 91608-1002.  The Delaware registered agent for Universal is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Universal is a subsidiary of NBC Universal, and among its holdings are amusement parks including Universal Studios Hollywood in Los Angeles, California; and Universal Islands of Adventure and Universal Studios Florida in Orlando, Florida.

15.    Defendant Blackstone Group L.P. ("Blackstone") is a Delaware limited partnership headquartered at 345 Park Ave., New York, NY 10154.  The Delaware registered agent for Blackstone is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Blackstone is a private equity and investment management firm. Among its holdings is at least a partial ownership and operating interest in the amusement park Universal Studios Florida in Orlando, Florida.

16.    The Walt Disney Co. ("Disney") is a Delaware corporation headquartered at 500 S. Buena Vista St., Burbank, CA 91521-9722.  The Delaware registered agent for Disney is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808. Disney is an amusement park owner and operator in the United States, with parks including Walt Disney World in Orlando Florida; Disneyland in Anaheim, California; and Disney's California Adventure in Anaheim, California.

17.    Walt Disney Parks and Resorts, LLC ("Disney Parks") is a Florida company headquartered at 1375 E. Buena Vista Drive, Lake Buena Vista, FL 32830-8402.  Disney Parks

is a subsidiary of Disney, and is an amusement park owner and operator in the United States, with parks including Walt Disney World in Orlando, Florida; Disneyland in Anaheim, California; and Disney's California Adventure in Anaheim, California.

## FIRST CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. 5,277,125)

18.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 17 as if fully set forth herein.

19.    On January 11, 1994, United States Letters Patent No. 5,277,125 ("the '125 patent") (attached hereto as Exhibit "A") was duly and legally issued.    The '125 patent is assigned to G&T.  Magnetar received an exclusive license under the '125 patent from G&T for certain fields of use.  Safety Braking is now the exclusive licensee under the '125 patent for such fields of use, and has the right to sue for past, present, and future infringement of the '125 patent, and further has the right to seek injunctive relief and monetary damages.

20.    Defendants listed above, through ownership and/or operation of various theme parks and amusement rides throughout the United States, are engaged in the manufacture and/or use of amusement rides that infringe the '125 patent, either literally or under the doctrine of equivalents, making Defendants liable for direct and/or indirect infringement under 35 U.S.C. § 271.  Such infringing amusement rides include, but are not limited to, roller coasters and/or drop tower rides.

## SECOND CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. 6,659,237)

21.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 20 as if fully set forth herein.

22.    On December 9, 2003, United States Letters Patent No. 6,659,237 ("the '237 patent") (attached hereto as Exhibit "B") was duly and legally issued.    The '237 patent is assigned to Magnetar. Safety Braking is the exclusive licensee under the '237 patent, and has the right to sue for past, present, and future infringement of the '237 patent, and further has the right to seek injunctive relief and monetary damages.

23.    Defendants Cedar Fair, Paramount, NBC Universal, and Universal, through ownership and/or operation of various theme parks and amusement rides throughout the United States, are engaged in the manufacture and/or use of amusement rides that infringe the '237 patent, either literally or under the doctrine of equivalents, making Cedar Fair, Paramount, NBC Universal, and Universal liable for direct and/or indirect infringement under 35 U.S.C. § 271. Such infringing amusement rides include, but are not limited to, roller coasters and/or drop tower rides.

## REQUEST FOR RELIEF

Wherefore, plaintiffs pray that this Court:

A.    Find that the '125 and '237 patents have been infringed by the Defendants as alleged herein;

B.    Award damages adequate to compensate Plaintiffs for each Defendant's infringements, but not less than a reasonable royalty for the use made of the claimed inventions by each Defendant, together with interest, including pre-judgment interest, and costs as fixed by the Court;

C.    Find that each Defendant's infringements have been willful and deliberate;

D.    Award Plaintiffs increased damages and attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285 because of the nature of each Defendant's infringements;

E.    Permanently enjoin each Defendant and their officers, agents, servants, employees and affiliates, as well as all others in active concert or participation with it as any of the foregoing, from inducing or contributing to the infringement of the '125 and '237 patents; and

F.    Award Plaintiffs such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY

Plaintiffs request that all issues triable by a jury be so tried in this case.

_____

Francis DiGiovanni (#3189)
Geoffrey A. Zelley (#4939)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19899
(302) 658-9141

Scott R. Miller
CONNOLLY BOVE LODGE & HUTZ LLP
355 S. Grand Ave.
Suite 3150
Los Angeles, CA 90071
(213) 787-2500

*Attorneys for Plaintiffs*

Dated:  March 1, 2007

523861_1

**EXHIBIT A**

US005277125A

# United States Patent [19]

## DiFonso et al.

[11] **Patent Number:** 5,277,125

[45] **Date of Patent:** Jan. 11, 1994

| | | |
|---|---|---|
| 177101 | 8/1986 | Japan .................................. 104/292 |
| 231804 | 10/1986 | Japan .................................. 104/292 |

[54] **MATERIAL HANDLING CAR AND TRACK ASSEMBLY HAVING OPPOSED MAGNET LINEAR MOTOR DRIVE AND OPPOSED PERMANENT MAGNET BRAKE ASSEMBLY**

[75] Inventors: **Gene DiFonso**, Arlington; **Joel L. Staehs**, DeSoto, both of Tex.

[73] Assignee: **BAE Automated Systems, Inc.,** Carrollton, Tex.

[21] Appl. No.: **967,661**

[22] Filed: **Oct. 28, 1992**

[51] Int. Cl.$^5$ ............................................. **B60L 13/02**

[52] U.S. Cl. ..................................... **104/292; 104/294; 188/158; 188/267**

[58] Field of Search ............... 104/290, 292, 283, 294; 188/267, 158

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,613,805 | 9/1986 | Matsuo et al. ...................... | 318/687 |
| 4,848,242 | 7/1989 | Matsuo ............................... | 104/290 |
| 4,919,054 | 4/1990 | Matsuo ............................... | 104/94 |
| 5,018,928 | 5/1991 | Hartlepp ............................. | 414/339 |
| 5,127,599 | 7/1992 | Veraart ............................... | 104/292 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 81105 | 4/1986 | Japan .................................. | 104/292 |

*Primary Examiner*—Robert J. Oberleitner
*Assistant Examiner*—S. Joseph Morano
*Attorney, Agent, or Firm*—Lorusso & Loud

[57] **ABSTRACT**

Material handling car and track assembly, the assembly comprising a car having wheels mounted thereon, and a track having two parallel rails, the wheels being adapted to roll on the rails to facilitate movement of the car along the track, a metal slider extending from an underside of the car and lengthwise of the car, and opposed linear motors mounted beween the tracks and spaced from each other to define a gap between the motors, the slider being daapted to pass through the gap, the motors being operative to act on the slider to impart thrust to the car, the motors being oriented such as to substantially eliminate magnetic atraction between the mtors and the car. The invention further contemplates opposed magents mountede beween the tracks and spaced from each other to define a gap between the magnets, the slider being dapted to pass through the gap between the magnets, the magnets being operative to act on the slider to impart braking to the car, whereby to decelerate the car.

