**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SAFETY BRAKING CORPORATION,
MAGNETAR TECHNOLOGIES CORP.,
and G&T CONVEYOR CO.,

        Plaintiffs,

        v.

SIX FLAGS THEME PARKS INC., TIERCO
MARYLAND, INC., GREAT AMERICA LLC,
KKI, LLC, MAGIC MOUNTAIN LLC, PARK
MANAGEMENT CORP., RIVERSIDE PARK
ENTERPRISES, INC., SIX FLAGS OVER GEORGIA
II, L.P., SIX FLAGS ST. LOUIS LLC, TEXAS FLAGS,
LTD., ASTROWORLD, L.P., DARIEN LAKE THEME
PARK AND CAMPING RESORT, INC., ELITCH
GARDENS, L.P., BUSCH ENTERTAINMENT CORP.,
CEDAR FAIR LP, PARAMOUNT PARKS, INC.,
KNOTT'S BERRY FARM, KINGS ISLAND
COMPANY, CEDAR FAIR, UNIVERSAL CITY
DEVELOPMENT PARTNERS LTD., UNIVERSAL
CITY STUDIOS LLLP,

        Defendants.

Civil Action No. 07-127-***

**PLAINTIFFS' UNOPPOSED APPLICATION FOR ISSUANCE OF LETTERS OF
REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO
THE HAGUE CONVENTION OF 1970 ON THE TAKING OF EVIDENCE
ABROAD IN CIVIL OR COMMERCIAL MATTERS**

        1.     Plaintiffs Safety Braking Corporation ("Safety Braking"), G&T Conveyor

Co. ("G&T"), and Magnetar Technologies Corporation ("Magnetar"), herein referred to

collectively as "Plaintiffs," respectfully apply for the issuance by the Court of two Letters

of Request filed concurrently herewith, seeking the assistance of the judicial authorities

of Switzerland for purposes of obtaining witness testimony and documents from two Swiss residents.

2.    This Application is made pursuant to, and in conformity with, the Hague Convention of 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, T.I.A.S. 7444, 23 U.S.T. 2555, *reprinted in* 28 U.S.C.A. § 1781, ("the Hague Convention") and Rules 28 and 30 of the Federal Rules of Civil Procedure.

3.    Issuance of a Letter of Request under the Hague Convention is the proper method for seeking testimony and documents of persons residing abroad.  Fed. R. Civ. P. 28; *Pain v. United Technologies Corp.*, 637 F.2d 775, 788-90 (D.C. Cir. 1980).

4.    Plaintiffs seek evidence from Patrick Spieldiener and Walter Bolliger (collectively referred to herein as "the witnesses").  Each of the witnesses is a Swiss resident.  Patrick Spieldiener is the President of Intamin AG ("Intamin"), a company that designs and manufactures amusement rides.  Walter Bolliger is President of Bolliger and Mabillard Consulting Engineers, Inc. ("B&M"), a company that designs and manufactures amusement rides.

5.    As Presidents of their respective companies, it is expected that the witnesses have within their possession, custody, or control, documents detailing the design, sale, and manufacturing, of amusement rides to Defendant companies, including several rides that infringe U.S. Patent No. 5,277,125 ("the '125 patent") or U.S. Patent No. 6,659,237 ("the '237 patent").

6.    Plaintiffs anticipate that the testimony and documents requested from the witnesses will provide necessary information regarding: (1) technical specifications of infringing rides manufactured and sold by Intamin and B&M to Defendants in this

litigation, (2) financial data for infringing rides manufactured and sold by Intamin and

B&M to Defendants in this litigation, (3) possible prior art to one or more patents in this

litigation, and (4) reasonable royalty rates for similar patents licensed by Intamin or

B&M.

7.      Therefore, Plaintiffs request that the Court approve and sign the attached

Letters of Request.  Plaintiffs further request that after the Court has signed the Letters of

Request, that the Clerk of this Court authenticate the Court's signature under the seal of

this Court, and that the Letters of Request be thereafter returned by the Clerk to counsel

for Plaintiffs.  Counsel will finalize translations of the Letters of Request and promptly

cause the Letters of Request to be transmitted to the appropriate judicial authorities in

Switzerland, in conformity with Article 2 of the Hague Convention.

8.      **The undersigned attorneys stand ready to reimburse this Court**

**and/or the judicial authorities of Switzerland for any expenses incurred in**

**connection with the execution of these Letters of Request.**

9.      In accordance with Local Rule 7.1.1, counsel for Plaintiffs has conferred

with counsel for Defendants and Defendants have indicated that they will not oppose this

Application for Issuance of Letters of Request.

## ARGUMENT

10.     Plaintiffs seek evidence from two Presidents of Swiss companies that

design and manufacture amusement rides, Intamin and B&M.  Intamin and B&M, as

designers and manufacturers of several infringing amusement rides, have documents and

information essential to Plaintiffs' claims and defenses.  Therefore, Plaintiffs seek to

compel testimony and document production through the Hague Convention.

I.    **THE ISSUANCE OF LETTERS OF REQUEST IS THE APPROPRIATE PROCEDURE FOR OBTAINING FOREIGN EVIDENCE**

11.    The Hague Convention requests that signatory nations, such as the United States and Switzerland, respond to requests from other signatories for evidence related to civil or commercial matters.  23 U.S.T. 2555.  Such requests are styled as a Letter of Request.  A Letter of Request is directed to the foreign judicial authority in order to enlist the cooperation of the courts of that nation in compelling evidence from witnesses.  *See* Fed. R. Civ. P. 28(b). Letters of Request for the examination of witnesses are properly issued pursuant to the Hague Convention when, as here, the information is "significant to the resolution" of the litigation.  *See DBMS Consultants v. Computer Assocs. Int'l Inc.,* 131 F.R.D. 367, 369 (D. Mass. 1990).

12.    Federal courts have statutory power under 28 U.S.C. § 1781 and also "inherent" authority to issue letters of request to foreign countries.  *See United States v. Reagan*, 453 F.2d 165, 172 (6th Cir. 1971); *see also* 28 U.S.C. 1651 ("All Writs Act") and Fed. R. Civ. P. 28(b).  Plaintiffs respectfully request that the Court grant this application and issue the attached proposed Letters of Request.

II.    **PLAINTIFFS REQUIRE FOREIGN EVIDENCE-TAKING TO FULLY AND FAIRLY PRESENT ITS DEFENSES AND COUNTERCLAIMS AT TRIAL**

13.    Plaintiffs' infringement allegations are based on rides that are operated at amusement parks owned and/or operated by Defendants, that meet all limitations of claims in the '125 patent and the '237 patent.  The rides were manufactured by several different companies, including Intamin and B&M.

14.    The witnesses are Swiss residents and Presidents of Intamin and B&M. Intamin and B&M designed, manufactured, and sold amusement rides that infringe

claims of the '125 patent and the '237 patent. These rides were provided to Defendants for use in amusement parks operated by Defendants. Plaintiffs anticipate that the testimony and documents requested from the witnesses will provide necessary information regarding:

> (i)    the technical design of amusement rides provided to Defendants that infringe the '125 patent and the '237 patent;
>
> (ii)   the purchase price, cost of design, and cost of production of amusement rides provided to Defendants that infringe the '125 patent and the '237 patent;
>
> (iii)  identification of possible prior art to the '125 patent and the '237 patent; and
>
> (iv)   information regarding the past licensing of patents covering similar technology to that claimed in the '125 patent and the '237 patent.

15.    The witnesses, as Swiss citizens, are outside the subpoena power of the United States. Plaintiffs therefore request that the Court issue the attached proposed Letters of Request seeking judicial assistance from the appropriate judicial authorities of Switzerland to obtain testimony and documents from the witnesses.

## III.    CONCLUSION

16.    The questions and document requests in the attached proposed Letters of Request are narrowly tailored to obtain relevant testimony and evidence and are necessary in order for Plaintiffs to fully and fairly present their claims and defenses at trial. For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Application and issue the attached Letters of Request to the appropriate Swiss authorities.

/s/ Geoffrey A. Zelley
Francis DiGiovanni (#3189)
Geoffrey A. Zelley (#4939)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19899
(302) 658-9141

Scott R. Miller
CONNOLLY BOVE LODGE & HUTZ LLP
355 S. Grand Ave.
Suite 3150
Los Angeles, CA 90071
(213) 787-2500

*Attorneys for Plaintiffs*

Dated: October 19, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to counsel of record on the Court's CM/ECF registrants for this case.  I further certify that on October 19, 2007, I caused a copy of the foregoing document to be served upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

| | |
|---|---|
| Jack B. Blumenfeld<br>Rodger D. Smith II<br>Morris, Nichols, Arsht & Tunnell, LLP<br>1201 N. Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>jblumenfeld@mnat.com<br>rsmith@mnat.com | Richard L. Horwitz<br>David E. Moore<br>Potter Anderson & Corroon LLP<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>Wilmington, DE 19801<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com |

### BY E-MAIL

| | |
|---|---|
| David B. Bassett<br>Amr O. Aly<br>Wilmer Cutler Pickering Hale<br>   and Dorr LLP<br>399 Park Avenue<br>New York, NY 10022<br>david.bassett@wilmerhale.com<br>amr.aly@wilmerhale.com | William F. Lee<br>James B. Lampert<br>Donald R. Steinberg<br>Wilmer Cutler Pickering Hale<br>   and Dorr LLP<br>60 State Street<br>Boston, MA 02109<br>william.lee@wilmerhale.com<br>james.lampert@wilmerhale.com<br>don.steinberg@wilmerhale.com |
| Paul V. Storm<br>Terrell R. Miller<br>Christopher J. Kling<br>Bank of America Plaza<br>901 Main Street, Suite 7100<br>Dallas, TX  75202<br>paulstorm@alliplaw.com<br>terrellmiller@alliplaw.com<br>chriskling@alliplaw.com | |

/s/ Geoffrey A. Zelley
Geoffrey A. Zelley (#4939)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAFETY BRAKING CORPORATION, MAGNETAR TECHNOLOGIES CORP., and G&T CONVEYOR CO., <br><br> Plaintiffs, <br><br> v. <br><br> SIX FLAGS THEME PARKS INC., TIERCO MARYLAND, INC., GREAT AMERICA LLC, KKI, LLC, MAGIC MOUNTAIN LLC, PARK MANAGEMENT CORP., RIVERSIDE PARK ENTERPRISES, INC., SIX FLAGS OVER GEORGIA II, L.P., SIX FLAGS ST. LOUIS LLC, TEXAS FLAGS, LTD., ASTROWORLD, L.P., DARIEN LAKE THEME PARK AND CAMPING RESORT, INC., ELITCH GARDENS, L.P., BUSCH ENTERTAINMENT CORP., CEDAR FAIR LP, PARAMOUNT PARKS, INC., KNOTT'S BERRY FARM, KINGS ISLAND COMPANY, CEDAR FAIR, UNIVERSAL CITY DEVELOPMENT PARTNERS LTD., UNIVERSAL CITY STUDIOS LLLP, <br><br> Defendants. | Civil Action No. 07-127-*** |

**PLAINTIFFS' REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the District of Delaware presents its compliments to the judicial authorities of Switzerland and requests assistance in obtaining evidence to be used in civil proceedings before this Court.

The request is made pursuant to, and in conformity with, Chapter I of the *Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* ("the Hague Convention"), to which both the United States and the Swiss

Confederation are parties, the Regulation on Judicial Assistance in Civil Matters (ZRHO) and Rules 28 and 30 of the United States Federal Rules of Civil Procedure.

Specifically, this Court requests assistance in compelling testimony and documents from a witness located in the canton of Schwyz in relation to the above-named action.  The Court asserts that the evidence sought is directly relevant and necessary to the issues in dispute.  This Request fully complies with Swiss reservations under the Hague Evidence Convention.  Trial in this action is scheduled to commence on February 2, 2009.

The particulars of this Hague Evidence Request are as follow:

| | | |
|---|---|---|
| *1.* | *Sender* | Hon. Mary Pat Thynge<br>United States Magistrate Judge<br>United States District Court for the<br>District of Delaware<br>844 N. King Street, Room 6100<br>Wilmington, DE 19801<br>U.S.A.<br><br>*(CIV NO. 07-127-\*\*\*)* |
| *2.* | *Central Authority of the Requested State:* | The Federal Justice and Police  Department<br>International Judicial and Extrajudicial<br>Assistance<br>Bundesrain 20<br>3003 Bern<br>Switzerland<br>Tel: 011-41-31-322-4310<br>Fax: 011-41-31-322-5380 |
| *3.* | *Person to whom the executed request is to be returned* | *Plaintiffs' U.S. Legal Representative:*<br><br>Francis DiGiovanni<br>Connolly Bove Lodge & Hutz LLP<br>The Nemours Building<br>1007 North Orange Street<br>P.O. Box 2207<br>Wilmington, DE 19899<br>U.S.A. |

*On behalf of:*
Hon. Mary Pat Thynge
United States Magistrate Judge
United States District Court for the
District of Delaware
844 N. King Street, Room 6100
Wilmington, DE 19801
U.S.A.

**4.    *In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following request:***

**5.    *Requesting judicial authority:***    Hon. Mary Pat Thynge
United States Magistrate Judge
United States District Court for the
District of Delaware
844 N. King Street, Room 6100
Wilmington, DE 19801
U.S.A.

**    *To the competent authority of:***    The Swiss Confederation

**6.    *Names and addresses of the parties and their representatives:***

**    *a.    Plaintiffs***    **SAFETY BRAKING CORPORATION**, a
Delaware corporation with offices in
California;

**MAGNETAR TECHNOLOGIES
CORPORATION**, a Nevada corporation
with offices in California;

**G&T CONVEYOR COMPANY,** a Florida
corporation with offices in Florida and
Texas;

***Plaintiffs' U.S. Legal Representatives:***

Francis DiGiovanni, Esq.
Geoffrey A. Zelley, Esq.
CONNOLLY BOVE LODGE & HUTZ
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

U.S.A.
Tel: 1.302.658.9141
Fax: 1.302.658.5614
Email: fdigiovanni@cblh.com
Email: gzelley@cblh.com

Scott Miller, Esq.
CONNOLLY BOVE LODGE & HUTZ
333 S. Grand Avenue
Suite 2300
Los Angeles, CA 90071
U.S.A.
Tel: 1.213.787.2500
Fax: 1.213.687.0498
Email: smiller@cblh.com

*b.*    *Defendants*

**SIX FLAGS THEME PARKS, INC.,** a Delaware corporation with offices in New York;

**TIERCO MARYLAND, INC.** a Delaware corporation;

**GREAT AMERICA LLC**, an Illinois company;

**KKI, LLC,** a Delaware company;

**MAGIC MOUNTAIN LLC,** a California company;

**PARK MANAGEMENT CORP.,** a California company;

**RIVERSIDE PARK ENTERPRISES,** a Massachusetts company;

**SIX FLAGS OVER GEORGIA II, L.P.,** a Delaware partnership;

**SIX FLAGS ST. LOUIS LLC,** a Missouri company;

**TEXAS FLAGS, LTD.,** a Texas partnership;

**ASTROWORLD, L.P.,** a Delaware partnership;

**DARIEN LAKE THEME PARK AND CAMPING RESORT INC.,** a New York corporation;

**ELITCH GARDENS, L.P.,** a Colorado partnership;

**CEDAR FAIR LP,** a Delaware partnership;

**PARAMOUNT PARKS, INC.,** a Delaware corporation;

**KNOTT'S BERRY FARM,** a California partnership;

**KINGS ISLAND COMPANY**, a Delaware company;

**CEDAR FAIR,** an Ohio partnership;

**UNIVERSAL CITY DEVELOPMENT PARTNERS LTD.,** a Florida partnership;

**UNIVERSAL CITY STUDIOS LLLP,** a Delaware partnership;

***<u>Above-named Defendants' U.S. Legal Representatives:</u>***

William F. Lee, Esq.
James B. Lampert, Esq.
Donald R. Steinberg, Esq.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
U.S.A.
Tel: +1.617.526.6000
Fax: +1.617.526.5000
Email: william.lee@wilmerhale.com
Email: james.lampert@wilmerhale.com
Email: don.steinberg@wilmerhale.com

David B. Bassett, Esq.
Amr O. Aly, Esq.
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, NY 10022
U.S.A.
Tel: +1.212.230.8800
Fax: +1.212.230.8888
Email: david.bassett@wilmerhale.com
Email: amr.aly@wilmerhale.com

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT AND
TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Tel: +1.302.658.9200
Fax: +1.302.658.3989
Email: jblumenfeld@mnat.com
Email: rsmith@mnat.com

**BUSCH ENTERTAINMENT CORP.**, a
Delaware corporation;

_**Above-named Defendant's U.S. Legal**_
_**Representatives:**_

Paul V. Storm, Esq.
Christopher J. Kling, Esq.
Terrell R. Miller, Esq.
Storm LLP
901 Main Street
Suite 7100
Dallas, TX 75202
U.S.A.
Tel: +1.214.347.4700
Fax: +1.214.347.4799
Email: paulstorm@alliplaw.com
Email: chriskling@alliplaw.com
Email: terrellmiller@alliplaw.com

Richard L. Horwitz
David E. Moore

POTTER ANDERSON AND CORROON
LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
U.S.A.
Tel: +1.302.984.6000
Fax: +1.302.658.1192
Email: rhorwitz@potteranderson.com
Email: dmoore@potteranderson.com

**7.** *Nature and purpose of the proceedings and summary of the facts:*

<u>**PARTIES**</u>

Plaintiff/Counterdefendant Safety Braking Company ("Safety Braking") is a

corporation organized and existing under the laws of Delaware, with a place of business

in California. Plaintiff/Counterdefendant Magnetar Technologies Corporation

("Magnetar") is a Nevada corporation with a place of business in California.

Plaintiff/Counterdefendant G&T Conveyor Co. ("G&T") is a Florida corporation with a

place of business in Florida. Plaintiffs Safety Braking, Magnetar, and G&T are

collectively referred to herein as "Plaintiffs."

Defendant/Counterclaimant Six Flags Theme Parks, Inc. ("SFTP") is a

corporation organized and existing under the laws of Delaware.

Defendant/Counterclaimant Tierco Maryland, Inc. ("Tierco") is a corporation organized

and existing under the laws of Delaware. Defendant/Counterclaimant Great America

LLC ("Great America") is a company organized and existing under the laws of Illinois.

Defendant/Counterclaimant KKI, LLC ("KKI") is a company organized and existing

under the laws of Delaware. Defendant/Counterclaimant Magic Mountain LLC ("Magic

Mountain") is a company organized and existing under the laws of the state of California.

Defendant/Counterclaimant Park Management Corporation ("PMC") is a corporation

organized and existing under the laws of the state of California.

Defendant/Counterclaimant Riverside Park Enterprises ("Riverside") is a company organized and existing under the laws of the commonwealth of Massachusetts.

Defendant/Counterclaimant Six Flags Over Georgia II, L.P. ("SFOG") is a partnership organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimant Six Flags St. Louis LLC ("SFSL") is a company organized and existing under the laws of the state of Missouri.  Defendant/Counterclaimant Texas Flags, Ltd. ("Texas Flags") is a partnership organized and existing under the laws of the state of Texas.  Defendant/Counterclaimant Astroworld, L.P. ("Astroworld") is a partnership organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimant Darien Lake Theme Park and Camping Resort, Inc. ("Darien Lake") is a corporation organized and existing under the laws of the state of New York.

