**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MAGNETAR TECHNOLOGIES       :
CORP. et al,                :
                            :
            Plaintiff,      :
      v.                    :   C. A. No. 07-127-LPS-MPT
                            :
                            :
SIX FLAGS THEME PARK        :
INC. et al,                 :
                            :
            Defendant.      :

## MEMORANDUM ORDER

## I. INTRODUCTION

On March 1, 2007, plaintiffs Safety Breaking Corporation ("SBC"), Magnetar

Technologies Corporation ("Magnetar") and G&T Conveyor Corporation ("G&T") filed

this action against defendants, a series of amusement park owners and operators ("Six

Flags"),[1] for patent infringement.[2]  The patent at issue, U.S. Patent No. 5,277,125 ("'125

patent"), was originally assigned to BAE Automated Systems ("BAE").[3]  G&T acquired

the assets of BAE in 2001.[4]  Magnetar received an exclusive license under the '125

patent from G&T for certain fields of use.[5]

In 2006, Magnetar and G&T licensed the '125 patent to Acacia Research Group

---

[1] There are over twenty amusement park owners and operators named as
defendants in this patent infringement suit.  These defendants will collectively be
referred to as "Six Flags" throughout this opinion.
[2] D.I. 1.
[3] D.I. 280 at 1.
[4] *Id.*
[5] *Id.*

1

LLC ("Acacia").[6]  Acacia and its subsidiaries acquire and assert patents through patent litigation.[7]  According to the Exclusive License Agreement ("Agreement") between Acacia, Magnetar and G&T, Acacia has control over the enforcement, litigation and settlement of patents and licenses.[8]  Following the Agreement, Acacia formed SBC as a special purpose entity to hold and enforce the patents.[9]  SBC was made the exclusive licensee of the '125 patent for such fields of use and has the right to sue for patent infringement.[10]  SBC retained Connolly Bove Lodge & Hutz ("Connolly Bove") to represent it in this patent infringement action.[11]  According to the Agreement, Connolly Bove also represented Magnetar and G&T, as well as Acacia.[12]

After the case was filed, Geoffrey Zelley ("Zelley"), an attorney with Connolly Bove went to Texas to investigate a BAE facility in Carrolton, referred to as the Luna Road facility ("Luna Road").[13]  At Luna Road, Zelley investigated whether a working prototype of the '125 patent had been reduced to practice and publicly demonstrated.[14]  In a memorandum ("Zelley memorandum") circulated within Connolly Bove and given to Acacia, Zelley discussed his findings, including that potential customers were invited to

---

[6] Id., Ex. 1, Exclusive License Agreement.
[7] *See* Acacia Research Group LLC About Us, ACACIA RESEARCH GROUP LLC (2008-2012), http://acaciatechnologies.com/aboutus_main.htm.
[8] D.I. 280, Ex. 1, Exclusive License Agreement.
[9] *Id.* at 2.
[10] Id.,Ex. 4, Non-Exclusive Patent License and Settlement Agreement.
[11] *Id.*
[12] *Compare* D.I. 280 at 9 (asserting after Acacia withdrew from litigation, Connolly Bove did not provide any legal advice to Magnetar), *and* D.I. 283 at 4 (arguing both Magnetar and G&T retained Connolly Bove).
[13] D.I. 280 at 2.
[14] *Id.*

observe a working prototype at Luna Road without confidentiality.[15]

Six Flags contends the Zelley memorandum evidences Magnetar and G&T's knowledge of the invalidity of the '125 patent, a fact which they actively concealed from Six Flags.[16]  After returning from Luna Road, Zelley executed interrogatory answers directed to the patent's public demonstration and reduction to practice, which defendants contend were misleading because the responses contained no mention of the Luna Road facts.[17]  Defendants also allege in a settlement agreement with the Universal theme park defendants, SBC misrepresented its knowledge about the patent's public use.[18]  Additionally, during the course of discovery, archived documents in a storage facility were destroyed.[19]  The storage facility was obtained by G&T when it acquired the assets of BAE.[20]  Defendants allege more than seven hundred boxes of documents were destroyed at the behest of Magnetar and G&T.[21]  Plaintiffs maintain the documents were not destroyed on Magnetar and G&T's behalf, but as part of designated disposal dates pursuant to BAE's retention policy.[22]  Plaintiffs also assert

---

[15] *Id.*, Ex. 27-C.

[16] *Id.* at 12.

[17] *Id.* at 3, Ex. 2 at 2-3.

[18] *Id.* at 3, Ex. 4.

[19] *Id.* at 4, Ex. 8.

[20] *Id.*, Ex. 7 at 10:3-16; Ex. 8.  The complaint in this case was filed in March 2007. On April 11, 2007, five weeks after the complaint was filed, 55 boxes of documents from BAE were destroyed.   On July 9, 2007, an additional 329 boxes of documents were destroyed.  Finally, in November 2007 another 400 boxes of documents were destroyed.  During depositions, plaintiffs reported the documents at issue were present in the storage facility.  When defendants went to the storage facility, they discovered the stored documents were being destroyed.

[21] *Id.* at 4.

[22] D.I. 285, Bruce Page ("Page") Decl. (Director of Dallas Operations at G&T, discussing routine disposal of records) at ¶¶ 1-3; D.I. 286, Ray Fodder ("Fodder") Decl. (Director of Contract Administration for BAE Automated, discussing disposal of BAE

other boxes were removed for prior litigation and were never returned to BAE after that litigation ended.[23]

In February 2008, Acacia withdrew from this case and Connolly Bove withdrew as counsel.[24]  Magnetar and G&T continued in the patent infringement case with the representation of Niro, Haller & Niro ("Niro").[25]  Magnetar also commenced litigation in the Central District of California against Intamin Limited ("Intamin") for patent infringement related to the '125 patent.[26]  Acacia/SBC instituted an action on February 15, 2008 in California state court against Magnetar and Ed Pribonic ("Pribonic"), President of Magnetar, for breach of the licensing agreement and fraud.[27]

On December 23, 2011, Intamin served a third-party subpoena on Acacia seeking all documents relating to the '125 patent.[28]  On January 17, 2012, Acacia's Senior Vice President, David White ("White"), produced all the documents without objection to Intamin and Magnetar.[29]  The production included the Zelley memorandum.[30]  On February 29, 2012, Six Flags served a third-party subpoena on Intamin seeking all documents produced by Acacia in the California litigation.[31]

---

records) at ¶¶ 1-4; D.I. 288, Dan Pockrus ("Pockrus") Decl. (Parts, Sales and Warranty Manager with G&T Conveyor, discussing routine disposal of records) at ¶¶ 1-4.
    [23] D.I. 283 at 1; D.I. 284, Ex. A at 16-17, 89-90.
    [24] D.I. 280 at 4.
    [25] *Id.*
    [26] *Id.* at 5.
    [27] *Id.* at 4, Ex. 5.
    [28] *Id.*, Ex. 11.
    [29] *Id.* at 5.
    [30] *Id.*
    [31] *Id.* at 5-6, Ex. 17.

Magnetar objected to the production, but not based on privilege or work product.[32]  On

March 6, 2012, Intamin produced the documents.[33]

The parties dispute whether Acacia diligently sought return of the documents

after producing them to Intamin.  Six Flags maintains Acacia waited two months before

requesting the documents be returned;  Magnetar and G&T note Acacia demanded their

return on March 21, 2012.[34]  Magnetar and G&T also argue their counsel advised they

were not waiving privilege.[35]

According to Connolly Bove, they first learned of the Acacia production when

Zelley was served with a subpoena on March 13, 2012.[36]  Within two weeks thereafter,

Connolly Bove learned the Zelley memorandum had been produced and demanded its

return.[37]  Afterward, Connolly Bove alleges Six Flags failed to disclose their possession

of additional documents containing the firm's work product.[38]

On March 14, 2012, Magnetar and G&T sent a letter asserting attorney-client

privilege applied to the Zelley memorandum in the Acacia production.[39]  On April 20,

2012, Magnetar and G&T identified twenty-one additional documents as subject to

---

[32] *Id.* at 6, Ex. 19.  The objection was based on exceeding the scope of discovery under FED. R. CIV. P. 26 and this court's order of April 16, 2010.

