# Exhibit PP

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3                              - - -
 4   SAFETY BRAKING CORPORATION,        : CIVIL ACTION
     MAGNETAR TECHNOLOGIES CORP., and   :
 5   G&T CONVEYOR CO.,                   :
                                        :
 6           Plaintiffs,                :
                                        :
 7        v                             :
                                        :
 8   SIX FLAGS, INC., SIX FLAGS THEME   :
     PARKS, INC., SF PARTNERSHIP,       :
 9   TIERCO MARYLAND INC., BUSH         :
     ENTERTAINMENT CORP., INC., CEDAR   :
10   FAIR LP, PARAMOUNT PARKS INC.,     :
     NBC UNIVERSAL INC., UNIVERSAL      :
11   STUDIOS INC. and BLACKSTONE        :
     GROUP, L.P.,                       :
12                                      : 1:07-cv-00127
             Defendants.                : LPS-MPT
13
14
                              - - -
15
16                       Wilmington, Delaware
            Tuesday, October 9, 2012 at 4:00 p.m.
17                       TELEPHONE CONFERENCE
18                              - - -
19
     BEFORE:   HONORABLE MARY PAT THYNGE, Magistrate Judge
20
                              - - -
21
22
23
     Ellie Corbett Hannum
24   Registered Merit Reporter
```

Page 2

1    APPEARANCES:

2

          ASHBY & GEDDES, P.A.
3         BY:  TIFFANY GEYER LYDON, ESQ.
4              and
5         NIRO, HALLER & NIRO
          BY:  JOSEPH N. HOSTENY, ESQ.,
6              PATRICK F. SOLON, ESQ.
7              (Chicago, Illinois)
8              Counsel for Plaintiffs
9

10

          O'KELLY ERNST BIELLI & WALLEN, LLC
11        BY:  SEAN T. O'KELLY, ESQ.
12             and
13

          FOLEY & LARDNER, LLP
14        BY:  AARON W. MOORE, ESQ.
15             (Boston, Massachusetts)
16             Counsel for Defendants
17

18

19

20

21

22

23

24

Page 3

```
 1                        - oOo -
 2                  P R O C E E D I N G S
 3            (REPORTER'S NOTE:  The following tele-
 4    conference was held in Judge Thynge's chambers, beginning
 5    at 4:00 p.m.)
 6                  THE COURT:  Good afternoon, Counsel.
 7    This is Judge Thynge.  I just want to tell you that Ellie
 8    Corbett is serving as the court reporter.  She is from
 9    Veritext.  So this is in the Magnetar versus Six Flags
10    matter.  It's a continuation of the discussion we had
11    back on September 10th.
12                  Who do I have on the line on behalf of
13    the plaintiffs?
14                  MS. LYDON:  Good afternoon, Your Honor.
15    Tiffany Lydon and with me is Joe Hosteny and also Pat
16    Solon.
17                  MR. HOSTENY:  Good afternoon, Your
18    Honor.  This is Joe.
19                  THE COURT:  Good afternoon to you, too.
20    And on behalf of the defendants please.
21                  MR. O'KELLY:  Good afternoon, Your
22    Honor, Sean O'Kelly.  I am joined by Aaron Moore and Luke
23    Silva of Foley & Lardner in Boston.
24                  THE COURT:  Aaron Moore?
```

Page 4

1                MR. MOORE:  Yes, Your Honor.  This is

2   Aaron Moore.  Let me just say that Matt Lowrie

3   participated last time but he is in Japan for depositions

4   at the moment and wasn't able to join this call.

5                THE COURT:  It's only a 14 hour time

6   difference.  Why not?

7                MR. MOORE:  Well, he has already been

8   there for a week and a half, I think in addition to it

9   being off hours, he is pretty drained at this point.

10               THE COURT:  Probably.  I don't envy him.

11               All right.  I left it up to the parties

12   to start working on this, to do a few things.  I tried to

13   go through what I had talked about to you before and so I

14   don't know what problem is left or what the problems are.

15   How far did you get, if you got anyplace at all?

16               MR. HOSTENY:  Your Honor, this is Joe.

17   We were dealing with two of the summaries, one was for

18   Dan Pockrus and the other one was for Ed Pribonic.  I

19   don't think we have any remaining issue regarding the

20   third one that was discussed in our last conference with

21   you, that is, for Joel Staehs.

22               With respect to Mr. Pockrus, there

23   was -- the defendants had a problem with -- ah, they had

24   an issue, nobody says problems anymore.  They had an

1    issue with one paragraph of his report because it

2    referred to possible comments about him on prior art.

3    What we did with that is we understand that the

4    defendants aren't going to be relying on prior art

5    references that aren't identified in their expert's

6    report, that's Mr. Kirtley.  And so we tried to

7    particularize the paragraph for Dan Pockrus a bit because

8    Mr. Pockrus, you may recall, is an engineer who's worked

9    at BAE for quite a few years, although his background is

10   an electrical engineer, unlike Mr. Staehs, he is a little

11   different, he is a double E, and Joel is a mechanical

12   engineer.

13            At any rate, the revised summary for him

14   says that Mr. Pockrus may testify that prior BAE systems

15   did not have opposed magnet assemblies or a fin.  He is

16   familiar with those systems from his work experience, not

17   from the lawsuit.  And he also might testify that there's

18   a difference between the Luna Road prototype and one of

19   the references that the defendants rely upon, the

20   Veraart.  In other words, Mr. Pockrus would say that the

21   arrangement of the motor and magnet in the Veraart patent

22   is different from what's described in the '125 and what

23   was described in the BAE prototype.

24            THE COURT:  Before you go on, which

Page 6

1    patent are you talking about, and can you spell it?

2                    MR. HOSTENY:  Yes.  It is one of the

3    ones that the defendants are, I believe, relying upon.

4    Veraart is V-E-R-A-A-R-T.  That patent number is

5    5,127,599.

6                    Essentially Mr. Pockrus, if he were to

7    testify about it, would say that the Veraart patent

8    doesn't represent technology that's any different or any

9    better than the prior BAE systems that he is familiar

10   with through his work experience.  That's essentially it

11   for Mr. Pockrus.  There was only that one paragraph that

12   was at issue between the parties when we talked about

13   this last week or whenever it was.

14                    THE COURT:  So that's Mr. Pockrus?

15                    MR. HOSTENY:  Yes.  And I can give you

16   the rundown on Mr. Pribonic right now, if you like.

17                    THE COURT:  Let's do them separately.

18                    MR. HOSTENY:  Okay.

19                    THE COURT:  Mr. Pockrus, an engineer,

20   but he was not the CEO; right?

21                    MR. HOSTENY:  This is Joe, Your Honor.

22   That's correct.  He was an electrical engineer working at

23   the company.  He is still working at -- now he works for

24   G&T, but he worked at BAE beginning, I think, probably in

1    the late '80s.  Not the CEO, not an inventor of the '125

2    patent.

3                    THE COURT:  All right.  I'm just making

4    some brief notes.  And who is going to be doing the

5    presentation on behalf of the defendants?

6                    MR. MOORE:  That would be me, Your

7    Honor, Mr. Moore.

8                    THE COURT:  You got stuck with that job.

9    So that's the reason why Matt's in Japan, you know.

10                   Go ahead, Mr. Moore.

11                   MR. MOORE:  Okay.  If the Court recalls,

12   there was also a disclosure discussed on the last call

13   for Mr. Staehs.  He was the retained expert who is also

14   an inventor on the '125 patent.

15                   THE COURT:  Yes, he was an inventor and

16   he was a consultant and then they were trying to convert

17   him into an expert to testify at trial without an expert

18   report.

19                   MR. MOORE:  Right.  And so what we got

20   from Mr. Staehs was not a disclosure under Rule 26 but

21   something called Summary of Testimony Joel Staehs.

22                   THE COURT:  I think he was doing it

23   under Rule 26(a) --

24                   MR. MOORE:  That was the case the first

1    time around, but now in this document it says the

2    plaintiffs do not regard this as expert testimony

3    governed by the Federal Rules of Evidence or by Rule 26.

4    So it's our understanding that the plaintiffs are not now

5    seeking or will not seek to offer any expert testimony

6    from Mr. Staehs.  And on that basis we think that he

7    doesn't need to be discussed any further, but I just want

8    to make that clear that the reason that we are not

9    discussing that is that it's our understanding that he is

10   not going to be offered as an expert.

11              THE COURT:  Okay.  And that's based upon

12   what you got from the summary; is that correct?  And

13   also, their statement that they do not consider this to

14   be -- for him to fall in the category of a Rule 26

15   expert, whether we are talking about Rule 26(a)(2)(B)

16   versus Rule 26(a)(2)(C)?

17              MR. MOORE:  That's correct.  The

18   disclosures we got for Mr. Pockrus and Mr. Pribonic both

19   reference Rule 26, whereas the Staehs document does not.

20              THE COURT:  And is that correct, Joe?

21              MR. HOSTENY:  Your Honor, with a little

22   bit of a qualification on it.  The reason I did that

23   summary was because we had this discussion the last time

24   around over whether a witness under, a lay witness under

1    Rule 701 could give an opinion based upon his or her

2    specialized knowledge acquired in the line of work.  So

3    what I did was I described the points that I think

4    Mr. Staehs would testify to if he winds up being a

5    witness in the case at trial.  And I put them in the

6    summary because I didn't want to have an argument between

7    the two sides over whether it was fact or whether it was

8    something that's sheeted into Rule 701 because it was

9    based on Mr. Staehs' knowledge because he is an engineer

10   and was the director of mechanical engineering at BAE.

11              The only other point I had about it is

12   that this is all subject to the caveat that we don't know

13   what questions Mr. Staehs might be asked on

14   cross-examination.  And you know there is always the

15   possibility that somebody opens the door to some

16   testimony that might otherwise not have been introduced

17   or might otherwise not have been admissible.  So we don't

18   know what the cross-examination would be.

19              Those were the qualifications I think we

20   discussed during our meet and confer on Mr. Staehs.

21              THE COURT:  Well, on the

22   cross-examination part, that's always up to the

23   cross-examiner as to what he or she is going to ask.  You

24   open a door and you live with it.  You don't open a door,

Page 10

```
 1    however, doesn't mean that the witness can voluntarily

 2    decide to expound, but that's something that I think can

 3    be dealt with by Judge Stark at trial.

 4                    In any event, this question goes to you,

 5    Mr. Moore, and that is, in light of what has been

 6    represented in the summary that's been provided

 7    concerning what Mr. Staehs would be testifying to

 8    potentially, at least on direct, do you have any problems

 9    with him testifying to that?

10                    MR. MOORE:  I don't think so, Your

11    Honor.  They removed the passages in the earlier

12    disclosures that talked about him offering opinions about

13    the differences between the patent claims and the prior

14    art, and that was our main concern with him.

15                    THE COURT:  All right.  Let's continue

16    on to Mr. Pockrus.  So what is your concern, Aaron,

17    regarding what's being proposed by the plaintiffs as to

18    Mr. Pockrus's testimony?

19                    MR. MOORE:  It's certainly the same

20    issue, Your Honor.  We understand that sort of the

21    touchstone here is whether these people have personal

22    knowledge.  Mr. Hosteny's characterization of this

23    individual's background and involvement is not accurate

24    when lined up with his deposition transcript.  I took his
```

1    deposition.  He has a bachelor's degree in computer

2    science.  He was a computer programmer.  He didn't become

3    involved in this project until after the prototyping was

4    done and they were actually installing the system at the

5    Denver Airport.  And he actually was unable to answer my

6    questions about the differences in the earlier BAE system

7    and the prototype that became the patent saying that --

8    he said, "You have to remember my background is

9    electrical not mechanical, and so asking me to speculate

10   on anything mechanical would be purely a guess on my

11   part."  I asked another question along those lines.  He

12   said again it would be speculation.  "You know, you are

13   kind of inferring that there was a design issue that made

14   the transition from one to the other.  I can't attest to

15   that."  He said, "I wasn't present during the design of

16   the dual motor that's shown here and I can't speculate as

17   to why they made such a change."

18              The idea that he has any personal

19   knowledge of any of this is really not supportable.  So

20   if the core question here is whether he is testifying or

21   whether he would be testifying about information that he

22   personally experienced, then I would think there is

23   really no way to support that argument.

24              THE COURT:  Okay.  I don't know whether

Page 12

1    I limited it that strictly as to personal experience, but

2    it was one emphasis that I placed on it.  Getting back to

3    Mr. Pockrus, when was his deposition taken?

4                    MR. MOORE:  August of 2011.

5                    I guess another issue, Your Honor, is

6    not all of what they are purporting they haven't

7    testified about in this paragraph in the new disclosure

8    would even be BAE information.  They are talking about

9    having him distinguish a prior patent that didn't come up

10   until this case.  So really that's classic expert

11   testimony.  And they had -- we gave them our expert

12   report.  They filed a response from a person they marked

13   opposite to our validity report.  And if there were

14   issues to be raised, it should have been raised by

15   Mr. Thompson or perhaps raised by Mr. Pockrus at the

16   time.  But there is no reason for them to have not done

17   this then.

18                    THE COURT:  Well, do you have a

19   problem -- and I can't remember the entire paragraph and

20   I'm not going to have Ellie go back and check her notes

21   as to what was actually said by Joe -- but do you have a

22   problem with the entire paragraph, such as him testifying

23   that, I believe it was said that they didn't have opposed

24   magnetic assemblies.  I think that's the note I made.  I

Page 13

1   know that he was also going to testify about the

2   difference between the Luna Road prototype and what I

3   will call the '599 patent.  And it was represented that

4   he was going to testify that the '599 patent is not

5   really any different from the BAE system that existed

6   before or the BAE prototype.  I can't remember exactly

7   what the testimony is going to be, because one part of

8   this is he is saying that I guess something did not have

9   opposed magnetic assemblies.  Was that the Luna Road

10  prototype?

11              MR. MOORE:  Your Honor, I don't think we

12  would dispute what, what were the brake structures in the

13  early system, which was the single-sided system, and the

14  Luna Road, which was double sided.  You can see that all

15  in the drawings, it's pretty clear.  The issue that we

16  have is whether we are going to get testimony that is

17  sort of expert opinion about why certain differences are

18  significant or why it wouldn't be obvious to make a

19  change from one to the other where we haven't seen any of

20  that in an expert report.

21              THE COURT:  So your concern -- let me

22  try to understand a little bit better what your concerns

23  are.  And that is, I guess a comparison of the '599

24  patent which is -- is that a prior art reference that you

```
 1    are using, Aaron?

 2                   MR. MOORE:  It is, yes.

 3                   THE COURT:  And I guess the BAE system

 4    or the '125 patent.  I'm not certain -- I recognize that

 5    you don't want him to be able to testify that the '599

 6    patent had significant differences or only went so far,

 7    and that what happened later on was that there were other

 8    differences, they were significant differences introduced

 9    into the '125 patent and then try to do a comparison

10    between the two, that is, between the '599 and the '125

11    patents.

12                   MR. MOORE:  Right.

13                   THE COURT:  Okay.  Joe, what's your

14    basis of having him try to testify along those lines if

15    that's what you are intending to offer him for?

16                   MR. HOSTENY:  Yes, Your Honor.  This is

17    Joe.

18                   I just pulled up his deposition because

19    I was a little surprised about what I heard, to be

20    honest.  I didn't sit through Dan's deposition, but I

21    have looked at it from time to time.  For example, one

22    page of his deposition, 26, he said he did see the BAE

23    system installed for Eastern in Atlanta and he was

24    familiar with what's called the telecar in the BAE system
```

Page 15

 1   there.  And the BAE system in Atlanta is, according to

 2   what we understand, is one of the earlier BAE systems

 3   that the defendants want to rely upon or use in their

 4   case.  And we, in turn, want to be able to have the

 5   knowledgeable people who saw the system say, for example,

 6   it does not have opposed magnets or and it did not have

 7   opposed motors to note the physical distinctions between

 8   the earlier BAE systems and the Luna Road BAE system.

 9                   Mr. Pockrus wouldn't be talking about

10   the '125 patent.  He would be talking about differences

11   between physical systems that he has seen and the Luna

12   Road prototype, which indeed he saw as well, and then he

13   saw the system at Denver when it was being installed

14   which likewise was different from the earlier BAE

15   systems.

16                   With respect to Veraart, I think the

17   reason Veraart comes up is because the defendants rely

18   upon it.  And I think the sensible engineer would say

19   that this system is really the same as the earlier BAE

20   systems and not the same as the Luna Road prototype or

21   the system installed in Denver.

22                   THE COURT:  And that I'm not certain I'm

23   willing to give you, to be allowed to do that.  I

24   understand it to things that he was involved in and gave

Page 16

1    an analysis or at least saw, observed, had some

2    familiarity with the BAE system that was involved in

3    Atlanta and was familiar with the telecar.  And you point

4    out to me that's an early BAE system.

5                    MR. HOSTENY:  Yes.

6                    THE COURT:  And that you want him to be

7    able to testify to doesn't have opposing motors, doesn't

8    have -- I wrote down a few other things -- and basically

9    note the physical differences between the BAE system in

10   Atlanta versus what else, and note the differences

11   between the BAE system in Atlanta and the BAE system in

12   Denver, I guess, and the Luna Road prototype, all things

13   that he had direct familiarity and was involved with,

14   which is an easier framework to work with.

15                   On your argument as to him being an

16   electrical engineer, quote/unquote, as to doing a

17   comparison with the system that is outlined in the '599

18   patent versus what?  I don't think he can sit there and

19   say, well, this is just as typical with prior art

20   systems.

21                   MR. HOSTENY:  No, I don't think he would

22   say that, Your Honor.  I think he would say he would look

23   at one drawing in Veraart and he'd say this system looks

24   like the old BAE systems, not the Luna Road system, what

Page 17

1   it looks like.

2                   MR. MOORE:  Your Honor, now we are

3   asking --

4                   MR. HOSTENY:  To be honest, we are in

5   the region with Mr. Pockrus where a summary is required

6   but not an expert report.

7                   MR. MOORE:  We disagree with that.  I

8   mean, this is exactly the problem.  We would be asking

9   apparently Mr. Pockrus to interpret this patent that came

10  up in this litigation and compare it to the claims.

11                  THE COURT:  Well, he is not going to be

12  comparing --

13                  MR. HOSTENY:  That's wrong.

14                  THE COURT:  Hold on.  My understanding

15  is if he is asked a question -- and this is the other

16  problem that I have -- and that is, a diagram or a figure

17  that's in the patent, for example, and he is looking at

18  the '599 figure in the patent, you want him to be able to

19  say that looks like an old BAE system, that he would be

20  allowed to say that without an expert report?

21                  MR. HOSTENY:  Right.  Without talking

22  about the '125 claims.

23                  THE COURT:  Without directly addressing

24  the '125 claims?

1              MR. HOSTENY:  Right.  He wouldn't be

2    comparing Veraart to the '125 claims.

3              MR. MOORE:  Well, then what's the point

4    then?  I understand his relevance to be validity, and so

5    what does it matter of Veraart is like what's in the BAE

6    system?

7              THE COURT:  Well, that's my point

8    exactly, but my question is whether or not -- my sole

9    issue or sole part of this is not to determine, I think,

10   whether or not the testimony is going to be relevant to

11   those issues, but whether he needed to have prepared an

12   expert report to even be able to say that.  I think

13   relevance is another issue.  What I understood that had

14   been teed up for me to decide -- and you guys can correct

15   me -- was essentially doing that comparison between Rule

16   26(a)(2)(B) and Rule 26(a)(2)(C).

17             Now, whether it's relevant testimony in

18   the case, and how it gets in, isn't that something that's

19   decided either at the summary judgment stage, if we are

20   talking about striking portions of his expert testimony

21   because it lacks relevance, or doing some type of

22   Daubert-related motion in that regard that it would not

23   provide -- it would confuse the jury, for example, and

24   would not provide any relevant testimony or it wouldn't

1  fit?  It wouldn't provide what's necessary for the jury

2  to analyze.  Isn't that the Daubert analysis on relevance

3  versus whether this man needed to prepare a report

4  consistent with Rule 26(a)(2)(B)?  I'm not slopping over

5  into the Daubert analysis yet.  Maybe I am slicing it too

6  thinly, but that's what I was looking at, Aaron.  If it

7  lacks relevance, if it lacks a relationship to the case

8  where the information that the expert is trying to

9  convey, because you don't necessarily --  well, I guess

10  he is not an expert though, right?  No, I guess he would

11  be an expert because he is giving testimony based upon

12  his expertise.  So at least to that extent he is.  And he

13  may be an expert under 26(a)(2)(C) where you get the

14  summary, but it doesn't necessarily mean he is going to

15  be allowed to testify about it at trial if he doesn't

16  meet the requirements of 702 and 703 as to what the

17  testimony is.

18             MR. HOSTENY:  Your Honor, this is Joe.

19  On the first point, relevance, I don't think we can say

20  at this point that it is relevant because we don't know,

21  for example, whether Veraart is going to have any role at

22  all in any summary judgment motion the defendants may

23  make and we are even farther away from trial so we don't

24  know about that either.

Page 20

