## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNETAR TECHNOLOGIES CORP.          :
and G&T CONVEYER CO.,                :
                                     :
                  Plaintiffs,        :
                                     :
      v.                             :   Civ. No. 07-127-LPS-MPT
                                     :
SIX FLAGS THEME PARKS INC., et al.,  :
                                     :
                  Defendants.        :

2014 FEB -7  AM 9: 31  FILED CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

In this patent infringement case, plaintiffs Magnetar Technologies Corp.

("Magnetar") and G&T Conveyor Co. ("G&T") (collectively, "plaintiffs") sued the

defendant theme park operators ("defendants") on March 1, 2007, alleging infringement

of U.S. Patent Nos. 5,277,125 ("the '125 patent") and 6,659,237 ("the '237 patent").[1]

Plaintiffs claim numerous roller coasters and other amusement park rides infringe claim

3 of the '125 patent and/or claims 1 and 10 of the '237 patent.  Fact discovery closed

April 2, 2012.  The parties submitted opening expert reports on June 1, 2012 and

rebuttal reports on July 1, 2012.  Expert discovery closed August 10, 2012.

Presently before the court is defendants' motion for summary judgment,

pursuant to FED. R. CIV. P. 56, on the doctrine of laches and patent marking.[2]  For the

reasons discussed herein, defendants' motion will be denied.

---

[1] D.I. 1.

[2] D.I. 335.  Defendants' motion was filed on January 18, 2013.  Briefing on this motion is as follows:  D.I. 336 (defendants' opening brief); D.I. 364 (plaintiffs' answering brief); and D.I. 382 (defendants' reply brief).

## II.    FACTUAL BACKGROUND

The extensive procedural and factual background in this case is detailed in the record. For the purpose of this motion for summary judgment, the court will briefly describe the facts pertinent to patent marking and the doctrine of laches.

The application that led to the '125 patent was filed on October 28, 1992 and the patent issued on January 11, 1994.[3] At that time, BAE Automated Systems, Inc. ("BAE") was the original patentee of the '125 patent.[4] An affiliate of G&T, Elite Line, was assigned the patent in 2002.[5] Subsequently, in 2003, G&T, whose primary business is baggage-handling equipment for airports, was assigned the patent.[6] Magnetar, whose business includes design and sale of magnetic brake systems for vehicles-principally amusement rides and roller coasters, received a field-limited exclusive license to the '125 patent from G&T on August 18, 2006.[7]

Claims 1-3 of the '125 patent include:  a track assembly of U-shaped rails with opposed linear motors and opposed permanent magnets (claim 1); a car and track assembly of cars with fins, a track with two rails, opposed linear motors and opposed permanent magnets (claim 2); or a car and track assembly of cars with fins, a track with two rails, and opposed magnet assemblies (claim 3).[8]

For the purpose of this motion, the parties do not dispute the system BAE sold to the City of Denver practices the '125 patent, and the system was not marked with the

---

[3] D.I. 336, Ex. A ('125 patent).
[4] *Id.*, Ex. A.
[5] D.I. 364, Ex. 2, Assignments.
[6] *Id.*, Ex. 2; *see also* D.I. 1 at ¶ 5.
[7] D.I. 364, Ex. 3 (License Agreement).
[8] '125 patent, claims 1-3.

2

'125 patent number.[9]  The parties also agree the Denver Airport system was the only relevant product sold by BAE or G&T in the United States.[10]  The system described in the patent was first sold to United Airlines for use in Denver, and then to the City of Denver for use throughout the airport.[11]  BAE and Denver had a preliminary agreement dated December 13, 1991 to immediately begin the design and manufacture of $20 million of track, with installation to commence in early 1992.[12]  A final agreement ("1992 agreement") dated May 3, 1992 was to provide an entire Integrated Airport Baggage Handling System ("IABHS") for the Denver International Airport ("DIA") for more than $195 million.[13]  The 1992 Agreement provided that BAE design, fabricate, manufacture, install, construct, conduct training and demonstrate/test the IABHS for DIA,[14] with substantial completion of the system by October 29, 1993 and final completion no later than 90 days after the date of substantial completion.[15]  The City was required to make its final payment to BAE in October 1993.[16]

Former BAE and current G&T engineer Dan Pockrus testified BAE began installing the IABHS in 1992, and Concourse A was completed first and tested in 1993.[17]  The entire system was mechanically complete prior to the testing in March 1994.[18]  Inventor Joel Staehs testified BAE began manufacturing the system in 1991 or

---

[9] *See* D.I. 336 at 2-4; D.I. 364 at 2.
[10] D.I. 336 at 2-4; D.I. 364 at 2.
[11] D.I. 364, Ex. 5 at DEN 002648.
[12] *Id.*, Ex. 5 at DEN 002648.
[13] *Id.*, Ex. 6 at DEN 002439.
[14] *Id.*, Ex. 6 at DEN 002439.
[15] *Id.*, Ex. 6 at DEN 002573.  While not specified in the contract, 90 days after the date of final completion was January 27, 1994.
[16] *Id.* at DEN 002572.
[17] D.I. 364, Ex. 4 at 91-92.
[18] *Id.*, Ex. 4 at 98-99.