**3 Claims, 3 Drawing Sheets**





FIG. I



*FIG. 2A*



*FIG. 2B*



*FIG. 2C*



*FIG. 3*

5,277,125

1

# MATERIAL HANDLING CAR AND TRACK ASSEMBLY HAVING OPPOSED MAGNET LINEAR MOTOR DRIVE AND OPPOSED PERMANENT MAGNET BRAKE ASSEMBLY

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a material handling car and track assembly and is directed more particularly to acceleration and deceleration means mounted in the track assembly and adapted to influence speed of the car.

### 2. Description of Prior Art

The prior art has recognized the need for means to propel a car along a track without the installation of a driver mechanism or braking mechanism on the car. Systems have incorporated linear induction motors as an efficient means of achieving this. Such systems commonly employ single motors along a track whereby a car is propelled by a force created by the change in magnetic flux as the car passes by the motors. However, a problem inherent in these systems is that of undue stress on the cars and tracks themselves due to an electromagnetic force created between the car and the motor, causing the car to be attracted toward the track. This attractive force exerted on the car dissipates after the car passes away from the motor. In systems where there are commonly several hundred motors in use through which a car passes as it travels through the system, the constant attractive stress and release of such stress, leads to wear and tear on the car. As a result, cars break down and are in need of frequent repair.

Such a system is disclosed in U.S. Pat. No. 4,919,054 to Matsuo. In this system, linear induction motors are disposed in single file underneath the transport path of the car, causing the motors to exert an attractive force while acting to drive the car. Due to numerous motors in the system, a car undergoing such repeated application and release of stress becomes structurally weak and requires frequent servicing.

Another problem recognized in the prior art relates to providing a means for controlling the speed of a car through the use of a decelerating mechanism external of the car. Many systems which have employed inductive motors to impel a car forward along a track have relied entirely upon the same motors for braking the car. A reverse thrust is applied to the car by passing reverse phase alternating current through the coils of the motor stators, to slow the car down. However, these systems potentially overwork the motors which often leads to motor failure.

An example of this type of system is disclosed in U.S. Pat. No. 4,848,242 to Matsuo. As in the Matsuo '054 system, single motors are disposed at predetermined intervals underneath the transport path and, as in the previous system, an attractive force on the car is exerted and released as the car moves in the direction of the transport path. The motors impel the car in the forward and reverse directions. Thus, the motors carry out the function of starting and stopping the car, depending on the direction of current flow. However, this dual function leads to increased wear and tear on the motors.

In other systems, such as disclosed in U.S. Pat. No. 5,018,928 to Hartlepp, a car is decelerated through the use of a magnetic piston which moves by compressed air in a tube, such that a car will follow the piston. However, the use of such a structure is complicated and thus provides great opportunity for malfunction. Additionally, this system discloses the use of linear induction motors for propelling a car on a track wherein induction motors are singly disposed. Accordingly, an attractive force is exerted on the cars driven by the motor.

An additional problem recognized in the art is the need to mitigate the effects of motor failure. In U.S. Pat. No. 4,613,805 to Matsuo, there is disclosed a system providing for continued operation through the use of an auxiliary power source in the event that the main power source becomes disabled. However, this system does not insure continued operation in the event that a motor along the transport path should become disabled.

## SUMMARY OF THE INVENTION

Accordingly, it is an object of the invention to provide a material handling car and track assembly which reduces wear and tear on cars traveling through the system and provides for continued operation in the event that a motor, or several motors, in the system become disabled. This object is accomplished by provision of a car having a metal slider on the underside of the car. The assembly further includes a track having two parallel rails. Movement is imparted to a car traveling on the rails by opposed linear motors operatively acting on the slider. The configuration of the motors is such that it causes the magnetic attraction between the linear motors and the car to substantially cancel out, thereby eliminating the attractive force on the car. Thus the cars, no longer subject to application and release of stresses, require less reparative maintenance and enjoy longer operating life. Additionally, through the use of coupled motors, should one motor become disabled, the remaining motor continues to impart motion until the afflicted motor is again operative.

A further object of the invention is to provide a simple means for decelerating the car without the use of mechanisms disposed on the car. The use of magnets disposed along the track enables the car's traveling speed to be decreased, the magnets operatively acting on the slider to decelerate the car.

With the above and other objects in view, as will herein after appear, a feature of the present invention is the provision of a material handling car and track assembly, the assembly comprising a car having wheels mounted thereon, and a track having two parallel rails, the wheels being adapted to roll on the rails to facilitate movement of the car along the track, a metal slider extending from an underside of the car and lengthwise of the car, and opposed linear motors mounted between the tracks, the motors being spaced from each other by a distance exceeding the thickness of the slider to define a gap between the motors, the slider being adapted to pass through the gap in travel of the car over the motors, the motors being operative to act on the slider to impart thrust to the car, the motors being oriented such as to substantially eliminate magnetic attraction between the motors and the car.

In accordance with a further feature of the invention, there is provided a material handling car and track assembly, the assembly comprising a car having wheels mounted thereon, and a track having two parallel rails, the wheels being adapted to roll on the rails to facilitate movement of the car along the track, a metal slider extending from an underside of the car and lengthwise of the car, and exposed magnets mounted between the tracks, the magnets being spaced from each other by a

5,277,125

**3**

distance exceeding the thickness of the slider to define a gap between the magnets, the slider being adapted to pass through the gap in travel of the car over the magnets, the magnets being operative to act on the slider to impart braking to the car, whereby the magnets are operative to decelerate the car.