Defendant/Counterclaimant Elitch Gardens, L.P. ("Elitch Gardens") is a partnership organized and existing under the laws of the state of Colorado.

Defendant/Counterclaimants SFTP, Tierco, Great America, KKI, Magic Mountain, PMC, Riverside, SFOG, SFSL, Texas Flags, Astroworld, Darien Lake, and Elitch Gardens are collectively referred to herein as "Six Flags."

Defendant/Counterclaimant Cedar Fair LP ("CFLP") is a partnership organized and existing under the laws of the state of Delaware.  Defendant/Counterclaimant Paramount Parks, Inc. ("Paramount") is a corporation organized and existing under the laws of the state of Delaware.  Knott's Berry Farm ("Knott's") is a partnership organized and existing under the laws of the state of California.  Defendant/Counterclaimant Kings Island Company ("Kings") is a corporation organized and existing under the laws of the

8

state of Delaware.  Defendant/Counterclaimant Cedar Fair ("CF") is a partnership

organized and existing under the laws of the state of Ohio.  Defendant/Counterclaimants

CFLP, Paramount, Knott's, Kings, and CF are collectively referred to herein as "Cedar

Fair."

      Defendant/Counterclaimant Universal City Development Partners Ltd. ("UCDP")

is a partnership organized and existing under the laws of the state of Florida.

Defendant/Counterclaimant Universal City Studios LLLP ("UCS") is a partnership

organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimants UCDP and UCS are collectively referred to herein as

"Universal."  Defendant/Counterclaimant Busch Entertainment Corp. ("Busch") is a

corporation organized and existing under the laws of the state of Delaware.

## ALLEGATIONS IN THE COMPLAINT

      Plaintiffs initiated a civil lawsuit in the United States District Court for the

District of Delaware against Defendants Six Flags, Cedar Fair, Universal, and Busch on

March 1, 2007, pursuant to the Patent Laws of the United States, 25 U.S.C. § 1 *et seq.*

Plaintiffs allege that Defendants Six Flags, Cedar Fair, Universal, and Busch have

infringed, and continue to infringe, United States Patent Number 5,277,125 ("the '125

patent") (*Annex C*; Exhibit 1) through Defendants' use for commercial purposes roller

coasters and other amusement devices incorporating all of the limitations of at least one

claim within the '125 patent.  Plaintiffs further allege that Defendants Universal and

Cedar Fair have infringed, and continue to infringe, United States Patent Number

6,659,237 ("the '237 patent") (*Annex C*; Exhibit 2) through Universal and Cedar Fair's

use for commercial purposes roller coasters and other amusement devices incorporating all of the limitations of at least one claim of the '237 patent.

Plaintiffs seek a judgment that Defendants Six Flags, Cedar Fair, Universal, and Busch have infringed the '125 patent and that the infringement was deliberate and willful; that Defendants be permanently enjoined from making, using, selling, or importing within the United States all devices incorporating all of the limitations of at least one claim within the '125 patent; for damages; reasonable attorneys fees, and such other relief as the Court deems proper. Plaintiffs further seek a judgment that Defendants Cedar Fair and Universal have infringed the '237 patent and that the infringement was deliberate and willful; that Defendants Cedar Fair and Universal be permanently enjoined from making, using, selling, or importing within the United States all devices incorporating all of the limitations of at least one claim within the '237 patent; for damages; reasonable attorneys fees, and such other relief as the Court deems proper.

## SIX FLAGS, CEDAR FAIR, AND UNIVERSAL'S DEFENSES AND COUNTERCLAIMS

In their Answer and Counterclaims, the Defendants denied that any devices used by Six Flags, Cedar Fair, or Universal infringe the '125 patent and assert that the '125 patent is invalid and unenforceable. The Cedar Fair and Universal Defendants denied that any devices used by Cedar Fair infringe the '237 patent and assert that the '237 patent is invalid and unenforceable. Defendants Six Flags, Cedar Fair, and Universal asserted several affirmative defenses, including equitable estoppel, laches, implied or actual contract, incorrect inventorship, and others.

As Counterclaims, Six Flags, Cedar Fair, and Universal sought dismissal of the Complaint of Plaintiffs; declaration of invalidity for the '125 patent and the '237 patent. Defendants Six Flags, Cedar Fair, and Universal seek a judgment that the '125 patent is invalid and unenforceable; that the '237 patent is invalid and unenforceable; declaration that Defendants Six Flags, Cedar Fair, and Universal have not infringed the '125 patent; declaration that Defendants Cedar Fair and Universal have not infringed the '237 patent; awarding Defendants their costs, including expert fees; and whatever other relief the Court may deem just.

## BUSCH'S DEFENSES AND COUNTERCLAIMS

In their Answer and Counterclaims, Busch denied that any devices it used infringed the '125 patent. By way of affirmative defenses, Busch claimed non-infringement of the '125 patent, estoppel based on the prosecution of the '125 patent, failure to mark devices produced with the patent number, invalidity of the '125 patent, laches, and lack of subject matter jurisdiction and/or standing.  By way of counterclaims, Busch alleged that that Plaintiffs/Counterclaim Defendants failed to name proper inventors in the '125 patent.  Busch seeks for its counterclaims: declaration of invalidity for the '125 patent; declaration of non-infringement of the '125 patent by Busch; declaration that Kwangho Chung should have been named as an inventor of the '125 patent; declaration that Busch owns an interest in the '125 patent; denial of Plaintiffs' requests; attorneys' fees; any other relief the Court deems just.

## STAGE OF THE PROCEEDINGS

Plaintiffs Safety Braking, Magnetar, and G&T commenced this action on March 1, 2007 when they filed their original Complaint.  A First Amended Complaint was filed

by Plaintiffs on August 9, 2007, naming additional Defendants (named above), and dismissing other Defendants (not named above).  Defendants Cedar Fair, Six Flags, and Universal filed their Answer and Counterclaims to that Complaint on August 23, 2007. Defendant Busch separately filed its Answer and Counterclaims on August 23, 2007. Responses to written interrogatories and requests for production of documents have been served by the parties.  Trial is scheduled to commence on February 2, 2009.

## <u>THE WITNESS</u>

The witness from whom testimony and documents are sought is Patrick Spieldiener, a Swiss resident, and President of Intamin AG.  Intamin AG is a Swiss company that designs, sells, manufactures, and installs amusement rides around the world.  Among those rides are several rides operated by Defendants that are believed to infringe either the '125 patent or the '237 patent.  Among those rides are El Toro at Six Flags Great Adventure; Superman The Escape at Six Flags Magic Mountain; Wicked Twister at Cedar Point; Steel Venom, formerly located at Geauga Lake; Steel Venom at Valleyfair; Volcano: The Blast Coaster at King's Dominion; Vertical Velocity at Six Flags Great America; Vertical Velocity at Six Flags Discovery Kingdom; Maverick at Cedar Point; Top Thrill Dragster at Cedar Point; Xcelerator at Knott's Berry Farm; Kingda Ka at Six Flags Great Adventure; Millennium Force at Cedar Point; Superman Ride of Steel, located at Six Flags New England, Six Flags America, and Darien Lake Theme Park; Drop Zone Stunt Tower, located at King's Dominion, Carrowinds, and Great America; Drop Zone at King's Island; Tower of Doom, located at Six Flags America and Elitch Gardens; Superman Tower of Power, located at Six Flags Kentucky

Kingdom and Six Flags St. Louis, and formerly located at Astroworld; Giant Drop at Six

Flags Great America; and Acrophobia at Six Flags Over Georgia.

In addition to designing, manufacturing, selling, and installing amusement rides,

Intamin AG is the assignee on numerous patents covering developments in the

technology of amusement rides, including but not limited to the application of eddy

current brakes in place of, or in supplement to, mechanical brakes.  Upon information and

belief, Intamin has, in the past, and does, currently, enter into negotiations concerning the

possible licensing of the technology claimed in those patents.

Should Patrick Spieldiener be unable to furnish the information sought in this

request, or should he be unable to attend and give his testimony, Intamin may name

anyone knowledgeable about the requested subject matter to speak in his place, subject to

the agreement of the parties in this litigation.

## RELEVANCE OF THE EVIDENCE SOUGHT

Plaintiffs in this case have alleged infringement of the '125 patent and the '237

patent by the Defendants named above.  Both patents claim the technology used in

certain applications of eddy currents for the purposes of stopping a car mounted on a rail.

It is alleged that Defendants infringe one or more of the patents by way of operating for

profit amusement rides incorporating eddy current brakes containing all limitations

present in particular claims of the '125 patent and the '237 patent.

As manufacturer of several of the alleged infringing devices, it is expected that

Intamin AG would have within its possession documents and information regarding the

technical specifications of the braking systems used in those amusement devices.  Any

documents would include, but not be limited to, technical or design drawings, project

summaries, plans, notes, purchase agreements, documents relating to contractual

negotiations as well as finalized contracts, installation plans, manufacturing plans,

budgets, and research and design documentation.  All of these documents may be

necessary for Plaintiffs to be able to prove infringement of the '125 patent or the '237

patent by one or more devices operated by Defendants and designed and manufactured by

Intamin AG.

      Additionally, in light of Intamin AG's experience in the field, it is expected that

Intamin AG would have documents and information within its possession relating to past

and ongoing licensing negotiations of patents that cover inventions within the same field

of technology, namely eddy current braking devices for amusement rides.  Such

documents would include but not be limited to e-mail or other communications,

documents pertaining to contractual negotiations and the resulting contracts, and

allegations of infringement.  This information may be necessary for Plaintiffs to be able

to prove damages in the form of a reasonable royalty should infringement be established

in the litigation.

      Plaintiffs assert that facts within the possession of Patrick Spieldiener, or

whomever else may be designated by Intamin AG at the approval of parties to this

litigation, will establish: (1) one or more amusement rides designed, manufactured, and

sold by Intamin AG and operated by one or more Defendant in this litigation contained

all of the claim limitations for particular claims of the '125 patent and/or the '237 patent,

(2) that Intamin AG has in the past negotiated licenses of patents assigned to Intamin AG

covering similar or the same area of technology as the '125 patent and/or the '237 patent,

and (3) that Intamin AG is still in the process of negotiating licenses of patents assigned

to Intamin AG covering similar or the same area of technology as the '125 patent and/or the '237 patent.

The District Court asserts that the facts surrounding Intamin's design and manufacturing of particular amusement rides, and Intamin's past and current negotiations to license patents in similar areas of technology to the '125 patent and the '237 patent, are essential to Plaintiffs' ability to fully set forth their claims and defenses at trial. Justice cannot be completely served without Patrick Spieldiener's testimony (or the testimony of someone appointed by Intamin AG competent to provide information in the stated areas, at the agreement of all parties to the litigation).

**8.    *Evidence to be obtained or other judicial act to be performed:***

The District Court seeks both oral testimony and document production from the witness. The District Court further requests that the documents produced by the witness be made available for inspection and copying by the parties at least two weeks prior to the oral examination so that counsel may have an opportunity to supplement the questions to be put to the witness based on information disclosed in the documents.

For the reasons set forth above, the District Court believes that the witness will be able to provide evidence directly relevant to the main issues between the parties and without which the ends of justice could not be properly met. The District Court believes that this evidence is not available from any other source.

Questions to be put to Patrick Spieldiener are listed as *Annex A*. Documents sought for production are listed as *Annex B*. Documents supporting this Request and for use during the witness examination are attached as *Annex C*.

**9.    *Identities and addresses of persons***   Patrick Spieldiener
**      *to be examined:***                   c/o Intamin AG

Veranastrasse 37
P.O. Box 95
CH-8832 Wollerau
Switzerland

**10.**  **Questions to be put to the persons**     Please see attached list (*Annex A*).
**to be examined or statement of the**
**subject matter about which they**
**are to be examined:**

**11.**  **Documents or other property to be**     Please see attached list (*Annex B*).
**inspected:**

**12.**  **Any requirement that the evidence**     The witness should be examined under
**be given on oath or affirmation**     oath or affirmation, or in the alternative,
**and any specific form to be used:**     should be instructed of the consequences for
the giving of untruthful and false answers
under the laws of Switzerland.

**13.**  **Special methods or procedure to be followed:**

The District Court requests

(1)     that the parties' representatives or their designees, interpreters, and a U.S.

verbatim court reporter as well as a Swiss stenographer be permitted to

attend and participate in the examination;

(2)     that the parties' legal representatives or their designees be permitted to

submit additional questions to the witness following responses to the

questions attached hereto in *Annex A*;

(3)     that the interpreters be permitted to assist with the witness examination, at

Plaintiffs' expense;

(4)     that a U.S. court reporter be permitted to record verbatim the witness

examination at Plaintiffs' expense; and

(5)     that the Swiss court ensure that any documents produced are authenticated

in accordance with its normal practice and procedures.

16

The District Court additionally requests that the confidentiality of any evidence produced as a result of this Request be maintained pursuant to the laws of Switzerland. Finally, in conformity with Article 7 of the Hague Evidence Convention, the U.S. District Court requests that the Plaintiffs' designee in the United States, Connolly Bove Lodge & Hutz LLP (see contact information above), be advised of the date and location of the Swiss hearing to execute this Request. Connolly Bove Lodge & Hutz LLP may also be contacted if the Swiss authorities require clarification with respect to any aspect of this Request.

| | |
|---|---|
| **14.** *Request for notification of the times and place for the execution of the Request and identity of the person to be notified:* | It is requested that testimony be taken at such place, date or time as ordered by the Swiss Court or as otherwise agreed to by the witness and the respective representatives of the Parties. |
| | When the time and place for execution of This request is ordered by the Swiss Court, It is requested that you provide notice Thereof to: |
| | ***Plaintiffs' U.S. designee:*** |
| | Francis DiGiovanni<br>CONNOLLY BOVE LODGE & HUTZ LLP<br>1007 N. Orange St.<br>PO Box 2207<br>Wilmington, DE 19899<br>U.S.A.<br>Tel: +1.302.658.9141<br>Fax: +1.302.658.5614<br>Email: fdigiovanni@cblh.com |
| **16.** *Specification of privilege or duty to refuse to give evidence under the laws of the State of origin:* | The witness may refuse to answer any question propounded pursuant to Section 13 above if such answer (1) would subject the witness to a real and appreciable danger of criminal liability in the United States, or (2) would disclose a confidential |

communication between the witness and his attorney.

**17.**   ***The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be Borne by:***

Plaintiff Safety Braking Corporation

***c/o Plaintiffs' legal representative:***

Francis DiGiovanni, Esq.
Geoffrey A. Zelley, Esq.
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange St.
P.O. Box 2207
Wilmington, DE 19899
U.S.A.
Tel: +1.302.658.9141
Fax: +1.302.658.5614
Email: fdigiovanni@cblh.com
Email: gzelley@cblh.com

Scott R. Miller, Esq.
CONNOLLY BOVE LODGE & HUTZ LLP
333 S. Grand Ave.
Suite 2300
Los Angeles, CA 90071
U.S.A.
Tel: +1.213.787.2500
Fax: +1.213.687.0498
Email: smiller@cblh.com

**18.**   ***Date of Request:***   _____

**19.**   ***Signature and seal of the Requesting Authority:***   _____

Hon. Mary Pat Thynge
United States Magistrate Judge
United States District Court for the District of Delaware
844 N. King Street, Room 6100
Wilmington, DE 19801
U.S.A.

18

*Annex A*:  Questions to be put to Patrick Spieldiener (in English and in German)
*Annex B:*  Documents Sought for Production (in English and in German)
*Annex C:*  Documents to be Used During Witness Examination/Documents Supporting this Request (in English and German)

*ANNEX A*
*Questions to be put to Patrick Spieldiener*

**Background Statement regarding questions to be put to the witness:**

Plaintiffs assert that several amusement rides designed and manufactured by Intamin AG ("Intamin"), and operated by Defendants, infringe at least one claim of the '125 patent and the '237 patent, as listed in the Request, item 7. Each of these rides, it is alleged, contain all of the limitations of at least one claim in the '125 patent and/or the '237 patent. Patrick Spieldiener is the President of Intamin, and as such, it is believed that he has direct knowledge, or at least has the ability to obtain direct knowledge, of the technical specifications of each of these rides, as well as their purchase prices and any contractual negotiations with Defendants. The testimony of Patrick Spieldiener may be necessary for the Plaintiffs to prove infringement of the '125 patent and/or the '237 patent by the Defendants.