[33] *Id.* at 6, Ex. 22.

[34] *See* D.I. 280 at 6 (asserting Acacia waited two months before requesting the documents be returned), *and* D.I. 283 at 6 (arguing Acacia demanded return of the documents on March 21, 2012, which is two months after the production date of January 17, 2012).

[35] D.I. 281 at 3-4.

[36] *Id.* at 3.

[37] *Id.* at 3, Ex. B.

[38] *Id.* at 3.

[39] *Id.* at 6-7.

attorney-client privilege.[40]   On May 8, 2012, Connolly Bove asserted work product

protection over seventy-six documents from Acacia's production.[41]   Six Flags requests

the objections of Magnetar, G&T and Connolly Bove be overruled and Six Flags' order

to compel be granted, requiring production of the disputed documents.[42]

    On April 18, 2012, this court addressed issues of attorney-client privilege and

work product protection with respect to the Zelley memorandum and the proposed

Zelley deposition.[43]   The court ruled the factual part of the Zelley memorandum was

discoverable, but the impressions of counsel contained in the document were not.[44]   In

addition to an attorney-client privilege analysis, the court considered the work product

protection and looked at when the memorandum was produced and to whom.[45]   Since

Zelley produced the memorandum to counsel, although there could be a waiver of

attorney-client privilege, it did not also mean waiver of the work product doctrine

occurred.[46]   Noting the attorney-client privilege is the client's privilege and the work

product immunity is only invoked by the attorney, the court concluded waiver of the

attorney-client privilege did not necessarily waive the work product immunity.[47]   The

court also noted there may be a joint representation argument on the behalf of Acacia,

Magnetar and G&T.[48]   Finally, the court allowed the deposition to move forward, but

---

[40] D.I. 280 at 6, Ex. 25.
[41] *Id.* at 6, Ex. 26.
[42] D.I. 279; D.I. 280.
[43] D.I. 282, Ex. A, Hearing Transcript at 71:10-77:18.
[44] *Id.* at 76:12-76:22.
[45] *Id.* at 72:3-8.
[46] *Id.* at 72:9-14.
[47] *Id.* at 73:2-8.
[48] *Id.* at 74:8-12.

limited it to what Zelley remembered from his interviews with BAE engineers.[49]

On June 26, 2012, G&T, as a third-party, was granted its motion to compel the return of twelve privileged documents, including the Zelley memorandum, in the District Court for the Central District of California.[50]  The court granted return of the privileged documents, citing joint privilege with Acacia and inadvertent production of documents by Acacia.[51]  That court held Acacia alone could not waive a privilege it shared with G&T because G&T and Acacia shared a common interest in the litigation and were represented by the same counsel.[52]  Finally, that court found Intamin could not rely on the crime-fraud exception.[53]  According to the California court, Intamin provided no evidence that G&T was seeking the aid of Zelley or Connolly Bove to perpetrate a crime or fraud.[54]

The ruling of the California district court is not controlling for the additional documents identified by Magnetar, G&T and Connolly Bove as subject to the attorney-client privilege and work product protection.[55]  Apart from the twelve documents in the California litigation, the motion to compel before this court concerns eight documents Magnetar and G&T are attempting to claw back and sixty-four documents Connolly Bove are requesting be returned.  Additionally, the California district court did not

---

[49] *Id.* at 76:23-77:3.  Objections have since been filed to this ruling which is presently before Judge Stark.  *See* D.I. 274.
[50] D.I. 297.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] The court is mindful of the apparent whipsaw effect the motions and arguments presented in this matter could occur between this court and the California District Court.

address the issue of spoliation, or Connolly Bove's claims of work product protection, as the firm was not before the district court in California and its work product documents were not at issue.

## II. PARTIES' POSITIONS

### A.    Defendants (Six Flags etc.)

Six Flags argues Acacia waived the attorney-client privilege and any work product protection.  Six Flags alleges Acacia must demonstrate the production was inadvertent and reasonable care was taken to protect it privileges in order to maintain the attorney-client privilege.  According to Six Flags, Acacia clearly waived because the production was deliberate and not inadvertent.  Additionally, since Acacia never reasonably sought to recover the produced documents, waiver of the attorney-client privilege occurred.  Finally, work product protection was waived because production by Acacia was made to an opposing party in litigation, Intamin.

Waiver by Acacia aside, Six Flags argues Magnetar and G&T never had any protection in the communications.  Six Flags disputes Magnetar and G&T's claims that there is a joint client privilege.  Rather, the communications were between Acacia and Connolly Bove, and did not involve Magnetar and G&T.  Additionally, Six Flags disputes the application of the joint client privilege to a single client and its attorney.  Finally, even if there was a joint client relationship, Six Flags maintains it disappeared when Acacia's relationship with Magnetar and G&T became adversarial.

Six Flags further contends Connolly Bove has no standing to oppose the production of documents because Connolly Bove is not a party in the litigation and did not produce the documents.  In essence, Connolly Bove waived its work product claims

when the firm provided documents to Acacia.  Because the documents at issue are not exclusively firm files, but are documents provided to Acacia for use in litigation, Acacia is under no obligation to obtain consent from Connolly Bove before disclosing them.

Six Flags also argues the communications at issue are factual in nature and should be produced because they are not shielded by the attorney-client privilege. Finally, Six Flags urges the court to reject the attorney-client privilege and work product protection claims because they are related to Magnetar and G&T's fraud.  Six Flags points to their misleading interrogatory responses, false testimony, fraudulent inducements to settle, spoliation of evidence and failure to produce documents as ongoing fraud.  Six Flags argues spoliation of evidence allows the crime-fraud exception to apply and compel the production of the documents, removing an purported protection under the attorney-client privilege or work product doctrine.

**B.    Connolly Bove**

Connolly Bove limited its response to its work product protection claims, but does not intend its silence on the other allegations raised by Six Flags to operate as an agreement with plaintiffs' position.  Connolly Bove rejects Six Flags' argument that Acacia's production operates as a waiver.  Connolly Bove maintains if Acacia waived its attorney-client privilege, it is without impact on Connolly Bove's work product protection.

Connolly Bove also disagrees with Six Flags' characterization of Acacia's production of documents as production to an adversary and outside the work product protection.  Connolly Bove argues work product protection belongs to an attorney and can only be waived by the attorney, unlike the attorney-client privilege.  Although Connolly Bove acknowledges that factual disputes are not protected by the attorney-

9

client or work product privileges, it questions what facts Six Flags is seeking to discover.
Connolly Bove speculates Six Flags' claim that facts are being withheld is disingenuous
and could be resolved by the parties through their meet and confer obligations.
Additionally, Connolly Bove argues against the application of the crime-fraud exception.
Instead, Connolly Bove maintains Six Flags has not established a prima facie case of
fraud or shown the communications were made in furtherance of fraud.  Connolly Bove
notes Six Flags only demonstrates a generalized allegation of fraud, which is insufficient
for the crime-fraud exception to apply.

Connolly Bove further disputes Six Flags' argument it does not have standing to
challenge the production of documents because the work product protection is only
invoked by the attorney, and waiver of the attorney-client privilege by the client does not
necessarily waive an attorney's work product protection.