```
 1                    THE COURT:  Do you have a trial date in
 2     this case?
 3                    MR. HOSTENY:  We do not have one, if my
 4     memory is correct.
 5                    THE COURT:  Well, I am hoping you don't
 6     because I just got the summary judgment motions and we
 7     are going to have to talk about when those are going to
 8     be done in light of this.
 9                    MR. HOSTENY:  I just saw that.
10                    On the second point, it seems to us that
11     26(a)(2)(C) -- there are so many subparagraphs that it's
12     hard to keep them straight -- but 26(a)(2)(C) doesn't
13     even use the word --
14                    THE COURT:  Relevance.
15                    MR. HOSTENY:  It simply refers to
16     witnesses who do not provide a written report, and we
17     don't have an otherwise stipulation or order in the case,
18     so it seems to me that the rule does govern.  I think
19     Mr. Pockrus really falls within C.  And I don't think one
20     can say when the rule is quite clear on this score that
21     an expert report can be required of him since he is not
22     retained for purposes of the litigation or for purposes
23     of providing expert testimony.
24                    THE COURT:  I think you misunderstood
```

Page 21

1   what I was saying, Joe.  I wasn't implying that he fell

2   within Rule 26(a)(2)(B).

3                    MR. HOSTENY:  Okay.

4                    THE COURT:  I was saying that it sounds

5   like he falls within 26(a)(2)(C), at least from what I've

6   heard so far.  But the issue that I was going to -- it

7   says here "unless otherwise stipulated or ordered," we

8   don't have that.  We don't have it yet at least.  "If a

9   witness is not required to provide a written report, this

10  disclosure must state the subject matter on which the

11  witness is expected to present evidence under Federal

12  Rules of Evidence 702, 703 or 705."

13                   And in that regard for that subsection

14  i, the subsection was answering, trying to answer Aaron's

15  question because it seemed to me Aaron's question went to

16  relevance and also went to the issues, potentially went

17  to the issues that you would have under Daubert because

18  it specifically references 702, 703 and 705, which deal

19  with expert testimony.  And then you have ii, which is a

20  summary of facts and opinions to which the witness is

21  expected to testify.

22                   Direct reference back to Rules of

23  Evidence 702, 703 and 705 puts it into, in my mind,

24  potentially into the Daubert framework.  That is, I could

Page 22

```
 1   decide now this type of information he's allowed to
 2   present at this stage of the analysis under discovery
 3   because he falls under 26(a)(2)(C), for example.  But
 4   that doesn't mean that by ruling that I have found that
 5   his information that he is going to provide that could
 6   fall under Federal Rules of Evidence 702, 703 or 705 is
 7   admissible or usable at trial or on summary judgment.
 8   That's something that could be left for Daubert.  And
 9   that's why I was trying to divide the two.  That's the
10   way that I was looking at what I was asked to do when I
11   went through the commentary that we had previously.
12               The only federal rule of evidence that
13   came up was 701, but we talked and concentrated on the
14   parts of Rule 26 that I discussed with you today.  That's
15   why I was doing that division.  And, quite frankly,
16   Aaron, did you understand what I was trying to say in
17   that regard?
18               MR. MOORE:  I think so, Your Honor.  I
19   do want to make one point clear, though.  I think I was
20   completely wrong when I understood the paragraph that we
21   are looking at proposes that Mr. Pockrus would compare
22   the prior art to the claims because it does say that he
23   would testify that the prior art systems did not have
24   opposed magnet assemblies or a fin.  Those are claim
```

Page 23

```
 1    terms.  And it says that he would testify that the
 2    Veraart patent uses a single-sided motor and does not
 3    have opposed magnet assemblies, so that's also claim
 4    terms.  So we are not talking solely here about comparing
 5    the prior art to the prior art.  We are talking about
 6    comparing the priority art to the claims.
 7                      THE COURT:  Well, what was said to me
 8    before by Joe was, here is a drawing in the patent.  If
 9    he looks at this drawing with his expertise that he has,
10    he can sit there and say, this figure or this drawing in
11    the patent shows as follows.  In other words, he is
12    saying as an electrical engineer and his background, he
13    could look at this drawing and say this is what it has
14    and it does not have, not saying that patent has or does
15    not have or the claim terms have or do not have that.
16                      That may be a fine line but that, I
17    think, is what Joe suggested before.  I am not agreeing,
18    though, Joe, if you are trying to expand it, that he
19    would sit there and look at the claim terms and say the
20    claim terms or the specification, as I look at the claim
21    term to help me understand this patent, would tell me X,
22    Y and Z.  You were describing to me that he would be
23    looking at a drawing.  And I do think, to some extent,
24    drawings, depending upon how detailed they are, is
```

Page 24

1    something that I would believe an engineer, assuming he

2    is qualified to read a particular drawing in this regard,

3    could say that this drawing does not show X, it does not

4    show Y, but it doesn't necessarily mean that the patent

5    doesn't cover it.  So that's where I get to the relevance

6    aspect.

7                   MR. MOORE:  Well, I think we would agree

8    that he probably should be able to testify about what BAE

9    drawings that he was familiar with would show.  The

10   problem that we have is that it appears to us, and I

11   think that the Court understands that it appears to us

12   that it's vague in this disclosure but it appears that

13   the idea is that he would do that in order to support an

14   argument that the claims are not anticipated or not

15   obvious.

16                  THE COURT:  Well, what I don't think he

17   can do is interpret the claims of the '599 patent.  I

18   don't know what the drawing is of the '599 patent that

19   was referenced.  All right?  I have no idea how detailed

20   these figures are.  Sometimes they can be quite detailed

21   and other times they look like stick drawings, I'm sorry.

22                  So if you have a drawing in front of him

23   or a design in front of him or a graph or whatever he

24   would be looking at as an engineer in front of him and

Page 25

1    that graph is the same as a drawing in the '599 patent, I

2    think he can say, Based upon what I see in this drawing,

3    it does not have the following.  But then I get back to

4    my side issue and saying, okay, that's fine and good, but

5    does that mean anything in relationship to the '599

6    patent?

7                   I mean, you can't back door expert

8    testimony, which is what I'm trying to avoid, back door

9    expert testimony on how a patent should be interpreted by

10   applying the claim terms that have been discussed or

11   decided by the Court and apply them to determine whether

12   those claim terms as they are in the prior art, if they

13   are the same or similar to the claim terms that are found

14   in the '125 patent.

15                  And that's why I got back -- as I said,

16   I got back to the issue of, okay, there's a drawing here.

17   That drawing may come from the '599 patent.  Saying that

18   drawing does not show the following doesn't mean anything

19   if you don't relate it to how important that drawing was

20   for determining what the claim terms of the '599 patent

21   mean and how those terms -- and what the '599 patent does

22   in comparison to the '125.

23                  And that's to the relevance argument

24   which I said has not been teed up to me and I don't think

Page 26

1   should be at this stage in a couple of telephone

2   conversations, but should be teed up to me if his

3   testimony is intended to be used in such a fashion on

4   summary judgment motion.  For example, that would make

5   his -- or a Daubert motion, not even on summary judgment,

6   but on a Daubert motion in that regard as to whether this

7   testimony is appropriate under 702 and 703.

8                    There are two different things going on

9   here.  One, did he have to do a report and what's he

10  going to be allowed to testify about absent a report?

11  What he could testify about under 26(a)(2)(B), what he

12  had to define under 26(a)(2)(B) and what he could be

13  allowed to provide you with under 26(a)(2)(C).  So I

14  consider that different from whether he is qualified to

15  testify under 702 and 703 and a Daubert analysis which of

16  course would go to relevance.  Right?

17                    Am I wrong on that?  I thought relevance

18  was part of the Daubert analysis.

19                    MR. MOORE:  I would agree with that,

20  Your Honor, it needs to be helpful to the jury.

21                    THE COURT:  That's exactly right.  It

22  needs to be helpful to the jury and it needs to fit.

23  Right?  Isn't that one of it?

24                    MR. MOORE:  To me it comes back, the

Page 27

1    question is what is he proposing to testify about?  If he

2    is only proposing to testify about the difference between

3    two pieces of prior art, then, I guess, maybe we don't

4    have a problem with that.  But it seems to me that he is

5    trying to do more than that or, as you say, this is a

6    back door that there is going to be some effort to

7    connect this up somehow with something that matters in

8    the claims.

9                    MR. HOSTENY:  Your Honor, this is Joe.

10   The paragraph we revised and even the original -- I

11   suppose defendants would say it was more vague -- but the

12   paragraph we revised doesn't include anything in it about

13   reading or interpreting or applying claim language.

14                    THE COURT:  Could you reread that

15   paragraph that was causing everybody angina?

16                    MR. HOSTENY:  I don't have the -- maybe

17   Mr. Moore has the old version.  I don't have the --

18                    THE COURT:  No.  I'm not looking for the

19   old version.

20                    MR. HOSTENY:  Oh, the current one.

21   Okay.

22                    THE COURT:  The current version.

23   Because the old version, as far as I'm concerned, is now

24   gone.  Let's talk about the current version.

1                    MR. HOSTENY:  What the paragraph now

2    says is, "Mr. Pockrus may give opinions regarding the

3    structure and function of the prototype at Luna Road, the

4    structural and functional differences between the

5    prototype and any prior systems built by BAE and the

6    advantages associated with the Luna Road prototype.

7    Assuming James L. Kirtley, Jr.'s report identifies all

8    prior references to be relied upon by defendants,

9    Mr. Pockrus may provide testimony regarding the

10   differences between the Luna Road prototype and the older

11   BAE systems identified in Section 9(f) of Kirtley's

12   report.  He may testify that the prior BAE systems did

13   not have opposed magnet assemblies or a fin.  Mr. Pockrus

14   may also provide testimony regarding the differences

15   between the Luna Road prototype and U.S. Patent

16   5,127,599."

17                    THE COURT:  Go back and repeat that

18   again.

19                    MR. HOSTENY:  "Mr. Pockrus may also

20   provide testimony regarding the differences between the

21   Luna Road prototype and U.S. Patent 5,127,599, the

22   Veraart patent.  Mr. Pockrus may testify that the system

23   described in the Veraart patent uses a single-sided

24   linear induction motor and does not have opposed magnet

1    assemblies."

2                    THE COURT:  And that's where I have my

3    problem, those last two sentences when you start taking

4    the Luna Road prototype, compare it to the '599 and how

5    the systems -- what was that last section, the systems?

6                    MR. HOSTENY:  "That the system described

7    in the Veraart patent uses a single-side linear induction

8    motor and does not have opposed magnet assemblies."

9                    Those are the differences that he would

10   say exist from looking at a drawing in Veraart and

11   comparing it to his knowledge of the Luna Road prototype.

12                   THE COURT:  And his statement as to what

13   the '599 patent does is based upon his review of a figure

14   in the '599 patent.

15                   MR. HOSTENY:  Right.

16                   THE COURT:  And I'm assuming that the

17   figure we are talking about -- do you describe which

18   figure he is relying upon?

19                   MR. HOSTENY:  We did not.

20                   THE COURT:  Well, I think that's

21   something that would have been important and should have

22   been because there's all sorts of figures in patents.

23   And we know that that figure may be referenced in the

24   specification for something that may not be a complete

1    representation of what the patent is.

2                    MR. SOLON:  Your Honor, this is Pat.  In

3    Veraart, there's an overview figure and it shows a track,

4    it shows a flat magnet, and it shows a car and it's flat.

5    There aren't two.  There is just one flat one.  And when

6    you look at grainy videos from the Eastern Airlines --

7    Atlanta or Miami -- or whatever airport it was that had

8    the old version of BAE, you know, it looks the same.  I

9    mean that's -- it's really, this is very basic pieces of

10   structure that are readily apparent and really don't get

11   into analysis at all, which is why it's something that we

12   thought that Mr. Pockrus could easily say.

13                   But, you know, it would be nice to have

14   someone who saw this live system and concedes that it's

15   the same as what's in Veraart say that.

16                   THE COURT:  Yeah.  But why didn't you

17   have your expert whoever wrote the report do that

18   originally because you would have --

19                   MR. SOLON:  That expert, Your Honor,

20   never saw that system.  He does talk about Veraart.

21                   THE COURT:  Let me back up.  Your expert

22   may never have seen the systems that BAE had, but you had

23   somebody who knew what the systems looked like and could

24   have described it.  And he could have relied upon that

Page 31

1    person, that is Mr. Pockrus, and could have --

2                    MR. MOORE:  We provided an expert report

3    with drawings of that system.  I mean, that was part of

4    our expert report.  This is no secret.  And we cited in

5    Mr. Pockrus's testimony, I think, and certainly included

6    the drawings showing it.  So the expert did see it.

7    Maybe he didn't go out --

8                    THE COURT:  Time out, Aaron.  It was

9    Aaron that was just talking, right?  Who was just

10   talking?

11                   MR. MOORE:  This is Mr. Moore, Your

12   Honor.

13                   THE COURT:  Okay.  I was responding to

14   Pat.  And what I was trying to say was that when

15   plaintiffs prepared or had their expert report prepared

16   on validity, it would have been after the expert report

17   that had been prepared by the defendants arguing that the

18   patent is invalid for these following reasons.  And they

19   would have had -- you would have known about the prior

20   art.  You would have known about this particular, the

21   '599 patent.

22                   What you are saying, what plaintiff's

23   counsel is saying to me now is it would be nice to have

24   somebody like Mr. Pockrus to be able to testify about all

Page 32

1    these other systems that BAE had, who was actually there,

2    who actually saw them, who viewed those systems, and for

3    him to do somewhat of a comparison at least between the

4    drawing in the '599 patent and the systems that he

5    observed.

6                    What I was saying is you still could

7    have him testify about what the BAE systems had or did

8    not have because he experienced that directly and he saw

9    drawings and he worked on them and he did different

10   things on them or was somehow involved in them, and he's

11   understanding, based upon his expertise, what these

12   systems had in them.  It wouldn't be something that I

13   would look at and sit there and say, yeah, I know there

14   are two motors or not because I'm not an engineer.

15                   You could have then, Plaintiff, had your

16   expert use what Mr. Pockrus had as part of his expert

17   report to rely upon as to why the BAE systems and the

18   '599 patent were essentially the same, and therefore why

19   the '599 patent is not prior art to the '125.  Right?

20                   MR. SOLON:  I guess you could do that,

21   but I'm not sure why I would need to.

22                   THE COURT:  Okay.  That's my question.

23                   MR. HOSTENY:  Your Honor, this is Joe.

24   It strikes me that it's logical to have a different

Page 33

```
 1    vantage point that may or may not become significant in

 2    later stages of this case, that is, you know, an expert

 3    always gets cross-examined.  How much are you getting

 4    paid?  They are buying your opinion, blah, blah, blah.

 5                    THE COURT:  Fine, Joe, and we know both

 6    sides have their experts.  That to me is personally a

 7    wash.

 8                    MR. HOSTENY:  But this is a guy who was

 9    there.

10                    THE COURT:  Yes.  But what he wasn't --

11                    MR. MOORE:  Your Honor.

12                    THE COURT:  Who was just speaking,

13    please?

14                    MR. MOORE:  It was Mr. Moore, Your

15    Honor, but I didn't mean to interrupt.

16                    THE COURT:  No.  Go ahead.  Did you want

17    to add something before I say anything further?