1992.[19] He stated some equipment had to be installed by January 11, 1994 in order to be ready for a test of the system in March 1994.[20] The original complaint in this matter was filed March 1, 2007.[21]

## III.   LEGAL STANDARD

### A.   Summary Judgment

A grant of summary judgment pursuant to Fed. R. Civ. P 56 (c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[22] This standard is applicable to all types of cases, including patent cases.[23] The movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case."[24] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[25] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[26]

The nonmovant must be given the benefit of all justifiable inferences and the

---

[19] D.I. 364, Ex. 7 at 142-43.
[20] *Id.*, Ex. 7 at
[21] D.I. 1.
[22] Fed. R. Civ. P. 56(c).
[23] *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).
[24] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[25] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).
[26] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

court must resolve any disputed issue of fact in favor of the nonmovant.[27]  The mere existence of some evidence in support of the nonmoving party, however, is not sufficient to deny a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.[28]  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.[29]

## IV.    ANALYSIS

### A.    Patent Marking

Generally, a patentee is "entitled to damages from the time when it either began marking its products in compliance with 35 U.S.C. § 287(a) or when it actually notified [the infringer] of its infringement, whichever was earlier."[30]  Section 287(a) ("the marking statute") provides, in relevant part, that:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.  In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for

---

[27] *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).
[28] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).
[29] *See Celotex Corp.*, 477 U.S. at 322-23.
[30] *American Med. Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993), *cert denied,* 511 U.S. 1070 (1994).

infringement shall constitute such notice.[31]

The purpose of the statute is threefold:  it incentivizes patentees to mark their product and, thus, place the world on notice of the existence of a patent, avoids innocent infringement, and aids the public in identifying patented articles.[32] Consequently, a patentee is entitled to damages from the time when it either began marking products in compliance with § 287(a), or when it notified the infringer through actual notice, whichever is earlier.[33]  Section 287(a) permits either constructive notice, where the patentee marks the article or product with the patent number, or actual notice.[34]  Actual notice is an affirmative communication by the patentee of a specific charge of infringement against an accused product, device or process.[35]

As outlined by the Federal Circuit, "[a]ny products entering the market prior to issuance of the patent will not be marked."[36]  Section 287(a) "preclude[s] recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute."[37]  "Therefore, a delay between issuance of the patent and compliance with the marking provisions of section 287(a) will not prevent recovery of damages after the date that marking has begun."[38]  Once marking has begun, though, "it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute."[39]

---

[31] 35 U.S.C. § 287(a).
[32] *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).
[33] *American Med. Sys. Inc.*, 6 F.3d at 1537.
[34] *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001).
[35] *Id.*
[36] *American Med. Sys. Inc.*, 6 F.3d at 1537.
[37] *Id.*
[38] *Id.*
[39] *Id.*

The marking requirement includes "persons making or selling any patented article for or under" the patentee.[40]   Therefore, "licensees . . . and other authorized parties . . . must also comply" with the marking requirement.[41]   The patentee "has the burden of pleading and proving at trial that she complied with the statutory requirements."[42]   "When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements."[43]

In *Inline Connection Corp. v. AOL Time Warner, Inc.*, this court granted partial summary judgment limiting damages pursuant to § 287(a).[44]   There, prior to patent issuance, the licensee installed a computer networking system encompassing the future patents, in hotels and apartments.[45]   Following issuance, the licensee was authorized to sell or offer for sale, without any obligation to mark, patented products and methods when a duty to mark existed under § 287(a).[46]

In support of its analysis, the court cited an agreement between the licensee and a third party, whereby the licensee provided high speed data communications service for use with computer equipment "to access the public Internet through dedicated . . . telecommunication lines."[47]   The licensee was also required to install, maintain, operate, repair, upgrade, replace and construct necessary improvements for the equipment and

---

[40] 35 U.S.C. § 287(a).

[41] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

[42] *Id.*

[43] *Id.* at 1111-12.

[44] 465 F. Supp. 2d 312, 321 (D. Del. 2006).

[45] *Id.* at 318.

[46] *Id.* at 319.