The above and other features of the invention, including various novel details of construction and combinations of parts, will now be more particularly described with reference to the accompanying drawings and pointed out in the claims. It will be understood that the particular devices embodying the invention are shown by way of illustration only and not as limitations of the invention. The principles and features of this invention may be employed in various and numerous embodiments without departing from the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

Reference is made to the accompanying drawings in which are shown illustrative embodiments of the invention, from which its novel features and advantages will be apparent.

In the accompanying drawings:

FIG. 1 is a front elevational view of one form of material handling car and track assembly illustrative of an embodiment of the invention, wherein the material handling car is shown having a metal slider on an underside portion of the car, and the track assembly is shown with linear induction motors in opposition, forming a gap therebetween to accommodate the passage of the slider;

FIG. 2A is a front elevational view of a decelerating means featuring decelerating magnets arranged in opposition and forming a gap therebetween adapted to accommodate the passage of the slider;

FIG. 2B is a perspective view of a portion of the decelerating means of FIG. 2A;

FIG. 2C is a top view of a portion of the decelerating means of FIG. 2A, showing the polar arrangement of magnets therein; and

FIG. 3 is a diagrammatic view of two opposed linear motors.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. 1, it will be seen that the illustrative assembly includes a car 1 having a chassis 2 on which are mounted travel wheels 4 to facilitate movement along a track assembly 6, which comprises two parallel rails 8.

Each of the rails 8 is of a U-shaped configuration and, as shown in FIG. 1, are opposed to each other Each of the U-shaped rails includes a substnatially horizontal bottom plae 3, for supporting a vertical travel wheel 5 of the car 1, and a substnatially ertical wall 7 for engagin a horizonal tavel wheel 9 of car 1, and a top wall 11 overlyin the bottom plate 3 and extending iwnardly from eside wall 7. Mounted on the chassis 2 is a tiltable tray 10 which is sized to accommodate a selected cargo, such as, for example, heavy, large or cumbersome baggage. The tray 10 is capable of being positioned in three positions, one in which it is adapted to receive material from a loading station, another in which it permits transport of material around curves in the track without spillage of material, and lastly, a third position in which it facilitates sliding of the material off the tray 10 onto a receiving platform.

**4**

On the underside of the chassis 2, a slider 12 is mounted which runs lengthwise along the chassis 2. The slider 12 comprises a fin which is preferably fabricated of an all-conductor, such as aluminum or copper. Other all-conductive materials are within the scope of the preferable materials, provided that such materials are non-magnetic. The use of such materials reduces the overall weight of the car so that it is 25% to 30% less than existing prior art cars which do not employ such materials. The slider 12 is preferably 0.25 inch thick and in one embodiment is 48 inches long.

Also shown in FIG. 1 is a track assembly with linear induction motors 16 disposed in opposition. Brackets 14 are disposed inwardly of the rails 8, and are adapted to retain the linear induction motors 16 such that the motors 16 form a gap 15 sized to be greater than the width of the slider 12. The two brackets 14 each hold a linear induction motor 16 in such an orientation that the motors extend to form the narrow gap 15 therebetween.

The linear induction motors 16 each include a stator assembly 30 (FIG. 3) having slots 32 therein. Within each stator assembly 30, there are disposed multiple phase windings 34. The windings 34 are disposed in the slots 32 so as to form a distributed winding pattern. When excited by a multiple phase alternating current source (not shown), the windings 34 generate a traveling magnetic wave defined by

$$b = B \cos \frac{(\pi S)}{p}$$

where
B=peak value of magnetic flux density in air gap
S=lengthwise distance of stator gap
p=pole pitch of stator

Inasmuch as the conductive slider 12 consists entirely of non-magnetic material, no force is produced tending to pull the slider sideways.

Because of magnetic induction action between the air gap magnetic flux wave and the slider, there occurs a flow of eddy currents defined by

$$j = J \sin \frac{(\pi S)}{p}$$

where
J=peak value of eddy current flow in the slider.

Interaction between the air gap flux wave and resulting eddy currents induced on the slider, produces thrust in the direction orthogonal to both flux and eddy current waves. The coil polarities are reversed from one stator assembly to the opposing stator assembly across the gap 15. As a result of this configuration, the attractive force created by single non-opposed stators is eliminated.

Referring to FIG. 1, it will be seen th the motors 16 are on about the same level above the botom plates 3 as are the horizontal travel wheels 9 and portions 13 of the ertical travel wheels 5 above their axes 15, when h car passes over the motors. Thus, as is paparent from FIG. 1, the driving force imparted to the slider 12 by the motors 16 is on about the same level as the horizontal wheels and the portion of the vertical wheels above the vertical wheel axes. Thus, there is produced subsntially only a forward thrust, without a turning moment imparted to the travel wheels tending to lift the wheels off the track.

5,277,125

5

In operation, the motors may be run continuously or may be provided with selective turn-off switches, such that one or more groups of motors may be turned off during periods of inactivity. Alternatively, a "presence control" may be utilized wherein the approach of a car is sensed and the motors turned on and, as the departure of the car from the scene is sensed, the motors turned off. A second alternative comprises a "speed control" wherein the speed of an approaching car is sensed and the motors are activated or deactivated in accordance with a preset desired speed for the car.

In FIG. 2A, there are shown decelerating magnetic members 20. Individual magnets 22 are each bonded to a steel plate 24 for support. The steel plates 24 are each attached to a mounting bracket 26. Steel gussets 28 (FIGS. 2A and 2B), each about 0.25 inch thick, are mounted across an inner angle of the mounting brackets 26, to provide support for the brackets 26. The magnetic members 20 are positioned between the rails 8 so as to form a gap 29, the width of which is greater than the width of the slider 12.

FIG. 2B shows the inner face of one of the identical opposed magnets and the positioning of the individual magnets 22. A selected number of magnets, depending upon the weight and desired velocity of the vehicle, are placed on each of the steel plates 24. FIG. 2C shows the magnets 22 and the polar orientation thereof. Thus, when the slider 12 passes between the magnetic members 20, as the car 1 travels along the tracks, the magnetic field created by the opposed polar orientation of individual magnets 22, serves to decelerate the car 1.