Further, Plaintiffs assert that Intamin is assignee of several patents relevant to the subject matter of the present case. Plaintiffs further assert that Intamin has in the past, and continues to this day, to license those patents. As President of Intamin, it is expected that Patrick Spieldiener would have knowledge of, or at least have access to knowledge of, any licensing negotiations entered into by Intamin regarding patents in the same area of technology, including but not limited to patents claiming eddy current brakes for use in amusement rides. The testimony of Patrick Spieldiener is necessary for the Plaintiffs to determine a reasonable royalty rate for infringement of the '125 patent and the '237 patent

**Questions to establish background and foundational information regarding witness:**

1. Please state your full name

2. Please state your home address.

3. Please state your date of birth.

4. Are you currently employed by Intamin?

5. Please state Intamin's address.

6. How long have you been employed by Intamin?

7. What positions or titles have you held at Intamin?

8. Please state your job responsibilities for each position or title held at Intamin.

9. In what group or department within Intamin did you hold each position?

10. During what time period did you hold each position?

11. As President of Intamin, what are your duties?

12. Do you have knowledge of all roller coasters or other amusement rides designed and manufactured by Intamin?

   a. *Questions to establish knowledge of rides designed and manufactured by Intamin, currently operated by Defendants:*

13. Do you have knowledge of a ride by the name of El Toro at Six Flags Great Adventure in Jackson, New Jersey?

14. Did Intamin design El Toro?

15. Did Intamin manufacture El Toro?

16. Did Intamin install El Toro?

17. Did Intamin sell El Toro?

18. To whom was El Toro sold?

19. When did Intamin begin design of El Toro?

20. When was El Toro manufactured?

21. When was El Toro sold?

22. When was El Toro installed?

23. What was the total contract cost for El Toro?

24. What portion of that cost was allocated to braking systems?

25. Does El Toro contain braking systems designed to slow the ride?

26. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

27. Are those permanent magnets in opposed arrays?

28. Is there a conductive metallic fin that extends from the cars of El Toro?

29. Where is that conductive metallic fin located on the car?

30. Where are those permanent magnets located in relation to the tracks of the ride?

31. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

32. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

33. Do these eddy currents create a braking force on the ride?

34. Does the ride contain cars?

35. Do the cars sit on parallel rails?

36. Do the cars have wheels?

37. Do the wheels allow the cars to roll on the rails?

38. Do you have knowledge of a ride by the name of Superman The Escape at Six Flags Magic Mountain?

39. Did Intamin design Superman The Escape?

40. Did Intamin manufacture Superman The Escape?

41. Did Intamin install Superman The Escape?

42. Did Intamin sell Superman The Escape?

43. To whom was Superman The Escape sold?

44. When did Intamin begin design of Superman The Escape?

45. When was Superman The Escape manufactured?

46. When was Superman The Escape sold?

47. When was Superman The Escape installed?

48. What was the total contract cost for Superman The Escape?

49. What portion of that cost was allocated to braking systems?

50. Does Superman The Escape contain braking systems designed to slow the ride?

51. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

52. Are those permanent magnets in opposed arrays?

53. Is there a conductive metallic fin that extends from the cars of Superman The Escape?

54. Where is that conductive metallic fin located on the car?

55. Where are those permanent magnets located in relation to the tracks of the ride?

56. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

57. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

58. Do these eddy currents create a braking force on the ride?

59. Does the ride contain cars?

60. Do the cars sit on parallel rails?

61. Do the cars have wheels?

62. Do the wheels allow the cars to roll on the rails?

63. Do you have knowledge of a ride by the name of Wicked Twister at Cedar Point?

64. Did Intamin design Wicked Twister?

65. Did Intamin manufacture Wicked Twister?

66. Did Intamin install Wicked Twister?

67. Did Intamin sell Wicked Twister?

68. To whom was Wicked Twister sold?

69. When did Intamin begin design of Wicked Twister?

70. When was Wicked Twister manufactured?

71. When was Wicked Twister sold?

72. When was Wicked Twister installed?

73. What was the total contract cost for Wicked Twister?

74. What portion of that cost was allocated to braking systems?

75. Does Wicked Twister contain braking systems designed to slow the ride?

76. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

77. Are those permanent magnets in opposed arrays?

78. Is there a conductive metallic fin that extends from the cars of Wicked Twister?

79. Where is that conductive metallic fin located on the car?

80. Where are those permanent magnets located in relation to the tracks of the ride?

81. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

82. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

83. Do these eddy currents create a braking force on the ride?

84. Does the ride contain cars?

85. Do the cars sit on parallel rails?

86. Do the cars have wheels?

87. Do the wheels allow the cars to roll on the rails?

88. Do you have knowledge of a ride by the name of Steel Venom, formerly located at Geauga Lake?

89. Did Intamin design Steel Venom?

90. Did Intamin manufacture Steel Venom?

91. Did Intamin install Steel Venom?

92. Did Intamin sell Steel Venom?

93. To whom was Steel Venom sold?

94. When did Intamin begin design of Steel Venom?

95. When was Steel Venom manufactured?

96. When was Steel Venom sold?

97. When was Steel Venom installed?

98. What was the total contract cost for Steel Venom?

99. What portion of that cost was allocated to braking systems?

100.     Does Steel Venom contain braking systems designed to slow the ride?

101.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

102.     Are those permanent magnets in opposed arrays?

103.     Is there a conductive metallic fin that extends from the cars of Steel Venom?

104.     Where is that conductive metallic fin located on the car?

105.     Where are those permanent magnets located in relation to the tracks of the ride?

106.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

107.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

108.     Do these eddy currents create a braking force on the ride?

109.     Does the ride contain cars?

110.     Do the cars sit on parallel rails?

111.     Do the cars have wheels?

112.     Do the wheels allow the cars to roll on the rails?

113.     Do you have knowledge of a ride by the name of Steel Venom at Valleyfair?

114.     Did Intamin design Steel Venom?

115.     Did Intamin manufacture Steel Venom?

116.     Did Intamin install Steel Venom?

117.     Did Intamin sell Steel Venom?

118.     To whom was Steel Venom sold?

119.     When did Intamin begin design of Steel Venom?

120.     When was Steel Venom manufactured?

121.     When was Steel Venom sold?

122.     When was Steel Venom installed?

123.     What was the total contract cost for Steel Venom?

124.     What portion of that cost was allocated to braking systems?

125.     Does Steel Venom contain braking systems designed to slow the ride?

126.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

127.     Are those permanent magnets in opposed arrays?

27

128.     Is there a conductive metallic fin that extends from the cars of

Steel Venom?

129.     Where is that conductive metallic fin located on the car?

130.     Where are those permanent magnets located in relation to the

tracks of the ride?

131.     When the ride passes over the magnets, does the conductive

metallic fin pass between the arrays of magnets?

132.     Does the movement of the conductive metallic fin through the

arrays of magnets produce eddy currents?

133.     Do these eddy currents create a braking force on the ride?

134.     Does the ride contain cars?

135.     Do the cars sit on parallel rails?

136.     Do the cars have wheels?

137.     Do the wheels allow the cars to roll on the rails?

138.     Do you have knowledge of a ride by the name of Volcano: The

Blast Coaster at King's Dominion?

139.     Did Intamin design Volcano: The Blast Coaster?

140.     Did Intamin manufacture Volcano: The Blast Coaster?

141.     Did Intamin install Volcano: The Blast Coaster?

142.     Did Intamin sell Volcano: The Blast Coaster?

143.     To whom was Volcano: The Blast Coaster sold?

144.     When did Intamin begin design of Volcano: The Blast Coaster?

145.     When was Volcano: The Blast Coaster manufactured?

146.      When was Volcano: The Blast Coaster sold?

147.      When was Volcano: The Blast Coaster installed?

148.      What was the total contract cost for Volcano: The Blast Coaster?

149.      What portion of that cost was allocated to braking systems?

150.      Does Volcano: The Blast Coaster contain braking systems designed to slow the ride?

151.      Do any of those braking systems impart braking on the ride through the use of permanent magnets?

152.      Are those permanent magnets in opposed arrays?

153.      Is there a conductive metallic fin that extends from the cars of Volcano: The Blast Coaster?

154.      Where is that conductive metallic fin located on the car?

155.      Where are those permanent magnets located in relation to the tracks of the ride?

156.      When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

157.      Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

158.      Do these eddy currents create a braking force on the ride?

159.      Does the ride contain cars?

160.      Do the cars sit on parallel rails?

161.      Do the cars have wheels?

162.      Do the wheels allow the cars to roll on the rails?

163.    Do you have knowledge of a ride by the name of Vertical Velocity

at Six Flags Great America?

164.    Did Intamin design Vertical Velocity?

165.    Did Intamin manufacture Vertical Velocity?

166.    Did Intamin install Vertical Velocity?

167.    Did Intamin sell Vertical Velocity?

168.    To whom was Vertical Velocity sold?

169.    When did Intamin begin design of Vertical Velocity?

170.    When was Vertical Velocity manufactured?

171.    When was Vertical Velocity sold?

172.    When was Vertical Velocity installed?

173.    What was the total contract cost for Vertical Velocity?

174.    What portion of that cost was allocated to braking systems?

175.    Does Vertical Velocity contain braking systems designed to slow

the ride?

176.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

177.    Are those permanent magnets in opposed arrays?

178.    Is there a conductive metallic fin that extends from the cars of

Vertical Velocity?

179.    Where is that conductive metallic fin located on the car?

180.    Where are those permanent magnets located in relation to the

tracks of the ride?

181.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

182.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

183.    Do these eddy currents create a braking force on the ride?

184.    Does the ride contain cars?

185.    Do the cars sit on parallel rails?

186.    Do the cars have wheels?

187.    Do the wheels allow the cars to roll on the rails?

188.    Do you have knowledge of a ride by the name of Vertical Velocity at Six Flags Discovery Kingdom?

189.    Did Intamin design Vertical Velocity?

190.    Did Intamin manufacture Vertical Velocity?

191.    Did Intamin install Vertical Velocity?

192.    Did Intamin sell Vertical Velocity?

193.    To whom was Vertical Velocity sold?

194.    When did Intamin begin design of Vertical Velocity?

195.    When was Vertical Velocity manufactured?

196.    When was Vertical Velocity sold?

197.    When was Vertical Velocity installed?

198.    What was the total contract cost for Vertical Velocity?

199.    What portion of that cost was allocated to braking systems?

200.     Does Vertical Velocity contain braking systems designed to slow the ride?

201.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

202.     Are those permanent magnets in opposed arrays?

203.     Is there a conductive metallic fin that extends from the cars of Vertical Velocity?

204.     Where is that conductive metallic fin located on the car?

205.     Where are those permanent magnets located in relation to the tracks of the ride?

206.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

207.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

208.     Do these eddy currents create a braking force on the ride?

209.     Does the ride contain cars?

210.     Do the cars sit on parallel rails?

211.     Do the cars have wheels?

212.     Do the wheels allow the cars to roll on the rails?

213.     Do you have knowledge of a ride by the name of Maverick at Cedar Point?

214.     Did Intamin design Maverick?

215.     Did Intamin manufacture Maverick?

216.    Did Intamin install Maverick?

217.    Did Intamin sell Maverick?

218.    To whom was Maverick sold?

219.    When did Intamin begin design of Maverick?

220.    When was Maverick manufactured?

221.    When was Maverick sold?

222.    When was Maverick installed?

223.    What was the total contract cost for Maverick?

224.    What portion of that cost was allocated to braking systems?

225.    Does Maverick contain braking systems designed to slow the ride?

226.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

227.    Are those permanent magnets in opposed arrays?

228.    Is there a conductive metallic fin that extends from the cars of

Maverick?

229.    Where is that conductive metallic fin located on the car?

230.    Where are those permanent magnets located in relation to the

tracks of the ride?

231.    When the ride passes over the magnets, does the conductive

metallic fin pass between the arrays of magnets?

232.    Does the movement of the conductive metallic fin through the

arrays of magnets produce eddy currents?

233.    Do these eddy currents create a braking force on the ride?

234.     Does the ride contain cars?

235.     Do the cars sit on parallel rails?

236.     Do the cars have wheels?

237.     Do the wheels allow the cars to roll on the rails?

238.     Do you have knowledge of a ride by the name of Top Thrill

Dragster at Cedar Point?

239.     Did Intamin design Top Thrill Dragster?

240.     Did Intamin manufacture Top Thrill Dragster?

241.     Did Intamin install Top Thrill Dragster?

242.     Did Intamin sell Top Thrill Dragster?

243.     To whom was Top Thrill Dragster sold?

244.     When did Intamin begin design of Top Thrill Dragster?

245.     When was Top Thrill Dragster manufactured?

246.     When was Top Thrill Dragster sold?

247.     When was Top Thrill Dragster installed?

248.     What was the total contract cost for Top Thrill Dragster?

249.     What portion of that cost was allocated to braking systems?

250.     Does Top Thrill Dragster contain braking systems designed to

slow the ride?

251.     Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

252.     Are those permanent magnets in opposed arrays?

253.     Is there a conductive metallic fin that extends from the cars of Top

Thrill Dragster?

254.     Where is that conductive metallic fin located on the car?

255.     Where are those permanent magnets located in relation to the

tracks of the ride?

256.     When the ride passes over the magnets, does the conductive

metallic fin pass between the arrays of magnets?

257.     Does the movement of the conductive metallic fin through the

arrays of magnets produce eddy currents?

258.     Do these eddy currents create a braking force on the ride?

259.     Does the ride contain cars?

260.     Do the cars sit on parallel rails?

261.     Do the cars have wheels?

262.     Do the wheels allow the cars to roll on the rails?

263.     Do you have knowledge of a ride by the name of Xcelerator at

Knott's Berry Farm?

264.     Did Intamin design Xcelerator?

265.     Did Intamin manufacture Xcelerator?

266.     Did Intamin install Xcelerator?

267.     Did Intamin sell Xcelerator?

268.     To whom was Xcelerator sold?

269.     When did Intamin begin design of Xcelerator?

270.     When was Xcelerator manufactured?

271.        When was Xcelerator sold?

272.        When was Xcelerator installed?

273.        What was the total contract cost for Xcelerator?

274.        What portion of that cost was allocated to braking systems?

275.        Does Xcelerator contain braking systems designed to slow the ride?

276.        Do any of those braking systems impart braking on the ride through the use of permanent magnets?

277.        Are those permanent magnets in opposed arrays?

278.        Is there a conductive metallic fin that extends from the cars of Xcelerator?

279.        Where is that conductive metallic fin located on the car?

280.        Where are those permanent magnets located in relation to the tracks of the ride?

281.        When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

282.        Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

283.        Do these eddy currents create a braking force on the ride?

284.        Does the ride contain cars?

285.        Do the cars sit on parallel rails?

286.        Do the cars have wheels?

287.        Do the wheels allow the cars to roll on the rails?

288.	Do you have knowledge of a ride by the name of Kingda Ka at Six

Flags Great Adventure?

289.	Did Intamin design Kingda Ka?

290.	Did Intamin manufacture Kingda Ka?

291.	Did Intamin install Kingda Ka?

292.	Did Intamin sell Kingda Ka?

293.	To whom was Kingda Ka sold?

294.	When did Intamin begin design of Kingda Ka?

295.	When was Kingda Ka manufactured?

296.	When was Kingda Ka sold?

297.	When was Kingda Ka installed?

298.	What was the total contract cost for Kingda Ka?

299.	What portion of that cost was allocated to braking systems?

300.	Does Kingda Ka contain braking systems designed to slow the

ride?

301.	Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

302.	Are those permanent magnets in opposed arrays?

303.	Is there a conductive metallic fin that extends from the cars of

Kingda Ka?

304.	Where is that conductive metallic fin located on the car?

305.	Where are those permanent magnets located in relation to the

tracks of the ride?

306.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

307.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

308.     Do these eddy currents create a braking force on the ride?

309.     Does the ride contain cars?

310.     Do the cars sit on parallel rails?

311.     Do the cars have wheels?

312.     Do the wheels allow the cars to roll on the rails?

313.     Do you have knowledge of a ride by the name of Millennium Force at Cedar Point?

314.     Did Intamin design Millennium Force?

315.     Did Intamin manufacture Millennium Force?

316.     Did Intamin install Millennium Force?

317.     Did Intamin sell Millennium Force?

318.     To whom was Millennium Force sold?

319.     When did Intamin begin design of Millennium Force?

320.     When was Millennium Force manufactured?

321.     When was Millennium Force sold?

322.     When was Millennium Force installed?

323.     What was the total contract cost for Millennium Force?

324.     What portion of that cost was allocated to braking systems?

325.     Does Millennium Force contain braking systems designed to slow the ride?

326.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

327.     Are those permanent magnets in opposed arrays?

328.     Is there a conductive metallic fin that extends from the cars of Millennium Force?

329.     Where is that conductive metallic fin located on the car?

330.     Where are those permanent magnets located in relation to the tracks of the ride?

331.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

332.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

333.     Do these eddy currents create a braking force on the ride?

334.     Does the ride contain cars?

335.     Do the cars sit on parallel rails?

336.     Do the cars have wheels?

337.     Do the wheels allow the cars to roll on the rails?

338.     Do you have knowledge of a ride by the name of Superman Ride of Steel at Six Flags New England?

339.     Did Intamin design Superman Ride of Steel?

340.     Did Intamin manufacture Superman Ride of Steel?

341.     Did Intamin install Superman Ride of Steel?

342.     Did Intamin sell Superman Ride of Steel?

343.     To whom was Superman Ride of Steel sold?

344.     When did Intamin begin design of Superman Ride of Steel?

345.     When was Superman Ride of Steel manufactured?

346.     When was Superman Ride of Steel sold?

347.     When was Superman Ride of Steel installed?

348.     What was the total contract cost for Superman Ride of Steel?

349.     What portion of that cost was allocated to braking systems?

350.     Does Superman Ride of Steel contain braking systems designed to slow the ride?

351.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

352.     Are those permanent magnets in opposed arrays?

353.     Is there a conductive metallic fin that extends from the cars of Superman Ride of Steel?

354.     Where is that conductive metallic fin located on the car?

355.     Where are those permanent magnets located in relation to the tracks of the ride?

356.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

357.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

358.    Do these eddy currents create a braking force on the ride?

359.    Does the ride contain cars?

360.    Do the cars sit on parallel rails?

361.    Do the cars have wheels?

362.    Do the wheels allow the cars to roll on the rails?

363.    Do you have knowledge of a ride by the name of Superman Ride

of Steel at Six Flags America?

364.    Did Intamin design Superman Ride of Steel?

365.    Did Intamin manufacture Superman Ride of Steel?

366.    Did Intamin install Superman Ride of Steel?

367.    Did Intamin sell Superman Ride of Steel?

368.    To whom was Superman Ride of Steel sold?

369.    When did Intamin begin design of Superman Ride of Steel?

370.    When was Superman Ride of Steel manufactured?

371.    When was Superman Ride of Steel sold?

372.    When was Superman Ride of Steel installed?

373.    What was the total contract cost for Superman Ride of Steel?

374.    What portion of that cost was allocated to braking systems?

375.    Does Superman Ride of Steel contain braking systems designed to

slow the ride?

376.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

377.    Are those permanent magnets in opposed arrays?

378.    Is there a conductive metallic fin that extends from the cars of Superman Ride of Steel?

379.    Where is that conductive metallic fin located on the car?

380.    Where are those permanent magnets located in relation to the tracks of the ride?

381.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

382.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

383.    Do these eddy currents create a braking force on the ride?

384.    Does the ride contain cars?

385.    Do the cars sit on parallel rails?

386.    Do the cars have wheels?

387.    Do the wheels allow the cars to roll on the rails?

388.    Do you have knowledge of a ride by the name of Superman Ride of Steel at Darien Lake Theme Park?

389.    Did Intamin design Superman Ride of Steel?

390.    Did Intamin manufacture Superman Ride of Steel?

391.    Did Intamin install Superman Ride of Steel?

392.    Did Intamin sell Superman Ride of Steel?

393.    To whom was Superman Ride of Steel sold?

394.    When did Intamin begin design of Superman Ride of Steel?

395.    When was Superman Ride of Steel manufactured?

396.    When was Superman Ride of Steel sold?

397.    When was Superman Ride of Steel installed?

398.    What was the total contract cost for Superman Ride of Steel?

399.    What portion of that cost was allocated to braking systems?

400.    Does Superman Ride of Steel contain braking systems designed to slow the ride?

401.    Do any of those braking systems impart braking on the ride through the use of permanent magnets?

402.    Are those permanent magnets in opposed arrays?

403.    Is there a conductive metallic fin that extends from the cars of Superman Ride of Steel?

404.    Where is that conductive metallic fin located on the car?

405.    Where are those permanent magnets located in relation to the tracks of the ride?

406.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

407.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

408.    Do these eddy currents create a braking force on the ride?

409.    Does the ride contain cars?

410.    Do the cars sit on parallel rails?

411.    Do the cars have wheels?

412.    Do the wheels allow the cars to roll on the rails?

413.     Do you have knowledge of a ride by the name of Drop Zone Stunt

Tower at King's Dominion?

414.     Did Intamin design Drop Zone Stunt Tower?

415.     Did Intamin manufacture Drop Zone Stunt Tower?

416.     Did Intamin install Drop Zone Stunt Tower?

417.     Did Intamin sell Drop Zone Stunt Tower?

418.     To whom was Drop Zone Stunt Tower sold?

419.     When did Intamin begin design of Drop Zone Stunt Tower?

420.     When was Drop Zone Stunt Tower manufactured?

421.     When was Drop Zone Stunt Tower sold?

422.     When was Drop Zone Stunt Tower installed?

423.     What was the total contract cost for Drop Zone Stunt Tower?

424.     What portion of that cost was allocated to braking systems?

425.     Does Drop Zone Stunt Tower contain braking systems designed to

slow the ride?

426.     Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

427.     Are those permanent magnets in opposed arrays?

428.     Is there a conductive metallic fin that extends from the cars of

Drop Zone Stunt Tower?