### C.    Plaintiffs (Magnetar and G&T)

Magnetar and G&T dispute there was spoliation justifying the piercing of the
attorney-client privilege.  Magnetar and G&T allege documents were not intentionally
destroyed by G&T, but were under BAE's control.  They point to a series of documents
produced to defendants to negate the claim Magnetar and G&T attempted to hide
relevant information.  Finally, Magnetar and G&T argue against defendants' conclusion
the '125 patent was invalid, noting this issue is hotly disputed and no effort was made to
conceal documents to hide the patent's alleged invalidity.

Magnetar and G&T also maintain there was a joint client privilege which was not
waived.  To demonstrate joint representation, Magnetar and G&T argue they both
retained Connolly Bove and Acacia was only a licensee, not an owner of Magnetar and

10

G&T's intellectual property.  In addition, both Magnetar and G&T were parties to the Universal settlement, and the contested documents include Magnetar and G&T and reference G&T and their counsel.  Magnetar and G&T allege the joint relationship continued until at least October 31, 2007, when Connolly Bove identified a conflict.  Even after this date, obligations remained because the parties agreed not to disparage each other or interfere with their respective contracts and relationships.  Magnetar and G&T also dispute a waiver of privilege due to any purported delay in requesting return of the documents.  Instead, Magnetar and G&T allege Six Flags ignored the Protective Order and the Delaware Rules of Professional Conduct and did not notify Acacia, the sender, of the transfer of privileged documents.

Magnetar and G&T also argue any waiver by Acacia is irrelevant.  Magnetar and G&T insist Acacia cannot waive the joint privilege for them.  The disputed communications involved Acacia, Magnetar and G&T, preventing Acacia from unilaterally waiving  privilege for all three parties.  Magnetar and G&T also dispute Acacia waived by not seeking the return of the inadvertently produced documents.  According to Magnetar and G&T, Acacia asked the Zelley memo be returned and Magnetar and G&T, upon learning of the production, were diligent in demanding the return of the documents, thereby refuting any waiver.

Finally, Magnetar and G&T argue against applying the crime-fraud exception to the attorney-client privilege in these circumstances.  Magnetar and G&T dispute Six Flags has alleged a prima facie case of fraud, one of the elements of the crime fraud exception.  Magnetar and G&T also maintain the '125 patent is not invalid, and argue Six Flags cannot demonstrate the disputed communications were made in furtherance

11

of fraud.

Additionally, Magnetar and G&T adopt by reference Connolly Bove's arguments.

## III. STANDARDS AND APPLICABLE LAW

### A. Waiver

The attorney-client privilege protects communications between attorneys and clients from compelled disclosure.[56]  The work product doctrine protects documents and theories prepared by an attorney in the course of an investigation if litigation is pending or anticipated.[57]  Disclosing otherwise privileged communications to third parties can waive either or both of these privileges.  Both the attorney-client privilege and the work product doctrine can only be asserted if certain requirements are met, and are only waived in specific circumstances.

### 1. Attorney-Client Privilege

The attorney-client privilege exists to encourage full and frank communications between counsel and their clients.[58]  The privilege applies only if:  (1) there is a communication, (2) made between privileged persons, (3) in confidence, (4) for the purpose of obtaining or providing legal assistance for the client.[59]  The party seeking to invoke the attorney-client privilege has the burden of establishing the existence of an attorney-client relationship and the confidential nature of the communication.[60]

Disclosing otherwise privileged communications to third parties waives attorney-

---

[56] *In re Teleglobe Commc'n Corp.*, 493 F.3d 345, 359 (3rd Cir. 2007).
[57] *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).
[58] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).
[59] *In re Teleglobe Commc'n Corp.*, 493 F.3d at 359.
[60] *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 16 (D. Del. 1984).

client privilege, unless, the voluntary disclosure is necessary to assist the client in

obtaining legal advice.[61]  Waiver, generally, must be clear and intentional.[62]  While

waiver of attorney-client privilege must generally be voluntary, in some circumstances

the privilege can be lost because documents were inadvertently disclosed.[63]

Consideration of five factors determines "whether an inadvertent disclosure constitutes

a waiver:  (1) the reasonableness of the precautions taken to prevent inadvertent

disclosure in view of the extent of the document production, (2) the number of

inadvertent disclosures, (3) the extent of the disclosure, (4) any delay and measures

taken to rectify the disclosure, and (5) whether the overriding interests of justice would

or would not be served by relieving the party of its errors."[64]

### 2. Work Product

The purpose of the work product doctrine differs from the attorney-client

privilege.[65]  While the attorney-client privilege promotes the attorney-client relationship,

the work product doctrine promotes the adversary system by protecting the

confidentiality of documents, records and materials which contain counsel's mental

impressions, strategies and thought processes made in anticipation of litigation.[66]

Because the work product doctrine serves to protect an attorney's work product from

the adversary, a disclosure to a third-party does not necessarily waive the protection of

---

[61] *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977).
[62] *IBM v. Sperry Rand Corp.*, 44 F.R.D. 10, 13 (D. Del. 1968).
[63] *Fidelity and Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 521 (E.D. Pa. 1996).
[64] *Id.* at 522.
[65] *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1427-28 (3rd Cir. 1991).
[66] *Id.* at 1428.

work product, as it does with attorney-client privilege.[67]  To waive the protection of the work product doctrine, the disclosure must enable an adversary to gain access to the information.[68]  To determine if there was a waiver of the work product doctrine, it is necessary to distinguish between disclosure to adversaries and disclosures to non-adversaries, as well as intentional and unintentional disclosures.[69]  Third Circuit courts hold "when the disclosure is either inadvertent or made to a non-adversary, it is appropriate to ask whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials."[70]

### C. Joint Privilege

The rules governing attorney-client privilege have evolved to cover the representation of two or more people by a single lawyer, a joint representation.  In a joint representation, the joint privilege applies when multiple clients hire the same counsel to represent them on a matter of common interest.[71]  Like attorney-client privilege, the joint privilege is not absolute.

The joint client relationship begins when the "co-clients convey their desire for representation, and the lawyer accepts."[72]  A co-client relationship generally continues until a client discharges the lawyer or the lawyer withdraws.[73]  Additionally, courts have

---

[67] *Id.*
[68] *Id.*
[69] *Id.* at 1430.
[70] *Id.*
[71] *In re Teleglobe Commc'n Corp.*, 493 F.3d at 359.
[72] *Id.*
[73] *Id.*

recognized that the relationship can terminate by implication.[74]  In particular, a joint
representation terminates when the parties have diverged and there is no justification
for using common attorneys.[75]  The scope of the co-client relationship is limited by "the
extent of the legal matter of common interest."[76]  In determining whether parties
intended to create a joint client relationship, courts look to how the parties interact with
the joint attorneys and with one another.[77]  The communications between co-clients and
their common attorneys are privileged.[78]  The joint privilege prevents those
communications from compelled disclosure to persons outside the joint representation.[79]
Waiving the joint privilege requires the consent of all joint clients.[80]  A client, however,
may unilaterally waive the privilege as to its own communications with a joint attorney,
as long as those communications concern only the waiving client.[81]  A client may not,
however, unilaterally waive the privilege of the other joint clients' communications or of
its communications that relate to other joint clients.[82]

### D. Standing

The attorney-client privilege belongs to the client and can only be asserted by the
client.[83]  By comparison, the work product protection belongs to the attorney.[84]  As a

---

[74] *Id.*
[75] *Id.*
[76] *Id.* at 363; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75 (2000).
[77] *In re Teleglobe Commc'n Corp.*, 493 F.3d at 363.
[78] *Id.*
[79] *Id.*
[80] *Id.*; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(2) (2000).
[81] *In re Teleglobe Commc'n Corp.*, 493 F.3d at 363.
[82] *Id.*
[83] *See Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 (D. Del. 1977)
("Since the attorney-client privilege is a client's privilege, while work product immunity
may be invoked only by an attorney, waiver of attorney-client privilege does not

result, an attorney, and not his client, would alone be capable of asserting the work product protection.[85]  While it is generally understood the attorney-client privilege can be invoked solely by the client, courts have not been as restrictive with work product protection.  Finding it unrealistic to hold only an attorney has an interest in the work product and recognizing a client's concern with protecting the preparation for a case, courts have allowed clients to assert the work product privilege as well.[86]  As a result, courts have found the work product doctrine is broader than the attorney-client privilege, and may be asserted by both the attorney and the client.[87]