18                    MR. MOORE:  I did, which is that I have

19    been sitting here puzzling why they would be interested

20    in comparing the prior art to the prior art.  And I guess

21    I am slow on the uptake, but I just figured out, which is

22    their expert who didn't provide a report, for whatever

23    reason, didn't address the BAE prior art system and now

24    they want to say -- they want to have Mr. Pockrus come in
```

Page 34

1   and say, well, the BAE prior art system is the same as

2   Veraart, which their expert did address, so they can have

3   somebody talk sort of in a roundabout way about that

4   combination in our expert's report.

5                    MR. HOSTENY:  Your Honor, this is Joe.

6   I don't think that's correct.

7                    THE COURT:  Well, then what is the

8   purpose of his testimony to link the prior BAE system to

9   the '599 patent?

10                   MR. HOSTENY:  Were you asking Aaron,

11  Your Honor?

12                   THE COURT:  No.  I was asking you, Joe.

13                   MR. HOSTENY:  Your Honor, both with

14  respect to Mr. Staehs and Mr. Pockrus, the main thrust of

15  their testimony is that they are not professional

16  experts.  They are engineers or computer scientists who

17  were at BAE who physically observed systems relevant to

18  this case so that they can say I saw differences between

19  these systems.  And here is what the differences are.

20                   THE COURT:  And I'm not stopping you

21  from allowing them to testify about those systems that

22  they had experience with and were familiar with.  What

23  I'm trying to avoid is circumventing Rule 26(a)(2)(B) by

24  using Rule 26(a)(2)(C).  And I had no problem with what

Page 35

1   you had said about Mr. Pockrus's testimony until we got

2   to the differences between the Luna Road and the '599

3   patent.  That's where I started having my problems.

4                   MR. HOSTENY:  Okay.  Your Honor, I don't

5   want to replow old ground -- this is Joe again -- but it

6   just seems to me that this is the kind of question that

7   Mr. Pockrus could answer without having provided an

8   expert report.  And it's something that's in his summary.

9                   I don't think it's precluded from being

10  in a summary by virtue of the fact that the Veraart

11  document has a patent number on it.  You know, it's a

12  drawing or drawings like many things that the engineers

13  look at.  And I think what we are proposing is not that

14  he compare claims or do something that Mr. Thompson may

15  do or Mr. Kirtley may do.

16                  THE COURT:  Well, Mr. Thompson -- is

17  Mr. Thompson your expert?

18                  MR. HOSTENY:  Right.  He is one of our

19  two experts.

20                  THE COURT:  And we know this, too, that

21  experts can augment their testimony when they take the

22  stand based upon what they heard in the courtroom.

23                  MR. HOSTENY:  Perhaps so.  That will be

24  subject to whatever the parties say and whatever Judge

Page 36

1   Stark rules, if and when the case is tried.

2                   THE COURT:  So when Mr. Pockrus takes

3   the stand and says the Luna Road had this type of

4   diagram, the '599 had this type of diagram, and, gee,

5   these two systems are really very similar based upon the

6   drawings.  And then that means that Mr. Thompson or

7   whoever the expert was who didn't address these prior art

8   systems will be able to -- or you make the argument that

9   they be able to use what Mr. Pockrus said on his

10  testimony to modify their -- what Mr. Pockrus testified

11  to and then the expert, who was actually testifying about

12  it, would modify.

13                  This is, I think, where the line and the

14  problem potentially exists.  But I'm leaning toward this

15  concept, and that is, I didn't have problems until we got

16  to the differences between the Luna Road and the '599

17  drawing.  Now, if you're allowed to do this, then it's

18  limited, it has to be limited to a '599 drawing.  And I

19  have no idea if there is more than one drawing in the

20  '599 patent.  Is there more than one figure?

21                  MR. MOORE:  I think there is.

22                  THE COURT:  Well, if he relied upon a

23  drawing, then that drawing has got to be identified.

24                  MR. HOSTENY:  Okay.

Page 37

1              THE COURT:  Because his testimony needs

2     to be locked in because the whole idea under subsection C

3     that we have been discussing is really not to have

4     somebody show up in court and be ready to testify on

5     points that fall into that category of, that hybrid

6     category, as I talked about before, of not just facts

7     because you don't generally get stuff all over the place

8     on facts except if it's asked for by way of interrogatory

9     or somebody is deposed, but where that opinion area, that

10    expertise comes in, that's related.  And I'm trying to

11    walk that fine tension in my decision here.

12              So Pockrus, based upon a drawing in the

13    '599 patent, can say how that drawing differs from what

14    he understood the Luna Road prototype was or how it was

15    the same.  Whatever you are putting him in for as far as

16    those two parts.  And then I don't want you to turn

17    around and now augment it and say 15 drawings in this

18    patent either.  It's based upon what you said to me "a

19    drawing" that he relied upon.

20              MR. HOSTENY:  There are two -- there are

21    more than two figures, but there are two figures that are

22    pertinent to what we are talking about, but we can pick

23    one of those.

24              THE COURT:  That's right.  He relied on

1    something.  And what you represented is it's a drawing.

2    So he can talk about how that drawing in the '599 doesn't

3    show the following, and how that drawing in the '599,

4    based upon what he knows about the Luna Road aspect, how

5    they are the same or how they could be different.  But

6    what he can't testify about is whether the '599 patent

7    stands for this or does not and how the '599 patent

8    compares to the '125, because that, no doubt in my mind,

9    I strongly feel he didn't do an expert report under

10   subsection B.

11              So what's the problem with Mr. Pribonic?

12   We haven't discussed Mr. Pribonic.

13              MR. MOORE:  Your Honor, this is

14   Mr. Moore.  So for Mr. Pribonic --

15              THE COURT:  Hold on for a second, I

16   don't think there's even been a representation by Joe yet

17   because we didn't even get into Mr. Pribonic.  We got

18   Staehs done and we got Mr. Pockrus done.  But I haven't

19   heard the summary that Mr. Pribonic, the part of the

20   summary that the parties have a disagreement on and what

21   plaintiffs' argument is yet, and then you can respond to

22   it, Aaron.

23              MR. MOORE:  Okay.

24              THE COURT:  Because they are the ones

Page 39

1    promoting the individual, so I will have them go first

2    and then we can go back and forth a little bit.

3                    MR. HOSTENY:  Thanks, Your Honor.  This

4    is Joe.

5                    I am using the flagged copy of the

6    summary for Mr. Pribonic that we got from Mr. Moore.  I

7    would like to go in reverse order on this because it just

8    makes a little more sense in light of his background.

9                    THE COURT:  His background -- refresh my

10   recollection, was he one of the inventors?

11                   MR. HOSTENY:  He was not one of the

12   inventors of the '125 patent.  He is the inventor of the

13   other patent involved in the case, the '237.  And he has

14   other patents as well in this general technological area.

15   He has got several patents.

16                   THE COURT:  All right.

17                   MR. HOSTENY:  Owns Magnetar

18   Technologies.  He has done that for decades.  He is a

19   mechanical engineer, and he has designed magnetic brakes

20   for amusement park rides for many, many years.  And

21   that's his experience and his knowledge that he has

22   gained over the course of his life.

23                   One section of his report concerns the

24   advantages of magnetic brake systems.  For example, when

Page 40

```
 1   you have a permanent magnetic brake, it does not require
 2   a power supply.  It doesn't need a control system.  There
 3   isn't any physical contact between the brake and the
 4   vehicles, unlike would be the case if you were using a
 5   friction brake.  Don't have to replace brake pads like
 6   you would in a friction brake or in a car.  You don't
 7   have brake dust.  And there are some other advantages
 8   here as well.  Fail-safe.  You don't have to worry about
 9   a computer failure.
10                   So that's all information that
11   Mr. Pribonic has used over the course of several decades
12   to encourage his clients to use magnetic brakes.  Those
13   are all features of the design of magnetic brakes which
14   he has done for several decades.  So it's not about the
15   patent, per se, it's about the advantages that can accrue
16   when you go from friction brakes where you have clamps
17   and motors or actuators and you go to a magnetic brake
18   instead.
19                   THE COURT:  Out of curiosity -- this is
20   just a side thought, and I'm sorry for interrupting
21   you -- but do you get squeaks with magnetic brakes?
22                   MR. HOSTENY:  No.
23                   THE COURT:  Okay.
24                   MR. HOSTENY:  They don't touch, unless
```

Page 41

1    they are improperly installed.  You can crush a hand --

2                    THE COURT:  Yeah.

3                    MR. HOSTENY:  -- with a magnetic brake.

4    When you install them, you have to be real careful.  But

5    one of the great virtues of the brake is that there is no

6    contact between the magnetic element and the fin, that is

7    the other portion of the brake.  That's the whole idea

8    behind them.  It's strictly the magnetic field created by

9    the relative movement that causes the magnetic brake to

10   function.  So it's not like you need an actuator to clamp

11   it down or a motor to clamp it down or anything like

12   that.

13                   So, generally speaking, it's the

14   physical advantages of magnetic brakes versus ordinary

15   friction brakes that Mr. Pribonic knows about from a

16   lifetime in the business.

17                   Second is we propose that he be able to

18   identify that the Steel Dragon ride in Japan uses

19   friction brakes because it has an unusually long brake

20   run.  One of the reasons you want to use magnetic brakes

21   is, according to Mr. Pribonic, is that you have shorter

22   brake runs available to you because of geographic

23   limitations where you may place a ride or the physical

24   layout of a ride.  That's the second aspect that's

1   disputed between the parties.

2                    The third and last is -- Mr. Pribonic

3   was questioned about this in his deposition.  He was

4   asked whether -- let me get the right page here.  Yeah,

5   this came up on several pages of his deposition.  He was

6   asked whether brakes made by Magnetar were covered by

7   Claim 3 of the '125 patent.  And Mr. Pribonic said they

8   were.

9                    And he didn't make that determination in

10  connection with this lawsuit.  What happened was a number

11  of years ago when he wanted to get a license -- well, he

12  decided he needed to get a license because he looked at

13  his brake structure and he concluded that they were

14  covered by Claim 3 of the '125 patent, which at that time

15  was owned by G&T and not licensed to Mr. Pribonic.  And

16  that was Mr. Pribonic's motivation to go and get a

17  license from G&T.

18                    So it doesn't have any connection with

19  this particular lawsuit.  It's knowledge that

20  Mr. Pribonic acquired in the course of his work.  And as

21  a mechanical engineer and a brake designer, I think he

22  was qualified to draw that conclusion.  He believed he

23  was because he went and got a license for which he has to

24  pay G&T.  And that's -- now G&T is a coplaintiff in the

Page 43

1    suit.

2                    So those are the points that we want to

3    have him testify about that I understand that Mr. Moore

4    and his colleagues disagree about.

5                    THE COURT:  All right.  Have you covered

6    everything, Joe, and do you have anything you wish to add

7    as far as argument?

8                    MR. HOSTENY:  No.  I don't think so,

9    Your Honor.  I think this is factual testimony by

10   Mr. Pribonic, and I don't think that -- I think he would

11   be able to testify to this without even a summary.

12                   THE COURT:  I understand what you are

13   arguing.

14                   Aaron, are you going to be addressing

15   this too?

16                   MR. MOORE:  Yes, Your Honor.

17                   THE COURT:  Your position on the

18   advantages of magnetic brakes versus -- what I will call

19   the category of the advantages of magnetic brakes over

20   the friction brakes.

21                   MR. MOORE:  Actually, again this may be

22   one of those issues that may be more of a relevance issue

23   or an expert qualification issue or something like that

24   because really what the disclosure says is he would

Page 44

1    testify about advantages of magnetic brakes.  But that

2    doesn't, in our view, really have anything to do with

3    this case at all because the question here would have to

4    be what, if any, are the advantages of the claimed

5    brakes?  So if the testimony, I suppose, is limited to

6    advantages of magnetic brakes in general, that might be

7    okay with us, as long as we are not talking about

8    Mr. Pribonic trying to testify that the particular

9    configuration of brakes in these patents provides these

10   advantages.

11                  THE COURT:  Are the parties now in

12   agreement?

13                  MR. HOSTENY:  This is Joe, Your Honor.

14   Perhaps we are.

15                  THE COURT:  I think he could also

16   testify to the advantages over friction because if he has

17   put that out there.

18                  And how about the ride in Japan, because

19   it seems to me that subpart is related to the first

20   subpart because it deals with friction brakes and why it

21   uses friction brakes.

22                  MR. MOORE:  Well, there is more in that

23   paragraph than just the ride in Japan, but we can start

24   with that one which is that, in our view is again an

Page 45

1    example of not someone speaking about their

2    contemporaneous knowledge of facts underlying the

3    dispute.  I mean, it's an example of our expert

4    identifying that ride in an opening report and instead of

5    getting a rebuttal report on that issue from the

6    plaintiffs, we now get this disclosure that says, well,

7    he is just going to say you are wrong, basically.

8              And so this is not something that he

9    experienced, this is him apparently going out and doing

10   research.  And so we think that we should have gotten a

11   report on that topic.

12             THE COURT:  Let's do it issue by issue.

13   What else is in there that bothers you?

14             MR. MOORE:  Well, what the cell on this

15   chart says is the content of paragraphs 32 and 34 of

16   Joseph Gemini's expert report.  The text at note 73 and

17   75 on page 23 of Gemini's report.  The general discussion

18   of the patents at Gemini paragraphs 17 and 18, and then

19   the businesses about the Steel Dragon ride in Japan.  And

20   then if you turn to Gemini's report, paragraph 32 says,

21   "I understand from Mr. Pribonic that the ability to build

22   roller coasters in the manner in which amusement parks

23   desire requires the use of magnetic brakes."

24             So here we have really the, I suppose,

1    the relevance problem again because it talks about

2    magnetic brakes not the patented brakes, but also we have

3    Mr. Pribonic now putting himself in the shoes of

4    amusement park owners and talking about what they would

5    or would not want, which clearly is not within his

6    expertise because he doesn't own amusement parks and he

7    doesn't even design roller coasters.  He designs brakes

8    only.

9              He goes on to say -- this is Mr. Gemini.

10   He says, "According to Mr. Pribonic, in general the land

11   footprint of these parks causes roller coasters to be

12   built with more feet of coaster that has to be fit into

13   smaller spaces.  This requires the roller coasters to add

14   twisting and turning elements and faster starts.

15   According to Mr. Pribonic, coasters running at higher

16   speeds cannot run on friction brakes."

17             So all of this has the problem of being

18   general.  It's not limited to the patented configuration

19   or not.  But also, again, now he has morphed from an

20   amusement park owner to a roller coaster ride designer.

21   And so, again, it's completely beyond anything that he

22   could fairly claim is within the realm of his personal

23   experience.

24             So it doesn't, we think, fall within

Page 47

1    that category of things for which an expert report could

2    be avoided.

3                    MR. HOSTENY:  Your Honor, this is Joe.

4    It would be impossible to design a magnetic brake for an

5    amusement park ride without knowing about amusement park

6    rides.  As you design these brakes, whether they are for

7    new coasters or retrofits, and I think Mr. Pribonic's

8    work is mostly in the retrofit area, you need to know the

9    run available.  You need to know the weight of the cars.

10   You need to know the speeds.  You need to know the

11   slopes.  You need to know the length of the hills.  You

12   need to know all kinds of details about the roller

13   coaster.

14                    I mean, just like if you were designing

15   a brake for an automobile, you would like to know how

16   many wheels does it have?  How fast is it going to go?

17   How much does it weigh?  And so forth and so on.  And

18   this information came up in Mr. Gemini's deposition

19   because, for example, you know, there was the discussion

20   of the Steel Dragon in Japan that Mr. Pribonic had told

21   Mr. Gemini that it was a much longer run.  And for that

22   reason it fit into a bit of a different category where it

23   was possible to use a friction brake on the Steel Dragon

24   as opposed to a magnetic brake.

Page 48

1            I think Mr. Pribonic would also know

2    that the general rule when these roller coasters are

3    built is that it must -- is that it often, not always,

4    but often, and maybe in most instances, replaces some

5    other ride or rides in a park and is usually in a

6    location that is not --  you don't have as much land as

7    you might want.  You are not building from scratch,

8    because you have other amusement rides around it and you

9    are confined.

10            So the fact that you are confined means

11    that you cannot necessarily, for example, have long runs

12    that allow you to use friction brakes that in turn

13    encourages the use of magnetic brakes.

14            I think if you read Mr. Gemini's report

15    as a whole, I think it's a fair -- I think it's a very

16    good reliance upon the factual information available to

17    Mr. Gemini in the case through Mr. Pribonic.  And had he

18    not talked to Mr. Pribonic, he would be doing a lousy job

19    of preparing an expert report.

20            So I think these are factual statements

21    from Mr. Pribonic.  I agree with you, when it comes to

22    Mr. Gemini, they are some of the bases for some of the

23    opinions that he is rendering, but if the defendants

24    don't think Mr. Gemini's report is adequately supported,

Page 49

```
 1    I suppose we fight that out with the Daubert motion.
 2                    THE COURT:  Let me just ask you one
 3    question, Joe.
 4                    Do you say that this case, that is the
 5    '125 patent, deals with magnetic brakes?
 6                    MR. HOSTENY:  I'm sorry, the '125, Your
 7    Honor?  I didn't hear the whole question.
 8                    THE COURT:  Does it deal with magnetic
 9    brakes?
10                    MR. HOSTENY:  Yes, the '125 patent does
11    deal with magnetic brakes.
12                    THE COURT:  And is this a conflict
13    between you and the defendant?  Because what I have heard
14    from Aaron is the reference that it deals with magnetic
15    brakes rather than the brakes involved in this case.  And
16    are you saying that the magnetic brakes structure that's
17    in the '125 patent covers the brakes that are involved in
18    this case and are the defendants saying they are not
19    magnetic brakes?
20                    MR. HOSTENY:  I understand the
21    difference between the parties to be, Your Honor, that we
22    are asserting that the defendants rides are covered by
23    either the '125 or the '237 patent, and that the
24    defendants are saying indeed we do use magnetic brakes on
```

Page 50

1    many of these rides, but they are not covered by the

2    asserted claims of the '125 or the '237.

3                      THE COURT:  Okay.

4                      MR. HOSTENY:  When you get to damages,

5    the difference between the parties is -- and that's where

6    Gemini comes in.  The difference between the parties is

7    that our case is that magnetic brakes have value for the

8    reasons described by Mr. Pribonic based on his

9    engineering experience.  And that has some influence upon

10   the damages that the defendants ought to pay and the

11   royalty that ought to be used in the case.  And the

12   defendants essentially say magnetic brakes are not

13   terribly useful; you could use friction brakes on all of

14   these rides.

15                      And we say, and Mr. Pribonic says, well,

16   for various reasons that's not so, because friction

17   brakes simply don't have these advantages and simply are

18   not -- they are not often used anymore.  The great

19   majority of new braking systems are magnetic brakes.

20                      So that's where I see the differences

21   between the parties.  One is with respect to

22   infringement.  The other is with respect to the value of

23   magnetic brake technology as compared to friction brake

24   technology.

Page 51

```
 1                    THE COURT:  Aaron, is Mr. Gemini an
 2    expert on damages?
 3                    MR. MOORE:  He is a damages expert, yes.
 4    Your Honor, it may help if I put this into context a
 5    little bit.  The issue here is whether the plaintiffs can
 6    invoke the entire market value rule.
 7                    THE COURT:  Sure.  I understand.
 8                    MR. MOORE:  So we have patents on brakes
 9    and they want a percentage of the entire ride.
10                    THE COURT:  I understand.
11                    MR. MOORE:  And so in order to do that
12    they have to show that the patented brake is the source
13    of demand for the entire ride.
14                    THE COURT:  Yes.
15                    MR. MOORE:  And what their evidence is
16    these sort of things that say magnetic brakes are great,
17    but what's missing, the link that is missing is the one
18    that would show that their magnetic brakes are great,
19    because not every magnetic brake is covered by these
20    patents, Number 1.
21                    Number 2, there are plenty of rides out
22    there, including the Steel Dragon ride that's the subject
23    we are at here, which is one of the biggest rides in the
24    world that doesn't use magnetic brakes.  So that's where
```

Page 52

1   this all comes in.  And essentially, again, we provided a

2   report from an expert who designs, describes, who said

3   that you don't need to use magnetic brakes and you don't

4   need to use their magnetic brakes.  And we didn't get a

5   response to that, and instead we get these sort of vague

6   statements from Mr. Pribonic, who is not even an

7   amusement park operator or a ride designer, that all of

8   these rides apparently have to have these magnetic brakes

9   and you can't use magnetic brakes, and none of that is

10  within his personal experience.

11              It could be that if there was a given

12  ride that he worked on, he might be able to say, yes, on

13  that ride you needed to use magnetic brakes.  You

14  couldn't use friction brakes.  But that's not what we are

15  talking about here.  We are talking about him

16  generalizing that to offer his opinion about, I guess,

17  every ride in the world and what they do or do not

18  require in terms of brakes.

19              THE COURT:  Well, the way I am viewing

20  this subpart, and I will just use it as the ride in

21  Japan, I kind of look at it as part of what we discussed

22  before:  magnetic brakes or friction.  I don't know

23  whether it falls into his ability to testify based either

24  upon his expertise, his understanding or his familiarity

Page 53

1   with the industry.  And it kind of seems to me it goes

2   under a Daubert and a weight and a relevance-type issue,

3   but not necessarily the issue that I'm trying to address

4   here.

5              So for that part I will allow it and say

6   that what needs to be described is what is under

7   subsection C as a witness who is going to be talking

8   about stuff that could fall into the 702, 703 and 705

9   category of the Federal Rules of Evidence.  But I'm not

10  commenting on the admissibility, the relevance or the

11  weight or whether a Daubert motion is appropriate.  I'm

12  not commenting on that at all.

13             Again, I am reemphasizing that I'm

14  limiting my analysis solely on that because this is a

15  discovery issue, not an admissibility, or whether it can

16  be used later on at trial, or even on a summary judgment

17  motion.  It appears on the surface to have some

18  relevance.  The question is whether they would make the

19  complete nexus that they need to under the Unilock

20  analysis or the RescueNet analysis that you have and how

21  the entire market value rule has been limited by the Fed

22  Circuit.  But I'm not commenting on that right now.

23             MR. MOORE:  Your Honor, on the discovery

24  side of things, we would submit that this is completely

Page 54

1    inadequate in terms of a disclosure even under section C.

2    If you look actually at -- the section refers in part to

3    the text at note 73 and 75 of Gemini's report.  The

4    entirety of those notes are discussions with

5    Mr. Pribonic, period.  So we have a disclosure here that

6    says he is going to offer testimony about discussions

7    apparently that he had with Mr. Gemini when we don't even

8    know what those discussions are.

9                    And the other topics are similarly

10   vague.  And also, he also references paragraph 17 and 18

11   of Gemini's report.  And it in those paragraphs Gemini

12   says that plaintiffs have asserted that certain roller

13   coaster rides purchased, installed and operated infringe

14   the '125 patent using the elements of Claim 3, including

15   brake equipment manufactured by -- now we are getting

16   into apparently infringement issues.

17                    THE COURT:  Well, I'm not allowing him

18   to testify as to infringement issues.  I mean, what

19   Gemini -- my understanding is that Gemini as an expert on

20   damages has to operate from this assumption.  Doesn't he

21   have to operate from the assumption starting off when he

22   is doing his analysis that infringement exists and what

23   he is trying to do is put a value on that?

24                    MR. MOORE:  I understand that.  But I

Page 55

1    don't see otherwise a reason for Mr. Pribonic's summary

2    to say that he is going to support those paragraphs.

3                    THE COURT:  Well, you don't want him to

4    come in and testify as to whether there was or was not

5    infringement.  That's what you don't want, right?  For

6    example.

7                    MR. MOORE:  Well, it's one of the

8    things, correct, yes, Your Honor.

9                    THE COURT:  Well, I went back and said

10   that -- I have emphasized if you fail to provide a report

11   under subsection B of Rule 26 that we have been

12   discussing and failed to provide in detail an analysis,

13   you can't testify as to whether or not the patent is

14   valid or whether or not the patent is infringed.

15                   So I'm not reading that as -- well, I

16   understand what your concern is, you don't want them to

17   be able to allow that.

18                   So, Joe, define more, put in more about

19   the conversations that he is going to be relying upon

20   about what he told Gemini.  I mean, if it's relating to

21   his purported familiarity with rides and his engineering

22   degree and you are looking at an area that you are going

23   to build a ride and what's the likely -- and in light of

24   that, as an engineer, what type of brakes would you use,

Page 56

1    that is, friction versus magnetic brakes, I think he can

2    testify to that.  But I don't think he can testify as to

3    whether the patents are infringed or not infringed,

4    whether they are valid or not valid, et cetera.

5                    MR. HOSTENY:  Are you talking about,

6    Your Honor, you are saying -- when you say "he," are you

7    referring to Mr. Gemini or Mr. Pribonic?

8                    THE COURT:  Mr. Pribonic.  I am assuming

9    Mr. Gemini isn't going to testify as to whether the

10   patents are valid or not or infringed or not infringed

11   because doesn't he, as an expert on damages, he has to

12   start off with his analysis with the assumption that the

13   patents are infringed and that they are valid?

14                   MR. HOSTENY:  Right.  I think he says

15   that he is not an infringement expert and takes that as

16   an assumption and does not have an opinion on that score.

17                   THE COURT:  Yeah.  And he wouldn't have

18   an opinion just like I don't believe Mr. Pribonic could

19   have an opinion on that score because he didn't file a

20   report as required under subsection B.  And he was never

21   put out there as an expert in that regard on those

22   issues.  He is out there testifying.

23                   MR. HOSTENY:  Yeah, I don't think the

24   disputed portions of Mr. Pribonic's report deal with

Page 57

```
 1   opinions regarding infringement or invalidity.  He

 2   doesn't mention any of the -- he doesn't mention the

 3   Kirtley report.  He doesn't mention any reference in it.

 4   He doesn't mention BAE earlier systems or the prototype.

 5   What he does mention is his engineering knowledge on the

 6   advantages of friction brakes and that he did -- he does

 7   say -- the one place where he does touch on the patent is

 8   he said he looked at Claim 3.