[47] *Id.* (omission in original).  Although the agreement was entered into prior to patent issuance, it continued following issuance of the patent.

service.[48]  For the system and services, each hotel paid the licensee usage fees on a

monthly basis.[49]  The court determined the licensee sold and offered for sale the

system, created prior to patent issuance, after the patent issued absent proper

markings,[50] concluding the patent holder's failure to require its licensee to mark

components of the system after the patent issued precluded it from recovering pre-

litigation damages.[51]

Here, defendants argue plaintiffs have not complied with the marking

requirement, since BAE installed an IABHS at the Denver International Airport in the

early 1990s, which was covered by claim 3 of the '125 patent, but failed to mark.[52]

Defendants further maintain BAE has continued to make and sell braking systems

covered by the license from G&T, but fail to mark those products.[53]  They point out

actual notice of the '125 patent and plaintiffs' infringement claims were not provided

until March 1, 2007.[54]  Consequently, plaintiffs are barred from recovering damages for

rides sold prior to March 1, 2007.[55]

Plaintiffs maintain their compliance with the marking statute is a disputed

question of fact for the jury, making summary judgment inappropriate.[56]  BAE only sold

one relevant "article," a baggage system with miles of track and numerous cars, which

was created under a contract with Denver signed two years prior to the issuance of the

---

[48] *Id.*
[49] *Id.*
[50] *Id.* at 323.
[51] *Id.* at 321.
[52] D.I. 336 at 2-4.
[53] *Id.* at 4.
[54] *Id.* at 5.
[55] *Id.* at 8.
[56] D.I. 364 at 9.

patent.[57]  Plaintiffs argue ample evidence supports that BAE completed "making,

offering for sale, and selling in the United States" the relevant system by January 11,

1994, allowing a jury to reasonably find BAE's conduct did not violate the statute.[58]

Assuming there was a technical failure to mark, plaintiffs maintain it was *de minimis*,

and does not bar damages.[59]  Refuting defendants' suggestion that BAE should have

marked Denver's patented article after the patent issued, plaintiffs contend the statute

imposes no such requirement under these circumstances.[60]

Plaintiffs note that damages since the filing of this case are not affected by the

motion, and thus marking after suit is irrelevant to defendants' marking defense.[61]

Finally, they maintain there is no evidence that Magnetar made or sold unmarked,

patented articles from the time of its August 2006 license to the time of this action, and

any sale of unmarked products before Magnetar had a license is not chargeable to

G&T.[62]

The court finds plaintiffs' compliance with the marking statute raises genuine

issues of material fact, and therefore summary judgment is inappropriate.  "[S]ection

287 . . . limits the extent to which damages may be recovered where products covered

by a U.S. patent are sold without the notice defined in the statute."[63]  Thus, items made,

offered for sale or sold prior to issuance of a patent are necessarily irrelevant to the

---

[57] *Id.* at 11.
[58] *Id.*
[59] *Id.* at 12.
[60] *Id.*
[61] *Id.*
[62] *Id.* at 13.
[63] *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002) (citing *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 393 (1936)).

marking statute.[64]

The only patented article sold by BAE is the IABHS created under contract with

Denver.  There is no dispute that the IABHS was not marked.[65]  The issue is whether

BAE was required to mark the Denver system, as the patent issued on January 11,

1994, with the system created under a contract entered into in 1992.

Under Federal Circuit precedent, "[a]ny products entering the market prior to

issuance of the patent will not be marked."[66]  Here, there is a genuine dispute regarding

whether the IABHS had "entered the market" prior to January 1994.  BAE and Denver

had a preliminary agreement in December 1991 to immediately begin the design and

manufacture of $20 million of track, with installation to start in 1992.[67]  The 1992

Agreement provided for BAE design, fabricate, manufacture, install, construct, conduct

training and demonstrate/test an IABHS for the Denver Airport,[68] with substantial

completion by October 29, 1993 and final completion of the work within 90 days

thereafter.[69]  All payments for the system were to occur by October 1993.[70]

Pockrus testified BAE began installation in Denver 1992, and the system was

mechanically complete prior to the March 1994 test.[71]  Staehs also testified the

equipment was likely installed by January 11, 1994, and was certainly installed before a

---

[64] *See American Med. Sys. Inc.*, 6 F.3d at 1537 ("Any products entering the market prior to issuance of the patent will not be marked.").

[65] D.I. 364 at 2; D.I. 336 at 8-11.

[66] *American Med. Sys. Inc.*, 6 F.3d at 1537.

[67] D.I. 364, Ex. 5 at DEN 002648.

[68] *Id.*, Ex. 6 at DEN 002439.

[69] *Id.*, Ex. 6 at DEN 002573.  As noted previously, based on the substantial completion date, the final completion date would have been January 27, 1994, sixteen days after the '125 patent issued.

[70] *Id.*, Ex. 6 at DEN 002572.

[71] *Id.*, Ex. 4 at 91-92, 98-99.

test of the system in March 1994.[72]  Photos submitted by defendants to prove BAE

failed to mark the system further confirm the Denver system was installed no later than

March 15, 1994.[73]  As a result, a genuine issue of material fact exists whether BAE had

finished the Denver system prior to issuance of the '125 patent on January 11, 1994.

Because a reasonable jury could find that the IABHS entered the market prior to

issuance of the patent, and therefore there was no statutory marking requirement,

summary judgment is inappropriate.