On the track assembly, the magnetic members 20 and the induction motors 16 are disposed in certain places where it is desirable that the speed of the car be either slowed or maintained. For example, in areas of an incline where it is likely that car speed will decrease, the induction motors may be disposed to maintain an appropriate speed. There are places along the track assembly where it is desirable that the speed of the car be decreased, such as in areas of sharp turns. It is in such areas that the magnetic members may be disposed to slow the car. Additionally, in areas where baggage is to be loaded onto and off of the tray of the car, magnetic members are disposed. Also, in areas where the tray has finished loading or unloading of baggage, induction motors may be positioned, so as to move the car along the track system and return the car to travel speed.

The motors may be reversed by merely reversing the direction of the traveling magnetic wave. This is accomplished by changing the phase rotation of the multiple phase power source, to provide a braking force on the cars. While it is preferable not to rely wholly on the motors for routine braking, use of the motors for braking over and beyond that provided by the magnetic members 20 is available.

It should be understood that the invention is not limited to the specific embodiment or construction described above and that various changes and modifications will be obvious to one skilled in the art without departing from the true spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A track assembly for driving a material handling car, said asembly comprisin:

two parallel rails upon which said car is driven, each of said rails havign a U-shaped configuration, said rails being in opposed position, each of said rails having a subsntaially horizontal bottom plate for

6

supporting a vertical travel wheel of said car, a substantially vertical side all for engaging a horizonal travel wheel of said car, and a top wall overlying said bottom plate and extending iwnardly from said side wall

linear induction motors mounted between said rails in an opposed configguration, said motors being on about the same level above said rail bottomplates as said horizontal tarvel wheel and portions of said vertical tarvel wheels above the axes thereof when said car passes over said motors, said opposed configuration defining a gap beween said motors permiting passage of a slider portion of said car therebetween, said configuration creating a driving force for impellin said car along said rails while causing cancellation of atractive forces exerted by seach of said induction motors respectively, such that said slider upon passage through said gap is subject only to said driving forcek said driving force being exerted by said motors at said level above said rail bottom plates so as to provide said driving force at said level of said horizontal travel wheels and said portions of said vertical travel wheels above said axes thereof, and

permanent magnets mounted between said rails at a point removed from said motors, said magnets being mounted in an opposed configuration defining a gap between said magnets which permits the passage of said slider therbetween, said magnets being adapted to exercise a braking force on said slider to decrease the speed of said car upon passage of said slider therebetween.

2. A material handling car and track assembly, said assembly comprising

a car having wheels mounted thereon, and a track having two parallel rails, said wheel being adapted to roll on said rails to faciliate movement of said car along said track, a metal fin extending from an underside of said car and lengthwise of said car, said fin exending from said car between said wheels and

opposed linear motors mounted between said tracks, said motors being spaced from each other by a distance exceeding the thickness of said fin to define a gap between said motors, said fin being adapted to pass through said gap in travel of said car over said motors said motors being oriented such as to substanatially eliminate magentic attraction between said motors and said car, and said motors bieng disposed between said wheels when said car passes over said motors, said moors being disposed at a level above bottom plates of said track rails and genraly equal to the level of portions of said wheels above said bottom plates and above the axes of said wheels when said car passes over said motors, and

opposed permanent mgents mounted between said tracks at a point removed from said motors, said magnets being spaced from each other by a distance exceeig the thickness of said fin to define a gap between said magnets, said fin being adapted to pass through said gap between said magnets in travel of said car over said magnets, said magnets being disposed on plates mounted between said tracks, said magnets being mounted side by side in a direction of travel of said car, said magnets being operative sequentially to act on said fin to impart braking to said car, whereby said motors are opera-

5,277,125

7

tive to accelerate said car and said magnets are operative to decelerate said car.

3. Material handling car and track assembly, said assembly comprising:

a car having wheels mounted thereon, and

a track having two parallel rails, said wheel being adapted to roll on said rails to facilitate movement of said car along said track,

a metal fin extending from an underside of said car and lengthwise of said car, and

opposed magnet assemblies mounted between said tracks, said opposed assemblies being spaced from

8

each other by a distance exceeding the thickness of said fin to define a gap between said magnet asemblies, said fin being adapted to pass through said gap in travel of said car over said magnets, each of said assemble is comprising a mounting bracket, a plate attached to said mounting bracket, and a series of magnets bonded to said plate, said magnets on said plate being disposed side by side in a direction of travel of said car on said rails, said magnets being operative sequentially to act on said fin to impart braking to said car.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,277,125                    **Page 1 of 2**

DATED       : **January 11, 1994**

INVENTOR(S) : **Gene DiFonso, Joel L. Staehs**

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

In the Abstract:

    Line 9: "daapted" should read "adapted"
    Line 13: "mtors" should read "motors"
    Line 14: "opposed" should read "opposed"
        "magents" should read "magnets"
        "mountede" should read "mounted"
    Line 16: "dapted" should read "adapted"

    Column 1: line 9; "fnvention" should read "invention"
    Column 1: line 15; "ar" should read "art"

    **Column 3: line 53; "1" should read "."**
    **line 54; "substnatially" should read —substantially—**
    **line 55; "plae" should read —plate—**
    **line 56; "substantially ertical" should read —substantially vertical"**
    line 56; "engagin" should read "engaging"
    line 57; "tavel" should read "travel"
    line 58; "overlyin" should read "overlying"
    line 59; "eside" should read "the side"
    Column 4: line 11; "48" should not be in bold
    line 57; "th" should read "that"
    line 58; "botom" should read "bottom"
    line 60; "ertical" should read "vertical"
    line 60; "h" should read "the"
    line 61; "paperent" should read "apparent"
    line 65; "substntially" should read "substantially"
    Column 5: line 64; "asembly comprisin" should read "assembly comprising"
    line 66; "havign" should read "having"
    line 68; "substntaially" should read "substantially"

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,277,125                      Page 2 of 2
DATED       : January 11, 1994
INVENTOR(S) : Gene DiFonso, Joel L. Staehs