429.     Where is that conductive metallic fin located on the car?

430.     Where are those permanent magnets located in relation to the

tracks of the ride?

431.      When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

432.      Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

433.      Do these eddy currents create a braking force on the ride?

434.      Does the ride contain cars?

435.      Do the cars sit on parallel rails?

436.      Do the cars have wheels?

437.      Do the wheels allow the cars to roll on the rails?

438.      Do you have knowledge of a ride by the name of Drop Zone Stunt Tower at Carrowinds?

439.      Did Intamin design Drop Zone Stunt Tower?

440.      Did Intamin manufacture Drop Zone Stunt Tower?

441.      Did Intamin install Drop Zone Stunt Tower?

442.      Did Intamin sell Drop Zone Stunt Tower?

443.      To whom was Drop Zone Stunt Tower sold?

444.      When did Intamin begin design of Drop Zone Stunt Tower?

445.      When was Drop Zone Stunt Tower manufactured?

446.      When was Drop Zone Stunt Tower sold?

447.      When was Drop Zone Stunt Tower installed?

448.      What was the total contract cost for Drop Zone Stunt Tower?

449.      What portion of that cost was allocated to braking systems?

450.    Does Drop Zone Stunt Tower contain braking systems designed to slow the ride?

451.    Do any of those braking systems impart braking on the ride through the use of permanent magnets?

452.    Are those permanent magnets in opposed arrays?

453.    Is there a conductive metallic fin that extends from the cars of Drop Zone Stunt Tower?

454.    Where is that conductive metallic fin located on the car?

455.    Where are those permanent magnets located in relation to the tracks of the ride?

456.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

457.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

458.    Do these eddy currents create a braking force on the ride?

459.    Does the ride contain cars?

460.    Do the cars sit on parallel rails?

461.    Do the cars have wheels?

462.    Do the wheels allow the cars to roll on the rails?

463.    Do you have knowledge of a ride by the name of Drop Zone Stunt Tower at Great America?

464.    Did Intamin design Drop Zone Stunt Tower?

465.    Did Intamin manufacture Drop Zone Stunt Tower?

466.    Did Intamin install Drop Zone Stunt Tower?

467.    Did Intamin sell Drop Zone Stunt Tower?

468.    To whom was Drop Zone Stunt Tower sold?

469.    When did Intamin begin design of Drop Zone Stunt Tower?

470.    When was Drop Zone Stunt Tower manufactured?

471.    When was Drop Zone Stunt Tower sold?

472.    When was Drop Zone Stunt Tower installed?

473.    What was the total contract cost for Drop Zone Stunt Tower?

474.    What portion of that cost was allocated to braking systems?

475.    Does Drop Zone Stunt Tower contain braking systems designed to slow the ride?

476.    Do any of those braking systems impart braking on the ride through the use of permanent magnets?

477.    Are those permanent magnets in opposed arrays?

478.    Is there a conductive metallic fin that extends from the cars of Drop Zone Stunt Tower?

479.    Where is that conductive metallic fin located on the car?

480.    Where are those permanent magnets located in relation to the tracks of the ride?

481.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

482.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

483.      Do these eddy currents create a braking force on the ride?

484.      Does the ride contain cars?

485.      Do the cars sit on parallel rails?

486.      Do the cars have wheels?

487.      Do the wheels allow the cars to roll on the rails?

488.      Do you have knowledge of a ride by the name of Drop Zone at King's Island?

489.      Did Intamin design Drop Zone?

490.      Did Intamin manufacture Drop Zone?

491.      Did Intamin install Drop Zone?

492.      Did Intamin sell Drop Zone?

493.      To whom was Drop Zone sold?

494.      When did Intamin begin design of Drop Zone?

495.      When was Drop Zone manufactured?

496.      When was Drop Zone sold?

497.      When was Drop Zone installed?

498.      What was the total contract cost for Drop Zone?

499.      What portion of that cost was allocated to braking systems?

500.      Does Drop Zone contain braking systems designed to slow the ride?

501.      Do any of those braking systems impart braking on the ride through the use of permanent magnets?

502.      Are those permanent magnets in opposed arrays?

503.    Is there a conductive metallic fin that extends from the cars of Drop Zone?

504.    Where is that conductive metallic fin located on the car?

505.    Where are those permanent magnets located in relation to the tracks of the ride?

506.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

507.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

508.    Do these eddy currents create a braking force on the ride?

509.    Does the ride contain cars?

510.    Do the cars sit on parallel rails?

511.    Do the cars have wheels?

512.    Do the wheels allow the cars to roll on the rails?

513.    Do you have knowledge of a ride by the name of Tower of Doom at Six Flags America?

514.    Did Intamin design Tower of Doom?

515.    Did Intamin manufacture Tower of Doom?

516.    Did Intamin install Tower of Doom?

517.    Did Intamin sell Tower of Doom?

518.    To whom was Tower of Doom sold?

519.    When did Intamin begin design of Tower of Doom?

520.    When was Tower of Doom manufactured?

521.        When was Tower of Doom sold?

522.        When was Tower of Doom installed?

523.        What was the total contract cost for Tower of Doom?

524.        What portion of that cost was allocated to braking systems?

525.        Does Tower of Doom contain braking systems designed to slow
the ride?

526.        Do any of those braking systems impart braking on the ride
through the use of permanent magnets?

527.        Are those permanent magnets in opposed arrays?

528.        Is there a conductive metallic fin that extends from the cars of
Tower of Doom?

529.        Where is that conductive metallic fin located on the car?

530.        Where are those permanent magnets located in relation to the
tracks of the ride?

531.        When the ride passes over the magnets, does the conductive
metallic fin pass between the arrays of magnets?

532.        Does the movement of the conductive metallic fin through the
arrays of magnets produce eddy currents?

533.        Do these eddy currents create a braking force on the ride?

534.        Does the ride contain cars?

535.        Do the cars sit on parallel rails?

536.        Do the cars have wheels?

537.        Do the wheels allow the cars to roll on the rails?

538.    Do you have knowledge of a ride by the name of Tower of Doom

at Elitch Gardens?

539.    Did Intamin design Tower of Doom?

540.    Did Intamin manufacture Tower of Doom?

541.    Did Intamin install Tower of Doom?

542.    Did Intamin sell Tower of Doom?

543.    To whom was Tower of Doom sold?

544.    When did Intamin begin design of Tower of Doom?

545.    When was Tower of Doom manufactured?

546.    When was Tower of Doom sold?

547.    When was Tower of Doom installed?

548.    What was the total contract cost for Tower of Doom?

549.    What portion of that cost was allocated to braking systems?

550.    Does Tower of Doom contain braking systems designed to slow

the ride?

551.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

552.    Are those permanent magnets in opposed arrays?

553.    Is there a conductive metallic fin that extends from the cars of

Tower of Doom?

554.    Where is that conductive metallic fin located on the car?

555.    Where are those permanent magnets located in relation to the

tracks of the ride?

556.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

557.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

558.     Do these eddy currents create a braking force on the ride?

559.     Does the ride contain cars?

560.     Do the cars sit on parallel rails?

561.     Do the cars have wheels?

562.     Do the wheels allow the cars to roll on the rails?

563.     Do you have knowledge of a ride by the name of Superman Tower of Power at Six Flags Kentucky Kingdom?

564.     Did Intamin design Superman Tower of Power?

565.     Did Intamin manufacture Superman Tower of Power?

566.     Did Intamin install Superman Tower of Power?

567.     Did Intamin sell Superman Tower of Power?

568.     To whom was Superman Tower of Power sold?

569.     When did Intamin begin design of Superman Tower of Power?

570.     When was Superman Tower of Power manufactured?

571.     When was Superman Tower of Power sold?

572.     When was Superman Tower of Power installed?

573.     What was the total contract cost for Superman Tower of Power?

574.     What portion of that cost was allocated to braking systems?

575.　　Does Superman Tower of Power contain braking systems designed to slow the ride?

576.　　Do any of those braking systems impart braking on the ride through the use of permanent magnets?

577.　　Are those permanent magnets in opposed arrays?

578.　　Is there a conductive metallic fin that extends from the cars of Superman Tower of Power?

579.　　Where is that conductive metallic fin located on the car?

580.　　Where are those permanent magnets located in relation to the tracks of the ride?

581.　　When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

582.　　Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

583.　　Do these eddy currents create a braking force on the ride?

584.　　Does the ride contain cars?

585.　　Do the cars sit on parallel rails?

586.　　Do the cars have wheels?

587.　　Do the wheels allow the cars to roll on the rails?

588.　　Do you have knowledge of a ride by the name of Superman Tower of Power at Six Flags St. Louis?

589.　　Did Intamin design Superman Tower of Power?

590.　　Did Intamin manufacture Superman Tower of Power?

591.　　　Did Intamin install Superman Tower of Power?

592.　　　Did Intamin sell Superman Tower of Power?

593.　　　To whom was Superman Tower of Power sold?

594.　　　When did Intamin begin design of Superman Tower of Power?

595.　　　When was Superman Tower of Power manufactured?

596.　　　When was Superman Tower of Power sold?

597.　　　When was Superman Tower of Power installed?

598.　　　What was the total contract cost for Superman Tower of Power?

599.　　　What portion of that cost was allocated to braking systems?

600.　　　Does Superman Tower of Power contain braking systems designed to slow the ride?

601.　　　Do any of those braking systems impart braking on the ride through the use of permanent magnets?

602.　　　Are those permanent magnets in opposed arrays?

603.　　　Is there a conductive metallic fin that extends from the cars of Superman Tower of Power?

604.　　　Where is that conductive metallic fin located on the car?

605.　　　Where are those permanent magnets located in relation to the tracks of the ride?

606.　　　When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

607.　　　Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

608.    Do these eddy currents create a braking force on the ride?

609.    Does the ride contain cars?

610.    Do the cars sit on parallel rails?

611.    Do the cars have wheels?

612.    Do the wheels allow the cars to roll on the rails?

613.    Do you have knowledge of a ride by the name of Superman Tower

of Power, formerly at Astroworld?

614.    Did Intamin design Superman Tower of Power?

615.    Did Intamin manufacture Superman Tower of Power?

616.    Did Intamin install Superman Tower of Power?

617.    Did Intamin sell Superman Tower of Power?

618.    To whom was Superman Tower of Power sold?

619.    When did Intamin begin design of Superman Tower of Power?

620.    When was Superman Tower of Power manufactured?

621.    When was Superman Tower of Power sold?

622.    When was Superman Tower of Power installed?

623.    What was the total contract cost for Superman Tower of Power?

624.    What portion of that cost was allocated to braking systems?

625.    Does Superman Tower of Power contain braking systems designed

to slow the ride?

626.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

627.    Are those permanent magnets in opposed arrays?

628.    Is there a conductive metallic fin that extends from the cars of Superman Tower of Power?

629.    Where is that conductive metallic fin located on the car?

630.    Where are those permanent magnets located in relation to the tracks of the ride?

631.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

632.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

633.    Do these eddy currents create a braking force on the ride?

634.    Does the ride contain cars?

635.    Do the cars sit on parallel rails?

636.    Do the cars have wheels?

637.    Do the wheels allow the cars to roll on the rails?

638.    Do you have knowledge of a ride by the name of Giant Drop at Six Flags Great America?

639.    Did Intamin design Giant Drop?

640.    Did Intamin manufacture Giant Drop?

641.    Did Intamin install Giant Drop?

642.    Did Intamin sell Giant Drop?

643.    To whom was Giant Drop sold?

644.    When did Intamin begin design of Giant Drop?

645.    When was Giant Drop manufactured?

646.    When was Giant Drop sold?

647.    When was Giant Drop installed?

648.    What was the total contract cost for Giant Drop?

649.    What portion of that cost was allocated to braking systems?

650.    Does Giant Drop contain braking systems designed to slow the ride?

651.    Do any of those braking systems impart braking on the ride through the use of permanent magnets?

652.    Are those permanent magnets in opposed arrays?

653.    Is there a conductive metallic fin that extends from the cars of Giant Drop?

654.    Where is that conductive metallic fin located on the car?

655.    Where are those permanent magnets located in relation to the tracks of the ride?

656.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

657.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

658.    Do these eddy currents create a braking force on the ride?

659.    Does the ride contain cars?

660.    Do the cars sit on parallel rails?

661.    Do the cars have wheels?

662.    Do the wheels allow the cars to roll on the rails?

663.    Do you have knowledge of a ride by the name of Acrophobia at

Six Flags Over Georgia?

664.    Did Intamin design Acrophobia?

665.    Did Intamin manufacture Acrophobia?

666.    Did Intamin install Acrophobia?

667.    Did Intamin sell Acrophobia?

668.    To whom was Acrophobia sold?

669.    When did Intamin begin design of Acrophobia?

670.    When was Acrophobia manufactured?

671.    When was Acrophobia sold?

672.    When was Acrophobia installed?

673.    What was the total contract cost for Acrophobia?

674.    What portion of that cost was allocated to braking systems?

675.    Does Acrophobia contain braking systems designed to slow the

ride?

676.    Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

677.    Are those permanent magnets in opposed arrays?

678.    Is there a conductive metallic fin that extends from the cars of

Acrophobia?

679.    Where is that conductive metallic fin located on the car?

680.    Where are those permanent magnets located in relation to the

tracks of the ride?

681.    When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

682.    Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

683.    Do these eddy currents create a braking force on the ride?

684.    Does the ride contain cars?

685.    Do the cars sit on parallel rails?

686.    Do the cars have wheels?

687.    Do the wheels allow the cars to roll on the rails?

688.    Has Intamin designed any other amusement rides for the above listed Defendants including eddy current brakes?

689.    What rides has Intamin designed for the above listed Defendants that include eddy current brakes?

690.    Has Intamin manufactured any other amusement rides for the above listed Defendants including eddy current brakes?

691.    What rides has Intamin manufactured for the above listed Defendants that include eddy current brakes?

692.    Has Intamin sold any other amusement rides for the above listed Defendants including eddy current brakes?

693.    What rides has Intamin sold to the above listed Defendants that include eddy current brakes?

694.    Do any of the rides designed, manufactured, or sold for the above listed Defendants have opposed configurations of magnets, a conductive

fin attached to a car, wheels to allow the car to move along parallel rails, so that when the conductive fin passes through the magnets, a braking force is imparted on the car?

695.     Which rides mentioned above have all of the listed characteristics?

### Questions Regarding Intamin Ownership in Patents covering Related Technologies

696.     Were you a named inventor in U.S. Patent No. 6,062,350, issued May 16, 2000?

697.     Is U.S. Patent No. 6,062,350 currently assigned to Intamin AG?

698.     Does Intamin have any ownership interest in U.S. Patent No. 6,062,350?

699.     Has Intamin contacted anyone regarding possible infringement of one or more claims of U.S. Patent No. 6,062,350?

700.     Has Intamin requested a licensing fee for continued use of a product accused of infringing one or more claims of U.S. Patent No. 6,062,350?

701.     What companies has Intamin contacted regarding possible infringement of one or more claims of U.S. Patent No. 6,062,350?

702.     Is there a standard licensing fee that Intamin requests for continued use of a product accused of infringing one or more claims of U.S. Patent No. 6,062,350?

703.     What is the standard licensing fee?

704.     Is the standard licensing fee a percentage of the overall cost of the ride?

705.    If so, what is that percentage?

706.    Is that standard licensing fee a set dollar amount per possible infringing ride?

707.    If so, what is the dollar amount?

708.    If there is no standard licensing fee, has Intamin successfully negotiated any licenses under U.S. Patent No. 6,062,350?

709.    With whom has Intamin successfully negotiated a license under U.S. Patent No. 6,062,350?

710.    What licensing fee did Intamin receive for each of those licenses?

711.    If any of the licensing fees were percentages of purchase price of the ride, what were those percentages?

712.    Were you a named inventor in U.S. Patent No. 5,628,690, issued May 16, 2000?

713.    Is U.S. Patent No. 5,628,690 currently assigned to Intamin AG?

714.    Does Intamin have any ownership interest in U.S. Patent No. 5,628,690?

715.    Has Intamin contacted anyone regarding possible infringement of one or more claims of U.S. Patent No. 5,628,690?

716.    Has Intamin requested a licensing fee for continued use of a product accused of infringing one or more claims of U.S. Patent No. 5,628,690?

717.    What companies has Intamin contacted regarding possible infringement of one or more claims of U.S. Patent No. 5,628,690?

718.    Is there a standard licensing fee that Intamin requests for continued

use of a product accused of infringing one or more claims of U.S. Patent

No. 5,628,690?

719.    What is the standard licensing fee?

720.    Is the standard licensing fee a percentage of the overall cost of the

ride?

721.    If so, what is that percentage?

722.    Is that standard licensing fee a set dollar amount per possible

infringing ride?

723.    If so, what is the dollar amount?

724.    If there is no standard licensing fee, has Intamin successfully

negotiated any licenses under U.S. Patent No. 5,628,690?

725.    With whom has Intamin successfully negotiated a license under

U.S. Patent No. 5,628,690?

726.    What licensing fee did Intamin receive for each of those licenses?

727.    If any of the licensing fees were percentages of purchase price of

the ride, what were those percentages?

### *ANNEX B*
#### *Documents Sought for Production*

The District Court requests that Patrick Spieldiener produce the following documents in his possession, custody, or control and that they be made available for inspection and copying at least two weeks prior to Patrick Spieldiener's oral examination. The rides mentioned are those listed in the Letter of Request, in the section entitled "The Witness."

1. All technical drawings, specifications, discussions, and all other documents indicating the nature of the braking systems installed on the above-listed amusement rides.

2. All technical drawings, specifications, discussions, and all other documents indicating the nature of the above-listed amusement rides, indicating the relationship of the track to the car.

3. All contracts and documents, evidencing discussions between Intamin and the purchaser of each of the above-listed amusement rides that indicate costs and terms of purchase of each of the above-listed amusement rides.

4. All documents indicating the design, manufacture, and installation of above-listed amusement rides.

5. All contracts setting forth a royalty rate or fee for use of magnetic braking technology.

6. All contracts setting forth a royalty rate or fee for use of amusement ride technology.

7.  Any documents, communications asserting that a product manufactured, sold, or used by another infringes one or more claims of U.S. Patent No. 6,062,350.

8.  Any documents or communications asserting that a product manufactured, sold, or used by another infringes one or more claims of U.S. Patent No. 5,628,690.

9.  Contracts, negotiations, faxes, e-mails, other documents concerning negotiations with other companies for the licensing of U.S. Patent No. 6,062,350.

10. Contracts, negotiations, faxes, e-mails, other documents concerning negotiations with other companies for the licensing of U.S. Patent No. 5,628,690.

11. Completed licensing contracts with any above-listed Defendant or other company for exclusive or non-exclusive licenses of U.S. Patent No. 6,062,350.

12. Completed licensing contracts with any above-listed Defendant or other company for exclusive or non-exclusive licenses of U.S. Patent No. 5,628,690.

13. Any documents, communications requesting the payment of a royalty for use of devices believed to infringe U.S. Patent No. 6,062,350.

14. Any documents, communications requesting the payment of a royalty for use of devices believed to infringe U.S. Patent No. 5,628,690.