The ability of a client to invoke the work product protection, however, does not mean work product material can be produced on the client's waiver alone.[88]  The work product doctrine is not absolute; a party may waive the protection through inadvertent disclosure of work product protected materials.[89]  To determine if a party has waived attorney work product protection through an inadvertent disclosure, a court considers the steps taken by a party to remedy the disclosure and any delay in doing so.[90] Furthermore, the court should consider whether the party asserting the protection

_____

necessarily also waive work product immunity, as to an attorney's memoranda on the same subject."); *see also Rhone-Poulenc Rorer Inc. v. The Home Indem. Co.*, 32 F.3d 851, 866 (3rd Cir. 1994) ("[T]he work product doctrine belongs to the professional, rather than the client.").

[84] *Hercules*, 434 F. Supp. at 152.

[85] *Id.*

[86] *In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 798, 801 (3rd Cir. 1979).

[87] *See In re Grand Jury* (OO-2H), 211 F. Supp. 2d 555, 562 (M.D. Pa. 2001) (finding client could indirectly assert work product privilege); *see also Grand Jury Proceedings (FMC Corp.)*, 604 F.2d at 801 (holding client has standing to assert its attorney's work product privilege).

[88] *Grand Jury Proceedings (FMC Corp.)*, 604 F.2d at 801 n.4.

[89] *In re Grand Jury (Impounded)*, 138 F. 3d 978, 981 (3rd Cir. 1998).

[90] *Novartis Pharm. Corp. v. Abbott Lab.*, 203 F.R.D. 159, 165 (D. Del. 2001).

pursued reasonable means to restore the confidentiality of the materials and to prevent further disclosures.[91]

### E. Spoliation

Spoliation refers to the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.[92]  A party has a duty to preserve evidence it knows or reasonably should know is relevant to the action.[93]  The duty to preserve evidence begins when litigation is pending or reasonably foreseeable.[94]  Reasonably foreseeable is "an objective standard that does not ask whether the party in fact reasonably foresaw litigation, but instead asks whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."[95]  The Federal Circuit explained "whether litigation is reasonably foreseeable is a flexible, fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry."[96]

Where a party neglects the duty to preserve evidence, or actively obstructs it, a court has the authority to impose sanctions.[97]  That authority includes the discretion to

---

[91] *Id.*

[92] *Micron Technology, Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011).

[93] *G.E. Harris Ry. Elec., LLC v. Westinghouse Air Brake Co.*, C.A. No. 99-070-GMS, 2004 WL 5702740, at *2 (D. Del. 2004).

[94] *Positran Mfg., Inc. v. Diebold, Inc.*, C.A. No. 02-466-GMS, 2003 WL 21104954, at *2 (D. Del. 2003).

[95] *Micron Technology,* 645 F.3d at 1320.

[96] *Id.*

[97] *In re Wechsler*, 121 F. Supp. 2d 404, 427 (D. Del. 2000).

determine the severity of the sanction imposed.[98]  In *Schmid v. Milwaukee Elec. Tool Corp*, the Third Circuit outlined the factors for determining the appropriate sanction:  (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and will serve to deter such conduct in the future.[99]  Courts within the Third Circuit impose sanctions based on the federal rules of procedure and evidence, as well as the court's inherent authority.[100]  A common sanction for spoliation is for a court to apply an inference, which allows a trier of fact to receive the fact of the document's non-production or destruction, as evidence that the party preventing production did so out of the fear that the contents were harmful to its interests.[101]  For the rule to apply, the evidence in question must be within the party's control.[102]  Further, it must appear there was actual suppression or withholding of the evidence.[103]  No unfavorable inference arises when the circumstances indicate the document was accidentally lost or  destroyed, or where the failure to produce it is properly accounted for.[104]

Courts may also dismiss claims or grant judgments, suppress countervailing evidence, or impose fines and attorneys' fees as sanctions for spoliation.[105]

---

[98] *G.E. Harris Ry. Elec., LLC.*, 2004 WL 5702740, at *2.

[99] *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3rd Cir. 1994).

[100] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

[101] *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3rd Cir. 1983); *United States v. Cherkasky Meat Co.*, 259 F.2d 89 (3rd Cir. 1958).

[102] *Gumbs*, 718 F.2d at 96.

[103] *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3rd Cir. 1995).

[104] *Id.*

[105] *Mosaid Techs., Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).

Nonetheless, the Third Circuit has instructed courts to exercise discretion in imposing sanctions and to choose "the least onerous sanction corresponding to the willfulness of the act and the prejudice suffered by the victim."[106]  The sanction of entering a judgment against a party is a last resort and should be imposed if no alternative remedy is available.[107]  Dismissal is a harsh sanction only to be imposed if there is clear and convincing evidence of both bad-faith spoliation and prejudice to the opposing party.[108]  To make a determination of bad faith, the court must find the party "intended to impair the ability of the potential defendant to defend itself."[109]  Prejudice to opposing parties requires a showing the spoilation "materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of his case."[110]  To satisfy the burden of demonstrating prejudice, a party may only "come forward with plausible, concrete suggestions as to what the evidence might have been."[111]  Although  courts have the right to impose sanctions for spoliation, this power is limited to what is necessary to redress conduct "which abuses the judicial process."[112]  Third Circuit courts have relied on the factors outlined in *Schmid* and the goals of "(1) deterring future spoliation of evidence; (2) protecting the defendant's interests; and (3) remedying the prejudice defendants suffered."[113]

Additionally, there has been a growing trend among  courts to find the attorney-

---

[106] *Schmid*, 13 F.3d at 79.
[107] *Baliotis v. McNeil*, 870 F. Supp. 1285, 1289 (M.D. Pa. 1994).
[108] *Micron Technology,* 645 F.3d at 1328.
[109] *Schmid*, 13 F.3d at 80.
[110] *Micron Technology,* 645 F.3d at 1328.
[111] *Schmid*, 13 F.3d at 80.
[112] *Chambers*, 501 U.S. at 45-46.
[113] *Micron Technology,* 645 F.3d at 1329.

client privilege is lost when spoliation has occurred.[114]   In *Major Tours Inc. v. Colorel*,

the court ordered production of defendant's litigation hold letters after finding the

defendant spoliated evidence.[115]   Although, in general, litigation hold letters are

privileged, courts have adopted the view that when spoliation occurs those letters

become discoverable.[116]   These cases, although specific to whether litigation hold

letters are discoverable, recognize a growing trend of waiver of privilege to require

production of documents where spoliation has occurred.[117]

Finally, courts can reserve judgment on whether to issue sanctions.[118]   In

*Wachtel v. Health Net, Inc.*, the district court ordered sanctions against a defendant who

failed to disclose the existence of certain emails and database records;[119] but, it

reserved judgment on whether to issue a default judgment.[120]   The court stressed the

importance of imposing sanctions serious enough to reflect the harm incurred.[121]   The