 9                THE COURT:  That's the next thing we are

10   going to talk about.  I think what caused the problem was

11   how it was written in your summary about what -- the fact

12   that Mr. Pribonic referenced back to paragraph, I think

13   it was 17 and 18 in Mr. Gemini's report, and Mr. Gemini

14   made a comment about infringement.  You know, I just

15   never expected that to be part of Mr. Pribonic's analysis

16   in the sense of -- and I didn't read it that way and I

17   just want to make it clear on the record it's not going

18   to be that way, that he is not going to be testifying

19   about infringement and noninfringement and validity and

20   invalidity.

21                MR. HOSTENY:  I pulled up Mr. Gemini's

22   report while we were looking at it, but that's my

23   understanding, too, that those were comments relevant to

24   Mr. Gemini's opinions about how to value the technology
```

1    in question.

2                    THE COURT:  That's right.

3                    MR. HOSTENY:  How to value the magnetic

4    brakes and put a number on it to the best of his ability

5    to do so.

6                    THE COURT:  Yes.

7                    MR. HOSTENY:  Not to opine directly or

8    indirectly, either himself or Mr. Pribonic through him,

9    that there was infringement.

10                    THE COURT:  Or Mr. Pribonic to try to do

11    directly or indirectly that there was infringement and

12    the patents are valid.

13                    MR. HOSTENY:  Well, we haven't included

14    anything in his summary to that effect.

15                    MR. SOLON:  This is Pat.  Joe can pull

16    it off, but I think what we said in the summary was it

17    was background information that Mr. Gemini mentioned in

18    those paragraphs, not infringement assumptions.

19                    THE COURT:  So you are saying that you

20    agree with the background information that this is the

21    information he would have gotten from Mr. Pribonic or

22    not?  Is that what you are meaning, Pat?  I'm sorry.

23                    MR. SOLON:  Your Honor, I am sitting

24    here trying to remember those paragraphs of the Gemini

Page 59

```
 1  report, and I think those paragraphs talk about

 2  background of the patents.  They may have a sentence that

 3  says I assume there is infringement, but that's not what

 4  our disclosure was about.

 5                    THE COURT:  And that's not the way I

 6  viewed it.

 7                    MR. SOLON:  Joe can pull it off.  He

 8  has, I think, access to it and I do not.

 9                    MR. MOORE:  This is Mr. Moore.  This is

10  really part of the problem:  this is so vague that we

11  can't even tell what is meant to be included and what is

12  covered by this summary and what we are going to be

13  hearing about at summary judgment or at trial.

14                    MR. HOSTENY:  This is Joe, Your Honor.

15  The defendants got Mr. Gemini's report and deposed him

16  about this and asked him questions about his

17  conversations with Mr. Pribonic.

18                    THE COURT:  Well, does Mr. Pribonic --

19                    MR. MOORE:  Not Mr. Gemini, I am saying

20  Mr. Pribonic.

21                    THE COURT:  He is saying the reverse,

22  though.  He is saying that you got information through

23  your own expert about what he learned from Mr. Pribonic.

24  Does Mr. Pribonic dispute what Mr. Gemini's deposition
```

1    says about what they discussed?

2                    MR. MOORE:  Yes.  I will tell you that

3    Mr. Gemini wasn't able to tell me anything more about

4    those discussions than what's in his report.

5                    THE COURT:  Hold on.  I think the real

6    issue is whether Mr. Pribonic is going to testify

7    differently than what Mr. Gemini said about what

8    Mr. Pribonic told him, right?

9                    MR. MOORE:  Well, there is that and

10   there is also what are the bases for these claims that

11   Mr. Pribonic is making in summary form in this

12   disclosure?

13                   THE COURT:  Well, the basis of the

14   claims, I understood, and this is where I went back to

15   before was you dispute whether he has got the experience

16   and the expertise to be able to make these statements.  I

17   think that goes to weight and to Daubert more so than it

18   does to subsection B and subsection C.  That's what I am

19   trying to distinguish between the two.

20                   Now, I have not allowed Mr. Pribonic to

21   comment upon whether there is infringement -- doing any

22   comparison about devices or prior art or anything to say

23   or make any comment that would reference as to whether or

24   not the patents are infringed or they are valid.

Page 61

1                MR. MOORE:  Your Honor, can I ask for

2    one other clarification?

3                THE COURT:  Okay.  But I want to say,

4    Aaron, if your concern was that Mr. Gemini had in his

5    report the word infringement or reference to infringement

6    in those two paragraphs, I'm not reading that what

7    Mr. Pribonic was going to say was going to deal with

8    whether there was or was not infringement or whether the

9    patents were valid or not.

10              Okay.  So there was another issue that

11    you wanted to ask.  What?

12              MR. MOORE:  I am just curious because,

13    as I mentioned, I think when I initially talked about

14    this section of Mr. Pribonic's report, it is not limited

15    to the patented brakes.  He is just talking about

16    magnetic brakes generally.  And I guess our question is,

17    is he going to be able to come in and talk about these

18    features of these alleged advantages being characteristic

19    of the patented system or is he going to be limited to

20    what he says here which is that these are features of

21    magnetic brakes in general?

22              THE COURT:  He's indicated that he is

23    giving a summary on magnetic brakes.  That's how I view

24    it.

Page 62

1                MR. MOORE:  Okay.  Thank you, Your

2     Honor.

3                THE COURT:  Now, the third issue is --

4     and now I can't even find my notes what the third issue

5     was, what I considered the third issue.

6                MR. HOSTENY:  This is Joe, Your Honor.

7     That is where I described how Mr. Pribonic in the course

8     of his business --

9                THE COURT:  Oh, with Claim 3, whether he

10    went out and got a license from G&T because he felt that

11    his devices were covered by Claim 3 of the '125 patent;

12    right?

13               MR. HOSTENY:  Correct.

14               THE COURT:  And you have indicated that

15    because he had already been asked this on deposition;

16    right?

17               MR. HOSTENY:  Yes, at the pages that we

18    indicated in the summary 22, 24, 110 to 111, 308 to 309.

19               THE COURT:  All right.  Aaron, you asked

20    it at deposition, right?

21               MR. MOORE:  I'm sorry, Your Honor.

22               THE COURT:  You asked it at deposition.

23               MR. MOORE:  I may have asked him why he

24    bought the patent and he said, probably said because I

Page 63

1    thought we infringed or something to that effect.

2                    MR. HOSTENY:  This is Joe.  This is what

3    he said at page 22.

4                    THE COURT:  Why don't you give me the

5    questions and then we can listen to the answer.

6                    MR. HOSTENY:  Right.  The earlier

7    question is on page 21.  Mr. Pribonic is asked about an

8    exhibit.  Exhibit 6, Aaron.

9                    And the question is:  "Can you tell me

10   what that is?"  And the answer is:  "This is the

11   maintenance manual for our model 020N4."

12                   And then it continues on to page 22 and

13   they changed a bit of the brake design.  And at the

14   latter part of page 22 here is the question that he is

15   asked by Mr. Moore:  "Is this brake marked with the

16   number of the '125 patent?"

17                   Answer:  "No, it is not."

18                   Question:  "Is there a reason for that?"

19                   Answer:  "We didn't have a license to

20   the '125 at that time."

21                   Question:  "Would this brake be covered

22   by the '125 patent?"

23                   Answer:  "Yes, it would."

24                   And that was the first exchange about

Page 64

1    it, and then there is another one later in the deposition

2    which I can go to as well if you like.

3                    THE COURT:  What was the question after

4    that?  After when it was asked was this brake covered by

5    the '125 patent and he said yes, what was the next

6    question?

7                    MR. HOSTENY:  At that point the next

8    page, page 23, another deposition exhibit was marked.

9    Mr. Pribonic was asked what it was.  He said it was the

10   maintenance manual for their model 015N4.

11                   THE COURT:  Okay.  So it went to another

12   model, not to the model that was being discussed on the

13   previous page?

14                   MR. HOSTENY:  Yes.

15                   THE COURT:  All right.  And when is the

16   next colloquy of questions concerning claims that could

17   even be related to Claim 3 of the '125 patent?

18                   MR. HOSTENY:  That's at page 110.  This

19   is the first day of the deposition, in the afternoon.

20   Mr. Moore asked:  "So when did Magnetar first learn of

21   the '125 patent?"

22                   Answer:  "I don't know.  Sometime

23   probably around 2006 or prior to 2006.  It may have even

24   have been cited as prior art in one of our patent

Page 65

1  applications, I'm not certain."

2              The next question:  "And did there come

3  a point at which Magnetar decided that it wanted to buy

4  or license that patent?"

5              Answer:  "Yes."

6              Question:  "Why?"

7              Answer:  "Well, because we were in the

8  business and I saw that there were multiple competitors

9  and multiple types of markets to get into it, and I

10 didn't want to get into a business and find out later

11 that I had stepped on somebody's toes and I'm going to

12 get sued or be stopped from manufacturing or selling

13 something.  So I thought it looked like a really good

14 patent, you know, and it had all of the elements, at

15 least what we were doing in the amusement park business,

16 and so I made an inquiry."

17             And then it goes on to ask him some

18 questions about whom he communicated with, Forest

19 Engineering, Allen Foster, and so forth.  That's pages

20 110 and 111.

21             THE COURT:  Is there anything else that

22 you cite to?

23             MR. HOSTENY:  Yes, there is.  I just

24 have to pull up one other deposition.  Bear with me for

Page 66

1    just a moment.  I thought I had it opened and I believe I

2    do.  The second day.  About page 300, give me a moment.

3    308 to 309.  Okay.

4                    About the middle of the page, Mr. Moore

5    asks:  "If you look at Claim 3 of the '125 patent, which

6    is Exhibit 2, in column 8 we talked before about this

7    language 'each assembly is comprising of a mounting

8    bracket, a plate attached to said mounting bracket and a

9    series of magnets bonded to the plate.'  Do you see

10   that?"

11                    Answer:  "Yes."

12                    "Is that similar to how the original

13   Magnetar brake that we talked about yesterday worked, the

14   one for Kennywood?"

15                    Answer:  "It's similar, yes."

16                    Question:  "Is it the case in the

17   current product that there's a mounting bracket and a

18   plate attached to the bracket with a magnet bonded to the

19   plate?"

20                    And the answer is:  "Pretty much so,

21   yes."

22                    And then they go into some questions

23   about details of the structure and the Wildcat ride and

24   the Hi-Miler and the Wild Mouse ride.  That's the

1    third -- let me see -- 308 and 309.  That was the third

2    reference that we provided.

3                   THE COURT:  All right.  Aaron?

4                   MR. MOORE:  Well, I guess I would say

5    that testimony is what it is.  I don't see how it

6    converts Mr. Pribonic into an expert on whether or not

7    the claims, as I think they were subsequently construed,

8    cover any Magnetar product.  He may believe that, that

9    doesn't mean he is entitled to say that in this case.

10                  THE COURT:  Well, what he testified to

11   on the pages that are so noted -- again, I go back to you

12   had information, you were aware that this was his

13   testimony.  How it can be used, I'm not ruling on that

14   right now.  But I certainly -- where identified in his

15   deposition, I certainly think that you've had notice.  He

16   didn't need to go into further detail.  You could have

17   questioned him further.  But I don't believe that

18   necessarily makes him an expert to testify on whether or

19   not the patents were infringed by the Magnetar brakes.

20   He may have felt they were.

21                  He has not been identified as an expert

22   to be able to testify as to that.  But that doesn't

23   necessarily mean that he is going to be an expert to

24   testify as to whether your devices infringe or do not

infringe.

But I, again, am not ruling on the weight, the relevance or the admissibility of that testimony. As I said, it could be all part of what you do with a Daubert motion or what you do on motions in limine. And, you know, he may have felt that Magnetar brakes infringed, which is a reason why he took a license.

Is his license, by the way, being used as evidence to support either plaintiffs' or defendants' position on the value?

MR. MOORE: Yes. Both, I would say.

THE COURT: Both sides are using -- okay. Well, that's an interesting situation. Obviously it's a license out there. You don't take a license because -- I think reading the comments together, not just limiting it to page 308 and 309 but the prior two pages -- and I can't remember what the page numbers were, I think they were someplace in the 20s -- is an interesting combination as to why he may have taken a license, but a lot of times you don't have the people on the stand who took a license. You just have the license out there and everybody is interpreting what was meant by it.

Page 69

1          MR. MOORE:  Well, Your Honor, I think

2    you could see or hear from those experts that I wasn't

3    pursuing that issue, in part, I think, because I wasn't

4    anticipating that Mr. Pribonic would be offering expert

5    testimony that the claims of the patent covered that

6    brake.

7          THE COURT:  But let me ask you.

8          MR. MOORE:  It's a little unfair to me

9    to have that be the basis for him now to be able to

10   provide expert testimony when at the time he was not

11   designated as an expert.

12         THE COURT:  But he is limited to what he

13   testified to, and that's what they are relying upon.

14   They haven't given you any more information as to why.

15   Right?

16         MR. MOORE:  His testimony is basically

17   the ultimate conclusion.

18         THE COURT:  He said he thought that it

19   was covered, that the Magnetar brakes were covered by the

20   '125 patent, Claim 3; right?  That's what he said.

21         MR. MOORE:  Right.

22         THE COURT:  And the relevance of having

23   the Magnetar brakes covered by the '125 patent is in

24   relationship to the brakes that are used by the

Page 70

```
 1    defendants?

 2                   MR. MOORE:  Well, I don't know, again,

 3    Your Honor, because it's not going to be a damages issue,

 4    I don't think, unless it's, again, kind of a bootstrap,

 5    this brake is covered and this brake looks like that

 6    brake kind of argument, then I don't know that it is

 7    necessarily relevant.

 8                   THE COURT:  No, but I'm saying is there

 9    an argument out there or testimony out there that the

10    Magnetar brakes and the brakes that are being used by the

11    defendants are the same brake?

12                   MR. MOORE:  There is not.  We may see

13    that, but presently nobody has said that and it's not in

14    any of these reports or disclosures that I've seen.

15                   THE COURT:  Well, like I said, I think

16    what has happened is to the extent that what his

17    deposition says, that's what he is going to have to live

18    with because they have not augmented beyond that.  So

19    that's a combination of what's in C, what is in

20    subsection C of Rule 26 that we have been talking about.

21    And what they are pointing to is the notice that you have

22    received.  And that's the parameters within which I think

23    they would have to necessarily be confined.

24                   But whether this has any relevance to
```

Page 71

1    this case, I don't know for sure.  But I'm not suggesting

2    that it can be used to show -- if there is no suggestion

3    to me that there is a relationship between that, that he

4    thought that his brakes infringed or his product, that

5    what he was making infringed is at all related to what

6    the defendants are doing.  So that was his opinion as to

7    why he decided he was going to get a license because he

8    thought he infringed.

9                    As I said, the inadmissibility of that

10   may not be something that Judge Stark allows.  I don't

11   know.  I'm not going to be deciding that at trial because

12   he just referred this matter through the summary judgment

13   motions, did he not, to me?

14                    MR. MOORE:  Yes.  All the way up to

15   trial, I think.

16                    THE COURT:  All the way up to trial?

17   Did he give me the pretrial, too?

18                    MR. HOSTENY:  I didn't think so, Your

19   Honor.

20                    THE COURT:  No.  I just thought he gave

21   it to me through the summary judgment.

22                    MR. MOORE:  I could be wrong.

23                    THE COURT:  But I think that's a

24   different issue than whether what you've got in his

1    "report" under 26(a)(2)(C) that references you back to

2    his limited testimony in his deposition, and you've

3    received that as to what he is going to testify about,

4    that's what he is limited to what he can testify to.  The

5    why was never asked as to why he thought it infringed.

6                    That's the reference that they are using

7    is his testimony in his deposition on those points, and

8    that's where I think they are limited to what he can

9    present in that regard if it's even admissible or usable

10   or relevant, et cetera, at trial.  When you are going to

11   use subsection C, I think you have got to provide a

12   summary.  And if he didn't explain why, and you were

13   relying upon a deposition that didn't explain why he

14   thought it infringed, I don't think he can tell you now

15   or add that now.

16                    MR. MOORE:  Okay.

17                    THE COURT:  Is there anything else that

18   we had to discuss on this point?

19                    MR. MOORE:  On that last point, Your

20   Honor, or on this whole issue?

21                    THE COURT:  Well, I thought what was

22   being presented were the points in Mr. Pribonic's and

23   Mr. Pockrus's reports where you couldn't come to an

24   agreement on.

Page 73

```
 1                    MR. MOORE:  No.  I think we have

 2   resolved all of the issues that the parties have.  I

 3   guess our one other question would be if we could have

 4   depositions of Mr. Pribonic and Mr. Pockrus now that we

 5   have settled on what their disclosures are?

 6                    THE COURT:  When would you plan to take

 7   them?

 8                    MR. MOORE:  Within the next couple of

 9   weeks.

10                    THE COURT:  Be careful what you wish

11   for, Mr. Moore.

12                    Your position, Joe?

13                    MR. HOSTENY:  I guess, Your Honor, I am

14   reluctant because I had offered that opportunity as part

15   of a compromise to try and cut this whole thing short,

16   and that would have been six or eight weeks ago.  So, you

17   know, we will do what you want us to do, but I'd really

18   rather not at this point because the defendants didn't

19   accept the offer that I made.