Defendants further argue that even if the IABHS was completed prior to the

patent's issuance, the patentee's running obligation to maintain and operate the system

required plaintiffs to mark the system after the patent issued.[74]  The court rejects this

argument, as no such obligation exists.  Contrary to defendants' position, the facts in

*Inline Connection Corp.* are not analogous to the situation at hand.[75]  There, although

an original computer networking system was installed before the patent issued, which

the court found was not required to be marked, the critical fact was that the licensee

continued to sell the system, absent proper marking, thereafter.[76]

In the instant matter, BAE, after the sale of the IABHS, continued to provide

services, such as testing and maintenance for the baggage-system, after delivery.[77]

This continued service is irrelevant to the marking statute, as BAE did not continue to

sell or offer for sale, or authorize a licensee to do the same, a product embodying the

---

[72] *Id.*, Ex. 7 at 142-43.
[73] D.I. 336, Exs. XX, YY; *see also* D.I. 336 at 4.
[74] D.I. 382 at 3.
[75] *Inline Connection Corp.*, 465 F. Supp. 2d at 315.
[76] *Id.* at 317.
[77] D.I. 336, Ex. I at 84-86.

patent following its issuance.[78]   Instead, BAE provided service for Denver's equipment.
As the court clarified upon reconsideration in *Inline*, the fact that hotel guests "used" the
computer networking system after the issuance date was not the basis for finding the
obligation to mark.[79]   Instead, pursuant to the agreement, the licensee was authorized
to sell or offer for sale, systems embodying the patents.[80]   Thus, BAE's continued
maintenance contract with Denver does not implicate the marking statute, as it only
maintained a previously sold system.  Defendants cite no case law for the proposition
that servicing, testing or maintaining a product or system already sold to the customer
triggers a requirement to mark.

Finally, in terms of defendants' assertion that Magnetar also failed to mark, they
provide no definitive evidence that Magnetar made or sold unmarked articles, covered
by the '125 patent, from the time of its August 18, 2006 license with G&T to the time of
suit on March 1, 2007.  Defendants' only evidence of purported sales of unmarked
patented articles is Edward Pribonic's deposition testimony that Magnetar failed to mark
products in accordance with its licensing agreement.[81]   Such vague deposition
testimony does not prove that, as a matter of law, plaintiffs should be precluded from
obtaining damages for rides sold prior to the date defendants received actual notice.
Instead, a genuine issue of material fact exists as to the specific products or systems
covered by the '125 patent that Magnetar failed to mark, and during what time period
this failure occurred.  If a jury concludes that under its license with G&T, Magnetar sold

---

[78] *Inline Connection Corp.*, 465 F. Supp. 2d at 320.
[79] *Id.* at 322-23.
[80] *See id.*
[81] D.I. 336, Ex. K at 144.

12

unmarked items covered under the '125 patent, damages from August 18, 2006 to March 1, 2007 may be implicated. Based on the evidence provided, however, summary judgment is inappropriate.

Consequently, defendants fail to demonstrate there is no genuine issue of material fact regarding plaintiffs' compliance with the marking statute.[82] Compliance with § 287(a) is a question of fact.[83] Plaintiffs have the burden of proving compliance with the statutory requirements. If compliance is found, no statutory obligation exists, and damages are not to be limited. Should the jury find, however, that the system was made or sold subsequent to issuance of the patent, damages may be limited accordingly. Because multiple issues of material fact exist, summary judgment in favor of defendants is not warranted.

## B.    Laches

Laches is an equitable defense to a claim for patent infringement. "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar."[84] "Laches will bar recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a counterclaim for infringement. The law of laches is rooted in the equitable principle that courts will not assist one who has 'slept on his rights.'"[85]

---

[82] FED. R. CIV. P. 56(c).

[83] *See Maxwell*, 86 F.3d at 1111.

[84] *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (*en banc*).

[85] *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 679 F. Supp. 2d 512, 519 (D. Del.

To establish laches, a defendant must prove: (1) the patentee delayed in bringing suit for an unreasonable and inexcusable length of time from the time the patentee knew or reasonably should have known of the defendant's allegedly infringing activity; *and* (2) material prejudice to the defendant resulted from the delay.[86]  Material prejudice may be  either economic or evidentiary.  Economic prejudice arises when an infringer suffers the loss of monetary investments or incurs damages that would likely have been prevented by an earlier suit,[87] and not merely monetary losses related to a finding of liability for infringement.[88]  Rather, the court must look for a change in the economic position of the alleged infringer during the period of delay.[89]  Evidentiary prejudice arises when the infringer cannot present a full and fair defense on the merits due to the loss of records, death of witnesses, or the dimming of memories, thereby undermining the court's ability to judge the facts.[90]  In *Wanlass v. General Electric Co.*, the Federal Circuit found evidentiary prejudice where the defendant had a policy of destroying internal documents after six years, key witnesses were deceased or unavailable, and the defendant no longer had models of some of the accused products.[91]

The equitable nature of laches does not follow hard and fast rules with regard to

---

2010).