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

```
Column 6: line 2; "all" should read "wall"
          line 4; "iwnardly" should read "inwardly"
          line 5; after "wall" please insert ","
          line 7; "configguarion" should read "configeration"
          line 10; "tarvel" should read "travel"
          line 15; "impellin" should read "impelling"
          line 16; "atractive" should read "attractive"
          line 17; "seach" should read "each"
          line 19; "forcek" should read "force"
          line 29; "therbetween" should read "therebetween"

          line 37; "rolll" should read "roll"
          line 40; "exending" should read "extending"
          line 47; after "said motors" please insert a comma ","
          line 48; "substanatially" should read "substantially"
          line 50; "bieng" should read "being"
          line 53; "genraly" should read "generally"
          line 57; "mgents" should read "magnets"
          line 60; "exceedig"  should read "exceeding"
Column 7: line 6;  "wheel" should read "wheels"
Cloumn 8: line 2;  "asem-" should read "assem-"
```

Signed and Sealed this

Eleventh Day of April, 1995

*Attest:*

*[signature: Bruce Lehman]*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# EXHIBIT B



US006659237B1

(12) **United States Patent**
Pribonic

(10) Patent No.: **US 6,659,237 B1**
(45) Date of Patent: **Dec. 9, 2003**

(54) **EDDY CURRENT BRAKE**

(75) Inventor: **Edward M. Pribonic**, Seal Beach, CA (US)

(73) Assignee: **Magnetar Technologies, Ltd.**, Seal Beach, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 53 days.

(21) Appl. No.: **09/880,353**

(22) Filed: **Jun. 13, 2001**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/447,206, filed on Nov. 22, 1999.

(51) Int. Cl.[7] ............................................. **B60L 7/28**
(52) U.S. Cl. ...................................... **188/165**; 108/180
(58) Field of Search ................................. 188/159, 161, 188/164, 165, 180, 41, 84; 104/250

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,301,623 A | * | 11/1981 | Demukai | .................. | 16/78 |
| 5,127,599 A | * | 7/1992 | Veraart | .................. | 104/292 |

| | | | | | |
|---|---|---|---|---|---|
| 5,195,618 A | * | 3/1993 | Wu | .................. | 188/164 |
| 5,277,125 A | * | 1/1994 | DiFonso et al. | .................. | 104/292 |
| 5,465,815 A | * | 11/1995 | Ikegami | .................. | 188/164 |
| 6,062,350 A | * | 5/2000 | Spieldiener et al. | .................. | 188/161 |
| 6,227,334 B1 | * | 5/2001 | Yumura et al. | .................. | 187/359 |
| 6,293,376 B1 | * | 9/2001 | Pribonic | .................. | 187/350 |
| 6,361,268 B1 | * | 3/2002 | Pelrine et al. | .................. | 104/284 |
| 6,412,611 B1 | * | 7/2002 | Pribonic | .................. | 187/375 |

FOREIGN PATENT DOCUMENTS

WO        WO 96/32172        * 10/1996

* cited by examiner

*Primary Examiner*—Jack Lavinder
*Assistant Examiner*—Bradley King
(74) *Attorney, Agent, or Firm*—Walter A. Hackler

(57) **ABSTRACT**

An eddy current brake includes a diamagnetic member, a first support wall and a second support wall with the first and second linear arrays of permanent magnets disposed on the walls facing one another. Apparatus is provided for moving at least one of the walls in order to control eddy current induced in the member in the passage of the member therepast to adjust the braking force between the magnets and the member. Apparatus is also provided for causing the velocity of the member to change the braking force between the magnets and the member.

**10 Claims, 4 Drawing Sheets**





_FIG. 1._

_FIG. 2._

_FIG. 3._



*FIG. 4.*



*FIG. 5.*



*FIG. 6.*



*FIG. 7.*



*FIG. 8.*



US 6,659,237 B1

1

# EDDY CURRENT BRAKE

The present application, is a continuation-in-part of U.S. patent application Ser. No. 09/447,206 filed Nov. 22, 1999.

The present invention is generally related to permanent magnet linear brakes and is more particularly directed to an eddy current brake and magnet system for providing adjustable braking for movable cars, for example, rail support cars, go cars, elevator cars, conveyer car, roller coaster cars among other.

Heretofore, eddy current braking system for providing deceleration of moving apparatus have utilized physically fixed magnets which provided no opportunity to adjust braking before or during passage of a diamagnetic member past a linear array of permanent magnets.

Accordingly, such prior art systems, when installed for decelerating a plurality of cars on a track, can not accommodate for variations in car weight and size.

The present invention provides for a unique permanent array arrangement and apparatus for adjusting braking force before and/or during passage of a car past a selected point.

## SUMMARY OF THE INVENTION

An eddy current brake in accordance with the present invention generally includes a diamagnetic or non-magnetic member, a first support wall and a separate second support wall disposed in a spaced apart relationship with the first support wall for enabling the member to pass therebetween.

A first linear array of permanent magnets is disposed on the first wall on the side facing the second wall and a second linear array of permanent magnets is disposed on the second wall on the side facing the first wall. The first and second arrays are parallel with one another and spaced apart from one another for allowing passage of the member therebetween and causing eddy current to be induced in the member which results in the braking force between the magnets and the member. No magnetic connection, such as a yoke, is required between the walls or the arrays of permanent magnets. This feature enables adjustability of the distance between the member and the magnet arrays.

In accordance with the present invention, apparatus is provided for moving a least one of the first and second walls in order to control eddy current induced in the member during the passage of the member therepast in order to adjust braking force between the magnets and the member. In one embodiment of the present invention, the apparatus includes means for moving at least one of the first and second walls in a direction perpendicular to the member, and in another embodiment of the present invention, the apparatus includes means for moving at least one of the first and second walls in a direction parallel to the member.

Thus, it can be seen that the apparatus in accordance with the present: invention provides for changing the spaced apart relationship between the first and second walls in order to control eddy current induced in the member during passage and adjust a braking force between the magnets and member.

Accordingly, the amount of deceleration provided to a given car may be adjusted in accordance with the present invention. In addition, cars of various sizes and weights may be utilized and the eddy current magnetic brake in accordance with the present invention adjusted to provide the proper, or desired, deceleration. In one embodiment to the present invention, apparatus is provided for adjusting the eddy current induced in the member, and the braking force, as a function of velocity of the member between the arrays. Thus, cars having various velocities upon passing the brake,

2

can be decelerated to a more uniform velocity exiting the brake in accordance with the present invention.

In this embodiment of the brake, the apparatus for adjusting eddy current includes a linkage mounting at least one of the first and second walls to a fixed foundation for enabling movement of the member therepast to change a distance between at least one of the first and second walls and the member. More particularly, the linkage may provide for changing a spaced apart relationship between the first and second walls.