# ANNEX C

US005277125A

# United States Patent [19]

## DiFonso et al.

| [11] | Patent Number: | **5,277,125** |
|---|---|---|
| [45] | Date of Patent: | **Jan. 11, 1994** |

[54] **MATERIAL HANDLING CAR AND TRACK ASSEMBLY HAVING OPPOSED MAGNET LINEAR MOTOR DRIVE AND OPPOSED PERMANENT MAGNET BRAKE ASSEMBLY**

[75] Inventors: **Gene DiFonso**, Arlington; **Joel L. Staehs**, DeSoto, both of Tex.

[73] Assignee: **BAE Automated Systems, Inc.**, Carrollton, Tex.

[21] Appl. No.: **967,661**

[22] Filed: **Oct. 28, 1992**

[51] Int. Cl.5 .............................................. B60L 13/02
[52] U.S. Cl. ...................................... 104/292; 104/294; 188/158; 188/267
[58] Field of Search ............... 104/290, 292, 283, 294; 188/267, 158

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,613,805 | 9/1986 | Matsuo et al. ..................... | 318/687 |
| 4,848,242 | 7/1989 | Matsuo ............................. | 104/290 |
| 4,919,054 | 4/1990 | Matsuo ............................. | 104/94 |
| 5,018,928 | 5/1991 | Hartlepp ........................... | 414/339 |
| 5,127,599 | 7/1992 | Veraart ............................ | 104/292 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 81105 | 4/1986 | Japan ............................. | 104/292 |
| 177101 | 8/1986 | Japan ............................. | 104/292 |
| 231804 | 10/1986 | Japan ............................. | 104/292 |

*Primary Examiner*—Robert J. Oberleitner
*Assistant Examiner*—S. Joseph Morano
*Attorney, Agent, or Firm*—Lorusso & Loud

[57] **ABSTRACT.**

Material handling car and track assembly, the assembly comprising a car having wheels mounted thereon, and a track having two parallel rails, the wheels being adapted to roll on the rails to facilitate movement of the car along the track, a metal slider extending from an underside of the car and lengthwise of the car, and opposed linear motors mounted beween the tracks and spaced from each other to define a gap between the motors, the slider being daapted to pass through the gap, the motors being operative to act on the slider to impart thrust to the car, the motors being oriented such as to substantially eliminate magnetic atraction between the mtors and the car. The invention further contemplates opposed magents mountede beween the tracks and spaced from each other to define a gap between the magnets, the slider being dapted to pass through the gap between the magnets, the magnets being operative to act on the slider to impart braking to the car, whereby to decelerate the car.

**3 Claims, 3 Drawing Sheets**





*FIG. 1*



*FIG. 2A*



*FIG. 2B*



*FIG. 2C*



## FIG. 3

5,277,125

1

2

MATERIAL HANDLING CAR AND TRACK
ASSEMBLY HAVING OPPOSED MAGNET
LINEAR MOTOR DRIVE AND OPPOSED
PERMANENT MAGNET BRAKE ASSEMBLY

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a material handling
car and track assembly and is directed more particularly
to acceleration and deceleration means mounted in the
track assembly and adapted to influence speed of the
car.

2. Description of Prior Art

The prior ar has recognized the need for means to
propel a car along a track without the installation of a
driver mechanism or braking mechanism on the car.
Systems have incorporated linear induction motors as
an efficient means of achieving this. Such systems com-
monly employ single motors along a track whereby a
car is propelled by a force created by the change in
magnetic flux as the car passes by the motors. However,
a problem inherent in these systems is that of undue
stress on the cars and tracks themselves due to an elec-
tromagnetic force created between the car and the mo-
tor, causing the car to be attracted toward the track.
This attractive force exerted on the car dissipates after
the car passes away from the motor. In systems where
there are commonly several hundred motors in use
through which a car passes as it travels through the
system, the constant attractive stress and release of such
stress, leads to wear and tear on the car. As a result, cars
break down and are in need of frequent repair.

Such a system is disclosed in U.S. Pat. No. 4,919,054
to Matsuo. In this system, linear induction motors are
disposed in single file underneath the transport path of
the car, causing the motors to exert an attractive force
while acting to drive the car. Due to numerous motors
in the system, a car undergoing such repeated applica-
tion and release of stress becomes structurally weak and
requires frequent servicing.

Another problem recognized in the prior art relates
to providing a means for controlling the speed of a car
through the use of a decelerating mechanism external of
the car. Many systems which have employed inductive
motors to impel a car forward along a track have relied
entirely upon the same motors for braking the car. A
reverse thrust is applied to the car by passing reverse
phase alternating current through the coils of the motor
stators, to slow the car down. However, these systems
potentially overwork the motors which often leads to
motor failure.

An example of this type of system is disclosed in U.S.
Pat. No. 4,848,242 to Matsuo. As in the Matsuo '054
system, single motors are disposed at predetermined
intervals underneath the transport path and, as in the
previous system, an attractive force on the car is exerted
and released as the car moves in the direction of the
transport path. The motors impel the car in the forward
and reverse directions. Thus, the motors carry out the
function of starting and stopping the car, depending on
the direction of current flow. However, this dual func-
tion leads to increased wear and tear on the motors.

In other systems, such as disclosed in U.S. Pat. No.
5,018,928 to Hartlepp, a car is decelerated through the
use of a magnetic piston which moves by compressed
air in a tube, such that a car will follow the piston.
However, the use of such a structure is complicated and

thus provides great opportunity for malfunction. Addi-
tionally, this system discloses the use of linear induction
motors for propelling a car on a track wherein induc-
tion motors are singly disposed. Accordingly, an attrac-
tive force is exerted on the cars driven by the motor.

An additional problem recognized in the art is the
need to mitigate the effects of motor failure. In U.S. Pat.
No. 4,613,805 to Matsuo, there is disclosed a system
providing for continued operation through the use of an
auxiliary power source in the event that the main power
source becomes disabled. However, this system does
not insure continued operation in the event that a motor
along the transport path should become disabled.

SUMMARY OF THE INVENTION

Accordingly, it is an object of the invention to pro-
vide a material handling car and track assembly which
reduces wear and tear on cars traveling through the
system and provides for continued operation in the
event that a motor, or several motors, in the system
become disabled. This object is accomplished by provi-
sion of a car having a metal slider on the underside of
the car. The assembly further includes a track having
two parallel rails. Movement is imparted to a car travel-
ing on the rails by opposed linear motors operatively
acting on the slider. The configuration of the motors is
such that it causes the magnetic attraction between the
linear motors and the car to substantially cancel out,
thereby eliminating the attractive force on the car. Thus
the cars, no longer subject to application and release of
stresses, require less reparative maintenance and enjoy
longer operating life. Additionally, through the use of
coupled motors, should one motor become disabled, the
remaining motor continues to impart motion until the
afflicted motor is again operative.

A further object of the invention is to provide a sim-
ple means for decelerating the car without the use of
mechanisms disposed on the car. The use of magnets
disposed along the track enables the car's traveling
speed to be decreased, the magnets operatively acting
on the slider to decelerate the car.

With the above and other objects in view, as will
herein after appear, a feature of the present invention is
the provision of a material handling car and track as-
sembly, the assembly comprising a car having wheels
mounted thereon, and a track having two parallel rails,
the wheels being adapted to roll on the rails to facilitate
movement of the car along the track, a metal slider
extending from an underside of the car and lengthwise
of the car, and opposed linear motors mounted between
the tracks, the motors being spaced from each other by
a distance exceeding the thickness of the slider to define
a gap between the motors, the slider being adapted to
pass through the gap in travel of the car over the mo-
tors, the motors being operative to act on the slider to
impart thrust to the car, the motors being oriented such
as to substantially eliminate magnetic attraction be-
tween the motors and the car.

In accordance with a further feature of the invention,
there is provided a material handling car and track
assembly, the assembly comprising a car having wheels
mounted thereon, and a track having two parallel rails,
the wheels being adapted to roll on the rails to facilitate
movement of the car along the track, a metal slider
extending from an underside of the car and lengthwise
of the car, and exposed magnets mounted between the
tracks, the magnets being spaced from each other by a

| 3 | 4 |

distance exceeding the thickness of the slider to define a gap between the magnets, the slider being adapted to pass through the gap in travel of the car over the magnets, the magnets being operative to act on the slider to impart braking to the car, whereby the magnets are operative to decelerate the car.

The above and other features of the invention, including various novel details of construction and combinations of parts, will now be more particularly described with reference to the accompanying drawings and pointed out in the claims. It will be understood that the particular devices embodying the invention are shown by way of illustration only and not as limitations of the invention. The principles and features of this invention may be employed in various and numerous embodiments without departing from the scope of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

Reference is made to the accompanying drawings in which are shown illustrative embodiments of the invention, from which its novel features and advantages will be apparent.

In the accompanying drawings:

FIG. 1 is a front elevational view of one form of material handling car and track assembly illustrative of an embodiment of the invention, wherein the material handling car is shown having a metal slider on an underside portion of the car, and the track assembly is shown with linear induction motors in opposition, forming a gap therebetween to accommodate the passage of the slider;

FIG. 2A is a front elevational view of a decelerating means featuring decelerating magnets arranged in opposition and forming a gap therebetween adapted to accommodate the passage of the slider;

FIG. 2B is a perspective view of a portion of the decelerating means of FIG. 2A;

FIG. 2C is a top view of a portion of the decelerating means of FIG. 2A, showing the polar arrangement of magnets therein; and

FIG. 3 is a diagrammatic view of two opposed linear motors.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. 1, it will be seen that the illustrative assembly includes a car 1 having a chassis 2 on which are mounted travel wheels 4 to facilitate movement along a track assembly 6, which comprises two parallel rails 8.

Each of the rails 8 is of a U-shaped configuration and, as shown in FIG. 1, are opposed to each otherl Each of the U-shaped rails includes a substnatially horizontal bottom plae 3, for supporting a vertical travel wheel 5 of the car 1, and a substantially ertical wall 7 for engagin a horizonal tavel wheel 9 of car 1, and a top wall 11 overlyin the bottom plate 3 and extending iwnardly from eside wall 7. Mounted on the chassis 2 is a tiltable tray 10 which is sized to accommodate a selected cargo, such as, for example, heavy, large or cumbersome baggage. The tray 10 is capable of being positioned in three positions, one in which it is adapted to receive material from a loading station, another in which it permits transport of material around curves in the track without spillage of material, and lastly, a third position in which it facilitates sliding of the material off the tray 10 onto a receiving platform.

On the underside of the chassis 2, a slider 12 is mounted which runs lengthwise along the chassis 2. The slider 12 comprises a fin which is preferably fabricated of an all-conductor, such as aluminum or copper. Other all-conductive materials are within the scope of the preferable materials, provided that such materials are non-magnetic. The use of such materials reduces the overall weight of the car so that it is 25% to 30% less than existing prior art cars which do not employ such materials. The slider 12 is preferably 0.25 inch thick and in one embodiment is 48 inches long.

Also shown in FIG. 1 is a track assembly with linear induction motors 16 disposed in opposition. Brackets 14 are disposed inwardly of the rails 8, and are adapted to retain the linear induction motors 16 such that the motors 16 form a gap 15 sized to be greater than the width of the slider 12. The two brackets 14 each hold a linear induction motor 16 in such an orientation that the motors extend to form the narrow gap 15 therebetween.

The linear induction motors 16 each include a stator assembly 30 (FIG. 3) having slots 32 therein. Within each stator assembly 30, there are disposed multiple phase windings 34. The windings 34 are disposed in the slots 32 so as to form a distributed winding pattern. When excited by a multiple phase alternating current source (not shown), the windings 34 generate a traveling magnetic wave defined by

$$b = B \cos \frac{(\pi S)}{p}$$

where
B=peak value of magnetic flux density in air gap
S=lengthwise distance of stator gap
p=pole pitch of stator

Inasmuch as the conductive slider 12 consists entirely of non-magnetic material, no force is produced tending to pull the slider sideways.

Because of magnetic induction action between the air gap magnetic flux wave and the slider, there occurs a flow of eddy currents defined by

$$j = J \sin \frac{(\pi S)}{p}$$

where
J=peak value of eddy current flow in the slider.

Interaction between the air gap flux wave and resulting eddy currents induced on the slider, produces thrust in the direction orthogonal to both flux and eddy current waves. The coil polarities are reversed from one stator assembly to the opposing stator assembly across the gap 15. As a result of this configuration, the attractive force created by single non-opposed stators is eliminated.

Referring to FIG. 1, it will be seen th the motors 16 are on about the same level above the botom plates 3 as are the horizontal travel wheels 9 and portions 13 of the ertical travel wheels 5 above their axes 15, when h car passes over the motors. Thus, as is paparent from FIG. 1, the driving force imparted to the slider 12 by the motors 16 is on about the same level as the horizontal wheels and the portion of the vertical wheels above the vertical wheel axes. Thus, there is produced substntially only a forward thrust, without a turning moment imparted to the travel wheels tending to lift the wheels off the track.

3,277,125

5

In operation, the motors may be run continuously or may be provided with selective turn-off switches, such that one or more groups of motors may be turned off during periods of inactivity. Alternatively, a "presence control" may be utilized wherein the approach of a car is sensed and the motors turned on and, as the departure of the car from the scene is sensed, the motors turned off. A second alternative comprises a "speed control" wherein the speed of an approaching car is sensed and the motors are activated or deactivated in accordance with a preset desired speed for the car.

In FIG. 2A, there are shown decelerating magnetic members 20. Individual magnets 22 are each bonded to a steel plate 24 for support. The steel plates 24 are each attached to a mounting bracket 26. Steel gussets 28 (FIGS. 2A and 2B), each about 0.25 inch thick, are mounted across an inner angle of the mounting brackets 26, to provide support for the brackets 26. The magnetic members 20 are positioned between the rails 8 so as to form a gap 29, the width of which is greater than the width of the slider 12.

FIG. 2B shows the inner face of one of the identical opposed magnets and the positioning of the individual magnets 22. A selected number of magnets, depending upon the weight and desired velocity of the vehicle, are placed on each of the steel plates 24. FIG. 2C shows the magnets 22 and the polar orientation thereof. Thus, when the slider 12 passes between the magnetic members 20, as the car 1 travels along the tracks, the magnetic field created by the opposed polar orientation of individual magnets 22, serves to decelerate the car 1.

On the track assembly, the magnetic members 20 and the induction motors 16 are disposed in certain places where it is desirable that the speed of the car be either slowed or maintained. For example, in areas of an incline where it is likely that car speed will decrease, the induction motors may be disposed to maintain an appropriate speed. There are places along the track assembly where it is desirable that the speed of the car be decreased, such as in areas of sharp turns. It is in such areas that the magnetic members may be disposed to slow the car. Additionally, in areas where baggage is to be loaded onto and off of the tray of the car, magnetic members are disposed. Also, in areas where the tray has finished loading or unloading of baggage, induction motors may be positioned, so as to move the car along the track system and return the car to travel speed.

The motors may be reversed by merely reversing the direction of the traveling magnetic wave. This is accomplished by changing the phase rotation of the multiple phase power source, to provide a braking force on the cars. While it is preferable not to rely wholly on the motors for routine braking, use of the motors for braking over and beyond that provided by the magnetic members 20 is available.

It should be understood that the invention is not limited to the specific embodiment or construction described above and that various changes and modifications will be obvious to one skilled in the art without departing from the true spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A track assembly for driving a material handling car, said asembly comprisin:

two parallel rails upon which said car is driven, each of said rails havign a U-shaped configuration, said rails being in opposed position, each of said rails having a subsntaially horizontal bottom plate for

6

supporting a vertical travel wheel of said car, a substantially vertical side all for engaging a horizonal travel wheel of said car, and a top wall overlying said bottom plate and extending iwnardly from said side wall

linear induction motors mounted between said rails in an opposed configguration, said motors being on about the same level above said rail bottomplates as said horizontal travel wheel and portions of said vertical tarvel wheels above the axes thereof when said car passes over said motors, said opposed configuration defining a gap beween said motors permiting passage of a slider portion of said car therebetween, said configuration creating a driving force for impellin said car along said rails while causing cancellation of atractive forces exerted by seach of said induction motors respectively, such that said slider upon passage through said gap is subject only to said driving forcek said driving force being exerted by said motors at said level above said rail bottom plates so as to provide said driving force at said level of said horizontal travel wheels and said portions of said vertical travel wheels above said axes thereof, and

permanent magnets mounted between said rails at a point removed from said motors, said magnets being mounted in an opposed configuration defining a gap between said magnets which permits the passage of said slider therbetween, said magnets being adapted to exercise a braking force on said slider to decrease the speed of said car upon passage of said slider therebetween.

2. A material handling car and track assembly, said assembly comprising

a car having wheels mounted thereon, and a track having two parallel rails, said wheel being adapted to roill on said rails to faciliate movement of said car along said track, a metal fin extending from an underside of said car and lengthwise of said car, said fin exending from said car between said wheels and

opposed linear motors mounted between said tracks, said motors being spaced from each other by a distance exceeding the thickness of said fin to define a gap between said motors, said fin being adapted to pass through said gap in travel of said car over said motors said motors being oriented such as to substanatially eliminate magentic attraction between said motors and said car, and said motors bieng disposed between said wheels when said car passes over said motors, said moors being disposed at a level above bottom plates of said track rails and genraly equal to the level of portions of said wheels above said bottom plates and above the axes of said wheels when said car passes over said motors, and

opposed permanent mgents mounted between said tracks at a point removed from said motors, said magnets being spaced from each other by a distance exceedig the thickness of said fin to define a gap between said magnets, said fin being adapted to pass through said gap between said magnets in travel of said car over said magnets, said magnets being disposed on plates mounted between said tracks, said magnets being mounted side by side in a direction of travel of said car, said magnets being operative sequentially to act on said fin to impart braking to said car, whereby said motors are opera-

5,277,125

7

tive to accelerate said car and said magnets are operative to decelerate said car.