---

[114] *See Major Tours, Inc. v. Colorel*, C.A. No. 05-3091, 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) (holding litigation hold letter discoverable due to finding of spoliation); *Keir v. Unumprovident Corp.*, C.A. No. 02-CV-8781(DLC), 2003 WL 21997747, at *6 (S.D.N.Y. Aug. 22, 2003) (allowing analysis of emails after finding electronic records ordered preserved were erased); *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 425 (S.D.N.Y. 2004) (disclosing details of litigation hold communication after discovering email had not been produced); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 634 (D. Colo. 2007) (permitting plaintiff to take deposition to explore procedures used to preserve documents after finding defendants expunged hard drives of employees after litigation had begun); *United Medical Supply Co v. United States*, 77 Fed. Cl. 257, 262 (Fed. Cl. 2007) (ordering production of defendant's hold letters after finding defendant spoliated evidence).
[115] *Major Tours*, 2009 WL 2413631, at *5.
[116] *Id.* at *4-5.
[117] *Id.*
[118] *Wachtel v. Health Net, Inc.,* 239 F.R.D. 81, 102 (D.N.J. 2006).
[119] *Id.* at 108-118.
[120] *Id.* at 102.
[121] *Id.* at 113.

court also stressed the importance of levying sanctions sufficient to remedy the prejudice suffered by a party and to punish another party's "disrespect and abuse of . . . [the] court's procedures."[122]

### F. Crime-Fraud Exception

Communications between an attorney and a client, otherwise privileged, are not protected by the attorney-client privilege or work product doctrine if they are made in furtherance of a crime or fraud.[123]  The party seeking discovery of privileged communications or documents must prove the crime-fraud exception applies by showing:  (1) a prima facie case of criminal or fraudulent conduct, and (2) the communications were made in furtherance of the crime or fraud.[124]

To establish a prima facie case of fraud, there must be more than allegations of inequitable fraud.[125]  This court has repeatedly held "absent a prima facie showing of fraud, an allegation of inequitable conduct, in and of itself, does not vitiate the attorney-client privilege."[126]  For the crime-fraud exception to apply, the communications at issue also must be made in furtherance of the crime or fraud.[127]  Communications which were made before the fraud or during the fraud are subject to the crime-fraud exception and

---

[122] *Id.*

[123] *Hercules,* 434 F. Supp. at 155.

[124] *Id.*

[125] *See WebXchange Inc. v. Dell Inc.,* 264 F.R.D. 123, 129 (D. Del. 2010) (finding allegations alone insufficient for prima facie case of fraud); *see also In re Spalding Sports Worldwide Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2007) (holding "inequitable conduct is not by itself common law fraud").

[126] *Allergan Inc. v. Pharmacia Corp.*, Civ. A. No. 01-141-SLR, 2002 WL 1268047 at *1 (D. Del. May 17, 2002).

[127] *Hercules*, 434 F. Supp. at 155.

not protected.[128]  To allow protection for these communications would permit an attorney

to be an accessory to a fraud without fear of discovery and would permit the client to

commit fraud with the aid of legal advice.[129]  Communications made after the fraud,

however, are protected and are not subject to the crime-fraud exception.[130]  The aim of

protecting these communications is to allow legal consultation for the purpose of

establishing a defense.[131]

## IV. DISCUSSION

### A. Waiver and Joint Privilege

Magnetar and G&T, as well as Connolly Bove, maintain the documents at issue

are subject to the work product protection.  Six Flags insists Acacia's production of

documents operates as a waiver of Magnetar, G&T, and Connolly Bove's attorney-client

privilege and work product protection.  First, whether Acacia's production is a waiver of

the attorney-client privilege depends on whether the production was inadvertent, which

is hotly contested.  Second, although production of documents can serve as a waiver of

work product protection, finding the production was inadvertent will undercut the

existence of a waiver.  Finally, where there is a joint client relationship, a joint privilege

exists, and a waiver of a joint privilege can only occur with the consent of all the parties

of the joint representation.

### 1. Waiver of Attorney-Client Privilege

Six Flags primarily argues there was a waiver of the work product privilege, but

---

[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*

also contends Acacia's production waived the attorney-client privilege and work product protection for all disputed documents in the litigation.[132]  The party seeking to invoke the attorney-client privilege has the burden of establishing the existence of an attorney-client relationship and the confidential nature of the communication.[133]

When a party discloses privileged communications to a third-party, it waives the attorney-client privilege.[134]  Waiver, however, generally must be clear and intentional.[135]  Acacia, as well as Magnetar and G&T, allege the production was inadvertent.[136]  To determine whether an inadvertent disclosure constitutes waiver, the court looks to a series of factors, including the existence of precautions, the number of inadvertent disclosures, the extent of the disclosure and any measures taken to rectify the disclosure.[137]  In this case, although the inadvertence of the disclosures is disputed, no precautions were in place to prevent disclosure.[138]  Both parties also dispute whether there was a delay in requesting the return of the documents and what measures were taken to remedy the disclosure.[139]  Considering the extent of the production, the lack of precautions to prevent a disclosure, and the uncertainty about whether the documents

---

[132] D.I. 280 at 6-7.

[133] *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 16 (D. Del. 1984).

[134] *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977).

[135] *IBM v. Sperry Rand Corp.*, 44 F.R.D. 10, 13 (D. Del. 1968).

[136] D.I. 283 at 6-7, Ex. N, O and R.  *See also*, D.I. 297, Minute Order dated June 26, 2012.

[137] *Fidelity and Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 522 (E.D. Pa. 1996).

[138] *Compare* D.I. 280 at 6 (asserting Acacia sent the documents intentionally), *and* D.I. 283 at 6 (arguing Acacia sent the documents inadvertently).

[139] *Compare* D.I. 280 at 6 (arguing Acacia waited two months before requesting the documents be sent back), *and* D.I. 283 at 6 (asserting Acacia demanded the return of the documents on March 21, 2012, which was two months after production on January 17, 2012).

were produced inadvertently, Acacia's attorney-client privilege may have been waived through its production. However, the unfairness Acacia's production created for plaintiffs, as well as Six Flags' failure to notify of the production of privileged documents, weighs against a waiver of the attorney-client privilege by plaintiffs. Further, even if Acacia waived their attorney-client privilege, there are limitations to the extent of this waiver under the work product doctrine and joint privilege.

### 2. Work Product Waiver

Six Flags contends Acacia's production operates as waiver of Connolly Bove, Magnetar and G&T's work product protection.[140] To determine whether the production of documents to a third-party is a waiver of the work product protection, courts "ask whether the circumstances surrounding the disclosure evidenced a conscious disregard of the possibility that an adversary might obtain the protected materials."[141] Plaintiffs, Connolly Bove and Acacia maintain the production was inadvertent and they attempted to remedy the disclosure. As previously noted herein, production was only obtained from Acacia, and therefore, the production does not rise to the level of "conscious disregard" on the part of plaintiffs and Connolly Bove. Additionally, the work product protection is not automatically waived through a client's (or former client's) production of documents since that protection is invoked by the attorney. As a result, any purported waiver of the attorney-client privilege by Acacia does not eliminate Connolly Bove's work product immunity. Since the documents identified by Connolly Bove are subject to its work product protection despite any alleged waiver by Acacia of its attorney-client

---

[140] D.I. 280 at 7-10.
[141] *Westinghouse*, 951 F.2d at 1430.