20                    THE COURT:  Well, I'm going to allow it

21   but, like I said, Mr. Moore, be careful what you wish for

22   and what you do because whatever you do in that

23   deposition, in the exploration, is in furtherance of

24   understanding and getting information because I'm
```

1    certain -- for example, experts when they provide an

2    expert report under 26(a)(2)(B) I'm sure don't put in

3    every little bit about what they relied upon and

4    everything in detail.  I'm sure it's quite detailed, but

5    I'm also certain from what I have seen of these reports

6    that it's conclusory in part.

7                  But once you take their deposition,

8    that's up to you as to what you want to explore in that

9    regard.  I think I tried to give you some parameters as

10   to what I'm allowing and what I'm not allowing, but you

11   will be allowed to take Mr. Pribonic and Mr. Pockrus's

12   deposition.

13                 In light of that, when is the due date

14   for your summary judgment motions or didn't we give a

15   date?

16                 MR. MOORE:  We don't have a date, Your

17   Honor, we were to talk about that today.

18                 THE COURT:  All right.  How much time

19   are you going to want after you get these two depositions

20   done before you start doing the summary judgment motions?

21   You don't have a trial date.

22                 MR. MOORE:  Not very long at all, Your

23   Honor.  We actually got pretty close to the due date last

24   time around.  So there's not that much more work for us

Page 75

```
 1   to do, I don't think.
 2                  THE COURT:  Well, that question was
 3   really asked not just of you, Aaron, it was also asked of
 4   Joe because I'm not certain if plaintiff is going to be
 5   moving on anything, including Daubert motions.  I throw
 6   Daubert out there too.
 7                  MR. HOSTENY:  Your Honor, we may have a
 8   Daubert motion.  We may well have one summary judgment
 9   motion.
10                  In terms of Mr. Pockrus and
11   Mr. Pribonic, I am going to be out of the country for
12   about 12 days beginning the 14th, which leaves it to Pat
13   and Laura Kenneally.  I don't know their schedules right
14   now so I'm a little leery of saying we can have the
15   deposition taken care of in the next couple of weeks
16   because I'm not going to be around.
17                  THE COURT:  Well, my question really is
18   how much time after their deposition is completed do you
19   think plaintiff is going to need to prepare their motions
20   that they intend to file?
21                  MR. HOSTENY:  Okay.  That then I would
22   say three weeks, Your Honor, perhaps less, but I suppose
23   I would say three.
24                  THE COURT:  Why don't we try to work
```

Page 76

1   with this rule of thumb -- and I'm not going to know the

2   date so I would appreciate getting that from you by way

3   of stipulation after the depositions are scheduled --

4   that you put in a time period of roughly three weeks

5   after the depositions are expected to be completed to

6   start off the opening briefs and then the answering and

7   then the reply.

8               Now, are you going to go by way of the

9   Court's schedule -- you can put that in yourself, because

10  I can't remember what the schedule was before, whether it

11  was the Court's schedule or there were dates that were

12  actually beyond the Court's schedule originally.

13              MR. MOORE:  I believe we had agreed to

14  modify the schedule.

15              THE COURT:  Right.  Did you understand

16  what I meant, that our rules, our local rules give you

17  roughly two weeks after the opening brief is done to

18  provide the answering brief, and then one week after the

19  answering brief is completed to provide the reply?  You

20  were not going on that type of schedule, is that what you

21  are saying to me?

22              MR. MOORE:  No, Your Honor, I think we

23  filed a stipulation that was approved to maybe make it a

24  month between opening and opposing briefs.

Page 77