[86] *See A.C. Aukerman Co.*, 960 F.2d at 1032.

[87] *Id.* at 1033.  Any monetary loss claimed by the defendant must have a proven "nexus" to the patentee's delay in filing suit.  *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995).

[88] *A.C. Aukerman*, 960 F.2d at 1033; *see also Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d 48, 49-50 (3d. Cir. 1972).

[89] *A.C. Aukerman*, 960 F.2d at 1033; *see also Crown Packaging*, 679 F. Supp. 2d at 526. (Change must be a result of the delay, not simply a business decision to capitalize on a market opportunity.).

[90] *A.C. Aukerman*, 960 F.2d at 1033.

[91] 148 F.3d 1334, 1340 (Fed. Cir. 1998).

the level of actual knowledge required to trigger laches.  The period from which the delay is measured begins at "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the allegedly infringing activity."[92]  It is "more than a mere suspicion but less than absolute assurance of [the] alleged infringement in order to activate the laches clock."[93]  Thus, courts impose a duty on patentees to police their patent rights, and will impose constructive knowledge based on the required reasonable, diligent inquiry.[94]  A patentee must investigate "'pervasive, open, and notorious activities' that a reasonable patentee would suspect were infringing."[95]  "For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention . . . give rise to a duty to investigate whether there is infringement."[96]  "Furthermore, constructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor."[97]

In *Wanlass v. Fedders Corp.*, the Federal Circuit found summary judgment on the issue of laches inappropriate where the patentee was not active in the air-

---

[92] *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1270 (Fed. Cir. 1990).

[93] *Rockwell Int'l Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000).

[94] *See Wanlass v. Gen. Elec. Co.*, 148 F.3d at 1338.

[95] *Id.* (quoting *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996)).

[96] *Id.* (citing *Hall*, 93 F.3d 1553).

[97] *Id.; see also Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911, 918 (E.D. Va. 1996) ("If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent.  If he shirks this duty, he does so in peril of triggering the laches period and perhaps ultimately losing his right to recover damages for the infringement."), *on remand* 14 F. Supp. 2d 800 (E.D. Va. 1998), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1990).

conditioning industry, or at least in the single-phase high-efficiency motor portion of the industry, did not attend trade shows during the relevant period of infringement, and did not receive trade journals or other periodicals published in the air-conditioning industry.[98]  There was virtually uncontradicted evidence that infringement could not be determined without purchasing the accused air conditioner, dismantling it, and testing the motor inside, making the alleged infringing activity neither open nor notorious.[99]

An alleged infringer can establish a presumption of laches by showing that more than six years elapsed between the time the patentee knew or should have known of the alleged infringing activity and initiating suit.[100]  Such delay raises a presumption that the delay is unreasonable, inexcusable, and prejudicial.[101]  The period does not begin, however, prior to the issuance of a patent.[102]  Where the presumption is established, the burden shifts to the patentee to produce sufficient evidence to "put the existence of a presumed fact into genuine dispute" with regard to the reasonableness of the delay or the alleged prejudice.[103]

"Importantly, where the patentee does not meet this burden of production by failing to come forward with _either_ affirmative evidence of a lack of prejudice _or_ a legally cognizable excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice '_must_ be inferred.'"[104]  The presumption, however, is not evidence.[105]  Where

---

[98] 145 F.3d 1461, 1467 (Fed. Cir. 1998).
[99] _See id._
[100] _A.C. Aukerman Co._, 960 F.2d at 1037.
[101] _Id._ at 1035-36.
[102] _Id._ at 1032 (citations omitted).
[103] _Id._ at 1038.
[104] _Hall_, 93 F.3d at 1553-54 (emphasis in original) (quoting _A.C. Aukerman Co._, 960 F.2d at 1037).
[105] _A.C. Aukerman Co._, 960 F.2d at 1037.

the "patentee presents a sufficiency of evidence which, if believed, would preclude a directed finding in favor of the infringer, the presumption evaporates and the accused infringer is left . . . to satisfy its burden of persuasion with actual evidence" of unreasonable delay and material prejudice.[106] "[T]he defendant bears the ultimate burden of persuasion," and the "burden of persuasion does not shift by reason of the patentee's six-year delay."[107]

"Ultimately, the establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case. Laches remains an equitable judgment of the trial court in light of all circumstances."[108] "The defense, being personal to the particular party and equitable in nature, must have flexibility in its application. A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties."[109] "Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied."[110] Thus, "[e]ven if unable to overcome the presumption, a patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds towards the patentee. This flows from the maxim, 'He who seeks equity must do equity.'"[111]