An embodiment of the present invention includes linkage for enabling movement of the member to change a transverse relationship between at least one of the first and second walls of the member and another embodiment provides linkage for enabling movement of the member to change a parallel relationship between the first and second walls and the member.

Magnetic coupling and inducement of eddy current is effective through a linear array of permanent magnets which includes a channel and plurality of magnets disposed therein. The magnets may be arranged within the channel in two adjacent rows with each magnet in each row being arranged with a magnetic field at a 90° angle to adjacent magnets in each row along the channel. Each magnet in each row is also arranged with a magnetic field at an angle to another adjacent magnet in the adjacent row.

## BRIEF DESCRIPTION OF THE DRAWINGS

The advantages and features of the present invention will be better understood by the following description when considered in conjunction with the accompanying drawings in which:

FIG. 1 is a perspective view of an eddy current brake in accordance with the present invention generally showing first and second spaced apart support walls and first and second linear arrays of permanent magnets along with a diamagnetic or nonmagnetic member attached to moving apparatus such as a car, represented by dashed line;

FIG. 2 is a perspective view of a first linear array of permanent magnets disposed upon a first support wall;

FIG. 3 is an elevational view of the brake shown in FIG. 1;

FIG. 4 shows a selectively actuatable brake system disengaged;

FIG. 5 shows a system of FIG. 8 engaged;

FIG. 6 is an elevational view of an alternative embodiment according to the present invention further showing apparatus for moving at least one of the first and second walls in order to control the distance between permanent magnets and opposing walls for adjusting braking force between the magnets and a member;

FIG. 7 is plan view of the brake shown in FIG. 6;

FIG. 8 is an enlarged view of a linear array of permanent magnets in accordance with the present invention generally including a channel and a plurality of magnets disposed therein in a particular arrangement as will be hereinafter described in greater detail;

FIGS. 9 and 10 show embodiment of the present invention similar to that shown in FIGS. 8 and 9 and further including apparatus for adjusting eddy current induced and the member, and braking force, is a function of velocity of the member between arrays of magnets;

FIGS. 11–14 are diagrams of alternative embodiments of the present invention which provide for linkage from at least

US 6,659,237 B1

3

one of the first and second walls to a fixed foundation for enabling movement of the member past the first and second walls with the first and second magnet arrays thereon to change a perpendicular relationship between the first and second walls and the member.

DETAILED DESCRIPTION

For the ensuing description of a braking apparatus 10 for an object 12, reference is made particularly to FIGS. 1–3. The object 12 is shown in generalized form only and is contemplated for movement in the direction of the arrow. Affixed to the object 12 is a member, or fin, 14 which extends outwardly from the object 12 and also moves with the object in the direction of arrow 15.

At some point along the path of movement there are mounted first and second laterally spaced magnet arrays 16 and 18. Each array includes an elongated support wall 20 which may be any cross-section, such as, for example an L-shaped cross-section, and on a lateral surface thereof, there are provided a linear series of permanent magnets 22, of any size, arrangement or configuration. For instance, the magnets may alternate in polarity as indicated by the identification letters "S" and "N". Also, the space 26 between the arrays is dimensioned and arranged with respect to the object path of movement, that the fin 14 will move along the space directly opposite the magnets and spacers, but remain out of physical contact with either the magnets or spacers.

When the fin 14 passes through the magnetic field existing in the space 26, an electric current (eddy current) is induced in the fin 14 which, in this case, reverses as the fin passes from a magnet of one polarity to a magnet of opposite polarity. These eddy currents produce a force exerted on the fin 14 (and object 12) of such direction as to reduce the velocity of movement of object 12 and fin 14. It is this deceleration that produces the "braking" of the present invention.

Although the above-described first embodiment includes movement of the object and fin past fixedly located magnet arrays, the magnet arrays can just as well be moved past a stationary object and fin. All that is needed to achieve the braking effect is relative movement between the magnets and fin. Since usually the object is moving, in that case the magnet arrays would be carried by the object and the fin fixedly mounted adjacent the path of movement. The choice of which technique to employ depends upon the particular application.

In its more general aspects, the invention can be advantageously employed for braking a large variety of moving objects. As an excellent example, eddy current braking for elevators could be highly advantageous as an emergency measure where normal operation has somehow been interfered with or disrupted. Also, many amusement park rides could benefit by having eddy current braking devices to retard excessive speed as the "ride" vehicle takes a corner or drops at a severe angle.

FIGS. 4 and 5 illustrate an object 52 with a brake fin 54 interconnected therewith, that moves generally along a direction indicated by an arrow 56 which normally will pass by a magnet carrier 58 beyond the range of substantial magnetic interaction (FIG. 4). The object 52 and fin 54 are provided with means 60 selectively actuatable for moving them toward the magnet carrier so as to effect magnetically coupling therewith (FIG. 5) and achieve braking.

With reference to FIGS. 6 and 7, there is shown an alternate embodiment 100 of the eddy current brake in accordance with the present invention generally including a

4

diamagnetic or non-magnetic member 102, a first support wall 104 and a second support wall 106. Walls 104, 106 are separate from one another and disposed in a spaced apart relationship upon a base or foundation 110 via leg portions 112, 114 respectively. The spaced apart relationship enables the member 102 to pass between the walls 104, 106 and because 104, 106 are not fixed with respect to one another, a distance D therebetween can be adjusted as will be hereinafter discussed in greater detail.

A first linear array 120 of permanent magnets 122, see FIG. 8, is disposed on the first on a side 124 facing the second wall 106.

A second linear array 130 of permanents (not individually shown) are disposed on the second wall 106 on a side 132 facing the first wall 104 with the first and second arrays 120, 130 being parallel with one another as shown in FIG. 10. Apparatus 140, 142 is provided for moving the walls 104, 106 and change the spaced apart relationship between the first and second walls 104, 106 in order to control, or adjust, eddy current induced in the member 102 during passage of the member 102 past and between the walls 104, 106 and magnets 120, 130 thereby adjusting the braking force between the magnets arrays 120, 130 and the member 102.

The apparatus 140, 142 may include adjusting nuts 144, 146 and bolts 148A, 148B, 150A, 150B interconnected between the walls 104, 106 and brackets 152, 154 fixed to the base 110.