3. Material handling car and track assembly, said assembly comprising:

a car having wheels mounted thereon, and

a track having two parallel rails, said wheel being adapted to roll on said rails to facilitate movement of said car along said track,

a metal fin extending from an underside of said car and lengthwise of said car, and

opposed magnet assemblies mounted between said tracks, said opposed assemblies being spaced from

8

each other by a distance exceeding the thickness of said fin to define a gap between said magnet asemblies, said fin being adapted to pass through said gap in travel of said car over said magnets, each of said assemble is comprising a mounting bracket, a plate attached to said mounting bracket, and a series of magnets bonded to said plate, said magnets on said plate being disposed side by side in a direction of travel of said car on said rails, said magnets being operative sequentially to act on said fin to impart braking to said car.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 5,277,125                    Page 1 of 2

DATED       : January 11, 1994

INVENTOR(S) : Gene DiFonso, Joel L. Staehs

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

In the Abstract:

Line 9: "daapted" should read "adapted"
Line 13: "mtors" should read "motors"
Line 14: "opposied" should read "opposed"
         "magents" should read "magnets"
         "mountede" should read "mounted"
Line 16: "dapted" should read "adapted"

Column 1: line 9; "fnvention" should read "invention"
Column 1: line 15; "ar" should read "art"

**Column 3: line 53; "1" should read "."**
**line 54; "substnatially" should read —substantially—**
**line 55; "plae" should read —plate—**
**line 56; "substantially ertical" should read**
**—substantially vertical"**
line 56; "engagin" should read "engaging"
line 57; "tavel" should read "travel"
line 58; "overlyin" should read "overlying"
line 59; "eside" should read "the side"
Column 4: line 11; "48" should not be in bold
line 57; "th" should read "that"
line 58; "botom" should read "bottom"
line 60; "ertical" should read "vertical"
line 60; "h" should read "the"
line 61; "paperent" should read "apparent"
line 65; "substntially" should read "substantially"
Column 5: line 64; "asembly comprisin" should read "assembly
         comprising"
line 66; "havign" should read "having"
line 68; "substntaially" should read "substantially"

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.  : **5,277,125**                    **Page 2 of 2**

DATED        : **January 11, 1994**

INVENTOR(S) : **Gene DiFonso, Joel L. Staehs**

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 6: line 2; "all" should read "wall"

line 4; "iwnardly" should read "inwardly"

line 5; after "wall" please insert ","

line 7; "configguarion" should read "configeration"

line 10; "tarvel" should read "travel"

line 15; "impellin" should read "impelling"

line 16; "atractive" should read "attractive"

line 17; "seach" should read "each"

line 19; "forcek" should read "force"

line 29; "therbetween" should read "therebetween"

line 37; "rolll" should read "roll"

line 40; "exending" should read "extending"

line 47; after "said motors" please insert a comma ","

line 48; "substanatially" should read "substantially"

line 50; "bieng" should read "being"

line 53; "genraly" should read "generally"

line 57; "mgents" should read "magnets"

line 60; "exceedig"  should read "exceeding"

Column 7: line 6;  "wheel" should read "wheels"

Cloumn 8: line 2;  "asem-" should read "assem-"

Signed and Sealed this

Eleventh Day of April, 1995

*Attest:*

*[signature: Bruce Lehman]*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 5,277,125                                      Page 1 of 1
APPLICATION NO. : 07/967661
DATED                 : January 11, 1994
INVENTOR(S)      : DiFonso et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page: Item (75), Inventors, "Gene DiFonso, Arlington; Joel L.

Staehs, DeSoto, both of Tex." should read -- Gene DiFonso, Arlington; Joel L. Staehs,

DeSoto; William C. Bortzfield *(deceased)*, Grand Prairie, all of Tex.--.

In the claims column 8, line 6, "assemble is" should read -- assemblies --.

Signed and Sealed this

Tenth Day of April, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 5,277,125                                          Page 1 of 1
APPLICATION NO. : 07/967661
DATED                  : January 11, 1994
INVENTOR(S)       : DiFonso et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:   Item (75), Inventors, "Gene DiFonso, Arlington; Joel L.

Staehs, DeSoto, both of Tex." should read -- Gene DiFonso, Arlington; Joel L. Staehs,

DeSoto; Willaim C. Bortzfield (*deceased*), Grand Prairie, all of Tex.--.

Column 8, line 6, "assemble is" should read -- assemblies --.

Signed and Sealed this

Seventeenth Day of April, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

US006659237B1

(12) **United States Patent**
Pribonic

(10) Patent No.: **US 6,659,237 B1**
(45) **Date of Patent:**   **Dec. 9, 2003**

(54) **EDDY CURRENT BRAKE**

(75) Inventor: **Edward M. Pribonic**, Seal Beach, CA (US)

(73) Assignee: **Magnetar Technologies, Ltd.**, Seal Beach, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 53 days.

(21) Appl. No.: **09/880,353**

(22) Filed: **Jun. 13, 2001**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/447,206, filed on Nov. 22, 1999.

(51) Int. Cl.$^7$ ................................................. **B60L 7/28**
(52) U.S. Cl. ...................................... **188/165**; 108/180
(58) Field of Search ................................. 188/159, 161, 188/164, 165, 180, 41, 84; 104/250

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,301,623 A | * | 11/1981 | Demukai | ....................... | 16/78 |
| 5,127,599 A | * | 7/1992 | Veraart | ....................... | 104/292 |

| | | | | | |
|---|---|---|---|---|---|
| 5,195,618 A | * | 3/1993 | Wu | ............................. | 188/164 |
| 5,277,125 A | * | 1/1994 | DiFonso et al. | ............. | 104/292 |
| 5,465,815 A | * | 11/1995 | Ikegami | ........................ | 188/164 |
| 6,062,350 A | * | 5/2000 | Spieldiener et al. | ......... | 188/161 |
| 6,227,334 B1 | * | 5/2001 | Yumura et al. | ............. | 187/359 |
| 6,293,376 B1 | * | 9/2001 | Pribonic | ..................... | 187/350 |
| 6,361,268 B1 | * | 3/2002 | Pelrine et al. | .............. | 104/284 |
| 6,412,611 B1 | * | 7/2002 | Pribonic | ..................... | 187/375 |

FOREIGN PATENT DOCUMENTS

WO      WO 96/32172      * 10/1996

* cited by examiner

*Primary Examiner*—Jack Lavinder
*Assistant Examiner*—Bradley King
(74) *Attorney, Agent, or Firm*—Walter A. Hackler

(57) **ABSTRACT**

An eddy current brake includes a diamagnetic member, a first support wall and a second support wall with the first and second linear arrays of permanent magnets disposed on the walls facing one another. Apparatus is provided for moving at least one of the walls in order to control eddy current induced in the member in the passage of the member therepast to adjust the braking force between the magnets and the member. Apparatus is also provided for causing the velocity of the member to change the braking force between the magnets and the member.

**10 Claims, 4 Drawing Sheets**







*FIG. 4.*



*FIG. 5.*



_FIG. 6._



_FIG. 7._



_FIG. 8._



US 6,659,237 B1

1

## EDDY CURRENT BRAKE

The present application, is a continuation-in-part of U.S. patent application Ser. No. 09/447,206 filed Nov. 22, 1999.

The present invention is generally related to permanent magnet linear brakes and is more particularly directed to an eddy current brake and magnet system for providing adjustable braking for movable cars, for example, rail support cars, go cars, elevator cars, conveyer car, roller coaster cars among other.

Heretofore, eddy current braking system for providing deceleration of moving apparatus have utilized physically fixed magnets which provided no opportunity to adjust braking before or during passage of a diamagnetic member past a linear array of permanent magnets.

Accordingly, such prior art systems, when installed for decelerating a plurality of cars on a track, can not accommodate for variations in car weight and size.

The present invention provides for a unique permanent array arrangement and apparatus for adjusting braking force before and/or during passage of a car past a selected point.

### SUMMARY OF THE INVENTION

An eddy current brake in accordance with the present invention generally includes a diamagnetic or non-magnetic member, a first support wall and a separate second support wall disposed in a spaced apart relationship with the first support wall for enabling the member to pass therebetween.

A first linear array of permanent magnets is disposed on the first wall on the side facing the second wall and a second linear array of permanent magnets is disposed on the second wall on the side facing the first wall. The first and second arrays are parallel with one another and spaced apart from one another for allowing passage of the member therebetween and causing eddy current to be induced in the member which results in the braking force between the magnets and the member. No magnetic connection, such as a yoke, is required between the walls or the arrays of permanent magnets. This feature enables adjustability of the distance between the member and the magnet arrays.

In accordance with the present invention, apparatus is provided for moving a least one of the first and second walls in order to control eddy current induced in the member during the passage of the member therepast in order to adjust braking force between the magnets and the member. In one embodiment of the present invention, the apparatus includes means for moving at least one of the first and second walls in a direction perpendicular to the member, and in another embodiment of the present invention, the apparatus includes means for moving at least one of the first and second walls in a direction parallel to the member.

Thus, it can be seen that the apparatus in accordance with the present: invention provides for changing the spaced apart relationship between the first and second walls in order to control eddy current induced in the member during passage and adjust a braking force between the magnets and member.

Accordingly, the amount of deceleration provided to a given car may be adjusted in accordance with the present invention. In addition, cars of various sizes and weights may be utilized and the eddy current magnetic brake in accordance with the present invention adjusted to provide the proper, or desired, deceleration. In one embodiment to the present invention, apparatus is provided for adjusting the eddy current induced in the member, and the braking force, as a function of velocity of the member between the arrays. Thus, cars having various velocities upon passing the brake,

2

can be decelerated to a more uniform velocity exiting the brake in accordance with the present invention.

In this embodiment of the brake, the apparatus for adjusting eddy current includes a linkage mounting at least one of the first and second walls to a fixed foundation for enabling movement of the member therepast to change a distance between at least one of the first and second walls and the member. More particularly, the linkage may provide for changing a spaced apart relationship between the first and second walls.

An embodiment of the present invention includes linkage for enabling movement of the member to change a transverse relationship between at least one of the first and second walls of the member and another embodiment provides linkage for enabling movement of the member to change a parallel relationship between the first and second walls and the member.

Magnetic coupling and inducement of eddy current is effective through a linear array of permanent magnets which includes a channel and plurality of magnets disposed therein. The magnets may be arranged within the channel in two adjacent rows with each magnet in each row being arranged with a magnetic field at a 90° angle to adjacent magnets in each row along the channel. Each magnet in each row is also arranged with a magnetic field at an angle to another adjacent magnet in the adjacent row.

### BRIEF DESCRIPTION OF THE DRAWINGS

The advantages and features of the present invention will be better understood by the following description when considered in conjunction with the accompanying drawings in which:

FIG. 1 is a perspective view of an eddy current brake in accordance with the present invention generally showing first and second spaced apart support walls and first and second linear arrays of permanent magnets along with a diamagnetic or nonmagnetic member attached to moving apparatus such as a car, represented by dashed line;

FIG. 2 is a perspective view of a first linear array of permanent magnets disposed upon a first support wall;

FIG. 3 is an elevational view of the brake shown in FIG. 1;

FIG. 4 shows a selectively actuatable brake system disengaged;

FIG. 5 shows a system of FIG. 8 engaged;

FIG. 6 is an elevational view of an alternative embodiment according with the present invention further showing apparatus for moving at least one of the first and second walls in order to control the distance between permanent magnets and opposing walls for adjusting braking force between the magnets and a member;

FIG. 7 is plan view of the brake shown in FIG. 6;

FIG. 8 is an enlarged view of a linear array of permanent magnets in accordance with the present invention generally including a channel and a plurality of magnets disposed therein in a particular arrangement as will be hereinafter described in greater detail;

FIGS. 9 and 10 show embodiment of the present invention similar to that shown in FIGS. 8 and 9 and further including apparatus for adjusting eddy current induced and the member, and braking force, is a function of velocity of the member between arrays of magnets;

FIGS. 11–14 are diagrams of alternative embodiments of the present invention which provide for linkage from at least

US 6,659,237 B1

3

one of the first and second walls to a fixed foundation for enabling movement of the member past the first and second walls with the first and second magnet arrays thereon to change a perpendicular relationship between the first and second walls and the member.

DETAILED DESCRIPTION

For the ensuing description of a braking apparatus 10 for an object 12, reference is made particularly to FIGS. 1–3. The object 12 is shown in generalized form only and is contemplated for movement in the direction of the arrow. Affixed to the object 12 is a member, or fin, 14 which extends outwardly from the object 12 and also moves with the object in the direction of arrow 15.

At some point along the path of movement there are mounted first and second laterally spaced magnet arrays 16 and 18. Each array includes an elongated support wall 20 which may be any cross-section, such as, for example an L-shaped cross-section, and on a lateral surface thereof, there are provided a linear series of permanent magnets 22, of any size, arrangement or configuration. For instance, the magnets may alternate in polarity as indicated by the identification letters "S" and "N". Also, the space 26 between the arrays is dimensioned and arranged with respect to the object path of movement, that the fin 14 will move along the space directly opposite the magnets and spacers, but remain out of physical contact with either the magnets or spacers.

When the fin 14 passes through the magnetic field existing in the space 26, an electric current (eddy current) is induced in the fin 14 which, in this case, reverses as the fin passes from a magnet of one polarity to a magnet of opposite polarity. These eddy currents produce a force exerted on the fin 14 (and object 12) of such direction as to reduce the velocity of movement of object 12 and fin 14. It is this deceleration that produces the "braking" of the present invention.

Although the above-described first embodiment includes movement of the object and fin past fixedly located magnet arrays, the magnet arrays can just as well be moved past a stationary object and fin. All that is needed to achieve the braking effect is relative movement between the magnets and fin. Since usually the object is moving, in that case the magnet arrays would be carried by the object and the fin fixedly mounted adjacent the path of movement. The choice of which technique to employ depends upon the particular application.

In its more general aspects, the invention can be advantageously employed for braking a large variety of moving objects. As an excellent example, eddy current braking for elevators could be highly advantageous as an emergency measure where normal operation has somehow been interfered with or disrupted. Also, many amusement park rides could benefit by having eddy current braking devices to retard excessive speed as the "ride" vehicle takes a corner or drops at a severe angle.

FIGS. 4 and 5 illustrate an object 52 with a brake fin 54 interconnected therewith, that moves generally along a direction indicated by an arrow 56 which normally will pass by a magnet carrier 58 beyond the range of substantial magnetic interaction (FIG. 4). The object 52 and fin 54 are provided with means 60 selectively actuatable for moving them toward the magnets 58 so as to effect magnetically coupling therewith (FIG. 5) and achieve braking.

With reference to FIGS. 6 and 7, there is shown an alternate embodiment 100 of the eddy current brake in accordance with the present invention generally including a

4

diamagnetic or non-magnetic member 102, a first support wall 104 and a second support wall 106. Walls 104, 106 are separate from one another and disposed in a spaced apart relationship upon a base or foundation 110 via leg portions 112, 114 respectively. The spaced apart relationship enables the member 102 to pass between the walls 104, 106 and because 104, 106 are not fixed with respect to one another, a distance D therebetween can be adjusted as will be hereinafter discussed in greater detail.

A first linear array 120 of permanent magnets 122, see FIG. 8, is disposed on the first on a side 124 facing the second wall 106.

A second linear array 130 of permanents (not individually shown) are disposed on the second wall 106 on a side 132 facing the first wall 104 with the first and second arrays 120, 130 being parallel with one another as shown in FIG. 10. Apparatus 140, 142 is provided for moving the walls 104, 106 and change the spaced apart relationship between the first and second walls 104, 106 in order to control, or adjust, eddy current induced in the member 102 during passage of the member 102 past and between the walls 104, 106 and magnets 120, 130 thereby adjusting the braking force between the magnets arrays 120, 130 and the member 102.

The apparatus 140, 142 may include adjusting nuts 144, 146 and bolts 148A, 148B, 150A, 150B interconnected between the walls 104, 106 and brackets 152, 154 fixed to the base 110.

Jam nuts 156, 158 prevent unwanted movement of the adjusting nuts 144, 146 and securing bolts 160, 162 extending through the base 110 and legs 112, 114 through slots 166, 168, fix the walls 104, 106 in a desired spaced apart relationship after adjustment. The exact size of the walls 104, 106, magnet arrays 120, 130, member 102 and spacing D will be dependant upon velocity and weight of a car (not shown) attached to the member 102 and may be empirically determined.

It should be appreciated that the apparatus 140, 142 may include any number of configurations for adjustment of the walls 104, 106. Such alternatives including single direction bolts, worm screws, jack screws, short in-line turn buckles, or other electrical, pneumatic, hydraulic system capable of providing the adjustment of spacing D, between the walls 104, 106. Such configurations may eliminate a need for the securing bolts 160 and 162.

Preferably, each magnet array 120, 130, as illustrated by the array 120 in FIG. 12, includes at least 1 row 170, each having individual magnets 180, 182, 184, 186. A second row 172 may include individual magnets 188, 190, 192, 194 respectively.

The magnet rows 170, 172 may be disposed in a tube, or channel 200 which may be formed of any suitable material such as aluminum, stainless steel, plastic; any number of magnets (not all shown) may be used.

The magnets 180, 194 are specifically arranged within the channel 200 with a specific magnetic field pattern. While two rows 170, 172 are shown, it should be appreciated that any suitable number of rows (not shown) may be utilized.

The channel 200 may be removably attached in any suitable manner to the wall 104. Thus, as hereinabove noted, assembly of the brake 100 is facilitated. Another advantage of the preassembly of magnets 180–186 is the is the fact that alternative magnet configurations may be easily exchanged on the wall 104 in order to tailor magnetic braking characteristics.

More particularly, a magnet 182 in a row 170 is arranged with a magnetic field (indicated by the arrow 204) which is

US 6,659,237 B1

5

6

at an angle to the magnetic fields 206, 208 of adjacent magnets 180, 184 in the row 170. A number of angular relationship between the adjacent magnets 180, 182, 184 such as, for example, 15°, 30°, 45° or 90°. When the angular relationship between adjacent magnet 180, 182, 184 is 90°, they may also be arranged with the magnetic field 104 at a 90° angle to a magnetic field 210 of the magnet 190 in the adjacent row 172.

Preferably, the magnets 180–194 are epoxied into the channel 200 and thereafter attached to the wall 104 in any suitable manner. Also, the channel 200 may be open, as shown, or closed, (not shown) and be of any suitable shape for containing the magnets. Because the magnets may be assembled in the channel 200 before installation on the wall 104, 106, assembly of the brake 100 is facilitated. In addition, change of magnetic field can be easily performed by changing of channels (not shown) having different magnet configurations therein.

The multi-row Halbach arrangement as shown in FIG. 8, can be built with no backiron. The advantage is that most of the flux is confined to the member of fin 102 area, without needing backiron as is needed in the standard eddy current brake (not shown). The flux is concentrated between the magnet array and is small above and below the magnets. Significant weight improvements result because no backiron is used.

Multiple rows 170, 172 in proper alignment permit the use of the cubic Halbach arrangement in such a way that brakes of increasing power levels can be constructed while maintaining a fixed depth of magnet.

The Halbach array can achieve higher braking forces for the equivalent volume of magnetic material of a conventional ECB. The Halbach array reduces stray magnetic field through the inactive side of the array.

With reference to the diagrams shown in FIGS. 13 and 14, apparatus 250 including links 252, 254 interconnecting the wall 104 with a foundation 258 provides for changing, controlling, or adjusting eddy current induced in the member 102, and braking force, as a function of member 102 velocity between the walls 104, 106 and arrays 120, 130. Only one wall 104 is shown in FIGS. 13, 14 for the sake of clarity.

As shown by the directional arrows 260, 262 in FIGS. 13, 14 respectively, movement of the member 102 past the wall 104 and array 120 attached thereto provides a reaction force as shown by the arrow 266 which raises the wall 104 from stops 270, 272 in order to change a transverse relationship between the wall 4 and array 120 and the member 104. This transverse movement raises 104 increasing relative penetration of 102, which increases the induced eddy currents and braking action.

Because the drag force is a function of velocity, when the walls 104 are mounted for pivoting on the links 252, 254, the wall 104 is raised a specific height based upon the drag force generated causing rotation of the links 250, 254. Thus, the penetration of the member 102 into the magnetic flux established by the arrays 120, 130 is self regulated.

When used in one orientation, as shown in FIGS. 9, 10, the member 102 having a velocity in excess in a predetermined value would generate drag forces 266 sufficient to rotate, or pivot, the wall 104 to increase member 102 penetration and subsequently generating higher drag forces to reduce the excess velocity. As the velocity falls below the level necessary to generate drag force sufficient to fully rotate the wall 104 and pivot linkages 252, 254, the wall 104 rotates back toward the default position. How far back it rotates is a self regulating function of the velocity/drag force in that instance.