24

privilege, Connolly Bove is entitled to have those documents returned.  However, to the extent any of those documents over which work product is asserted, are the same as the eight documents Magnetar and G&T insist are subject to attorney-client privilege, those documents may be subject to production as addressed later in this opinion under spoliation and according to the order herein.[142]

### 3. Joint Privilege

The existence of a joint privilege from a joint client relationship among Magnetar, G&T and Acacia, would prevent Acacia's production from serving as a waiver of work product protection or the attorney-client privilege for Magnetar and G&T.  Six Flags insists there was no joint client relationship among Magnetar, G&T and Acacia and argues many of the disputed documents are solely between Connolly Bove and Acacia and do not include Magnetar and G&T.  Despite Six Flags assertions to the contrary, the Agreement between Acacia, Magnetar and G&T requires the parties to cooperate in litigation.[143]  The Agreement also required them to retain Connolly Bove, make Magnetar and G&T parties to Acacia's settlement with Universal, and prevented them from disclosing confidential information outside the Agreement and disparaging one another.[144]  Additionally, Magnetar and G&T point to communications between Acacia and Connolly Bove, who were also Magnetar and G&T's counsel, that refer to Magnetar

---

[142] The exact number of documents Connolly Bove asserts are subject to the work product protection is a bit uncertain.  *See* D.I,. 280 at 6, Ex. 26 (describing over seventy-six for which work product was asserted) and D.I. 303 (alleged waiver of sixty-four documents Connolly Bove is trying to claw back).  whatever the number of documents involved, none were produced for *in camera* review by the court.  However, in light of the findings herein, such a review is unnecessary.
[143] D.I. 280, Ex. 1, Exclusive License Agreement.
[144] *Id.*

and G&T.[145]   Thus, the Agreement to retain common counsel and the inclusion of

Magnetar and G&T in the disputed communications indicate a joint client relationship

existed among Magnetar, G&T and Acacia which protected their communications under

joint privilege.

Six Flags argues even if a joint client relationship existed among Acacia,

Magnetar and G&T, it terminated and the disputed communications occurred after the

termination and are not subject to the joint privilege.[146]   A joint representation terminates

when the parties diverge and there is no justification for using common attorneys.[147]   Six

Flags asserts the parties diverged as early as 2007, when Acacia concluded the

litigation was not viable and the common interest evaporated.[148]   Six Flags alleges

Connolly Bove ended its representation of Magnetar and G&T, and the parties had an

adversarial relationship, terminating any joint client relationship and joint client

privilege.[149]   Finally, Six Flags insists even if a joint privilege existed, it was waived by

Acacia, Magnetar and G&T, because they failed to take precautions to prevent

disclosure or to review the documents after production.[150]   Magnetar and G&T maintain

the termination and change of counsel occurred later, in either February or March

2008, or at the earliest October 2007.[151]   Thus, according to Magnetar and G&T, the

communications occurred before termination of the joint relationship even if the

_____

[145] D.I. 280, Exs. 27-A, 27-B, 27-C, 27-E, 27-F.
[146] D.I. 280 at 9.
[147] *Teleglobe*, 493 F.3d at 362.
[148] D.I. 280 at 9.
[149] *Id.*
[150] D.I. 280 at 10.
[151] D.I. 283 at 4-5.

relationship terminated on October 31, 2007 when Connolly Bove advised of a conflict and ended its representation of Magnetar and G&T.

*In re Teleglobe Communications Corporation v. BCE Inc.* held a waiver of joint privilege required the consent of all clients.[152]  The only circumstance where a client can unilaterally waive the privilege is if the communication *only concerns* the waiving client; communications relating to other joint clients cannot be unilaterally waived.[153]  Six Flags relies heavily on Magnetar and G&T's delay in requesting the return of the disputed documents and their failure to avoid the disclosure.[154]  However, a waiver of a joint privilege is not accomplished by failing to take precautions to prevent disclosing documents in the custody of a former joint client or through delay in not immediately requesting their return.  Since there was a joint relationship and a joint privilege among Acacia, Magnetar and G&T at the time the documents were prepared, a waiver would require the consent of these parties.  Even if Acacia waived its own attorney-client privilege, its unilateral waiver does not relinquish joint privilege for Magnetar and G&T.

Further, as noted in *Teleglobe*, because the documents at issue name Magnetar and G&T, or include their counsel, Acacia could not unilaterally waive the privilege for them by producing documents.  Since joint privilege existed at the time the disputed documents were created, it was not waived by Acacia through the production of documents.

**B. Standing**

---

[152] *Teleglobe*, 493 F.3d at 363.
[153] *Id.*
[154] D.I. 280 at 10.

The issue of standing is directly related to the previous discussion herein regarding waiver of the work product protection.  Connolly Bove maintains it has standing to assert its own work product protection because that right is an attorney's privilege.[155]  Six Flags argues Connolly Bove lost their work product protection when the firm provided documents to Acacia and Acacia produced those documents to a third-party, in essence waiving the work product protection.[156]  Six Flags's argument a client can solely waive the work product protection for itself and its attorney through the production of a document is incorrect.

To assess whether a client waived work product protection through the production of documents, a court considers the steps taken by a party to remedy the disclosure, any delay in seeking a remedy, and whether the party asserting the protection pursued reasonable means to restore the confidentiality of the materials and to prevent further disclosures.[157]  Here, the parties dispute whether the production was in fact inadvertent.[158]  Six Flags maintains the production of documents was knowing and deliberate, but Magnetar and G&T argue the documents were produced inadvertently.[159]  The parties also dispute whether there was a delay in remedying the disclosure.  Moreover, if any delay occurred, Connolly Bove, Magnetar and G&T attribute it to Six Flags' delay in notifying Acacia of the production of privileged documents, and Six Flags' hesitance to disclose to Connolly Bove possession of other

---

[155] D.I. 281 at 2.
[156] D.I. 280 at 10-11.
[157] *Novartis Pharm. Corp. v. Abbott Lab.*, 203 F.R.D. 123, 129 (D. Del. 2010).
[158] *Compare* D.I. 280 at 6 (asserting Acacia sent the documents intentionally), *and* D.I. 283 at 6 (arguing Acacia sent the documents inadvertently).
[159] *Id.*

documents containing work product.[160]

Connolly Bove has standing to assert its work product protection.  Once it became aware of the production, Connolly Bove repeatedly demanded return of the documents based on the work product protection.  The evidence shows when Connolly Bove became aware of Acacia's production, it immediately requested the return of the work product documents.[161]  When the Zelley memorandum issue was addressed by the court in April 2012, Connolly Bove first learned during that conference,[162] as evidenced by the documents attached to Six Flags' response, that other documents produced by Acacia may have been subject to the attorney work product doctrine.  As shown by the various exhibits provided by Connolly Bove, Magnetar and G&T to their briefing, once those documents were identified and provided by Six Flags, their return was immediately sought.[163]

Finally, holding a client could waive work product protection for an attorney, whether the production by the client was inadvertent or intentional, while such production was unknown to counsel would undercut the purpose of the work product protection.  In the instant matter, when Connolly Bove provided the documents in question, it was during or related to its joint representation of Acacia, Magnetar and

---

[160] D.I. 281 at 3-4; D.I. 283 at 5-7.

[161] The finding herein does not change the court's prior analysis regarding the Zelley document which was provided to and reviewed by the court during the April 2012 teleconference.  Nor does it affect the determination that facts learned by counsel referenced in the Zelley memorandum are discoverable.

[162] The court also learned for the first time that Six Flags possessed other documents beyond the Zelley memorandum that potentially were subject to the work doctrine protection.

[163] *See* D.I. 282, Ex. D and F.

G&T.  Providing information that falls within the attorney work product protection to a
client while representing that client is not a circumstance evidencing a conscious
disregard that an adversary might possibly obtain such protected materials.  To find
otherwise would prevent any communication between counsel and a client containing
the thought processes or analyses of the attorney, and would effectively eliminate the
conveyance of any advice while the attorney-client relationship exists.

Finally, Six Flags criticizes Connolly Bove's absence from the California
proceedings as somehow operating as waiver or lack of standing regarding the attorney
work product protection.  In light of the piecemeal approach defendants, as well as a
companion entity, Intamin, have taken in this court and in the California court regarding
the various privilege issues, the court finds this argument unpersuasive.