```
 1                    THE COURT:  Was that signed by Judge
 2    Stark?
 3                    MR. MOORE:  I think so, yes.
 4                    THE COURT:  And is that the most recent
 5    stipulation, do you think?
 6                    MR. MOORE:  I think so.  Joe can correct
 7    me if I am wrong.
 8                    MR. HOSTENY:  I have no memory.  It is
 9    what it is.
10                    THE COURT:  I don't either.  I saw the
11    stipulation, but I certainly don't remember it.  So what
12    I suggest is you get dates for the two gentlemen's
13    depositions.  I'm assuming that neither deposition is
14    going to take that long; is that correct?
15                    MR. MOORE:  Yeah, I doubt they will both
16    go full days.  Maybe we can do them both in one day, I
17    don't know.
18                    THE COURT:  Figure them out and see what
19    can be done.  And then take three weeks from the last
20    person's, the completion of the last person's deposition,
21    either Mr. Pockrus or Mr. Pribonic, and start off, put in
22    dates so I understand it, and send a stipulation to me so
23    I will have an idea as to when to expect these.  Like,
24    are you going to dump all of this stuff on me just before
```

1   Christmas?

2                   MR. MOORE:  We certainly won't do that

3   if you don't want us to, Your Honor.

4                   THE COURT:  Well, I think time is

5   running out for you to be able to get it completed by

6   then anyhow, so I'm not so worried about that.

7                   MR. HOSTENY:  I am just looking at a

8   stipulation here that we did in August on the schedule.

9   And we were going to file dispositive motions and Daubert

10  motions on December 14th, the oppositions were going to

11  be due on October 12.

12                  THE COURT:  So it's roughly a month.

13                  MR. HOSTENY:  Pretty close to a month,

14  reply, three weeks.  So that was the schedule we were

15  thinking of.  I guess what we can do is schedule these

16  two depositions and then figure three weeks from those

17  dates for the filing of Daubert and summary judgments and

18  construct a schedule based on that.

19                  THE COURT:  Yes.

20                  MR. HOSTENY:  And do a stipulation.

21                  THE COURT:  That's fine with me,

22  gentlemen.  Just as long as I'm not going to be running

23  against any time period -- that is, I'm not going to be

24  looking at a pretrial conference that Judge Stark has set

Page 79

1   up and you have represented to me that he does not have a

2   pretrial conference set up.  Because what I don't want to

3   do is find out that I'm getting the reply briefs a month

4   before the pretrial conference, because I have no

5   certainty that I would be able to get those decisions out

6   in a timely fashion before the pretrial conference to

7   which, of course, you both know that you have the right

8   to object.

9              MR. HOSTENY:  I am just looking at the

10  last referral, Your Honor, and it just says referred to

11  you to hear and resolve all pretrial matters up to and

12  including the resolution of case dispositive motions.  So

13  it doesn't appear that it includes the pretrial.

14             THE COURT:  Well, I recognize it doesn't

15  include the pretrial.  The question is whether he has a

16  pretrial conference date already in place for himself.

17             MR. HOSTENY:  Oh.

18             THE COURT:  Because that's two different

19  judges working on the same case.  One of them deciding

20  the case dispositives, to which you have the right to

21  take an objection, which I have to add another month in.

22  If there's been no pretrial conference date by Judge

23  Stark, then I have got a comfort level to give you the

24  time that you need to be able to do the case

Page 80

1   dispositives.  That's what I was implying.

2                   MR. HOSTENY:  Okay.

3                   THE COURT:  I know that was a long

4   sentence, wasn't it?

5                   MR. HOSTENY:  I am just looking to see

6   if there was an earlier stipulation or order from Judge

7   Stark governing that, and I just don't believe there was.

8                   MR. SOLON:  Joe, it's Pat.  Your Honor,

9   I'm quite confident there is no pretrial date from Judge

10  Stark.

11                  THE COURT:  It wouldn't surprise me.  It

12  wasn't his practice in the past, although he is starting

13  to do it a little more frequently now.

14                  All right, Counsel.  Thank you very

15  much.  As you know, the transcript of today's proceeding

16  will serve as my order on the issues that we addressed.

17  It's a continuation of the discussion we had back on

18  September 10th.  So between the two transcripts hopefully

19  that has addressed all the issues and I have answered all

20  the questions.

21                  ALL COUNSEL:  Thank you, Your Honor.

22                  THE COURT:  Thank you.  Have a good

23  night.

24                  (The conference concluded at 5:49 p.m.)

Page 81

C E R T I F I C A T E

1

2

3    STATE OF DELAWARE:

4    NEW CASTLE COUNTY:

5         I, Ellen Corbett Hannum, a Notary Public within and

6    for the County and State aforesaid, do hereby certify

7    that the foregoing teleconference was taken before me,

8    pursuant to notice, at the time and place indicated; that

9    the statements of participants were correctly recorded in

10   machine shorthand by me and thereafter transcribed under

11   my supervision with computer-aided transcription; that

12   the transcript is a true record of the statements made by

13   the participants; and that I am neither of counsel nor

14   kin to any party in said action, nor interested in the

15   outcome thereof.

16        WITNESS my hand and official seal this 12th day of

17   October A.D. 2012.

18

     _____

19              Ellen Corbett Hannum, RMR, CMRS

               Notary Public - Reporter

20              Delaware Certified Shorthand Reporter

               Certification No. 118-RPR, Expires 1-31-13

21

22

23

24

[& - allowed]

**&**

**&**   2:2,5,10,13 3:23

**0**

**00127**   1:12
**015n4**   64:10
**020n4**   63:11

**1**

**1**   51:20
**1-31-13**   81:20
**10th**   3:11 80:18
**110**   62:18 64:18
  65:20
**111**   62:18 65:20
**118**   81:20
**12**   75:12 78:11
**125**   5:22 7:1,14 14:4
  14:9,10 15:10 17:22
  17:24 18:2 25:14,22
  32:19 38:8 39:12
  42:7,14 49:5,6,10
  49:17,23 50:2 54:14
  62:11 63:16,20,22
  64:5,17,21 66:5
  69:20,23
**12th**   81:16
**14**   4:5
**14th**   75:12 78:10
**15**   37:17
**17**   45:18 54:10
  57:13
**18**   45:18 54:10
  57:13
**1:07**   1:12

**2**

**2**   8:15,16 18:16,16
  19:4,13 20:11,12
  21:2,5 22:3 26:11
  26:12,13 34:23,24
  51:21 66:6 72:1
  74:2
**2006**   64:23,23
**2011**   12:4

**2012**   1:16 81:17
**20s**   68:19
**21**   63:7
**22**   62:18 63:3,12,14
**23**   45:17 64:8
**237**   39:13 49:23
  50:2
**24**   62:18
**26**   7:20,23 8:3,14,15
  8:16,19 14:22 18:16
  18:16 19:4,13 20:11
  20:12 21:2,5 22:3
  22:14 26:11,12,13
  34:23,24 55:11
  70:20 72:1 74:2

**3**

**3**   42:7,14 54:14 57:8
  62:9,11 64:17 66:5
  69:20
**300**   66:2
**308**   62:18 66:3 67:1
  68:17
**309**   62:18 66:3 67:1
  68:17
**32**   45:15,20
**34**   45:15

**4**

**4:00**   1:16 3:5

**5**

**5,127,599**   6:5 28:16
  28:21
**599**   13:3,4,23 14:5
  14:10 16:17 17:18
  24:17,18 25:1,5,17
  25:20,21 29:4,13,14
  31:21 32:4,18,19
  34:9 35:2 36:4,16
  36:18,20 37:13 38:2
  38:3,6,7
**5:49**   80:24

**6**

**6**   63:8

**7**

**701**   9:1,8 22:13
**702**   19:16 21:12,18
  21:23 22:6 26:7,15
  53:8
**703**   19:16 21:12,18
  21:23 22:6 26:7,15
  53:8
**705**   21:12,18,23
  22:6 53:8
**73**   45:16 54:3
**75**   45:17 54:3

**8**

**8**   66:6
**80s**   7:1

**9**

**9**   1:16 28:11

**a**

**a.d.**   81:17
**aaron**   2:14 3:22,24
  4:2 10:16 14:1 19:6
  22:16 31:8,9 34:10
  38:22 43:14 49:14
  51:1 61:4 62:19
  63:8 67:3 75:3
**aaron's**   21:14,15
**ability**   45:21 52:23
  58:4
**able**   4:4 14:5 15:4
  16:7 17:18 18:12
  24:8 31:24 36:8,9
  41:17 43:11 52:12
  55:17 60:3,16 61:17
  67:22 69:9 78:5
  79:5,24
**absent**   26:10
**accept**   73:19
**access**   59:8
**accrue**   40:15
**accurate**   10:23

**acquired**   9:2 42:20
**action**   1:4 81:14
**actuator**   41:10
**actuators**   40:17
**add**   33:17 43:6
  46:13 72:15 79:21
**addition**   4:8
**address**   33:23 34:2
  36:7 53:3
**addressed**   80:16,19
**addressing**   17:23
  43:14
**adequately**   48:24
**admissibility**   53:10
  53:15 68:3
**admissible**   9:17
  22:7 72:9
**advantages**   28:6
  39:24 40:7,15 41:14
  43:18,19 44:1,4,6
  44:10,16 50:17 57:6
  61:18
**aforesaid**   81:6
**afternoon**   3:6,14,17
  3:19,21 64:19
**ago**   42:11 73:16
**agree**   24:7 26:19
  48:21 58:20
**agreed**   76:13
**agreeing**   23:17
**agreement**   44:12
  72:24
**ah**   4:23
**ahead**   7:10 33:16
**aided**   81:11
**airlines**   30:6
**airport**   11:5 30:7
**alleged**   61:18
**allen**   65:19
**allow**   48:12 53:5
  55:17 73:20
**allowed**   15:23 17:20
  19:15 22:1 26:10,13
  36:17 60:20 74:11

**allowing** 34:21
54:17 74:10,10
**allows** 71:10
**amusement** 39:20
45:22 46:4,6,20
47:5,5 48:8 52:7
65:15
**analysis** 16:1 19:2,5
22:2 26:15,18 30:11
53:14,20,20 54:22
55:12 56:12 57:15
**analyze** 19:2
**angina** 27:15
**answer** 11:5 21:14
35:7 63:5,10,17,19
63:23 64:22 65:5,7
66:11,15,20
**answered** 80:19
**answering** 21:14
76:6,18,19
**anticipated** 24:14
**anticipating** 69:4
**anymore** 4:24 50:18
**anyplace** 4:15
**apparent** 30:10
**apparently** 17:9
45:9 52:8 54:7,16
**appear** 79:13
**appearances** 2:1
**appears** 24:10,11,12
53:17
**applications** 65:1
**apply** 25:11
**applying** 25:10
27:13
**appreciate** 76:2
**appropriate** 26:7
53:11
**approved** 76:23
**area** 37:9 39:14 47:8
55:22
**arguing** 31:17 43:13
**argument** 9:6 11:23
16:15 24:14 25:23
36:8 38:21 43:7

70:6,9
**arrangement** 5:21
**art** 5:2,4 10:14
13:24 16:19 22:22
22:23 23:5,5,6
25:12 27:3 31:20
32:19 33:20,20,23
34:1 36:7 60:22
64:24
**ashby** 2:2
**asked** 9:13 11:11
17:15 22:10 37:8
42:4,6 59:16 62:15
62:19,22,23 63:7,15
64:4,9,20 72:5 75:3
75:3
**asking** 11:9 17:3,8
34:10,12
**asks** 66:5
**aspect** 24:6 38:4
41:24
**assemblies** 5:15
12:24 13:9 22:24
23:3 28:13 29:1,8
**assembly** 66:7
**asserted** 50:2 54:12
**asserting** 49:22
**associated** 28:6
**assume** 59:3
**assuming** 24:1 28:7
29:16 56:8 77:13
**assumption** 54:20
54:21 56:12,16
**assumptions** 58:18
**atlanta** 14:23 15:1
16:3,10,11 30:7
**attached** 66:8,18
**attest** 11:14
**augment** 35:21
37:17
**augmented** 70:18
**august** 12:4 78:8
**automobile** 47:15
**available** 41:22 47:9
48:16

**avoid** 25:8 34:23
**avoided** 47:2
**aware** 67:12

**b**

**b** 8:15 18:16 19:4
21:2 26:11,12 34:23
38:10 55:11 56:20
60:18 74:2
**bachelor's** 11:1
**back** 3:11 12:2,20
21:22 25:3,7,8,15
25:16 26:24 27:6
28:17 30:21 39:2
55:9 57:12 60:14
67:11 72:1 80:17
**background** 5:9
10:23 11:8 23:12
39:8,9 58:17,20
59:2
**bae** 5:9,14,23 6:9,24
9:10 11:6 12:8 13:5
13:6 14:3,22,24
15:1,2,8,8,14,19
16:2,4,9,11,11,24
17:19 18:5 24:8
28:5,11,12 30:8,22
32:1,7,17 33:23
34:1,8,17 57:4
**based** 8:11 9:1,9
19:11 25:2 29:13
32:11 35:22 36:5
37:12,18 38:4 50:8
52:23 78:18
**bases** 48:22 60:10
**basic** 30:9
**basically** 16:8 45:7
69:16
**basis** 8:6 14:14
60:13 69:9
**bear** 65:24
**beginning** 3:4 6:24
75:12
**behalf** 3:12,20 7:5

**believe** 6:3 12:23
24:1 56:18 66:1
67:8,17 76:13 80:7
**believed** 42:22
**best** 58:4
**better** 6:9 13:22
**beyond** 46:21 70:18
76:12
**bielli** 2:10
**biggest** 51:23
**bit** 5:7 8:22 13:22
39:2 47:22 51:5
63:13 74:3
**blackstone** 1:11
**blah** 33:4,4,4
**bonded** 66:9,18
**bootstrap** 70:4
**boston** 2:15 3:23
**bothers** 45:13
**bought** 62:24
**bracket** 66:8,8,17
66:18
**brake** 13:12 39:24
40:1,3,5,5,6,7,17
41:3,5,7,9,19,22
42:13,21 47:4,15,23
47:24 50:23,23
51:12,19 54:15
63:13,15,21 64:4
66:13 69:6 70:5,5,6
70:11
**brakes** 39:19 40:12
40:13,16,21 41:14
41:15,19,20 42:6
43:18,19,20 44:1,5
44:6,9,20,21 45:23
46:2,2,7,16 47:6
48:12,13 49:5,9,11
49:15,15,16,17,19
49:24 50:7,12,13,17
50:19 51:8,16,18,24
52:3,4,8,9,13,14,18
52:22 55:24 56:1
57:6 58:4 61:15,16
61:21,23 67:19 68:7

69:19,23,24 70:10
70:10 71:4
**braking** 1:4 50:19
**brief** 7:4 76:17,18
76:19
**briefs** 76:6,24 79:3
**build** 45:21 55:23
**building** 48:7
**built** 28:5 46:12
48:3
**bush** 1:9
**business** 41:16 62:8
65:8,10,15
**businesses** 45:19
**buy** 65:3
**buying** 33:4

**c**

**c** 3:2 8:16 18:16
19:13 20:11,12,19
21:5 22:3 26:13
34:24 37:2 53:7
54:1 60:18 70:19,20
72:1,11 81:1,1
**call** 4:4 7:12 13:3
43:18
**called** 7:21 14:24
**car** 30:4 40:6
**care** 75:15
**careful** 41:4 73:10
73:21
**cars** 47:9
**case** 7:24 9:5 12:10
15:4 18:18 19:7
20:2,17 33:2 34:18
36:1 39:13 40:4
44:3 48:17 49:4,15
49:18 50:7,11 66:16
67:9 71:1 79:12,19
79:20,24
**castle** 81:4
**category** 8:14 37:5,6
43:19 47:1,22 53:9
**caused** 57:10

**causes** 41:9 46:11
**causing** 27:15
**caveat** 9:12
**cedar** 1:9
**cell** 45:14
**ceo** 6:20 7:1
**certain** 13:17 14:4
15:22 54:12 65:1
74:1,5 75:4
**certainly** 10:19 31:5
67:14,15 77:11 78:2
**certainty** 79:5
**certification** 81:20
**certified** 81:20
**certify** 81:6
**cetera** 56:4 72:10
**chambers** 3:4
**change** 11:17 13:19
**changed** 63:13
**characteristic** 61:18
**characterization**
10:22
**chart** 45:15
**check** 12:20
**chicago** 2:7
**christmas** 78:1
**circuit** 53:22
**circumventing**
34:23
**cite** 65:22
**cited** 31:4 64:24
**civil** 1:4
**claim** 22:24 23:3,15
23:19,20,20 25:10
25:12,13,20 27:13
42:7,14 46:22 54:14
57:8 62:9,11 64:17
66:5 69:20
**claimed** 44:4
**claims** 10:13 17:10
17:22,24 18:2 22:22
23:6 24:14,17 27:8
35:14 50:2 60:10,14
64:16 67:7 69:5

**clamp** 41:10,11
**clamps** 40:16
**clarification** 61:2
**classic** 12:10
**clear** 8:8 13:15
20:20 22:19 57:17
**clearly** 46:5
**clients** 40:12
**close** 74:23 78:13
**cmrs** 81:19
**coaster** 46:12,20
47:13 54:13
**coasters** 45:22 46:7
46:11,13,15 47:7
48:2
**colleagues** 43:4
**colloquy** 64:16
**column** 66:6
**combination** 34:4
68:20 70:19
**come** 12:9 25:17
33:24 55:4 61:17
65:2 72:23
**comes** 15:17 26:24
37:10 48:21 50:6
52:1
**comfort** 79:23
**comment** 57:14
60:21,23
**commentary** 22:11
**commenting** 53:10
53:12,22
**comments** 5:2 57:23
68:16
**communicated**
65:18
**company** 6:23
**compare** 17:10
22:21 29:4 35:14
**compared** 50:23
**compares** 38:8
**comparing** 17:12
18:2 23:4,6 29:11
33:20

**comparison** 13:23
14:9 16:17 18:15
25:22 32:3 60:22
**competitors** 65:8
**complete** 29:24
53:19
**completed** 75:18
76:5,19 78:5
**completely** 22:20
46:21 53:24
**completion** 77:20
**comprising** 66:7
**compromise** 73:15
**computer** 11:1,2
34:16 40:9 81:11
**concedes** 30:14
**concentrated** 22:13
**concept** 36:15
**concern** 10:14,16
13:21 55:16 61:4
**concerned** 27:23
**concerning** 10:7
64:16
**concerns** 13:22
39:23
**concluded** 42:13
80:24
**conclusion** 42:22
69:17
**conclusory** 74:6
**confer** 9:20
**conference** 1:17 3:4
4:20 78:24 79:2,4,6
79:16,22 80:24
**confident** 80:9
**configuration** 44:9
46:18
**confined** 48:9,10
70:23
**conflict** 49:12
**confuse** 18:23
**connect** 27:7
**connection** 42:10,18
**consider** 8:13 26:14

considered  62:5
consistent  19:4
construct  78:18
construed  67:7
consultant  7:16
contact  40:3 41:6
contemporaneous
  45:2
content  45:15
context  51:4
continuation  3:10
  80:17
continue  10:15
continues  63:12
control  40:2
conversations  26:2
  55:19 59:17
convert  7:16
converts  67:6
convey  19:9
conveyor  1:5
coplaintiff  42:24
copy  39:5
corbett  1:23 3:8
  81:5,19
core  11:20
corp  1:4,9
corporation  1:4
correct  6:22 8:12,17
  8:20 18:14 20:4
  34:6 55:8 62:13
  77:6,14
correctly  81:9
counsel  2:8,16 3:6
  31:23 80:14,21
  81:13
country  75:11
county  81:4,6
couple  26:1 73:8
  75:15
course  26:16 39:22
  40:11 42:20 62:7
  79:7
court  1:1 3:6,8,19
  3:24 4:5,10 5:24

6:14,17,19 7:3,8,11
7:15,22 8:11,20
9:21 10:15 11:24
12:18 13:21 14:3,13
15:22 16:6 17:11,14
17:23 18:7 20:1,5
20:14,24 21:4 23:7
24:11,16 25:11
26:21 27:14,18,22
28:17 29:2,12,16,20
30:16,21 31:8,13
32:22 33:5,10,12,16
34:7,12,20 35:16,20
36:2,22 37:1,4,24
38:15,24 39:9,16
40:19,23 41:2 43:5
43:12,17 44:11,15
45:12 49:2,8,12
50:3 51:1,7,10,14
52:19 54:17 55:3,9
56:8,17 57:9 58:2,6
58:10,19 59:5,18,21
60:5,13 61:3,22
62:3,9,14,19,22
63:4 64:3,11,15
65:21 67:3,10 68:13
69:7,12,18,22 70:8
70:15 71:16,20,23
72:17,21 73:6,10,20
74:18 75:2,17,24
76:15 77:1,4,10,18
78:4,12,19,21 79:14
79:18 80:3,11,22
court's  76:9,11,12
courtroom  35:22
cover  24:5 67:8
covered  42:6,14
  43:5 49:22 50:1
  51:19 59:12 62:11
  63:21 64:4 69:5,19
  69:19,23 70:5
covers  49:17
created  41:8
cross  9:14,18,22,23
  33:3

crush  41:1
curiosity  40:19
curious  61:12
current  27:20,22,24
  66:17
cut  73:15
cv  1:12

### d

d  3:2
damages  50:4,10
  51:2,3 54:20 56:11
  70:3
dan  4:18 5:7
dan's  14:20
date  20:1 74:13,15
  74:16,21,23 76:2
  79:16,22 80:9
dates  76:11 77:12,22
  78:17
daubert  18:22 19:2
  19:5 21:17,24 22:8
  26:5,6,15,18 49:1
  53:2,11 60:17 68:5
  75:5,6,8 78:9,17
day  64:19 66:2
  77:16 81:16
days  75:12 77:16
deal  21:18 49:8,11
  56:24 61:7
dealing  4:17
deals  44:20 49:5,14
dealt  10:3
decades  39:18 40:11
  40:14
december  78:10
decide  10:2 18:14
  22:1
decided  18:19 25:11
  42:12 65:3 71:7
deciding  71:11
  79:19
decision  37:11
decisions  79:5

defendant  49:13
defendants  1:12
  2:16 3:20 4:23 5:4
  5:19 6:3 7:5 15:3,17
  19:22 27:11 28:8
  31:17 48:23 49:18
  49:22,24 50:10,12
  59:15 68:10 70:1,11
  71:6 73:18
define  26:12 55:18
degree  11:1 55:22
delaware  1:2,16
  81:3,20
demand  51:13
denver  11:5 15:13
  15:21 16:12