Defendants argue plaintiffs are barred from recovering damages due to their

---

[106] *Id.* at 1037-38.
[107] *Id.* at 1038-39.
[108] *Abbott Diabetes Care, Inc. v. Roche Diagnostics Corp.*, 2007 U.S. Dist. LEXIS 31193, at *8 (N.D. Cal. Apr. 24, 2007) (internal citation omitted) (citing *A.C. Aukerman Co.*, 960 F.2d at 1036).
[109] *A.C. Aukerman Co.*, 960 F.2d at 1032. (internal citation omitted).
[110] *Id.* at 1036.
[111] *Id.*

unreasonable delay in filing suit.[112]  They note any allegedly infringing activity began more than eleven years before suit was filed, and this delay will inflict prejudice on them if the '125 patent is not invalidated.[113]  According to defendants, during the intervening time period, plaintiffs destroyed potentially millions of pages of documents from an archive created and maintained by BAE.[114]  Additionally, Gene DiFonso, the first named inventor and a BAE employee with extensive knowledge of the patented technology, passed away during this delay period.[115]

Defendants maintain that during this time, plaintiffs were on constructive notice of the allegedly infringing activities, because at least seven accused amusement park rides were in public use more than six years before March 1, 2007, and the relevant structure of these rides were visible to park visitors from publicly accessible locations.[116]  Because plaintiffs' unreasonable and inexcusable delay in filing suit from the time they knew or reasonably should have known of their claims stands to severely prejudice defendants, their claims for infringement damages should be barred.[117]  At a minimum, defendants maintain the presumption of laches applies for the seven rides operating for more than six years before this action, and plaintiffs offer no evidence to overcome the presumption.[118]

Plaintiffs maintain laches presents material issues of fact.  First, laches is a personal defense requiring each of the nineteen defendants to prove knowledge and

---

[112] D.I. 336 at 9.
[113] *Id.*
[114] *Id.*
[115] *Id.* at 10-12.
[116] *Id.* at 11.
[117] *Id.*
[118] *Id.*

delay by a patent holder regarding that defendant's infringement, and that it was prejudiced by unreasonable delay.[119]  Because defendants have failed to so prove, summary judgment is inappropriate.[120]  Moreover, constructive knowledge of infringement is a disputed fact, and each defendant must prove, with undisputed evidence, that whoever was the patent holder at the relevant time had constructive knowledge of that defendant's infringement.  Because defendants failed to demonstrate any patentee should have known of any defendant's infringement during the relevant time period, defendants' motion must be denied.[121]  Finally, plaintiffs contend that even if the rebuttable presumption of laches is applied, whether defendants suffered evidentiary prejudiced is a material issue of disputed fact.[122]

### 1.    Presumption of Laches

Defendants may establish the presumption by showing more than six years elapsed between the time the patent holders[123]–BAE, Elite Line, or G&T–knew or should have known of the alleged infringing activity.[124]  Since this matter was brought on March 1, 2007, to trigger the presumption, defendants must show the patentees knew or should have known of the alleged infringement of the '125 patent on or before March 1, 2001.  More specifically, because defendants raise laches on summary judgment, they must show an absence of genuine issues of material fact as to whether the patentees had such knowledge before the crucial 2001 date.

---

[119] D.I. 364 at 14.
[120] *Id.* at 14-17.
[121] *Id.* at 18.
[122] *Id.* at 18-20.
[123] Magnetar's knowledge is irrelevant to the doctrine of laches, as Magnetar became a licensee of the '125 patent less than a year prior to suit.
[124] *A.C. Aukerman Co.*, 960 F.2d at 1037.

Defendants do not argue the patent holders had actual knowledge of infringement. Therefore, they must show they had constructive knowledge of defendants' infringement, that is "more than a mere suspicion but less than absolute assurance of [the] alleged infringement."[125] While the patentees were under a duty to police their patent rights, defendants present no evidence that they reasonably should have known of the infringing conduct prior to the filing date of the present action. That an allegedly infringing ride was in use eleven years before this action is insufficient establish constructive knowledge,[126] as the "mere passage of time does not constitute laches."[127] Instead, defendants must demonstrate that the patent owners had reason to know of these infringing rides, but nonetheless delayed bringing suit.

In their attempt to establish constructive knowledge, defendants fail to prove the amusement park rides at issue constitute "'pervasive, open, and notorious activities' that a reasonable patentee would suspect were infringing."[128] To support their argument that the relevant structures (the car, track and brakes) of the accused rides are visible, defendants point to websites which include photographs and videos showing the braking systems of the accused rides.[129] However, the rides shown in the cited videos, the "Intimidator 305" and "Daredevil Dive,"[130] were not in use until April 1,

---

[125] *Rockwell Int'l Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000).

[126] *See McKesson Info. Solutions LLC v. Trizetto Grp., Inc.*, 426 F. Supp. 2d 203, 209 (D. Del. 2006). Despite eleven year time lapse between issuance of the patent and the plaintiff's action, this court denied summary judgement for the defendant on laches because when plaintiff knew or reasonably should have known of the alleged infringement was in dispute.