Jam nuts 156, 158 prevent unwanted movement of the adjusting nuts 144, 146 and securing bolts 160, 162 extending through the base 110 and legs 112, 114 through slots 166, 168, fix the walls 104, 106 in a desired spaced apart relationship after adjustment. The exact size of the walls 104, 106, magnet arrays 120, 130, member 102 and spacing D will be dependant upon velocity and weight of a car (not shown) attached to the member 102 and may be empirically determined.

It should be appreciated that the apparatus 140, 142 may include any number of configurations for adjustment of the walls 104, 106. Such alternatives including single direction bolts, worm screws, jack screws, short in-line turn buckles, or other electrical, pneumatic, hydraulic system capable of providing the adjustment of spacing D, between the walls 104, 106. Such configurations may eliminate a need for the securing bolts 160 and 162.

Preferably, each magnet array 120, 130, as illustrated by the array 120 in FIG. 12, includes at least 1 row 170, each having individual magnets 180, 182, 184, 186. A second row 172 may include individual magnets 188, 190, 192, 194 respectively.

The magnet rows 170, 172 may be disposed in a tube, or channel 200 which may be formed of any suitable material such as aluminum, stainless steel, plastic; any number of magnets (not all shown) may be used.

The magnets 180, 194 are specifically arranged within the channel 200 with a specific magnetic field pattern. While two rows 170, 172 are shown, it should be appreciated that any suitable number of rows (not shown) may be utilized.

The channel 200 may be removably attached in any suitable manner to the wall 104. Thus, as hereinabove noted, assembly of the brake 100 is facilitated. Another advantage of the preassembly of magnets 180–186 is the is the fact that alternative magnet configurations may be easily exchanged on the wall 104 in order to tailor magnetic braking characteristics.

More particularly, a magnet 182 in a row 170 is arranged with a magnetic field (indicated by the arrow 204) which is

US 6,659,237 B1

5

at an angle to the magnetic fields 206, 208 of adjacent magnets 180, 184 in the row 170. A number of angular relationship between the adjacent magnets 180, 182, 184 such as, for example, 15°, 30°, 45° or 90°. When the angular relationship between adjacent magnet 180, 182, 184 is 90°, they may also be arranged with the magnetic field 104 at a 90° angle to a magnetic field 210 of the magnet 190 in the adjacent row 172.

Preferably, the magnets 180–194 are epoxied into the channel 200 and thereafter attached to the wall 104 in any suitable manner. Also, the channel 200 may be open, as shown, or closed, (not shown) and be of any suitable shape for containing the magnets. Because the magnets may be assembled in the channel 200 before installation on the wall 104, 106, assembly of the brake 100 is facilitated. In addition, change of magnetic field can be easily performed by changing of channels (not shown) having different magnet configurations therein.

The multi-row Halbach arrangement as shown in FIG. 8, can be built with no backiron. The advantage is that most of the flux is confined to the member of fin 102 area, without needing backiron as is needed in the standard eddy current brake (not shown). The flux is concentrated between the magnet array and is small above and below the magnets. Significant weight improvements result because no backiron is used.

Multiple rows 170, 172 in proper alignment permit the use of the cubic Halbach arrangement in such a way that brakes of increasing power levels can be constructed while maintaining a fixed depth of magnet.

The Halbach array can achieve higher braking forces for the equivalent volume of magnetic material of a conventional ECB. The Halbach array reduces stray magnetic field through the inactive side of the array.

With reference to the diagrams shown in FIGS. 13 and 14, apparatus 250 including links 252, 254 interconnecting the wall 104 with a foundation 258 provides for changing, controlling, or adjusting eddy current induced in the member 102, and braking force, as a function of member 102 velocity between the walls 104, 106 and arrays 120, 130. Only one wall 104 is shown in FIGS. 13, 14 for the sake of clarity.

As shown by the directional arrows 260, 262 in FIGS. 13, 14 respectively, movement of the member 102 past the wall 104 and array 120 attached thereto provides a reaction force as shown by the arrow 266 which raises the wall 104 from stops 270, 272 in order to change a transverse relationship between the wall 4 and array 120 and the member 104. This transverse movement raises 104 increasing relative penetration of 102, which increases the induced eddy currents and braking action.

Because the drag force is a function of velocity, when the walls 104 are mounted for pivoting on the links 252, 254, the wall 104 is raised a specific height based upon the drag force generated causing rotation of the links 250, 254. Thus, the penetration of the member 102 into the magnetic flux established by the arrays 120, 130 is self regulated.

When used in one orientation, as shown in FIGS. 9, 10, the member 102 having a velocity in excess in a predetermined value would generate drag forces 266 sufficient to rotate, or pivot, the wall 104 to increase member 102 penetration and subsequently generating higher drag forces to reduce the excess velocity. As the velocity falls below the level necessary to generate drag force sufficient to fully rotate the wall 104 and pivot linkages 252, 254, the wall 104 rotates back toward the default position. How far back it rotates is a self regulating function of the velocity/drag force in that instance.

6

Thus, the apparatus 250 can be utilized as an automatic "trim" brake actuating only when necessary and only with a force necessary to maintain the desired velocity of the member 102 and vehicle attached (not shown). Opposite linkages (not shown) would have the effect of lowering the wall 102 upon movement of the member 102 therepast, thereby having the effect of flattening the initial drag peak and providing flatter more uniform deceleration.

As diagramed in FIGS. 11 and 12, apparatus 280 including pivoting links 282, 284, 286, 288 interconnected between a foundation 290 and the walls 104, 106 enable movement of the member as indicated by the arrow 302 to pivot the links 282, 284, 286, 288 in direction indicated by the arrows 304, 306 in order to, change a distance $d_1$ between the walls 104, 106. The magnet arrays are not shown in FIGS. 11 and 12 for the sake of clarity in describing wall 104, 106 movement. Since the walls 104, 106 carry the magnet arrays 120, 130 the distance between the arrays 120, 130 is also varied. The links 282, 284, 286, 288 may include spring loaded pivots 310, 312, 314, 316 respectively in order to bias the walls 104, 106 against stops 320, 322 in a rest position.

As shown in FIG. 12, movement of the member between the walls 104, 106 decreases the distance $d_1$ to $d_2$, thus increasing the induced eddy currents and increasing a braking action. A stop 326 defines the minimum distance $d_2$ of approach between the walls 104, 106.