Thus, the apparatus 250 can be utilized as an automatic "trim" brake actuating only when necessary and only with a force necessary to maintain the desired velocity of the member 102 and vehicle attached (not shown). Opposite linkages (not shown) would have the effect of lowering the wall 102 upon movement of the member 102 therepast, thereby having the effect of flattening the initial drag peak and providing flatter more uniform deceleration.

As diagramed in FIGS. 11 and 12, apparatus 280 including pivoting links 282, 284, 286, 288 interconnected between a foundation 290 and the walls 104, 106 enable movement of the member as indicated by the arrow 302 to pivot the links 282, 284, 286, 288 in direction indicated by the arrows 304, 306 in order to, change a distance $d_1$ between the walls 104, 106. The magnet arrays are not shown in FIGS. 11 and 12 for the sake of clarity in describing wall 104, 106 movement. Since the walls 104, 106 carry the magnet arrays 120, 130 the distance between the arrays 120, 130 is also varied. The links 282, 284, 286, 288 may include spring loaded pivots 310, 312, 314, 316 respectively in order to bias the walls 104, 106 against stops 320, 322 in a rest position.

As shown in FIG. 12, movement of the member between the walls 104, 106 decreases the distance $d_1$ to $d_2$, thus increasing the induced eddy currents and increasing a braking action. A stop 326 defines the minimum distance $d_2$ of approach between the walls 104, 106.

Similar linkage apparatus is shown in FIGS. 13 and 14 in connection with the walls 104, 106 and member 102. In this instance, links 342, 344, 346, 348 are interconnected so that movement indicated by the arrow 360 of the member 102 causes a spread or widening as indicated by the arrows 364, 366 of the walls 104, 106. Stops 370, 372, 376 limit the movement of the walls 104, 106 in a manner similar to that described in connection with the apparatus 280 shown in FIGS. 11, 12.

Spring loaded pivots keep the walls 104, 106 initially biased against the stop 376. This configuration lowers the magnetic coupling due to movement of the member 102 between the walls 104, 106 and, as hereinabove noted, has the effect of flattening the initial drag peak and provide a flatter more uniform deceleration. It should be appreciated that other means of opening and closing arrays and lowering the walls 104, 106 may be utilized which can include other mechanical, pneumatic, hydraulic or other components (not shown) to provide the same function.

Although there has been hereinabove described an eddy current braking apparatus in accordance with the present invention for the purpose of illustrating the manner in which the invention may be used to advantage, it will be appreciated that invention is not limited thereto. Accordingly, all modifications, variations or equivalent arrangements which may occur to those skilled in the art should be considered to be within the scope of the invention as defined in the appended claims.

What is claimed is:

1. An eddy current brake comprising:

a diamagnetic or non-magnetic member;

a first support wall;

a separate second support wall disposed in a spaced apart relationship with said first support wall for enabling the member to pass therebetween;

a first linear array of permanent magnets disposed on the first wall on a side of the first wall facing the second wall;

a second linear array of permanent magnets disposed on the second wall on a side of the second wall facing the

US 6,659,237 B1

7

first wall, the first and second arrays being parallel with one another; and

apparatus for adjusting eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays, said apparatus including linkages for enabling movement of the member therepast to change the spaced apart relationship between the first and second walls.

2. Eddy current braking apparatus comprising:

a diamagnetic or non-magnetic member;

a linear array of permanent magnets including a channel and a plurality of magnets disposed therein, the magnets being arranged within said channel in two adjacent rows, each magnet in each row being arranged with a magnetic field at a 90° angle to another adjacent magnets in each row along the channel, each magnet in each row also being arranged with a magnetic field at an angle to another adjacent magnet in the adjacent row; and,

means, mounting the linear array with respect to the member, for enabling passage past one another at a distance sufficient to cause eddy currents to be induced in the member resulting in a braking force between the linear array and the member.

3. The brake according to claim 2 further comprising a second linear array of permanent magnets including a second channel and a plurality of magnets disposed therein, the magnets being arranged within said second channel in two adjacent rows, each magnet in each row being arranged with a magnetic field at a 90° angle to adjacent magnets in each row along said second channel, each magnet in each row also being arranged with a magnetic field at a 90° angle to another adjacent magnet in the adjacent row; and

means, mounting the second linear array with respect to the member, for enabling passage past one another at a distance sufficient to cause eddy currents to be induced in the member resulting in a braking force between the linear array and the member.

4. The brake according to claim 3 further comprising a first support wall for, supporting the linear array, and second wall for supporting the second linear array and apparatus for moving at least one of the first and second walls in order to

8

control the eddy current induced in the member during passage of the member therepast to adjust braking force between the magnets and the member.

5. The brake according to claim 4 wherein the apparatus includes means for moving at least one of the first and second walls in a direction perpendicular to the member.

6. The brake according to claim 4 wherein the apparatus includes means for moving at least one of the first and second walls in a direction parallel to the member.

7. The brake according to claim 3 further comprising a first support wall for supporting the linear array, a second wall, disposed in a spaced apart relationship with said first support wall, for supporting the second linear array and apparatus for changing the spaced apart relationship between the first and second walls in order to adjust eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays.

8. The brake according to claim 7 wherein the apparatus for adjusting eddy current includes a linkage mounting at least one of the first and second walls to a fixed foundation, for enabling movement of the member therepast to change a distance between at least one of the first and second walls and the member.

9. The brake according to claim 7 wherein the apparatus for adjusting eddy current includes linkages, mounting the first and second walls to a fixed foundation, for enabling movement of the member therepast to change the spaced apart relationship between the first and second walls.

10. An eddy current brake comprising:

a diamagnetic or non-magnetic member;

a first linear array of permanent magnets;

a second linear array of permanent magnets disposed in a spaced apart relationship with said first linear array for enabling the member to pass therebetween, the first and second arrays being parallel with one another; and

apparatus for adjusting eddy current induced in the member, and braking force, as a function of velocity of the member between the arrays, said apparatus including linkages for enabling movement of the member therepast to change the spaced apart relationship between the first and second arrays.

* * * * *

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAFETY BRAKING CORPORATION, MAGNETAR TECHNOLOGIES CORP., and G&T CONVEYOR CO., <br><br> Plaintiffs, <br><br> v. <br><br> SIX FLAGS THEME PARKS INC., TIERCO MARYLAND, INC., GREAT AMERICA LLC, KKI, LLC, MAGIC MOUNTAIN LLC, PARK MANAGEMENT CORP., RIVERSIDE PARK ENTERPRISES, INC., SIX FLAGS OVER GEORGIA II, L.P., SIX FLAGS ST. LOUIS LLC, TEXAS FLAGS, LTD., ASTROWORLD, L.P., DARIEN LAKE THEME PARK AND CAMPING RESORT, INC., ELITCH GARDENS, L.P., BUSCH ENTERTAINMENT CORP., CEDAR FAIR LP, PARAMOUNT PARKS, INC., KNOTT'S BERRY FARM, KINGS ISLAND COMPANY, CEDAR FAIR, UNIVERSAL CITY DEVELOPMENT PARTNERS LTD., UNIVERSAL CITY STUDIOS LLLP, <br><br> Defendants. | Civil Action No. 07-127-*** |

---

**PLAINTIFFS' REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the District of Delaware presents its compliments to the judicial authorities of Switzerland and requests assistance in obtaining evidence to be used in civil proceedings before this Court.

The request is made pursuant to, and in conformity with, Chapter I of the *Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* ("the Hague Convention"), to which both the United States and the Swiss

1

Confederation are parties, the Regulation on Judicial Assistance in Civil Matters (ZRHO) and Rules 28 and 30 of the United States Federal Rules of Civil Procedure.

Specifically, this Court requests assistance in compelling testimony and documents from a witness located in the canton of Valais in relation to the above-named action. The Court asserts that the evidence sought is directly relevant and necessary to the issues in dispute. This Request fully complies with Swiss reservations under the Hague Evidence Convention. Trial in this action is scheduled to commence on February 2, 2009.

The particulars of this Hague Evidence Request are as follow:

| | | |
|---|---|---|
| *1.* | *Sender* | Hon. Mary Pat Thynge<br>United States Magistrate Judge<br>United States District Court for the<br>District of Delaware<br>844 N. King Street, Room 6100<br>Wilmington, DE 19801<br>U.S.A.<br><br>*(CIV NO. 07-127-\*\*\*)* |
| *2.* | *Central Authority of the Requested State:* | The Federal Justice and Police  Department<br>International Judicial and Extrajudicial<br>Assistance<br>Bundesrain 20<br>3003 Bern<br>Switzerland<br>Tel: 011-41-31-322-4310<br>Fax: 011-41-31-322-5380 |
| *3.* | *Person to whom the executed request is to be returned* | *Plaintiffs' U.S. Legal Representative:*<br><br>Francis DiGiovanni<br>Connolly Bove Lodge & Hutz LLP<br>The Nemours Building<br>1007 North Orange Street<br>P.O. Box 2207<br>Wilmington, DE 19899<br>U.S.A. |

*On behalf of:*
Hon. Mary Pat Thynge
United States Magistrate Judge
United States District Court for the
District of Delaware
844 N. King Street, Room 6100
Wilmington, DE 19801
U.S.A.

**4.    *In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following request:***

**5.    *Requesting judicial authority:***    Hon. Mary Pat Thynge
United States Magistrate Judge
United States District Court for the
District of Delaware
844 N. King Street, Room 6100
Wilmington, DE 19801
U.S.A.

**      *To the competent authority of:***    The Swiss Confederation

**6.    *Names and addresses of the parties and their representatives:***

**      a.    *Plaintiffs***    **SAFETY BRAKING CORPORATION**, a
Delaware corporation with offices in
California;

**MAGNETAR TECHNOLOGIES
CORPORATION**, a Nevada corporation
with offices in California;

**G&T CONVEYOR COMPANY,** a Florida
corporation with offices in Florida and
Texas;

***Plaintiffs' U.S. Legal Representatives:***

Francis DiGiovanni, Esq.
Geoffrey A. Zelley, Esq.
CONNOLLY BOVE LODGE & HUTZ
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

3

U.S.A.
Tel: 1.302.658.9141
Fax: 1.302.658.5614
Email: fdigiovanni@cblh.com
Email: gzelley@cblh.com

Scott Miller, Esq.
CONNOLLY BOVE LODGE & HUTZ
333 S. Grand Avenue
Suite 2300
Los Angeles, CA 90071
U.S.A.
Tel: 1.213.787.2500
Fax: 1.213.687.0498
Email: smiller@cblh.com

*b.    Defendants*    **SIX FLAGS THEME PARKS, INC.,** a Delaware corporation with offices in New York;

**TIERCO MARYLAND, INC.** a Delaware corporation;

**GREAT AMERICA LLC**, an Illinois company;

**KKI, LLC,** a Delaware company;

**MAGIC MOUNTAIN LLC,** a California company;

**PARK MANAGEMENT CORP.,** a California company;

**RIVERSIDE PARK ENTERPRISES,** a Massachusetts company;

**SIX FLAGS OVER GEORGIA II, L.P.,** a Delaware partnership;

**SIX FLAGS ST. LOUIS LLC,** a Missouri company;

**TEXAS FLAGS, LTD.,** a Texas partnership;

**ASTROWORLD, L.P.,** a Delaware partnership;

**DARIEN LAKE THEME PARK AND CAMPING RESORT INC.,** a New York corporation;

**ELITCH GARDENS, L.P.,** a Colorado partnership;

**CEDAR FAIR LP,** a Delaware partnership;

**PARAMOUNT PARKS, INC.,** a Delaware corporation;

**KNOTT'S BERRY FARM,** a California partnership;

**KINGS ISLAND COMPANY**, a Delaware company;

**CEDAR FAIR,** an Ohio partnership;

**UNIVERSAL CITY DEVELOPMENT PARTNERS LTD.,** a Florida partnership;

**UNIVERSAL CITY STUDIOS LLLP,** a Delaware partnership;

***Above-named Defendants' U.S. Legal Representatives:***

William F. Lee, Esq.
James B. Lampert, Esq.
Donald R. Steinberg, Esq.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
U.S.A.
Tel: +1.617.526.6000
Fax: +1.617.526.5000
Email: william.lee@wilmerhale.com
Email: james.lampert@wilmerhale.com
Email: don.steinberg@wilmerhale.com

David B. Bassett, Esq.
Amr O. Aly, Esq.
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, NY 10022
U.S.A.
Tel: +1.212.230.8800
Fax: +1.212.230.8888
Email: david.bassett@wilmerhale.com
Email: amr.aly@wilmerhale.com

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT AND
TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Tel: +1.302.658.9200
Fax: +1.302.658.3989
Email: jblumenfeld@mnat.com
Email: rsmith@mnat.com

**BUSCH ENTERTAINMENT CORP.**, a
Delaware corporation;

***Above-named Defendant's U.S. Legal
Representatives:***

Paul V. Storm, Esq.
Christopher J. Kling, Esq.
Terrell R. Miller, Esq.
Storm LLP
901 Main Street
Suite 7100
Dallas, TX 75202
U.S.A.
Tel: +1.214.347.4700
Fax: +1.214.347.4799
Email: paulstorm@alliplaw.com
Email: chriskling@alliplaw.com
Email: terrellmiller@alliplaw.com

Richard L. Horwitz
David E. Moore

6

POTTER ANDERSON AND CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
U.S.A.
Tel: +1.302.984.6000
Fax: +1.302.658.1192
Email: rhorwitz@potteranderson.com
Email: dmoore@potteranderson.com

**7.    *Nature and purpose of the proceedings and summary of the facts:***

<u>**PARTIES**</u>

Plaintiff/Counterdefendant Safety Braking Company ("Safety Braking") is a corporation organized and existing under the laws of Delaware, with a place of business in California. Plaintiff/Counterdefendant Magnetar Technologies Corporation ("Magnetar") is a Nevada corporation with a place of business in California. Plaintiff/Counterdefendant G&T Conveyor Co. ("G&T") is a Florida corporation with a place of business in Florida. Plaintiffs Safety Braking, Magnetar, and G&T are collectively referred to herein as "Plaintiffs."

Defendant/Counterclaimant Six Flags Theme Parks, Inc. ("SFTP") is a corporation organized and existing under the laws of Delaware. Defendant/Counterclaimant Tierco Maryland, Inc. ("Tierco") is a corporation organized and existing under the laws of Delaware. Defendant/Counterclaimant Great America LLC ("Great America"), is a company organized and existing under the laws of Illinois. Defendant/Counterclaimant KKI, LLC ("KKI") is a company organized and existing under the laws of Delaware. Defendant/Counterclaimant Magic Mountain LLC ("Magic Mountain") is a company organized and existing under the laws of the state of California. Defendant/Counterclaimant Park Management Corporation ("PMC") is a corporation

7

organized and existing under the laws of the state of California.

Defendant/Counterclaimant Riverside Park Enterprises ("Riverside") is a company

organized and existing under the laws of the commonwealth of Massachusetts.

Defendant/Counterclaimant Six Flags Over Georgia II, L.P. ("SFOG") is a partnership

organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimant Six Flags St. Louis LLC ("SFSL") is a company organized

and existing under the laws of the state of Missouri.  Defendant/Counterclaimant Texas

Flags, Ltd. ("Texas Flags"), is a partnership organized and existing under the laws of the

state of Texas.  Defendant/Counterclaimant Astroworld, L.P. ("Astroworld") is a

partnership organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimant Darien Lake Theme Park and Camping Resort, Inc. ("Darien

Lake") is a corporation organized and existing under the laws of the state of New York.

Defendant/Counterclaimant Elitch Gardens, L.P. ("Elitch Gardens") is a partnership

organized and existing under the laws of the state of Colorado.

Defendant/Counterclaimants SFTP, Tierco, Great America, KKI, Magic Mountain, PMC,

Riverside, SFOG, SFSL, Texas Flags, Astroworld, Darien Lake, and Elitch Gardens are

collectively referred to herein as "Six Flags."

       Defendant/Counterclaimant Cedar Fair LP ("CFLP") is a partnership organized

and existing under the laws of the state of Delaware.  Defendant/Counterclaimant

Paramount Parks, Inc. ("Paramount") is a corporation organized and existing under the

laws of the state of Delaware.  Knott's Berry Farm ("Knott's") is a partnership organized

and existing under the laws of the state of California.  Defendant/Counterclaimant Kings

Island Company ("Kings") is a corporation organized and existing under the laws of the

state of Delaware.  Defendant/Counterclaimant Cedar Fair ("CF") is a partnership

organized and existing under the laws of the state of Ohio.  Defendant/Counterclaimants

CFLP, Paramount, Knott's, Kings, and CF are collectively referred to herein as "Cedar

Fair."

Defendant/Counterclaimant Universal City Development Partners Ltd. ("UCDP")

is a partnership organized and existing under the laws of the state of Florida.

Defendant/Counterclaimant Universal City Studios LLLP ("UCS") is a partnership

organized and existing under the laws of the state of Delaware.

Defendant/Counterclaimants UCDP and UCS are collectively referred to herein as

"Universal."  Defendant/Counterclaimant Busch Entertainment Corp. ("Busch") is a

corporation organized and existing under the laws of the state of Delaware.

## ALLEGATIONS IN THE COMPLAINT

Plaintiffs initiated a civil lawsuit in the United States District Court for the

District of Delaware against Defendants Six Flags, Cedar Fair, Universal, and Busch on

March 1, 2007, pursuant to the Patent Laws of the United States, 25 U.S.C. § 1 *et seq.*

Plaintiffs allege that Defendants Six Flags, Cedar Fair, Universal, and Busch have

infringed, and continue to infringe, United States Patent Number 5,277,125 ("the '125

patent") (*Annex C*; Exhibit 1) through Defendants' use for commercial purposes roller

coasters and other amusement devices incorporating all of the limitations of at least one

claim within the '125 patent.  Plaintiffs further allege that Defendants Universal and

Cedar Fair have infringed, and continue to infringe, United States Patent Number

6,659,237 ("the '237 patent") (*Annex C*; Exhibit 2) through Universal and Cedar Fair's

use for commercial purposes roller coasters and other amusement devices incorporating all of the limitations of at least one claim of the '237 patent.

Plaintiffs seek a judgment that Defendants Six Flags, Cedar Fair, Universal, and Busch have infringed the '125 patent and that the infringement was deliberate and willful; that Defendants be permanently enjoined from making, using, selling, or importing within the United States all devices incorporating all of the limitations of at least one claim within the '125 patent; for damages; reasonable attorneys fees, and such other relief as the Court deems proper. Plaintiffs further seek a judgment that Defendants Cedar Fair and Universal have infringed the '237 patent and that the infringement was deliberate and willful; that Defendants Cedar Fair and Universal be permanently enjoined from making, using, selling, or importing within the United States all devices incorporating all of the limitations of at least one claim within the '237 patent; for damages; reasonable attorneys fees, and such other relief as the Court deems proper.