### C. Crime-Fraud Exception

Application of the crime-fraud exception to the attorney-client privilege requires:
(1) a prima facie case of criminal or fraudulent conduct, and (2) that the communications
were made in furtherance of the crime or fraud.[164]  When demonstrating a prima facie
case of fraud, generalized allegations of fraud will not suffice.[165]  Here, Six Flags alleges
Magnetar and G&T perpetuated a fraud by knowingly concealing the invalidity of the
'125 patent, failing to produce documents during discovery, providing false interrogatory
responses and fraudulently inducing a settlement.[166]  While the destruction of

---

[164] *Hercules*, 434 F. Supp. at 155.
[165] *WebXchange Inc. v. Dell Inc.,* 264 F.R.D. 123, 129 (D. Del. 2010) (finding
allegations alone insufficient for prima facie case of fraud); *In re Spalding Sports
Worldwide Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2007) (holding "inequitable conduct is not
by itself common law fraud").
[166] D.I. 280 at 3-4.

documents in this case is a serious concern, Six Flags is unable to demonstrate a prima

facie case of crime or fraud.  Magnetar and G&T dispute the invalidity of the '125 patent

and any effort to conceal its invalidity in discovery or during litigation.[167]  Similarly,

allegations of Magnetar and G&T's incomplete interrogatory answers and

uncooperativeness with discovery requests falls short of demonstrating a prima facie

case of crime or fraud.

 The crime-fraud exception is also limited to circumstances where the client seeks

legal assistance to plan or perpetrate a crime or fraud.[168]  Six Flags cannot meet this

second prong.  First, Six Flags does not point to any specific communications meant to

demonstrate the furtherance of a fraud or crime.  Second, Six Flags does not present

any evidence of how the disputed documents or Connolly Bove furthered the crime or

fraud.  Third, even accepting Six Flags allegations as a prima facie case of fraud, the

crime-fraud exception only applies to communications which occur before or during the

crime, not communications made after the fact.[169]  While it is unclear how the

documents furthered a crime or fraud, many of these documents would be outside the

scope of the crime-fraud exception because they took place after the completion of the

alleged fraud.  Thus, Six Flags does not demonstrate Magnetar and G&T or Connolly

Bove engaged in a crime or fraud, or that Connolly Bove's services were utilized in

order to plan or perpetrate a crime or fraud.

 **D. Spoliation**

---

[167] D.I. 283 at 7.
[168] *Hercules*, 434 F. Supp. at 155.
[169] *Id.*

31

Six Flags alleges Magnetar and G&T failed to disclose their knowledge of the invalidity of the '125 patent, did not cooperate in discovery, gave misleading interrogatory answers and fraudulently induced a settlement.[170]  All of these allegations are disputed by Magnetar and G&T.[171]  While Magnetar and G&T may have been less than forthcoming throughout litigation, Six Flags' allegations in this regard fall short of spoliation.  Spoliation refers to the actual destruction or alteration of evidence, where litigation is pending or reasonably foreseeable.[172]  The destruction of documents in the BAE warehouse, which was under the control of G&T, and occurred after the commencement of litigation is spoliation.  Magnetar and G&T maintain this disposal of documents was part of a routine procedure, of which they did not have knowledge or direct.[173]  However, since litigation had begun and the storage facility for the documents was under the control of G&T, although Magnetar and G&T may not have actively obstructed the discovery of evidence, they neglected their duty to preserve evidence, and should have been aware of BAE's document retention policy for approximately six years before this action was filed.  Further, Magnetar and G&T were aware documents in prior related litigation had not been returned after that litigation was completed.[174]  No evidence of their efforts to preserve those potentially relevant documents has been presented.  Magnetar and G&T offer affidavits asserting documents were not

---

[170] *Id.* at 3-4.
[171] D.I. 283 at 1-3.
[172] *Micron Technology, Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011).
[173] D.I. 283 at 1; D.I. 288, Pockrus Decl. at ¶¶ 1-4.
[174] D.I. 284, Ex. A Dan Pockrus ("Pockrus") Deposition (Parts, Sales and Warranty Manager with G&T Conveyor, discussing routine disposal of records) at 89:8-90:25.

intentionally destroyed, but were lost in prior litigation.[175]  However, these affidavits do

not discuss whether the affiants inspected the documents or when the "lost" documents

were prepared.[176]  Further, the affidavits are limited to the affiants' review of the

certificates of destruction, and fail to clarify whether the destroyed documents included

documents pertaining to the ongoing litigation.[177]  The certificates of destruction merely

provide the date of destruction, the number of cartons involved and a very general

description of the contents as "mixed paper and file contents."[178]  Although the affiants

purport that "to their knowledge no documents pertaining to any ongoing litigation were

destroyed," there is no evidence any affiant personally inspected or had the documents

inspected before their destruction.  Nor do the affidavits advise when the destroyed

documents were prepared.[179]  Thus, despite Magnetar and G&T's arguments to the

contrary, the extent of the documents destroyed and their contents is unknown.

       Where there is spoliation, a  court has the authority to impose sanctions.[180]

Determining the severity of the sanction requires the court to consider the degree of

fault of the party who altered or destroyed the evidence, the degree of prejudice

suffered by the opposing party, and whether there is a lesser sanction that will avoid

substantial unfairness to the opposing party and serve to deter such conduct in the

---

[175] D.I. 285, Page Decl. at ¶¶ 1-3; D.I. 286, Fodder Decl. at ¶¶ 1-4; D.I. 288, Pockrus Decl. at ¶¶ 1-4.
[176] D.I. 285, Page Decl. at ¶ 1; D.I. 286, Fodder Decl. at ¶ 3; D.I. 288, Pockrus Decl. at ¶ 1.
[177] D.I. 285, Page Decl. at ¶ 2; D.I. 286, Fodder Decl. at ¶¶ 2-3; D.I. 288, Pockrus Decl. at ¶ 2.
[178] D.I. 280, Ex. 8.
[179] *Id.*
[180] D.I. 283 at 1.

future.[181]   Here, although the disposal of the documents was not at Magnetar and G&T's direction, their destruction occurred after litigation began.   Thus, Magnetar and G&T were directly involved in litigation while the destruction of potentially relevant documents occurred.   Similarly, the level of prejudice suffered by Six Flags is difficult to discern because of the absence of seven hundred boxes of documents.   Six Flags suggests the destroyed documents could have dealt with on-sale bar issues in support of invalidity, and may have also addressed misrepresentations regarding validity made in relation to the Universal settlement.   Due to the extensive number of documents destroyed, the potential prejudice their destruction may have caused Six Flags, and the occurrence of the destruction after the start of litigation, the spoliation here is a serious matter worthy of sanction.

Entering a judgment or dismissal are harsh sanctions which require clear and convincing evidence of bad faith spoliation and prejudice to the opposing party. Magnetar and G&T insist since the loss of documents was part of routine destruction policy, any spoliation was not in bad faith, nor intended to impair Six Flags' defense. However, the sizable amount of documents involved demonstrates a clear failure by plaintiffs to satisfy their preservation obligation.   These documents could have aided Six Flags' on the issue of invalidity of the '125 patent.   Although the absence of evidence of bad faith spoliation does not warrant dismissal or entering an unfavorable judgment, the lack of reasonable preservation measures and prejudice weighs in favor of a lesser sanction.

---

[181] *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3rd Cir. 1994).

Another sanction for spoliation is for the court to apply an inference.[182]  The inference sanction allows instructing the fact finder to take as fact that the motivation for not producing a document was because its contents were adverse to the non-producing party.[183]  Magnetar and G&T contend for sanctions to be imposed, there must be actual suppression or withholding of documents within the party's control,[184] and where a disputed document was lost, accidentally destroyed, or can be accounted for in some way, then sanctions are not justified.[185]  Since the documents were not destroyed at their direction, but were accidentally destroyed under BAE's routine document retention procedures, Magnetar and G&T argue sanctions for spoliation are not warranted.[186]

Under the spoliation and the appropriate sanction analysis, the court may sanction a party where that party neglected its duty to preserve evidence.  There is no requirement for sanction that the party actively concealed, destroyed or withheld evidence-neglect is sufficient.  In order to apply the inference sanction, however, there must be withholding of documents within the party's control.  Here, the documents were clearly under the control of G&T at the time of their destruction.  Although the instant matter does not involve the typical intentional withholding of the documents as is routinely involved for an inference, G&T's control of the documents and the potential prejudice to defendants, makes an inference a possible sanction for spoliation.