depending  23:24
deposed  37:9 59:15
deposition  10:24
  11:1 12:3 14:18,20
  14:22 42:3,5 47:18
  59:24 62:15,20,22
  64:1,8,19 65:24
  67:15 70:17 72:2,7
  72:13 73:23 74:7,12
  75:15,18 77:13,20
depositions  4:3 73:4
  74:19 76:3,5 77:13
  78:16
describe  29:17
described  5:22,23
  9:3 28:23 29:6
  30:24 50:8 53:6
  62:7
describes  52:2
describing  23:22
design  11:13,15
  24:23 40:13 46:7
  47:4,6 63:13
designated  69:11
designed  39:19
designer  42:21
  46:20 52:7
designing  47:14

**designs** 46:7 52:2
**desire** 45:23
**detail** 55:12 67:16
    74:4
**detailed** 23:24 24:19
    24:20 74:4
**details** 47:12 66:23
**determination** 42:9
**determine** 18:9
    25:11
**determining** 25:20
**devices** 60:22 62:11
    67:24
**diagram** 17:16 36:4
    36:4
**difference** 4:6 5:18
    13:2 27:2 49:21
    50:5,6
**differences** 10:13
    11:6 13:17 14:6,8,8
    15:10 16:9,10 28:4
    28:10,14,20 29:9
    34:18,19 35:2 36:16
    50:20
**different** 5:11,22
    6:8 13:5 15:14 26:8
    26:14 32:9,24 38:5
    47:22 71:24 79:18
**differently** 60:7
**differs** 37:13
**direct** 10:8 16:13
    21:22
**directly** 17:23 32:8
    58:7,11
**director** 9:10
**disagree** 17:7 43:4
**disagreement** 38:20
**disclosure** 7:12,20
    12:7 21:10 24:12
    43:24 45:6 54:1,5
    59:4 60:12
**disclosures** 8:18
    10:12 70:14 73:5
**discovery** 22:2
    53:15,23

**discuss** 72:18
**discussed** 4:20 7:12
    8:7 9:20 22:14
    25:10 38:12 52:21
    60:1 64:12
**discussing** 8:9 37:3
    55:12
**discussion** 3:10 8:23
    45:17 47:19 80:17
**discussions** 54:4,6,8
    60:4
**dispositive** 78:9
    79:12
**dispositives** 79:20
    80:1
**dispute** 13:12 45:3
    59:24 60:15
**disputed** 42:1 56:24
**distinctions** 15:7
**distinguish** 12:9
    60:19
**district** 1:1,2
**divide** 22:9
**division** 22:15
**document** 8:1,19
    35:11
**doing** 7:4,22 16:16
    18:15,21 22:15 45:9
    48:18 54:22 60:21
    65:15 71:6 74:20
**door** 9:15,24,24
    25:7,8 27:6
**double** 5:11 13:14
**doubt** 38:8 77:15
**dragon** 41:18 45:19
    47:20,23 51:22
**drained** 4:9
**draw** 42:22
**drawing** 16:23 23:8
    23:9,10,13,23 24:2
    24:3,18,22 25:1,2
    25:16,17,18,19
    29:10 32:4 35:12
    36:17,18,19,23,23
    37:12,13,19 38:1,2

38:3
**drawings** 13:15
    23:24 24:9,21 31:3
    31:6 32:9 35:12
    36:6 37:17
**dual** 11:16
**due** 74:13,23 78:11
**dump** 77:24
**dust** 40:7

**e**

**e** 3:2,2 5:11 6:4 81:1
    81:1
**earlier** 10:11 11:6
    15:2,8,14,19 57:4
    63:6 80:6
**early** 13:13 16:4
**easier** 16:14
**easily** 30:12
**eastern** 14:23 30:6
**ed** 4:18
**effect** 58:14 63:1
**effort** 27:6
**eight** 73:16
**either** 18:19 19:24
    37:18 49:23 52:23
    58:8 68:10 77:10,21
**electrical** 5:10 6:22
    11:9 16:16 23:12
**element** 41:6
**elements** 46:14
    54:14 65:14
**ellen** 81:5,19
**ellie** 1:23 3:7 12:20
**emphasis** 12:2
**emphasized** 55:10
**encourage** 40:12
**encourages** 48:13
**engineer** 5:8,10,12
    6:19,22 9:9 15:18
    16:16 23:12 24:1,24
    32:14 39:19 42:21
    55:24
**engineering** 9:10
    50:9 55:21 57:5

65:19
**engineers** 34:16
    35:12
**entertainment** 1:9
**entire** 12:19,22 51:6
    51:9,13 53:21
**entirety** 54:4
**entitled** 67:9
**envy** 4:10
**equipment** 54:15
**ernst** 2:10
**esq** 2:3,5,6,11,14
**essentially** 6:6,10
    18:15 32:18 50:12
    52:1
**et** 56:4 72:10
**event** 10:4
**everybody** 27:15
    68:23
**evidence** 8:3 21:11
    21:12,23 22:6,12
    51:15 53:9 68:10
**exactly** 13:6 17:8
    18:8 26:21
**examination** 9:14
    9:18,22
**examined** 33:3
**examiner** 9:23
**example** 14:21 15:5
    17:17 18:23 19:21
    22:3 26:4 39:24
    45:1,3 47:19 48:11
    55:6 74:1
**exchange** 63:24
**exhibit** 63:8,8 64:8
    66:6
**exist** 29:10
**existed** 13:5
**exists** 36:14 54:22
**expand** 23:18
**expect** 77:23
**expected** 21:11,21
    57:15 76:5
**experience** 5:16
    6:10 12:1 34:22

39:21 46:23 50:9
52:10 60:15
**experienced**  11:22
32:8 45:9
**expert**  7:13,17,17
8:2,5,10,15 12:10
12:11 13:17,20 17:6
17:20 18:12,20 19:8
19:10,11,13 20:21
20:23 21:19 25:7,9
30:17,19,21 31:2,4
31:6,15,16 32:16,16
33:2,22 34:2 35:8
35:17 36:7,11 38:9
43:23 45:3,16 47:1
48:19 51:2,3 52:2
54:19 56:11,15,21
59:23 67:6,18,21,23
69:4,10,11 74:2
**expert's**  5:5 34:4
**expertise**  19:12 23:9
32:11 37:10 46:6
52:24 60:16
**experts**  33:6 34:16
35:19,21 69:2 74:1
**expires**  81:20
**explain**  72:12,13
**exploration**  73:23
**explore**  74:8
**expound**  10:2
**extent**  19:12 23:23
70:16

**f**

**f**  2:6 28:11 81:1
**fact**  9:7 35:10 48:10
57:11
**facts**  21:20 37:6,8
45:2
**factual**  43:9 48:16
48:20
**fail**  40:8 55:10
**failed**  55:12
**failure**  40:9

**fair**  1:10 48:15
**fairly**  46:22
**fall**  8:14 22:6 37:5
46:24 53:8
**falls**  20:19 21:5 22:3
52:23
**familiar**  5:16 6:9
14:24 16:3 24:9
34:22
**familiarity**  16:2,13
52:24 55:21
**far**  4:15 14:6 21:6
27:23 37:15 43:7
**farther**  19:23
**fashion**  26:3 79:6
**fast**  47:16
**faster**  46:14
**features**  40:13 61:18
61:20
**fed**  53:21
**federal**  8:3 21:11
22:6,12 53:9
**feel**  38:9
**feet**  46:12
**fell**  21:1
**felt**  62:10 67:20 68:6
**field**  41:8
**fight**  49:1
**figure**  17:16,18
23:10 29:13,17,18
29:23 30:3 36:20
77:18 78:16
**figured**  33:21
**figures**  24:20 29:22
37:21,21
**file**  56:19 75:20 78:9
**filed**  12:12 76:23
**filing**  78:17
**fin**  5:15 22:24 28:13
41:6
**find**  62:4 65:10 79:3
**fine**  23:16 25:4 33:5
37:11 78:21
**first**  7:24 19:19 39:1
44:19 63:24 64:19

64:20
**fit**  19:1 26:22 46:12
47:22
**flagged**  39:5
**flags**  1:8,8 3:9
**flat**  30:4,4,5
**foley**  2:13 3:23
**following**  3:3 25:3
25:18 31:18 38:3
**follows**  23:11
**footprint**  46:11
**foregoing**  81:7
**forest**  65:18
**form**  60:11
**forth**  39:2 47:17
51:9
**foster**  65:19
**found**  22:4 25:13
**framework**  16:14
21:24
**frankly**  22:15
**frequently**  80:13
**friction**  40:5,6,16
41:15,19 43:20
44:16,20,21 46:16
47:23 48:12 50:13
50:16,23 52:14,22
56:1 57:6
**front**  24:22,23,24
**full**  77:16
**function**  28:3 41:10
**functional**  28:4
**further**  8:7 33:17
67:16,17
**furtherance**  73:23

**g**

**g**  3:2
**g&t**  1:5 6:24 42:15
42:17,24,24 62:10
**gained**  39:22
**geddes**  2:2
**gee**  36:4
**gemini**  45:18 46:9
47:21 48:17,22 50:6

51:1 54:7,11,19,19
55:20 56:7,9 57:13
58:17,24 59:19 60:3
60:7 61:4
**gemini's**  45:16,17
45:20 47:18 48:14
48:24 54:3,11 57:13
57:21,24 59:15,24
**general**  39:14 44:6
45:17 46:10,18 48:2
61:21
**generalizing**  52:16
**generally**  37:7 41:13
61:16
**gentlemen**  78:22
**gentlemen's**  77:12
**geographic**  41:22
**getting**  12:2 33:3
45:5 54:15 73:24
76:2 79:3
**geyer**  2:3
**give**  6:15 9:1 15:23
28:2 63:4 66:2
71:17 74:9,14 76:16
79:23
**given**  52:11 69:14
**giving**  19:11 61:23
**go**  4:13 5:24 7:10
12:20 26:16 28:17
31:7 33:16 39:1,2,7
40:16,17 42:16
47:16 64:2 66:22
67:11,16 76:8 77:16
**goes**  10:4 46:9 53:1
60:17 65:17
**going**  5:4 7:4 8:10
9:23 12:20 13:1,4,7
13:16 17:11 18:10
19:14,21 20:7,7
21:6 22:5 26:8,10
27:6 43:14 45:7,9
47:16 53:7 54:6
55:2,19,22 56:9
57:10,17,18 59:12
60:6 61:7,7,17,19

65:11 67:23 70:3,17
71:7,11 72:3,10
73:20 74:19 75:4,11
75:16,19 76:1,8,20
77:14,24 78:9,10,22
78:23
**good** 3:6,14,17,19
3:21 25:4 48:16
65:13 80:22
**gotten** 45:10 58:21
**govern** 20:18
**governed** 8:3
**governing** 80:7
**grainy** 30:6
**graph** 24:23 25:1
**great** 41:5 50:18
51:16,18
**ground** 35:5
**group** 1:11
**guess** 11:10 12:5
13:8,23 14:3 16:12
19:9,10 27:3 32:20
33:20 52:16 61:16
67:4 73:3,13 78:15
**guy** 33:8
**guys** 18:14

**h**

**half** 4:8
**haller** 2:5
**hand** 41:1 81:16
**hannum** 1:23 81:5
81:19
**happened** 14:7
42:10 70:16
**hard** 20:12
**hear** 49:7 69:2 79:11
**heard** 14:19 21:6
35:22 38:19 49:13
**hearing** 59:13
**held** 3:4
**help** 23:21 51:4
**helpful** 26:20,22
**hi** 66:24

**higher** 46:15
**hills** 47:11
**hold** 17:14 38:15
60:5
**honest** 14:20 17:4
**honor** 3:14,18,22
4:1,16 6:21 7:7 8:21
10:11,20 12:5 13:11
14:16 16:22 17:2
19:18 22:18 26:20
27:9 30:2,19 31:12
32:23 33:11,15 34:5
34:11,13 35:4 38:13
39:3 43:9,16 44:13
47:3 49:7,21 51:4
53:23 55:8 56:6
58:23 59:14 61:1
62:2,6,21 69:1 70:3
71:19 72:20 73:13
74:17,23 75:7,22
76:22 78:3 79:10
80:8,21
**honorable** 1:19
**hopefully** 80:18
**hoping** 20:5
**hosteny** 2:5 3:15,17
4:16 6:2,15,18,21
8:21 14:16 16:5,21
17:4,13,21 18:1
19:18 20:3,9,15
21:3 27:9,16,20
28:1,19 29:6,15,19
32:23 33:8 34:5,10
34:13 35:4,18,23
36:24 37:20 39:3,11
39:17 40:22,24 41:3
43:8 44:13 47:3
49:6,10,20 50:4
56:5,14,23 57:21
58:3,7,13 59:14
62:6,13,17 63:2,6
64:7,14,18 65:23
71:18 73:13 75:7,21
77:8 78:7,13,20
79:9,17 80:2,5

**hosteny's** 10:22
**hour** 4:5
**hours** 4:9
**hybrid** 37:5

**i**

**idea** 11:18 24:13,19
36:19 37:2 41:7
77:23
**identified** 5:5 28:11
36:23 67:14,21
**identifies** 28:7
**identify** 41:18
**identifying** 45:4
**ii** 21:19
**illinois** 2:7
**implying** 21:1 80:1
**important** 25:19
29:21
**impossible** 47:4
**improperly** 41:1
**inadequate** 54:1
**inadmissibility** 71:9
**include** 27:12 79:15
**included** 31:5 58:13
59:11
**includes** 79:13
**including** 51:22
54:14 75:5 79:12
**indicated** 61:22
62:14,18 81:8
**indirectly** 58:8,11
**individual** 39:1
**individual's** 10:23
**induction** 28:24
29:7
**industry** 53:1
**inferring** 11:13
**influence** 50:9
**information** 11:21
12:8 19:8 22:1,5
40:10 47:18 48:16
58:17,20,21 59:22
67:12 69:14 73:24

**infringe** 54:13 67:24
68:1
**infringed** 55:14 56:3
56:3,10,10,13 60:24
63:1 67:19 68:7
71:4,5,8 72:5,14
**infringement** 50:22
54:16,18,22 55:5
56:15 57:1,14,19
58:9,11,18 59:3
60:21 61:5,5,8
**initially** 61:13
**inquiry** 65:16
**install** 41:4
**installed** 14:23
15:13,21 41:1 54:13
**installing** 11:4
**instances** 48:4
**intend** 75:20
**intended** 26:3
**intending** 14:15
**interested** 33:19
81:14
**interesting** 68:14,20
**interpret** 17:9 24:17
**interpreted** 25:9
**interpreting** 27:13
68:23
**interrogatory** 37:8
**interrupt** 33:15
**interrupting** 40:20
**introduced** 9:16
14:8
**invalid** 31:18
**invalidity** 57:1,20
**inventor** 7:1,14,15
39:12
**inventors** 39:10,12
**invoke** 51:6
**involved** 11:3 15:24
16:2,13 32:10 39:13
49:15,17
**involvement** 10:23
**issue** 4:19,24 5:1
6:12 10:20 11:13

12:5 13:15 18:9,13
21:6 25:4,16 43:22
43:23 45:5,12,12
51:5 53:2,3,15 60:6
61:10 62:3,4,5 69:3
70:3 71:24 72:20
**issues** 12:14 18:11
21:16,17 43:22
54:16,18 56:22 73:2
80:16,19

**j**

**james** 28:7
**japan** 4:3 7:9 41:18
44:18,23 45:19
47:20 52:21
**job** 7:8 48:18
**joe** 3:15,18 4:16
6:21 8:20 12:21
14:13,17 19:18 21:1
23:8,17,18 27:9
32:23 33:5 34:5,12
35:5 38:16 39:4
43:6 44:13 47:3
49:3 55:18 58:15
59:7,14 62:6 63:2
73:12 75:4 77:6
80:8
**joel** 4:21 5:11 7:21
**join** 4:4
**joined** 3:22
**joseph** 2:5 45:16
**jr.'s** 28:7
**judge** 1:19 3:4,7
10:3 35:24 71:10
77:1 78:24 79:22
80:6,9
**judges** 79:19
**judgment** 18:19
19:22 20:6 22:7
26:4,5 53:16 59:13
71:12,21 74:14,20
75:8
**judgments** 78:17

**jury** 18:23 19:1
26:20,22

**k**

**keep** 20:12
**kenneally** 75:13
**kennywood** 66:14
**kin** 81:14
**kind** 11:13 35:6
52:21 53:1 70:4,6
**kinds** 47:12
**kirtley** 5:6 28:7
35:15 57:3
**kirtley's** 28:11
**knew** 30:23
**know** 4:14 7:9 9:12
9:14,18 11:12,24
13:1 19:20,24 24:18
29:23 30:8,13 32:13
33:2,5 35:11,20
47:8,9,10,10,11,12
47:15,19 48:1 52:22
54:8 57:14 64:22
65:14 68:6 70:2,6
71:1,11 73:17 75:13
76:1 77:17 79:7
80:3,15
**knowing** 47:5
**knowledge** 9:2,9
10:22 11:19 29:11
39:21 42:19 45:2
57:5
**knowledgeable** 15:5
**known** 31:19,20
**knows** 38:4 41:15

**l**

**l** 28:7
**l.p.** 1:11
**lacks** 18:21 19:7,7
**land** 46:10 48:6
**language** 27:13 66:7
**lardner** 2:13 3:23
**late** 7:1
**laura** 75:13

**lawsuit** 5:17 42:10
42:19
**lay** 8:24
**layout** 41:24
**leaning** 36:14
**learn** 64:20
**learned** 59:23
**leaves** 75:12
**leery** 75:14
**left** 4:11,14 22:8
**length** 47:11
**level** 79:23
**license** 42:11,12,17
42:23 62:10 63:19
65:4 68:8,9,15,15
68:21,22,22 71:7
**licensed** 42:15
**life** 39:22
**lifetime** 41:16
**light** 10:5 20:8 39:8
55:23 74:13
**likewise** 15:14
**limine** 68:6
**limitations** 41:23
**limited** 12:1 36:18
36:18 44:5 46:18
53:21 61:14,19
69:12 72:2,4,8
**limiting** 53:14 68:17
**line** 3:12 9:2 23:16
36:13
**linear** 28:24 29:7
**lined** 10:24
**lines** 11:11 14:14
**link** 34:8 51:17
**listen** 63:5
**litigation** 17:10
20:22
**little** 5:10 8:21 13:22
14:19 39:2,8 51:5
69:8 74:3 75:14
80:13
**live** 9:24 30:14
70:17

**llc** 2:10
**llp** 2:13
**local** 76:16
**location** 48:6
**locked** 37:2
**logical** 32:24
**long** 41:19 44:7
48:11 74:22 77:14
78:22 80:3
**longer** 47:21
**look** 16:22 23:13,19
23:20 24:21 30:6
32:13 35:13 52:21
54:2 66:5
**looked** 14:21 30:23
42:12 57:8 65:13
**looking** 17:17 19:6
22:10,21 23:23
24:24 27:18 29:10
55:22 57:22 78:7,24
79:9 80:5
**looks** 16:23 17:1,19
23:9 30:8 70:5
**lot** 68:21
**lousy** 48:18
**lowrie** 4:2
**lp** 1:10
**lps** 1:12
**luke** 3:22
**luna** 5:18 13:2,9,14
15:8,11,20 16:12,24
28:3,6,10,15,21
29:4,11 35:2 36:3
36:16 37:14 38:4
**lydon** 2:3 3:14,15

**m**

**machine** 81:10
**magistrate** 1:19
**magnet** 5:15,21
22:24 23:3 28:13,24
29:8 30:4 66:18
**magnetar** 1:4 3:9
39:17 42:6 64:20
65:3 66:13 67:8,19

68:6 69:19,23 70:10

**magnetic** 12:24 13:9
39:19,24 40:1,12,13
40:17,21 41:3,6,8,9
41:14,20 43:18,19
44:1,6 45:23 46:2
47:4,24 48:13 49:5
49:8,11,14,16,19,24
50:7,12,19,23 51:16
51:18,19,24 52:3,4
52:8,9,13,22 56:1
58:3 61:16,21,23

**magnets** 15:6 66:9

**main** 10:14 34:14

**maintenance** 63:11
64:10

**majority** 50:19

**making** 7:3 60:11
71:5

**man** 19:3

**manner** 45:22

**manual** 63:11 64:10

**manufactured**
54:15

**manufacturing**
65:12

**marked** 12:12 63:15
64:8

**market** 51:6 53:21

**markets** 65:9

**mary** 1:19

**maryland** 1:9

**massachusetts** 2:15

**matt** 4:2

**matt's** 7:9

**matter** 3:10 18:5
21:10 71:12

**matters** 27:7 79:11

**mean** 10:1 17:8
19:14 22:4 24:4
25:5,7,18,21 30:9
31:3 33:15 45:3
47:14 54:18 55:20
67:9,23

**meaning** 58:22

**means** 36:6 48:10

**meant** 59:11 68:23
76:16

**mechanical** 5:11
9:10 11:9,10 39:19
42:21

**meet** 9:20 19:16

**memory** 20:4 77:8

**mention** 57:2,2,3,4,5

**mentioned** 58:17
61:13

**merit** 1:24

**miami** 30:7

**middle** 66:4

**miler** 66:24

**mind** 21:23 38:8

**missing** 51:17,17

**misunderstood**
20:24

**model** 63:11 64:10
64:12,12

**modify** 36:10,12
76:14

**moment** 4:4 66:1,2

**month** 76:24 78:12
78:13 79:3,21

**moore** 2:14 3:22,24
4:1,2,7 7:6,7,10,11
7:19,24 8:17 10:5
10:10,19 12:4 13:11
14:2,12 17:2,7 18:3
22:18 24:7 26:19,24
27:17 31:2,11,11
33:11,14,14,18
36:21 38:13,14,21
39:6 43:3,16,21
44:22 45:14 51:3,8
51:11,15 53:23
54:24 55:7 59:9,9
59:19 60:2,9 61:1
61:12 62:1,21,23
63:15 64:20 66:4
67:4 68:12 69:1,8
69:16,21 70:2,12

71:14,22 72:16,19
73:1,8,11,21 74:16
74:22 76:13,22 77:3
77:6,15 78:2

**morphed** 46:19

**motion** 18:22 19:22
26:4,5,6 49:1 53:11
53:17 68:5 75:8,9

**motions** 20:6 68:5
71:13 74:14,20 75:5
75:19 78:9,10 79:12

**motivation** 42:16

**motor** 5:21 11:16
23:2 28:24 29:8
41:11

**motors** 15:7 16:7
32:14 40:17

**mounting** 66:7,8,17

**mouse** 66:24

**movement** 41:9

**moving** 75:5

**mpt** 1:12

**multiple** 65:8,9

**n**

**n** 2:5 3:2

**nbc** 1:10

**necessarily** 19:9,14
24:4 48:11 53:3
67:18,23 70:7,23

**necessary** 19:1

**need** 8:7 32:21 40:2
41:10 47:8,9,10,10
47:11,12 52:3,4
53:19 67:16 75:19
79:24

**needed** 18:11 19:3
42:12 52:13

**needs** 26:20,22,22
37:1 53:6

**neither** 77:13 81:13

**never** 30:20,22
56:20 57:15 72:5

**new** 12:7 47:7 50:19
81:4

**nexus** 53:19

**nice** 30:13 31:23

**night** 80:23

**niro** 2:5,5

**noninfringement**
57:19

**notary** 81:5,19

**note** 3:3 12:24 15:7
16:9,10 45:16 54:3

**noted** 67:11

**notes** 7:4 12:20 54:4
62:4

**notice** 67:15 70:21
81:8

**number** 6:4 35:11
42:10 51:20,21 58:4
63:16

**numbers** 68:18

**o**

**o** 3:2

**o'kelly** 2:10,11 3:21
3:22

**object** 79:8

**objection** 79:21

**observed** 16:1 32:5
34:17

**obvious** 13:18 24:15

**obviously** 68:14

**october** 1:16 78:11
81:17

**offer** 8:5 14:15
52:16 54:6 73:19

**offered** 8:10 73:14

**offering** 10:12 69:4

**official** 81:16

**oh** 27:20 62:9 79:17

**okay** 6:18 7:11 8:11
11:24 14:13 21:3
25:4,16 27:21 31:13
32:22 35:4 36:24
38:23 40:23 44:7
50:3 61:3,10 62:1
64:11 66:3 68:14
72:16 75:21 80:2