[127] *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).

[128] *Wanless v. Gen. Elec. Co.*, 148 F.3d at 1338. (quoting *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996)).

[129] D.I. 336 at 5.

[130] *Id.*

2010 and May 28, 2011, respectively.[131]  Showing that these roller coasters are publicly viewable is irrelevant, as laches cannot apply to rides made available after the filing of this matter.[132]

Defendants also argue the public nature of the infringing structures is evident because plaintiffs' pre-suit investigation consisted of visiting defendants' amusement parks and observing their rides in operation, and their infringement expert relied on such public information.[133]  This argument is unpersuasive.  The cited August 2007 emails between Magnetar's Ed Pribonic and Acacia Resources, owner of former plaintiff Safety Breaking, concerning a visit to Knott's Berry Farm five months following the filing of this action do not conclusively show that an earlier visit would have revealed infringement of any ride relevant to the laches defense.[134]  None of the seven oldest rides relied on by defendants are located at Knott's Berry Farm,[135] and Magnetar and Acacia are not the relevant parties for laches.  Nothing in the emails suggest BAE and G&T ever visited any amusement park, much less a specific amusement park that had a specific infringing ride, on or before February 28, 2001.  Thus, the post-suit emails cited by defendants are irrelevant, and fail to show the patentees had a reason to visit the theme parks to observe potentially infringing rides.  To show constructive knowledge of the infringing rides due to their public nature, defendants must demonstrate that the relevant structures on each of the eight rides in question were

---

[131] *See id.*, Ex. H at Sch. 1.
[132] *See, e.g., A.C. Aukerman Co.*, 960 F.2d at 1037.
[133] D.I. 336 at 5-6.
[134] *Id.*, Ex. WW.  Although cited in the defendants' opening brief, this exhibit was not attached to their submission.  It was, however, located in an unrelated brief submitted by defendants.
[135] *Id.*, Ex. H at Sch. 1.

open and notorious to the public during this time period.[136]  Because defendants fail to

provide such evidence, summary judgment is not warranted.

Moreover, defendants provide no evidence of "sales, marketing, publication, or

public use of a product similar to or embodying technology similar to the patented

invention" which gave rise to a duty on the part of BAE or G&T to investigate whether

there was infringement.[137]  They further fail to show that plaintiffs had any occasion to

believe the technology embodied in the '125 patent and utilized in the Denver baggage

system would be used in roller coasters.  Thus, whether the obligation to investigate

was triggered remains at issue.

Constructive knowledge may also be imputed "even where [the patentee] has no

actual knowledge of the sales, marketing, publication, public use, or other conspicuous

activities of potential infringement if these activities are sufficiently prevalent in the

inventor's field of endeavor."[138]  Vast differences between certain patent holders' and

defendants' fields of endeavor preclude such imputation of knowledge.  Neither BAE

nor G&T had any involvement in the amusement-park ride industry, as they constructed

airport-baggage-handling systems.[139]  Similar to *Wanlass v. Fedders Corp.*, they were

---

[136] *See id.*, Ex. H at Sch. 1. Assuming a finding of laches, the doctrine would arguably preclude damages for any rides in use more than six years prior to the date of filing, March 1, 2007. Of the forty-two amusement park rides accused of infringing the '125 patent, eight of these rides opened on or before March 1, 2001.

[137] *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998)

[138] *Id.*; *see also Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911, 918 (E.D. Va. 1996) ("If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent. If he shirks this duty, he does so in peril of triggering the laches period and perhaps ultimately losing his right to recover damages for the infringement."), *on remand* 14 F. Supp. 2d 800 (E.D. Va. 1998), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1990).

[139] D.I. 336, Ex. I at 20-22.

not active in the industry, and there is no evidence that they attended trade shows or received publications in the relevant industry.[140]

Although the United States Supreme Court "has consistently imputed to parties who failed to examine readily available information the knowledge contained in it and the results of inquiries that the knowledge would have motivated a reasonable man to conduct,"[141] defendants have not shown such readily available information existed, or that the patent holders acted unreasonably. Consequently, a genuine issue remains as to whether BAE and G&T reasonably should of known of the allegedly infringing roller coasters. Absent this constructive knowledge, and because there has been no assertion of actual knowledge, the presumption of laches is inapplicable.

## 2. Reasonableness of the Delay

Without the benefit of the six-year presumption, the burden remains on defendants to establish whether plaintiffs' delay was unreasonable and inexcusable, and whether defendants suffered either economic or evidentiary prejudice that would have been avoided had plaintiffs filed suit earlier.[142]

With regard to the first prong of unreasonable delay, "[t]he length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances."[143] In determining whether plaintiffs' delay was unreasonable, the court looks to the period of time beginning when plaintiffs knew or reasonably should have known of each defendant's alleged infringing activity and ending when plaintiffs filed

---

[140] See 145 F.3d 1461, 1467 (Fed. Cir. 1998).