Similar linkage apparatus is shown in FIGS. 13 and 14 in connection with the walls 104, 106 and member 102. In this instance, links 342, 344, 346, 348 are interconnected so that movement indicated by the arrow 360 of the member 102 causes a spread or widening as indicated by the arrows 364, 366 of the walls 104, 106. Stops 370, 372, 376 limit the movement of the walls 104, 106 in a manner similar to that described in connection with the apparatus 280 shown in FIGS. 11, 12.

Spring loaded pivots keep the walls 104, 106 initially biased against the stop 376. This configuration lowers the magnetic coupling due to movement of the member 102 between the walls 104, 106 and, as hereinabove noted, has the effect of flattening the initial drag peak and provide a flatter more uniform deceleration. It should be appreciated that other means of opening and closing arrays and lowering the walls 104, 106 may be utilized which can include other mechanical, pneumatic, hydraulic or other components (not shown) to provide the same function.

Although there has been hereinabove described an eddy current braking apparatus in accordance with the present invention for the purpose of illustrating the manner in which the invention may be used to advantage, it will be appreciated that invention is not limited thereto. Accordingly, all modifications, variations or equivalent arrangements which may occur to those skilled in the art should be considered to be within the scope of the invention as defined in the appended claims.

What is claimed is:

1. An eddy current brake comprising:

a diamagnetic or non-magnetic member;

a first support wall;

a separate second support wall disposed in a spaced apart relationship with said first support wall for enabling the member to pass therebetween;

a first linear array of permanent magnets disposed on the first wall on a side of the first wall facing the second wall;

a second linear array of permanent magnets disposed on the second wall on a side of the second wall facing the

US 6,659,237 B1

7

first wall, the first and second arrays being parallel with one another; and

apparatus for adjusting eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays, said apparatus including linkages for enabling movement of the member therepast to change the spaced apart relationship between the first and second walls.

2. Eddy current braking apparatus comprising:

a diamagnetic or non-magnetic member;

a linear array of permanent magnets including a channel and a plurality of magnets disposed therein, the magnets being arranged within said channel in two adjacent rows, each magnet in each row being arranged with a magnetic field at a 90° angle to another adjacent magnets in each row along the channel, each magnet in each row also being arranged with a magnetic field at an angle to another adjacent magnet in the adjacent row; and;

means, mounting the linear array with respect to the member, for enabling passage past one another at a distance sufficient to cause eddy currents to be induced in the member resulting in a braking force between the linear array and the member.

3. The brake according to claim 2 further comprising a second linear array of permanent magnets including a second channel and a plurality of magnets disposed therein, the magnets being arranged within said second channel in two adjacent rows, each magnet in each row being arranged with a magnetic field at a 90° angle to adjacent magnets in each row along said second channel, each magnet in each row also being arranged with a magnetic field at a 90° angle to another adjacent magnet in the adjacent row; and

means, mounting the second linear array with respect to the member, for enabling passage past one another at a distance sufficient to cause eddy currents to be induced in the member resulting in a braking force between the linear array and the member.

4. The brake according to claim 3 further comprising a first support wall for, supporting the linear array, and second wall for supporting the second linear array and apparatus for moving at least one of the first and second walls in order to

8

control the eddy current induced in the member during passage of the member therepast to adjust braking force between the magnets and the member.

5. The brake according to claim 4 wherein the apparatus includes means for moving at least one of the first and second walls in a direction perpendicular to the member.

6. The brake according to claim 4 wherein the apparatus includes means for moving at least one of the first and second walls in a direction parallel to the member.

7. The brake according to claim 3 further comprising a first support wall for supporting the linear array, a second wall, disposed in a spaced apart relationship with said first support wall, for supporting the second linear array and apparatus for changing the spaced apart relationship between the first and second walls in order to adjust eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays.

8. The brake according to claim 7 wherein the apparatus for adjusting eddy current includes a linkage mounting at least one of the first and second walls to a fixed foundation, for enabling movement of the member therepast to change a distance between at least one of the first and second walls and the member.

9. The brake according to claim 7 wherein the apparatus for adjusting eddy current includes linkages, mounting the first and second walls to a fixed foundation, for enabling movement of the member therepast to change the spaced apart relationship between the first and second walls.

10. An eddy current brake comprising:

a diamagnetic or non-magnetic member;

a first linear array of permanent magnets;

a second linear array of permanent magnets disposed in a spaced apart relationship with said first linear array for enabling the member to pass therebetween, the first and second arrays being parallel with one another; and

apparatus for adjusting eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays, said apparatus including linkages for enabling movement of the member therepast to change the spaced apart relationship between the first and second arrays.

*    *    *    *    *

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SAFETY BRAKING CORPORATION, MAGNETAR TECHNOLOGIES CORP., and G&T CONVEYOR CO.

**(b)** County Of Residence of First Listed Plaintiff    **Orange County, California**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)

Francis DiGiovanni (#3189)
Geoffrey A. Zelley (#4939)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 658-9141

## DEFENDANTS

SIX FLAGS, INC., SIX FLAGS THEME PARKS INC., SF PARTNERSHIP, TIERCO MARYLAND, INC., BUSCH ENTERTAINMENT CORP., CEDAR FAIR LP, PARAMOUNT PARKS, INC., NBC UNIVERSAL, INC., UNIVERSAL STUDIOS, INC., BLACKSTONE GROUP L.P., THE WALT DISNEY CO., and WALT DISNEY PARKS AND RESORTS, LLC,

County Of Residence Of First Listed Defendant    **New York County, New York**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

X 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault. Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>X 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/ Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities – Employment<br>☐ 446 Amer. w/Disabilities – Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br><br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. §§ 284 and 285

Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND: **In excess of $75,000.00** and injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND:    X YES    ☐ NO

## VIII. RELATED CASE(S) IF ANY    NONE

(See instructions):    JUDGE    DOCKET NUMBERS

DATE
**March 1, 2007**

SIGNATURE OF ATTORNEY OF RECORD
**Francis DiGiovanni (#3189)**

FOR OFFICE USE ONLY

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS–44

Authority For Civil Cover Sheet

The JS–44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs – Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below: federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statues unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                    Brief Description: Unauthorized reception of cable service.
**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _0 7 - 1 2 7 -_____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___12___ COPIES OF AO FORM 85.

MAR 0 3 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Ben Lougheed
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action