## SIX FLAGS, CEDAR FAIR, AND UNIVERSAL'S DEFENSES AND COUNTERCLAIMS

In their Answer and Counterclaims, the Defendants denied that any devices used by Six Flags, Cedar Fair, or Universal infringe the '125 patent and assert that the '125 patent is invalid and unenforceable. The Cedar Fair and Universal Defendants denied that any devices used by Cedar Fair infringe the '237 patent and assert that the '237 patent is invalid and unenforceable. Defendants Six Flags, Cedar Fair, and Universal asserted several affirmative defenses, including equitable estoppel, laches, implied or actual contract, incorrect inventorship, and others.

As Counterclaims, Six Flags, Cedar Fair, and Universal sought dismissal of the Complaint of Plaintiffs; declaration of invalidity for the '125 patent and the '237 patent. Defendants Six Flags, Cedar Fair, and Universal seek a judgment that the '125 patent is invalid and unenforceable; that the '237 patent is invalid and unenforceable; declaration that Defendants Six Flags, Cedar Fair, and Universal have not infringed the '125 patent; declaration that Defendants Cedar Fair and Universal have not infringed the '237 patent; awarding Defendants their costs, including expert fees; and whatever other relief the Court may deem just.

## BUSCH'S DEFENSES AND COUNTERCLAIMS

In their Answer and Counterclaims, Busch denied that any devices it used infringed the '125 patent. By way of affirmative defenses, Busch claimed non-infringement of the '125 patent, estoppel based on the prosecution of the '125 patent, failure to mark devices produced with the patent number, invalidity of the '125 patent, laches, and lack of subject matter jurisdiction and/or standing. By way of counterclaims, Busch alleged that that Plaintiffs/Counterclaim Defendants failed to name proper inventors in the '125 patent. Busch seeks for its counterclaims: declaration of invalidity for the '125 patent; declaration of non-infringement of the '125 patent by Busch; declaration that Kwangho Chung should have been named as an inventor of the '125 patent; declaration that Busch owns an interest in the '125 patent; denial of Plaintiffs' requests; attorneys' fees; any other relief the Court deems just.

## STAGE OF THE PROCEEDINGS

Plaintiffs Safety Braking, Magnetar, and G&T commenced this action on March 1, 2007 when they filed their original Complaint. A First Amended Complaint was filed

by Plaintiffs on August 9, 2007, naming additional Defendants (named above), and dismissing other Defendants (not named above).  Defendants Cedar Fair, Six Flags, and Universal filed their Answer and Counterclaims to that Complaint on August 23, 2007. Defendant Busch separately filed its Answer and Counterclaims on August 23, 2007. Responses to written interrogatories and requests for production of documents have been served by the parties.  Trial is scheduled to commence on February 2, 2009.

## THE WITNESS

The witness from whom testimony and documents are sought is Walter Bolliger, a Swiss resident, and President of Bolliger & Mabillard Consulting Engineers, Inc. ("B&M").  B&M is a Swiss company that designs, sells, manufactures, and installs amusement rides around the world.  Among those rides are several rides operated by Defendants that are believed to infringe either the '125 patent or the '237 patent.  Among those rides are Goliath at Six Flags Over Georgia; Sheikra at Busch Gardens Africa in Florida; Griffon at Busch Gardens Europe in Virginia; Silver Bullet at Knott's Berry Farm; Patriot at Worlds of Fun; Nitro at Six Flags Great Adventure.

Should Walter Bolliger be unable to furnish the information sought in this request, or should he be unable to attend and give his testimony, B&M may name anyone knowledgeable about the requested subject matter to speak in his place, subject to the agreement of the parties in this litigation.

## RELEVANCE OF THE EVIDENCE SOUGHT

Plaintiffs in this case have alleged infringement of the '125 patent and the '237 patent by the Defendants named above.  Both patents claim the technology used in certain applications of eddy currents for the purposes of stopping a car mounted on a rail.

It is alleged that Defendants infringe one or more of the patents by way of operating for profit amusement rides incorporating eddy current brakes containing all limitations present in particular claims of the '125 patent and the '237 patent.

As manufacturer of several of the alleged infringing devices, it is expected that B&M would have within its possession documents and information regarding the technical specifications of the braking systems used in those amusement devices. Any documents would include, but not be limited to, technical or design drawings, project summaries, plans, notes, purchase agreements, documents relating to contractual negotiations as well as finalized contracts, installation plans, manufacturing plans, budgets, and research and design documentation. All of these documents may be necessary for Plaintiffs to be able to prove infringement of the '125 patent or the '237 patent by one or more devices operated by Defendants and designed and manufactured by B&M.

Plaintiffs assert that facts within the possession of Walter Bolliger, or whomever else may be designated by B&M at the approval of parties to this litigation, will establish that one or more amusement rides designed, manufactured, and sold by B&M and operated by one or more Defendant in this litigation contained all of the claim limitations for particular claims of the '125 patent and/or the '237 patent. The District Court asserts that the facts surrounding B&M's design and manufacturing of particular amusement rides are essential to Plaintiffs' ability to fully set forth their claims and defenses at trial. Justice cannot be completely served without Walter Bolliger's testimony (or the testimony of someone appointed by B&M competent to provide information in the stated areas, at the agreement of all parties to the litigation).

8.    *Evidence to be obtained or other judicial act to be performed:*

The District Court seeks both oral testimony and document production from the witness.  The District Court further requests that the documents produced by the witness be made available for inspection and copying by the parties at least two weeks prior to the oral examination so that counsel may have an opportunity to supplement the questions to be put to the witness based on information disclosed in the documents.

For the reasons set forth above, the District Court believes that the witness will be able to provide evidence directly relevant to the main issues between the parties and without which the ends of justice could not be properly met.  The District Court believes that this evidence is not available from any other source.

Questions to be put to Walter Bolliger are listed as *Annex A*.  Documents sought for production are listed as *Annex B*.  Documents supporting this Request and for use during the witness examination are attached as *Annex C*.

| | | |
|---|---|---|
| 9. | *Identities and addresses of persons to be examined:* | Walter Bolliger c/o Bolliger & Mabillard Consulting Engineers, Inc. Chemin des Dailles 31 CH-1870 Monthey Switzerland |
| 10. | *Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined:* | Please see attached list (*Annex A)*. |
| 11. | *Documents or other property to be inspected:* | Please see attached list (*Annex B*). |
| 12. | *Any requirement that the evidence be given on oath or affirmation and any specific form to be used:* | The witness should be examined under oath or affirmation, or in the alternative, should be instructed of the consequences for the giving of untruthful and false answers under the laws of Switzerland. |

**13.    *Special methods or procedure to be followed:***

The District Court requests

(1)    that the parties' representatives or their designees, interpreters, and a U.S. verbatim court reporter as well as a Swiss stenographer be permitted to attend and participate in the examination;

(2)    that the parties' legal representatives or their designees be permitted to submit additional questions to the witness following responses to the questions attached hereto in *Annex A*;

(3)    that the interpreters be permitted to assist with the witness examination, at Plaintiffs' expense;

(4)    that a U.S. court reporter be permitted to record verbatim the witness examination at Plaintiffs' expense; and

(5)    that the Swiss court ensure that any documents produced are authenticated in accordance with its normal practice and procedures.

The District Court additionally requests that the confidentiality of any evidence produced as a result of this Request be maintained pursuant to the laws of Switzerland. Finally, in conformity with Article 7 of the Hague Evidence Convention, the U.S. District Court requests that the Plaintiffs' designee in the United States, Connolly Bove Lodge & Hutz LLP (see contact information above), be advised of the date and location of the Swiss hearing to execute this Request.  Connolly Bove Lodge & Hutz LLP may also be contacted if the Swiss authorities require clarification with respect to any aspect of this Request.

**14.    *Request for notification of the times*** It is requested that testimony be taken at

|  |  | such place, date or time as ordered by the Swiss Court or as otherwise agreed to by the witness and the respective representatives of the Parties. |
|---|---|---|

*and place for the execution of the Request and identity of the person to be notified:*

such place, date or time as ordered by the Swiss Court or as otherwise agreed to by the witness and the respective representatives of the Parties.

When the time and place for execution of This request is ordered by the Swiss Court, It is requested that you provide notice Thereof to:

*Plaintiffs' U.S. designee:*

Francis DiGiovanni
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange St.
PO Box 2207
Wilmington, DE 19899
U.S.A.
Tel: +1.302.658.9141
Fax: +1.302.658.5614
Email: fdigiovanni@cblh.com

**16.**    *Specification of privilege or duty to refuse to give evidence under the laws of the State of origin:*

The witness may refuse to answer any question propounded pursuant to Section 13 above if such answer (1) would subject the witness to a real and appreciable danger of criminal liability in the United States, or (2) would disclose a confidential communication between the witness and his attorney.

**17.**    *The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be Borne by:*

Plaintiff Safety Braking Corporation

*c/o Plaintiffs' legal representative:*

Francis DiGiovanni, Esq.
Geoffrey A. Zelley, Esq.
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange St.
P.O. Box 2207
Wilmington, DE 19899
U.S.A.
Tel: +1.302.658.9141

16

Fax: +1.302.658.5614
Email: fdigiovanni@cblh.com
Email: gzelley@cblh.com

Scott R. Miller, Esq.
CONNOLLY BOVE LODGE & HUTZ
LLP
333 S. Grand Ave.
Suite 2300
Los Angeles, CA 90071
U.S.A.
Tel: +1.213.787.2500
Fax: +1.213.687.0498
Email: smiller@cblh.com

**18.    *Date of Request:***      _____

**19.    *Signature and seal of the Requesting***
    ***Authority:***      _____
          Hon. Mary Pat Thynge
          United States Magistrate Judge
          United States District Court for the
          District of Delaware
          844 N. King Street, Room 6100
          Wilmington, DE 19801
          U.S.A.

*Annex A*:  Questions to be put to Walter Bolliger (in English and in German)
*Annex B*:  Documents Sought for Production (in English and in German)
*Annex C:*  Documents to be Used During Witness Examination/Documents Supporting this Request (in English and German)

*ANNEX A*
*Questions to be put to Walter Bolliger*

**Background Statement regarding questions to be put to the witness:**

Plaintiffs assert that several amusement rides designed and manufactured by

B&M, and operated by Defendants, infringe at least one claim of the '125 patent and the

'237 patent, as listed in the Request, item 7.  Each of these rides, it is alleged, contain all

of the limitations of at least one claim in the '125 patent and/or the '237 patent.  Walter

Bolliger is the President of B&M, and as such, it is believed that he has direct knowledge,

or at least has the ability to obtain direct knowledge, of the technical specifications of

each of these rides, as well as their purchase prices and any contractual negotiations with

Defendants.  The testimony of Walter Bolliger may be necessary for the Plaintiffs to

prove infringement of the '125 patent and/or the '237 patent by the Defendants.

**Questions to establish background and foundational information regarding witness:**

1.  Please state your full name

2.  Please state your home address.

3.  Please state your date of birth.

4.  Are you currently employed by B&M?

5.  Please state B&M's address.

6.  How long have you been employed by B&M?

7.  What positions or titles have you held at B&M?

8.  Please state your job responsibilities for each position or title held at B&M.

9.  In what group or department within B&M did you hold each position?

10. During what time period did you hold each position?

11. As President of B&M, what are your duties?

12. Do you have knowledge of all roller coasters or other amusement rides designed and manufactured by B&M?

 

    *a.* ***Questions to establish knowledge of rides designed and manufactured by B&M, currently operated by Defendants:***

13. Do you have knowledge of a ride by the name of Goliath at Six Flags Over Georgia?

14. Did B&M design Goliath?

15. Did B&M manufacture Goliath?

16. Did B&M install Goliath?

17. Did B&M sell Goliath?

18. To whom was Goliath sold?

19. When did B&M begin design of Goliath?

20. When was Goliath manufactured?

21. When was Goliath sold?

22. When was Goliath installed?

23. What was the total contract cost for Goliath?

24. What portion of that cost was allocated to braking systems?

25. Does Goliath contain braking systems designed to slow the ride?

26. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

27. Are those permanent magnets in opposed arrays?

28. Is there a conductive metallic fin that extends from the cars of Goliath?

29. Where is that conductive metallic fin located on the car?

30. Where are those permanent magnets located in relation to the tracks of the ride?

31. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

32. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

33. Do these eddy currents create a braking force on the ride?

34. Does the ride contain cars?

35. Do the cars sit on parallel rails?

36. Do the cars have wheels?

37. Do the wheels allow the cars to roll on the rails?

38. Do you have knowledge of a ride by the name of Sheikra at Busch Gardens Africa in Florida?

39. Did B&M design Sheikra?

40. Did B&M manufacture Sheikra?

41. Did B&M install Sheikra?

42. Did B&M sell Sheikra?

43. To whom was Sheikra sold?

44. When did B&M begin design of Sheikra?

45. When was Sheikra manufactured?

46. When was Sheikra sold?

47. When was Superman Sheikra installed?

48. What was the total contract cost for Sheikra?

49. What portion of that cost was allocated to braking systems?

50. Does Sheikra contain braking systems designed to slow the ride?

51. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

52. Are those permanent magnets in opposed arrays?

53. Is there a conductive metallic fin that extends from the cars of Sheikra?

54. Where is that conductive metallic fin located on the car?

55. Where are those permanent magnets located in relation to the tracks of the ride?

56. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

57. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

58. Do these eddy currents create a braking force on the ride?

59. Does the ride contain cars?

60. Do the cars sit on parallel rails?

61. Do the cars have wheels?

62. Do the wheels allow the cars to roll on the rails?

63. Do you have knowledge of a ride by the name of Griffon at Busch Gardens Europe in Virginia?

64. Did B&M design Griffon?

65. Did B&M manufacture Griffon?

66. Did B&M install Griffon?

67. Did B&M sell Griffon?

68. To whom was Griffon sold?

69. When did B&M begin design of Griffon?

70. When was Griffon manufactured?

71. When was Griffon sold?

72. When was Griffon installed?

73. What was the total contract cost for Griffon?

74. What portion of that cost was allocated to braking systems?

75. Does Griffon contain braking systems designed to slow the ride?

76. Do any of those braking systems impart braking on the ride through the use of permanent magnets?

77. Are those permanent magnets in opposed arrays?

78. Is there a conductive metallic fin that extends from the cars of Griffon?

79. Where is that conductive metallic fin located on the car?

80. Where are those permanent magnets located in relation to the tracks of the ride?

81. When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

82. Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

83. Do these eddy currents create a braking force on the ride?

84. Does the ride contain cars?

85. Do the cars sit on parallel rails?

86. Do the cars have wheels?

87. Do the wheels allow the cars to roll on the rails?

88. Do you have knowledge of a ride by the name of Silver Bullet at Knott's Berry Farm?

89. Did B&M design Silver Bullet?

90. Did B&M manufacture Silver Bullet?

91. Did B&M install Silver Bullet?

92. Did B&M sell Silver Bullet?

93. To whom was Silver Bullet sold?

94. When did B&M begin design of Silver Bullet?

95. When was Silver Bullet manufactured?

96. When was Silver Bullet sold?

97. When was Silver Bullet installed?

98. What was the total contract cost for Silver Bullet?

99. What portion of that cost was allocated to braking systems?

100.    Does Silver Bullet contain braking systems designed to slow the ride?

101.    Do any of those braking systems impart braking on the ride through the use of permanent magnets?

102.    Are those permanent magnets in opposed arrays?

103.    Is there a conductive metallic fin that extends from the cars of

Silver Bullet?

104.    Where is that conductive metallic fin located on the car?

105.    Where are those permanent magnets located in relation to the

tracks of the ride?

106.    When the ride passes over the magnets, does the conductive

metallic fin pass between the arrays of magnets?

107.    Does the movement of the conductive metallic fin through the

arrays of magnets produce eddy currents?

108.    Do these eddy currents create a braking force on the ride?

109.    Does the ride contain cars?

110.    Do the cars sit on parallel rails?

111.    Do the cars have wheels?

112.    Do the wheels allow the cars to roll on the rails?

113.    Do you have knowledge of a ride by the name of Patriot at Worlds

of Fun?

114.    Did B&M design Patriot?

115.    Did B&M manufacture Patriot?

116.    Did B&M install Patriot?

117.    Did B&M sell Patriot?

118.    To whom was Patriot sold?

119.    When did B&M begin design of Patriot?

120.    When was Patriot manufactured?

121.     When was Patriot sold?

122.     When was Patriot installed?

123.     What was the total contract cost for Patriot?

124.     What portion of that cost was allocated to braking systems?

125.     Does Patriot contain braking systems designed to slow the ride?

126.     Do any of those braking systems impart braking on the ride through the use of permanent magnets?

127.     Are those permanent magnets in opposed arrays?

128.     Is there a conductive metallic fin that extends from the cars of Patriot?

129.     Where is that conductive metallic fin located on the car?

130.     Where are those permanent magnets located in relation to the tracks of the ride?

131.     When the ride passes over the magnets, does the conductive metallic fin pass between the arrays of magnets?

132.     Does the movement of the conductive metallic fin through the arrays of magnets produce eddy currents?

133.     Do these eddy currents create a braking force on the ride?

134.     Does the ride contain cars?

135.     Do the cars sit on parallel rails?

136.     Do the cars have wheels?

137.     Do the wheels allow the cars to roll on the rails?

138.     Do you have knowledge of a ride by the name of Nitro at Six Flags

Great Adventure?

139.     Did B&M design Nitro?

140.     Did B&M manufacture Nitro?

141.     Did B&M install Nitro?

142.     Did B&M sell Nitro?

143.     To whom was Nitro sold?

144.     When did B&M begin design of Nitro?

145.     When was Nitro manufactured?

146.     When was Nitro sold?

147.     When was Nitro installed?

148.     What was the total contract cost for Nitro?

149.     What portion of that cost was allocated to braking systems?

150.     Does Nitro contain braking systems designed to slow the ride?

151.     Do any of those braking systems impart braking on the ride

through the use of permanent magnets?

152.     Are those permanent magnets in opposed arrays?

153.     Is there a conductive metallic fin that extends from the cars of

Nitro?

154.     Where is that conductive metallic fin located on the car?

155.     Where are those permanent magnets located in relation to the

tracks of the ride?

156.    When the ride passes over the magnets, does the conductive

metallic fin pass between the arrays of magnets?

157.    Does the movement of the conductive metallic fin through the

arrays of magnets produce eddy currents?

158.    Do these eddy currents create a braking force on the ride?

159.    Does the ride contain cars?

160.    Do the cars sit on parallel rails?

161.    Do the cars have wheels?

162.    Do the wheels allow the cars to roll on the rails?

### *ANNEX B*
*Documents Sought for Production*

The District Court requests that Walter Bolliger produce the following documents in his possession, custody, or control and that they be made available for inspection and copying at least two weeks prior to Walter Bolliger's oral examination.  The rides mentioned are those listed in the Letter of Request, in the section entitled "The Witness."

1. All technical drawings, specifications, discussions, and all other documents indicating the nature of the braking systems installed on the above-listed amusement rides.

2. All technical drawings, specifications, discussions, and all other documents indicating the nature of the above-listed amusement rides, indicating the relationship of the track to the car.

3. All contracts and documents evidencing discussions between B&M and the purchaser of each of the above-listed amusement rides that indicate costs and terms of purchase of each of the above-listed amusement rides.

4. All documents indicating the design, manufacture, and installation of above-listed amusement rides.

5. All contracts setting forth a royalty rate or fee for use of magnetic braking technology.

6. All contracts setting forth a royalty rate or fee for use of amusement ride technology.