Another sanction is to hold the attorney-client privilege is lost and the contested

---

[182] *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3rd Cir. 1983); *United States v. Cherkasky Meat Co.*, 259 F.2d 89 (3rd Cir. 1958).
[183] *Gumbs*, 718 F.2d at 96.
[184] D.I. 283 at 1.
[185] *Id.*
[186] *Id.*

documents discoverable.[187]   Spoliation cases finding waiver of the attorney-client

privilege addressed litigation hold letters and ordered their production.[188]   In those

cases, courts emphasized the necessity of imposing sanctions which remedy the

prejudice suffered by a party and punish the opposition's spoliation.[189]   Those cases

also noted the limitations of jury instructions regarding application of an inference or

ordering dismissal or entering judgment.[190]   Although those cases dealt solely with

litigation hold letters, the case law reasoning is analogous to the present matter.

Additionally, the policy and rationale behind finding a limited waiver of attorney-client

privilege where spoliation exists is advisable on the facts of this case, particularly since

the documents at issue include a litigation hold letter.

Addressing the eight documents at issue and consistent with the case law noted

herein, the litigation hold letter produced is discoverable.   In light of the court's earlier

decision that the underlying facts of the Zelley memorandum were discoverable, those

facts related to the Zelley memorandum are similarly subject to production.   As

---

[187] *See Major Tours, Inc. v. Colorel*, C.A. No. 05-3091, 2009 WL 2413631, at *2
(D. N.J. Aug. 4, 2009) (holding litigation hold letter discoverable due to finding of
spoliation); *Keir v. Unumprovident Corp.*, C.A. No. 02-CV-8781 (DLC), 2003 WL
21997747, at *6 (S.D.N.Y. Aug. 22, 2003) (allowing analysis of emails after finding
electronic records ordered preserved were erased); *Zubulake v. UBS Warburg LLC,* 229
F.R.D. 422, 425 (S.D.N.Y. 2004) (disclosing details of litigation hold communication
after discovering email had not been produced); *Cache La Poudre Feeds, LLC v. Land
O'Lakes, Inc.*, 244 F.R.D. 614, 634 (D. Colo. 2007) (permitting plaintiff to take
deposition to explore procedures used to preserve documents after finding defendants
expunged hard drives of employees after litigation had begun); *United Medical Supply
Co v. United States*, 77 Fed. Cl. 257, 262 (Fed. Cl. 2007) (ordering production of
defendant's hold letters after finding defendant spoliated evidence).

[188] *Id.*

[189] *Major Tours*, C.A. No. 05-3091, 2009 WL 2413631, at *4.

[190] *Id.*

described herein, those portions of the documents subject to the work product protection, which remain insulated from production are carefully distinguished from those portions to be produced.  Guided by the standards of discovery, only those documents relevant to claims and defenses in this matter are subject to production.  As ordered below, Six Flags' motion to compel is granted in part with limited production of documents at issue.

**V. Conclusion**

Therefore, consistent with the reasoning contained herein,  IT IS ORDERED and ADJUDGED that defendants' motion to compel (D.I. 279) is GRANTED in part and DENIED in part:

1.      Production of documents by Acacia does not operate as a waiver of Connolly Bove's work product protection.  Acacia, alone, could not waive the work product privilege of Connolly Bove.

2.      Connolly Bove has standing to assert the work product protection because the production of documents by Acacia did not extinguish its work product privilege.  Six Flags' motion to compel regarding those documents is DENIED.

3.      The crime-fraud exception does not operate to pierce the attorney-client privilege.  Six Flags has neither demonstrated a prima facie case of fraud, nor a plan to perpetrate an ongoing crime or fraud.

4.      The destruction of documents at the BAE site constitutes spoliation for which the following sanction requiring production of certain documents or portions of documents is imposed regarding eight of the documents at issue:

37

a.  Exhibit 27-A,[191] an email from Connolly Bove to Acacia regarding an obligation to preserve documents is a litigation hold letter and subject to production based on the relevant case law and analysis contained herein.[192]

b.  Exhibit 27-B is protected under Connolly Bove's work product protection and shall be returned.[193]

c.  Exhibit 27-C, or the Zelley memorandum, has already been addressed and the court's earlier decision controls.[194]

d.  Exhibit 27-D, like the Zelley memorandum, is subject to production in part as it relates to facts. [195]

I.  The entire first paragraph is discoverable with the exception of the words following "competitors" and before the phrase "whether there would have been" in the fifth sentence of line eight.

ii.  The second paragraph is discoverable from "his assertion" through the conclusion of the first sentence.  The second sentence of this paragraph is redacted.  The third sentence starting with  "[w]hen" is discoverable in whole.

iii.  Only the third sentence in the third paragraph is subject to production beginning with "[h]e also" and ending with "sure."  The remainder of the third paragraph is redacted on the basis of attorney work product privilege.

iv.  The fourth and final paragraph of Exhibit 27-D is protected by

---

[191] All eight exhibits referenced herein are found at D.I. 280.
[192] D.I. 280, Ex. 27-A.
[193] D.I. 280, Ex. 27-B.
[194] D.I. 280, Ex. 27-C;  D.I. 282, Ex. A, Hearing Transcript at 71:10-77:18.
[195] D.I. 280, Ex. 27-D.

attorney work product and shall be redacted.

       e.  Exhibit 27-E is subject to production in part.[196]  The first email exchange starting with the number "3" and ending with "adventure" is discoverable.  The second email exchange beginning with the word "[h]ow" and ending with the word "litigation" is also discoverable.  The third email exchange in Exhibit 27-E is a reproduction of Exhibit 27-D the production of which is limited to the extent described in paragraph 4d above.

       f.  Exhibit 27-F is protected under Connolly Bove's work product protection and shall be returned.[197]

       g.  In light the findings herein, Exhibit 27-G is not relevant to the claims and defenses in this matter and is not discoverable.[198]  It addresses the potential conflict issues arising between Acacia and Magnetar which resulted in Connolly Bove's withdrawal as counsel.

       h.  Exhibit 27-H which is the same as Exhibit27-I is also not relevant and shall be returned.  It is a letter from Connolly Bove addressing the conflict that arose between Acacia and Magnetar, and the bases for its withdrawal as counsel.[199]

       I.  Regarding Exhibit 27-I, since it is the same document as Exhibit 27-H, it shall be returned.[200]

    5.  Except as ordered herein, the documents identified by Connolly Bove as

---

[196] D.I. 280, Ex. 27-E.
[197] D.I. 280, Ex. 27-F.
[198] D.I. 280, Ex. 27-G.
[199] D.I. 280, Ex. 27-H.
[200] D.I. 280, Ex. 27-I.

subject to the attorney work product privilege shall also be returned.

6.  Within in 14 calendar days, defendants and its counsel are to return the documents so designated by the court.  Plaintiffs shall provide the redacted documents to defendants within the same time period.[201]


Dated: August 22, 2012                    /s/ Mary Pat Thynge
                                          UNITED STATES MAGISTRATE JUDGE

---

[201] This decision is distinguishable from the minute order of June 26, 2012 of the District Court for the Central District of California, since spoliation, waiver by Connolly Bove of its work product protection, and waiver by G&T and Magnetar of the attorney-client privilege for the eight documents in question were not presented to nor addressed by that court.  As a result, FED. R. EVID. 502(d) is not implicated on these issues.