**old** 16:24 17:19 27:17,19,23 30:8 35:5
**older** 28:10
**once** 74:7
**ones** 6:3 38:24
**ooo** 3:1
**open** 9:24,24
**opened** 66:1
**opening** 45:4 76:6 76:17,24
**opens** 9:15
**operate** 54:20,21
**operated** 54:13
**operator** 52:7
**opine** 58:7
**opinion** 9:1 13:17 33:4 37:9 52:16 56:16,18,19 71:6
**opinions** 10:12 21:20 28:2 48:23 57:1,24
**opportunity** 73:14
**opposed** 5:15 12:23 13:9 15:6,7 22:24 23:3 28:13,24 29:8 47:24
**opposing** 16:7 76:24
**opposite** 12:13
**oppositions** 78:10
**order** 20:17 24:13 39:7 51:11 80:6,16
**ordered** 21:7
**ordinary** 41:14
**original** 27:10 66:12
**originally** 30:18 76:12
**ought** 50:10,11
**outcome** 81:15
**outlined** 16:17
**overview** 30:3
**owned** 42:15
**owner** 46:20
**owners** 46:4

**owns** 39:17

**p**

**p** 3:2
**p.a.** 2:2
**p.m.** 1:16 3:5 80:24
**pads** 40:5
**page** 14:22 42:4 45:17 63:3,7,12,14 64:8,8,13,18 66:2,4 68:17,18
**pages** 42:5 62:17 65:19 67:11 68:18
**paid** 33:4
**paragraph** 5:1,7 6:11 12:7,19,22 22:20 27:10,12,15 28:1 44:23 45:20 54:10 57:12
**paragraphs** 45:15 45:18 54:11 55:2 58:18,24 59:1 61:6
**parameters** 70:22 74:9
**paramount** 1:10
**park** 39:20 46:4,20 47:5,5 48:5 52:7 65:15
**parks** 1:8,10 45:22 46:6,11
**part** 9:22 11:11 13:7 18:9 26:18 31:3 32:16 38:19 52:21 53:5 54:2 57:15 59:10 63:14 68:4 69:3 73:14 74:6
**participants** 81:9,13
**participated** 4:3
**particular** 24:2 31:20 42:19 44:8
**particularize** 5:7
**parties** 4:11 6:12 35:24 38:20 42:1 44:11 49:21 50:5,6 50:21 73:2

**partnership** 1:8
**parts** 22:14 37:16
**party** 81:14
**passages** 10:11
**pat** 1:19 3:15 30:2 31:14 58:15,22 75:12 80:8
**patent** 5:21 6:1,4,7 7:2,14 10:13 11:7 12:9 13:3,4,24 14:4 14:6,9 15:10 16:18 17:9,17,18 23:2,8 23:11,14,21 24:4,17 24:18 25:1,6,9,14 25:17,20,21 28:15 28:21,22,23 29:7,13 29:14 30:1 31:18,21 32:4,18,19 34:9 35:3,11 36:20 37:13 37:18 38:6,7 39:12 39:13 40:15 42:7,14 49:5,10,17,23 54:14 55:13,14 57:7 62:11 62:24 63:16,22 64:5 64:17,21,24 65:4,14 66:5 69:5,20,23
**patented** 46:2,18 51:12 61:15,19
**patents** 14:11 29:22 39:14,15 44:9 45:18 51:8,20 56:3,10,13 58:12 59:2 60:24 61:9 67:19
**patrick** 2:6
**pay** 42:24 50:10
**people** 10:21 15:5 68:21
**percentage** 51:9
**period** 54:5 76:4 78:23
**permanent** 40:1
**person** 12:12 31:1
**person's** 77:20,20
**personal** 10:21 11:18 12:1 46:22

**52:10**
**personally** 11:22 33:6
**pertinent** 37:22
**physical** 15:7,11 16:9 40:3 41:14,23
**physically** 34:17
**pick** 37:22
**pieces** 27:3 30:9
**place** 37:7 41:23 57:7 79:16 81:8
**placed** 12:2
**plaintiff** 32:15 75:4 75:19
**plaintiff's** 31:22
**plaintiffs** 1:6 2:8 3:13 8:2,4 10:17 31:15 38:21 45:6 51:5 54:12 68:10
**plan** 73:6
**plate** 66:8,9,18,19
**please** 3:20 33:13
**plenty** 51:21
**pockrus** 4:18,22 5:7 5:8,14,20 6:6,11,14 6:19 8:18 10:16 12:3,15 15:9 17:5,9 20:19 22:21 28:2,9 28:13,19,22 30:12 31:1,24 32:16 33:24 34:14 35:7 36:2,9 36:10 37:12 38:18 73:4 75:10 77:21
**pockrus's** 10:18 31:5 35:1 72:23 74:11
**point** 4:9 9:11 16:3 18:3,7 19:19,20 20:10 22:19 33:1 64:7 65:3 72:18,19 73:18
**pointing** 70:21
**points** 9:3 37:5 43:2 72:7,22

**portion** 41:7
**portions** 18:20
  56:24
**position** 43:17 68:11
  73:12
**possibility** 9:15
**possible** 5:2 47:23
**potentially** 10:8
  21:16,24 36:14
**power** 40:2
**practice** 80:12
**precluded** 35:9
**prepare** 19:3 75:19
**prepared** 18:11
  31:15,15,17
**preparing** 48:19
**present** 11:15 21:11
  22:2 72:9
**presentation** 7:5
**presented** 72:22
**presently** 70:13
**pretrial** 71:17 78:24
  79:2,4,6,11,13,15,16
  79:22 80:9
**pretty** 4:9 13:15
  66:20 74:23 78:13
**previous** 64:13
**previously** 22:11
**pribonic** 4:18 6:16
  8:18 38:11,12,14,17
  38:19 39:6 40:11
  41:15,21 42:2,7,15
  42:20 43:10 44:8
  45:21 46:3,10,15
  47:20 48:1,17,18,21
  50:8,15 52:6 54:5
  56:7,8,18 57:12
  58:8,10,21 59:17,18
  59:20,23,24 60:6,8
  60:11,20 61:7 62:7
  63:7 64:9 67:6 69:4
  73:4 74:11 75:11
  77:21
**pribonic's** 42:16
  47:7 55:1 56:24

57:15 61:14 72:22
**prior** 5:2,4,14 6:9
  10:13 12:9 13:24
  16:19 22:22,23 23:5
  23:5 25:12 27:3
  28:5,8,12 31:19
  32:19 33:20,20,23
  34:1,8 36:7 60:22
  64:23,24 68:17
**priority** 23:6
**probably** 4:10 6:24
  24:8 62:24 64:23
**problem** 4:14,23
  12:19,22 17:8,16
  24:10 27:4 29:3
  34:24 36:14 38:11
  46:1,17 57:10 59:10
**problems** 4:14,24
  10:8 35:3 36:15
**proceeding** 80:15
**product** 66:17 67:8
  71:4
**professional** 34:15
**programmer** 11:2
**project** 11:3
**promoting** 39:1
**propose** 41:17
**proposed** 10:17
**proposes** 22:21
**proposing** 27:1,2
  35:13
**prototype** 5:18,23
  11:7 13:2,6,10
  15:12,20 16:12 28:3
  28:5,6,10,15,21
  29:4,11 37:14 57:4
**prototyping** 11:3
**provide** 18:23,24
  19:1 20:16 21:9
  22:5 26:13 28:9,14
  28:20 33:22 55:10
  55:12 69:10 72:11
  74:1 76:18,19
**provided** 10:6 31:2
  35:7 52:1 67:2

**provides** 44:9
**providing** 20:23
**public** 81:5,19
**pull** 58:15 59:7
  65:24
**pulled** 14:18 57:21
**purchased** 54:13
**purely** 11:10
**purported** 55:21
**purporting** 12:6
**purpose** 34:8
**purposes** 20:22,22
**pursuant** 81:8
**pursuing** 69:3
**put** 9:5 44:17 51:4
  54:23 55:18 56:21
  58:4 74:2 76:4,9
  77:21
**puts** 21:23
**putting** 37:15 46:3
**puzzling** 33:19

**q**

**qualification** 8:22
  43:23
**qualifications** 9:19
**qualified** 24:2 26:14
  42:22
**question** 10:4 11:11
  11:20 17:15 18:8
  21:15,15 27:1 32:22
  35:6 44:3 49:3,7
  53:18 58:1 61:16
  63:7,9,14,18,21
  64:3,6 65:2,6 66:16
  73:3 75:2,17 79:15
**questioned** 42:3
  67:17
**questions** 9:13 11:6
  59:16 63:5 64:16
  65:18 66:22 80:20
**quite** 5:9 20:20
  22:15 24:20 74:4
  80:9

**quote** 16:16

**r**

**r** 3:2 6:4,4 81:1
**raised** 12:14,14,15
**rate** 5:13
**read** 24:2 48:14
  57:16
**readily** 30:10
**reading** 27:13 55:15
  61:6 68:16
**ready** 37:4
**real** 41:4 60:5
**really** 11:19,23
  12:10 13:5 15:19
  20:19 30:9,10 36:5
  37:3 43:24 44:2
  45:24 59:10 65:13
  73:17 75:3,17
**realm** 46:22
**reason** 7:9 8:8,22
  12:16 15:17 33:23
  47:22 55:1 63:18
  68:7
**reasons** 31:18 41:20
  50:8,16
**rebuttal** 45:5
**recall** 5:8
**recalls** 7:11
**received** 70:22 72:3
**recognize** 14:4
  79:14
**recollection** 39:10
**record** 57:17 81:12
**recorded** 81:9
**reemphasizing**
  53:13
**reference** 8:19
  13:24 21:22 49:14
  57:3 60:23 61:5
  67:2 72:6
**referenced** 24:19
  29:23 57:12
**references** 5:5,19
  21:18 28:8 54:10

72:1
**referral** 79:10
**referred** 5:2 71:12
79:10
**referring** 56:7
**refers** 20:15 54:2
**refresh** 39:9
**regard** 8:2 18:22
21:13 22:17 24:2
26:6 56:21 72:9
74:9
**regarding** 4:19
10:17 28:2,9,14,20
57:1
**region** 17:5
**registered** 1:24
**relate** 25:19
**related** 18:22 37:10
44:19 64:17 71:5
**relating** 55:20
**relationship** 19:7
25:5 69:24 71:3
**relative** 41:9
**relevance** 18:4,13
18:21 19:2,7,19
20:14 21:16 24:5
25:23 26:16,17
43:22 46:1 53:2,10
53:18 68:3 69:22
70:24
**relevant** 18:10,17,24
19:20 34:17 57:23
70:7 72:10
**reliance** 48:16
**relied** 28:8 30:24
36:22 37:19,24 74:3
**reluctant** 73:14
**rely** 5:19 15:3,17
32:17
**relying** 5:4 6:3
29:18 55:19 69:13
72:13
**remaining** 4:19
**remember** 11:8
12:19 13:6 58:24

68:18 76:10 77:11
**removed** 10:11
**rendering** 48:23
**repeat** 28:17
**replace** 40:5
**replaces** 48:4
**replow** 35:5
**reply** 76:7,19 78:14
79:3
**report** 5:1,6 7:18
12:12,13 13:20 17:6
17:20 18:12 19:3
20:16,21 21:9 26:9
26:10 28:7,12 30:17
31:2,4,15,16 32:17
33:22 34:4 35:8
38:9 39:23 45:4,5
45:11,16,17,20 47:1
48:14,19,24 52:2
54:3,11 55:10 56:20
56:24 57:3,13,22
59:1,15 60:4 61:5
61:14 72:1 74:2
**reporter** 1:24 3:8
81:19,20
**reporter's** 3:3
**reports** 70:14 72:23
74:5
**represent** 6:8
**representation** 30:1
38:16
**represented** 10:6
13:3 38:1 79:1
**require** 40:1 52:18
**required** 17:5 20:21
21:9 56:20
**requirements** 19:16
**requires** 45:23
46:13
**reread** 27:14
**rescuenet** 53:20
**research** 45:10
**resolution** 79:12
**resolve** 79:11

**resolved** 73:2
**respect** 4:22 15:16
34:14 50:21,22
**respond** 38:21
**responding** 31:13
**response** 12:12 52:5
**retained** 7:13 20:22
**retrofit** 47:8
**retrofits** 47:7
**reverse** 39:7 59:21
**review** 29:13
**revised** 5:13 27:10
27:12
**ride** 41:18,23,24
44:18,23 45:4,19
46:20 47:5 48:5
51:9,13,22 52:7,12
52:13,17,20 55:23
66:23,24
**rides** 39:20 47:6
48:5,8 49:22 50:1
50:14 51:21,23 52:8
54:13 55:21
**right** 4:11 6:16,20
7:3,19 10:15 14:12
17:21 18:1 19:10
24:19 26:16,21,23
29:15 31:9 32:19
35:18 37:24 39:16
42:4 43:5 53:22
55:5 56:14 58:2
60:8 62:12,16,19,20
63:6 64:15 67:3,14
69:15,20,21 74:18
75:13 76:15 79:7,20
80:14
**rmr** 81:19
**road** 5:18 13:2,9,14
15:8,12,20 16:12,24
28:3,6,10,15,21
29:4,11 35:2 36:3
36:16 37:14 38:4
**role** 19:21
**roller** 45:22 46:7,11
46:13,20 47:12 48:2

54:12
**roughly** 76:4,17
78:12
**roundabout** 34:3
**royalty** 50:11
**rpr** 81:20
**rule** 7:20,23 8:3,14
8:15,16,19 9:1,8
18:15,16 19:4 20:18
20:20 21:2 22:12,14
34:23,24 48:2 51:6
53:21 55:11 70:20
76:1
**rules** 8:3 21:12,22
22:6 36:1 53:9
76:16,16
**ruling** 22:4 67:13
68:2
**run** 41:20 46:16
47:9,21
**rundown** 6:16
**running** 46:15 78:5
78:22
**runs** 41:22 48:11

s

**s** 3:2
**safe** 40:8
**safety** 1:4
**saw** 15:5,12,13 16:1
20:9 30:14,20 32:2
32:8 34:18 65:8
77:10
**saying** 11:7 13:8
21:1,4 23:12,14
25:4,17 31:22,23
32:6 49:16,18,24
56:6 58:19 59:19,21
59:22 70:8 75:14
76:21
**says** 4:24 5:14 8:1
21:7 23:1 28:2 36:3
43:24 45:6,15,20
46:10 50:15 54:6,12
56:14 59:3 60:1

61:20 70:17 79:10
**schedule** 76:9,10,11
  76:12,14,20 78:8,14
  78:15,18
**scheduled** 76:3
**schedules** 75:13
**science** 11:2
**scientists** 34:16
**score** 20:20 56:16,19
**scratch** 48:7
**se** 40:15
**seal** 81:16
**sean** 2:11 3:22
**second** 20:10 38:15
  41:17,24 66:2
**secret** 31:4
**section** 28:11 29:5
  39:23 54:1,2 61:14
**see** 13:14 14:22 25:2
  31:6 50:20 55:1
  66:9 67:1,5 69:2
  70:12 77:18 80:5
**seek** 8:5
**seeking** 8:5
**seen** 13:19 15:11
  30:22 70:14 74:5
**selling** 65:12
**send** 77:22
**sense** 39:8 57:16
**sensible** 15:18
**sentence** 59:2 80:4
**sentences** 29:3
**separately** 6:17
**september** 3:11
  80:18
**series** 66:9
**serve** 80:16
**serving** 3:8
**set** 78:24 79:2
**settled** 73:5
**sf** 1:8
**sheeted** 9:8
**shoes** 46:3
**short** 73:15

**shorter** 41:21
**shorthand** 81:10,20
**show** 24:3,4,9 25:18
  37:4 38:3 51:12,18
  71:2
**showing** 31:6
**shown** 11:16
**shows** 23:11 30:3,4
  30:4
**side** 25:4 29:7 40:20
  53:24
**sided** 13:13,14 23:2
  28:23
**sides** 9:7 33:6 68:13
**signed** 77:1
**significant** 13:18
  14:6,8 33:1
**silva** 3:23
**similar** 25:13 36:5
  66:12,15
**similarly** 54:9
**simply** 20:15 50:17
  50:17
**single** 13:13 23:2
  28:23 29:7
**sit** 14:20 16:18
  23:10,19 32:13
**sitting** 33:19 58:23
**situation** 68:14
**six** 1:8,8 3:9 73:16
**slicing** 19:5
**slopes** 47:11
**slopping** 19:4
**slow** 33:21
**smaller** 46:13
**sole** 18:8,9
**solely** 23:4 53:14
**solon** 2:6 3:16 30:2
  30:19 32:20 58:15
  58:23 59:7 80:8
**somebody** 9:15
  30:23 31:24 34:3
  37:4,9
**somebody's** 65:11

**someplace** 68:19
**somewhat** 32:3
**sorry** 24:21 40:20
  49:6 58:22 62:21
**sort** 10:20 13:17
  34:3 51:16 52:5
**sorts** 29:22
**sounds** 21:4
**source** 51:12
**spaces** 46:13
**speaking** 33:12
  41:13 45:1
**specialized** 9:2
**specifically** 21:18
**specification** 23:20
  29:24
**speculate** 11:9,16
**speculation** 11:12
**speeds** 46:16 47:10
**spell** 6:1
**squeaks** 40:21
**staehs** 4:21 5:10
  7:13,20,21 8:6,19
  9:4,9,13,20 10:7
  34:14 38:18
**stage** 18:19 22:2
  26:1
**stages** 33:2
**stand** 35:22 36:3
  68:22
**stands** 38:7
**stark** 10:3 36:1
  71:10 77:2 78:24
  79:23 80:7,10
**start** 4:12 29:3
  44:23 56:12 74:20
  76:6 77:21
**started** 35:3
**starting** 54:21 80:12
**starts** 46:14
**state** 21:10 81:3,6
**statement** 8:13
  29:12
**statements** 48:20
  52:6 60:16 81:9,12

**states** 1:1
**steel** 41:18 45:19
  47:20,23 51:22
**stepped** 65:11
**stick** 24:21
**stipulated** 21:7
**stipulation** 20:17
  76:3,23 77:5,11,22
  78:8,20 80:6
**stopped** 65:12
**stopping** 34:20
**straight** 20:12
**strictly** 12:1 41:8
**strikes** 32:24
**striking** 18:20
**strongly** 38:9
**structural** 28:4
**structure** 28:3 30:10
  42:13 49:16 66:23
**structures** 13:12
**stuck** 7:8
**studios** 1:11
**stuff** 37:7 53:8
  77:24
**subject** 9:12 21:10
  35:24 51:22
**submit** 53:24
**subparagraphs**
  20:11
**subpart** 44:19,20
  52:20
**subsection** 21:13,14
  37:2 38:10 53:7
  55:11 56:20 60:18
  60:18 70:20 72:11
**subsequently** 67:7
**sued** 65:12
**suggest** 77:12
**suggested** 23:17
**suggesting** 71:1
**suggestion** 71:2
**suit** 43:1
**summaries** 4:17
**summary** 5:13 7:21
  8:12,23 9:6 10:6

17:5 18:19 19:14,22
20:6 21:20 22:7
26:4,5 35:8,10
38:19,20 39:6 43:11
53:16 55:1 57:11
58:14,16 59:12,13
60:11 61:23 62:18
71:12,21 72:12
74:14,20 75:8 78:17
**supervision**  81:11
**supply**  40:2
**support**  11:23 24:13
55:2 68:10
**supportable**  11:19
**supported**  48:24
**suppose**  27:11 44:5
45:24 49:1 75:22
**sure**  32:21 51:7 71:1
74:2,4
**surface**  53:17
**surprise**  80:11
**surprised**  14:19
**system**  11:4,6 13:5
13:13,13 14:3,23,24
15:1,5,8,13,19,21
16:2,4,9,11,11,17,23
16:24 17:19 18:6
28:22 29:6 30:14,20
31:3 33:23 34:1,8
40:2 61:19
**systems**  5:14,16 6:9
15:2,8,11,15,20
16:20,24 22:23 28:5
28:11,12 29:5,5
30:22,23 32:1,2,4,7
32:12,17 34:17,19
34:21 36:5,8 39:24
50:19 57:4

**t**

**t**  2:11 6:4 81:1,1
**take**  35:21 68:15
73:6 74:7,11 77:14
77:19 79:21

**taken**  12:3 68:20
75:15 81:7
**takes**  36:2 56:15
**talk**  20:7 27:24
30:20 34:3 38:2
57:10 59:1 61:17
74:17
**talked**  4:13 6:12
10:12 22:13 37:6
48:18 61:13 66:6,13
**talking**  6:1 8:15
12:8 15:9,10 17:21
18:20 23:4,5 29:17
31:9,10 37:22 44:7
46:4 52:15,15 53:7
56:5 61:15 70:20
**talks**  46:1
**technological**  39:14
**technologies**  1:4
39:18
**technology**  6:8
50:23,24 57:24
**teed**  18:14 25:24
26:2
**tele**  3:3
**telecar**  14:24 16:3
**teleconference**  81:7
**telephone**  1:17 26:1
**tell**  3:7 23:21 59:11
60:2,3 63:9 72:14
**tension**  37:11
**term**  23:21
**terms**  23:1,4,15,19
23:20 25:10,12,13
25:20,21 52:18 54:1
75:10
**terribly**  50:13
**testified**  12:7 36:10
67:10 69:13
**testify**  5:14,17 6:7
7:17 9:4 13:1,4 14:5
14:14 16:7 19:15
21:21 22:23 23:1
24:8 26:10,11,15
27:1,2 28:12,22

31:24 32:7 34:21
37:4 38:6 43:3,11
44:1,8,16 52:23
54:18 55:4,13 56:2
56:2,9 60:6 67:18
67:22,24 72:3,4
**testifying**  10:7,9
11:20,21 12:22
36:11 56:22 57:18
**testimony**  7:21 8:2,5
9:16 10:18 12:11
13:7,16 18:10,17,20
18:24 19:11,17
20:23 21:19 25:8,9
26:3,7 28:9,14,20
31:5 34:8,15 35:1
35:21 36:10 37:1
43:9 44:5 54:6 67:5
67:13 68:4 69:5,10
69:16 70:9 72:2,7
**text**  45:16 54:3
**thank**  62:1 80:14,21
80:22
**thanks**  39:3
**theme**  1:8
**thereof**  81:15
**thing**  57:9 73:15
**things**  4:12 15:24
16:8,12 26:8 32:10
35:12 47:1 51:16
53:24 55:8
**think**  4:8,19 6:24
7:22 8:6 9:3,19 10:2
10:10 11:22 12:24
13:11 15:16,18
16:18,21,22 18:9,12
19:19 20:18,19,24
22:18,19 23:17,23
24:7,11,16 25:2,24
29:20 31:5 34:6
35:9,13 36:13,21
38:16 42:21 43:8,9
43:10,10 44:15
45:10 46:24 47:7
48:1,14,15,15,20,24

56:1,2,14,23 57:10
57:12 58:16 59:1,8
60:5,17 61:13 67:7
67:15 68:16,19 69:1
69:3 70:4,15,22
71:15,18,23 72:8,11
72:14 73:1 74:9
75:1,19 76:22 77:3
77:5,6 78:4
**thinking**  78:15
**thinly**  19:6
**third**  4:20 42:2 62:3
62:4,5 67:1,1
**thompson**  12:15
35:14,16,17 36:6
**thought**  26:17 30:12
40:20 63:1 65:13
66:1 69:18 71:4,8
71:20 72:5,14,21
**three**  75:22,23 76:4
77:19 78:14,16
**throw**  75:5
**thrust**  34:14
**thumb**  76:1
**thynge**  1:19 3:7
**thynge's**  3:4
**tierco**  1:9
**tiffany**  2:3 3:15
**time**  4:3,5 8:1,23
12:16 14:21,21 31:8
42:14 63:20 69:10
74:18,24 75:18 76:4
78:4,23 79:24 81:8
**timely**  79:6
**times**  24:21 68:21
**today**  22:14 74:17
**today's**  80:15
**toes**  65:11
**told**  47:20 55:20
60:8
**topic**  45:11
**topics**  54:9
**touch**  40:24 57:7
**touchstone**  10:21

**track** 30:3
**transcribed** 81:10
**transcript** 10:24
  80:15 81:12
**transcription** 81:11
**transcripts** 80:18
**transition** 11:14
**trial** 7:17 9:5 10:3
  19:15,23 20:1 22:7
  53:16 59:13 71:11
  71:15,16 72:10
  74:21
**tried** 4:12 5:6 36:1
  74:9
**true** 81:12
**try** 13:22 14:9,14
  58:10 73:15 75:24
**trying** 7:16 19:8
  21:14 22:9,16 23:18
  25:8 27:5 31:14
  34:23 37:10 44:8
  53:3 54:23 58:24
  60:19
**tuesday** 1:16
**turn** 15:4 37:16
  45:20 48:12
**turning** 46:14
**twisting** 46:14
**two** 4:17 9:7 14:10
  22:9 26:8 27:3 29:3
  30:5 32:14 35:19
  36:5 37:16,20,21,21
  60:19 61:6 68:17
  74:19 76:17 77:12
  78:16 79:18 80:18
**type** 18:21 22:1 36:3
  36:4 53:2 55:24
  76:20
**types** 65:9
**typical** 16:19

**u**

**u.s.** 28:15,21
**ultimate** 69:17

**unable** 11:5
**underlying** 45:2
**understand** 5:3
  10:20 13:22 15:2,24
  18:4 22:16 23:21
  43:3,12 45:21 49:20
  51:7,10 54:24 55:16
  76:15 77:22
**understanding** 8:4,9
  17:14 32:11 52:24
  54:19 57:23 73:24
**understands** 24:11
**understood** 18:13
  22:20 37:14 60:14
**unfair** 69:8
**unilock** 53:19
**united** 1:1
**universal** 1:10,10
**unquote** 16:16
**unusually** 41:19
**uptake** 33:21
**usable** 22:7 72:9
**use** 15:3 20:13 32:16
  36:9 40:12 41:20
  45:23 47:23 48:12
  48:13 49:24 50:13
  51:24 52:3,4,9,13
  52:14,20 55:24
  72:11
**useful** 50:13
**uses** 23:2 28:23 29:7
  41:18 44:21
**usually** 48:5

**v**

**v** 1:7 6:4
**vague** 24:12 27:11
  52:5 54:10 59:10
**valid** 55:14 56:4,4
  56:10,13 58:12
  60:24 61:9
**validity** 12:13 18:4
  31:16 57:19
**value** 50:7,22 51:6
  53:21 54:23 57:24

58:3 68:11
**vantage** 33:1
**various** 50:16
**vehicles** 40:4
**veraart** 5:20,21 6:4
  6:7 15:16,17 16:23
  18:2,5 19:21 23:2
  28:22,23 29:7,10
  30:3,15,20 34:2
  35:10
**veritext** 3:9
**version** 27:17,19,22
  27:23,24 30:8
**versus** 3:9 8:16
  16:10,18 19:3 41:14
  43:18 56:1
**videos** 30:6
**view** 44:2,24 61:23
**viewed** 32:2 59:6
**viewing** 52:19
**virtue** 35:10
**virtues** 41:5
**voluntarily** 10:1

**w**

**w** 2:14
**walk** 37:11
**wallen** 2:10
**want** 3:7 8:7 9:6
  14:5 15:3,4 16:6
  17:18 22:19 33:16
  33:24,24 35:5 37:16
  41:20 43:2 46:5
  48:7 51:9 55:3,5,16
  57:17 61:3 65:10
  73:17 74:8,19 78:3
  79:2
**wanted** 42:11 61:11
  65:3
**wash** 33:7
**way** 11:23 22:10
  34:3 37:8 52:19
  57:16,18 59:5 68:9
  71:14,16 76:2,8

**week** 4:8 6:13 76:18
**weeks** 73:9,16 75:15
  75:22 76:4,17 77:19
  78:14,16
**weigh** 47:17
**weight** 47:9 53:2,11
  60:17 68:3
**went** 14:6 21:15,16
  21:16 22:11 42:23
  55:9 60:14 62:10
  64:11
**wheels** 47:16
**wild** 66:24
**wildcat** 66:23
**willing** 15:23
**wilmington** 1:16
**winds** 9:4
**wish** 43:6 73:10,21
**witness** 8:24,24 9:5
  10:1 21:9,11,20
  53:7 81:16
**witnesses** 20:16
**word** 20:13 61:5
**words** 5:20 23:11
**work** 5:16 6:10 9:2
  16:14 42:20 47:8
  74:24 75:24
**worked** 5:8 6:24
  32:9 52:12 66:13
**working** 4:12 6:22
  6:23 79:19
**works** 6:23
**world** 51:24 52:17
**worried** 78:6
**worry** 40:8
**written** 20:16 21:9
  57:11
**wrong** 17:13 22:20
  26:17 45:7 71:22
  77:7
**wrote** 16:8 30:17

**x**

**x** 23:21 24:3

**[y - z]**                                                              Page 16

| y |
|---|
| **y**  23:22 24:4 |
| **yeah**  30:16 32:13 |
|    41:2 42:4 56:17,23 |
|    77:15 |
| **years**  5:9 39:20 |
|    42:11 |
| **yesterday**  66:13 |

| z |
|---|
| **z**  23:22 |