[141] See Wanlass v. Gen. Elec. Co., 148 F.3d at 1338-39.

[142] See id. at 1337; see also A.C. Aukerman Co., 960 F.2d at 1028.

[143] A.C. Aukerman Co., 960 F.2d at 1032.

23

suit.  Because a dispute exists regarding whether the patent holders knew, or in the exercise of reasonable diligence should have known, of the allegedly infringing activity prior to bringing suit, no such delay has been established.

### 3.    Material Prejudice

#### a.    Economic Prejudice

Defendants first discuss potential economic prejudice in their reply brief in support of their motion.[144]  Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the plaintiff filed suit earlier.[145]  In this regard, the court looks for a change in the economic position of defendants during the period of delay, and cannot simply infer economic prejudice from the possibility of damages pursuant to a finding of liability for infringement.[146]  In the absence of the presumption of laches, the burden of proof on this issue rests with defendants.  The court finds defendants fail to demonstrate that they suffered any economic prejudice from plaintiffs' delay in bringing suit.  Therefore, this factor is not a basis for laches.

#### b.    Evidentiary Prejudice

Finally, despite finding that defendants have failed to prove knowledge, constructive or otherwise, of their infringing activities, the court will nonetheless briefly examine whether material prejudice exists from plaintiffs' delay in bringing suit. Evidentiary prejudice arises when the infringer cannot present a full and fair defense on

---

[144] D.I. 382.
[145] *A.C. Aukerman Co.*, 960 F.2d at 1038.
[146] *Id.*

24

the merits due to the loss of records, death of witnesses, or the dimming of memories, thereby undermining the court's ability to judge the facts.[147]  Here, a genuine issue exists as to whether there is a nexus between the evidentiary prejudice that defendants allege they suffered due to plaintiffs' delay, and defendants "inability to present a full and fair defense on the merits."[148]  Because the court is unable to establish at what point patentees knew or should have known of the alleged infringement, it is impossible to determine whether any evidence was lost after that date.

Defendants argue that evidentiary prejudice exists because in 2007, G&T destroyed over seven hundred boxes of documents that belonged to BAE, which likely contained records concerning the development and commercialization of the Denver System.[149]  The Denver system was dismantled and removed from the Airport prior to this action.  Gene DiFonso, the first named inventor of the '125 patent and the BAE employee most knowledgeable of the development and commercialization of the patented technology, is deceased.[150]  Such evidentiary loss could potentially be materially prejudicial to defendants, since such resources could have been used to gain information available regarding on sale bar or public use prior to the filing of the patent application, as well as the failure to name all inventors.  Similar to *Wanlass v. Gen. Electric Co.*, key internal documents were likely lost and a key witness is deceased.  However, genuine issues of material fact remain concerning the "particular prejudice

---

[147] *Id.* at 1033.
[148] *Id.*
[149] *See* D.I. 336, Ex. CC.  This court has found the destruction of such materials to consistute spoliation.
[150] *Id.* at 9-10.

[defendants] suffered from the absence of these witnesses or evidence,"[151] and whether the loss of potential evidence occurred during a period of unreasonable delay.

As a result, defendants have not shown a key element of their claim. Defendants fail to meet their burdens of production and proof, since the only evidence proffered fails to demonstrate that the "allegedly prejudicial changes in circumstance occurred after [plaintiffs] knew or should have known of the allegedly infringing activities."[152] As outlined by the Federal Circuit, what is crucial is the date the patentee knew or should have known of the infringement, the date the patentee brought suit, and what happened in the interim.[153] Thus, by definition, actions undertaken before the delay period, however prejudicial, "may not figure at all in the analysis."[154]

Overall, the doctrine of laches is an equitable doctrine that must be applied cautiously. The circumstances of this case suggest that laches is best considered based upon a fully developed record. Presently, genuine issues of material fact remain surrounding when plaintiffs knew or reasonably should have known to inquire about infringement; whether all or some of the delay in filing suit is excusable; and whether defendants suffered economic and/or evidentiary prejudice as a result of the delay, requiring defendants' motion for summary judgment on laches be denied.

## V.   RECOMMENDED DISPOSITION

Consistent with the findings herein,

IT IS RECOMMENDED that defendants' motion for summary judgment (D.I. 335)

---

[151] *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992).
[152] *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1557 (Fed. Cir. 1996) (internal citations omitted).
[153] *See Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir.1990).
[154] *See Hall*, 93 F.3d at 1557.

be denied.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days limited to ten (10) pages after service of the same.  Any response shall be limited to ten (10) pages.

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date:  February 7, 2014            /s/   Mary Pat Thynge
                                  UNITED STATES MAGISTRATE JUDGE

27