IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAGNETAR TECHNOLOGIES CORP.　　:
and G&T CONVEYOR CO.,　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiffs,　　:
　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　:　　C. A. No. 07-127-LPS-MPT
　　　　　　　　　　　　　　　　　:
SIX FLAGS THEME PARKS, INC.,　　:
et al.,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　:

## REPORT AND RECOMMENDATION

## I.　　INTRODUCTION

On March 1, 2007, plaintiffs Magnetar Technologies Corp. ("Magnetar") and G&T

Conveyor Co. ("G&T") (collectively, "plaintiffs") sued multiple theme park operators

("defendants"), alleging infringement of U.S. Patent Nos. 5,277,125 ("the '125 patent")

and 6,659,237 ("the '237 patent").[1]  On February 7, 2014, this court issued Reports and

Recommendations (the "February 7, 2014 R&Rs") finding the '125 patent and the '237

patent invalid and/or not infringed on multiple grounds.[2]  On July 29, 2014, the court

adopted those Reports and Recommendations and entered judgment for defendants

and against plaintiffs.[3]  On April 17, 2015, the United States Court of Appeals for the

Federal Circuit affirmed the court's rulings[4] and the Federal Circuit's mandate issued on

May 26, 2015.[5]  Currently before the court is defendants' Renewed Motion for Attorneys'

---

[1] D.I. 1.  Plaintiffs filed an amended complaint on August 9, 2007.  D.I. 56.
[2] D.I. 404, 405, 407.
[3] D.I. 425.
[4] *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 599 F. App'x 960 (Fed. Cir. 2015).
[5] D.I. 450.

Fees pursuant to 35 U.S.C. § 285.[6]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The record details the extensive factual and procedural background in this case. For the purposes of this motion, only a brief recitation of pertinent facts is necessary.

Plaintiffs are assignees and/or exclusive licensees of the '125 and '237 patents.[7] Plaintiffs acquired the '125 patent from BAE Automated Systems, Inc. ("BAE").  The '125 patent claims a car and track assembly with wheels rolling on a two-rail track and a metal fin extending down from the car and passing between linear motors.[8]  Joel L. Staehs ("Staehs") and Gene DiFonso ("DiFonso") are the named inventors.  The '237 patent claims an eddy current brake.  Edward M. Pribonic ("Pribonic") is the sole named inventor.[9]  Defendants are amusement park operators.[10]

In 2006, plaintiffs licensed the '125 and '237 patents to Acacia Research Group LLC ("Acacia").[11]  Acacia and its subsidiaries acquire and then assert patents through litigation.[12]  Plaintiffs assigned control over the enforcement, litigation, settlement and licensing of the '125 and '237 patents to Acacia.  Subsequently, Acacia formed Safety Braking Corporation ("SBC") as a special purpose entity to hold and enforce the patents

---

[6] D.I. 463.

[7] *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No.07-127-LPS-MPT, 2014 WL 530241, at *1 n.1 (D. Del. Feb. 7, 2014) ("Magnetar is the assignee of the '237 patent and holds an exclusive field-limited license for the '125 patent."); *id.* at 1 n.2 ("G&T is the assignee of the '125 patent.").

[8] *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 547712, at *1 (D. Del. Feb. 7, 2014).

[9] *Id.* at *11.

[10] *Id.* at *1.

[11] D.I. 1 at 6-7.

[12] D.I. 428, Ex. 17 at 4.

in suit.[13]

On March 1, 2007, SBC and plaintiffs instituted the present matter, alleging braking systems and assemblies in defendants' amusement park rides infringe claim 3 of the '125 patent and/or claims 1 and 10 of the '237 patent.[14]  SBC retained Connolly Bove Lodge & Hutz ("Connolly Bove") to represent both SBC and plaintiffs.

In September 2007, Jeffrey Zelley ("Zelley"), an associate at Connolly Bove, reviewed BAE's archival records in G&T's possession to identify privileged documents not subject to production.[15]  Thereafter, Zelley submitted a memorandum (the "Memorandum") to Connolly Bove and Acacia.  The Memorandum flagged several dates, including (1) October 28, 1991, the critical date of the '125 patent; (2) August 7, 1991, the date when BAE prepared a "detailed engineering proposal" for United Airways, explaining the construction of a telecar system for the Denver International Airport (the "Denver Prototype"); and (3) November 12, 1991, when DiFonso advised Bechtel Corporation that commercial negotiations to install the Denver Prototype had begun.[16]  The Memorandum also noted a prototype covered by the '125 patent constructed for American Airlines may have been publicly available before the critical date.

The Memorandum was intended for internal circulation.  Zelley and Connolly Bove did not disclose its contents in their responses to defendants' interrogatories. They also failed to share the Memorandum with Niro, Haller, & Niro (the "Niro Firm")

---

[13] *See* D.I. 1 at 6-7.
[14] *Id.* at 1-8.
[15] D.I. 428, Ex. 1.
[16] *Id.*

3

when it assumed representation of plaintiffs.  On February 29, 2012, however,

defendants obtained a copy of the Memorandum in response to production in related

litigation in another jurisdiction.[17]

Before BAE went out of business in 2001, it established a record retention

schedule for disposal of its archival records.[18]  That schedule continued after the filing of

this matter.  Subsequently, this court found plaintiffs liable for negligent spoliation of

archival records relating to the prosecution of the '125 patent and sanctioned them by

finding factual parts of the Memorandum and certain other documents discoverable.[19]

Subsequently, the Honorable Leonard P. Stark adopted those findings.[20]

In February 2008, Acacia and SBC withdrew from this matter and advised

plaintiffs that the potential public use of the Denver Prototype threatened their patent

portfolio and chances to prevail in this action.[21]  Connolly Bove withdrew as plaintiffs'

counsel in July 2008.[22]  Plaintiffs continued this action with the representation of the

Niro Firm.[23]

In March 2011, this court denied[24] defendants' motion for leave to file a

supplemental *Markman* brief to add a new term, "between," of the '125 patent to be

_____

[17] D.I. 427 at 3.
[18] D.I. 428, Ex. 5.
[19] *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 491-92 (D. Del. 2012), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014).
[20] *Magnetar*, 2014 WL 545440, at *3.
[21] *See* D.I. 427 at 5.
[22] *See id.* at 4.
[23] D.I. 84.
[24] D.I. 213 at 1.

construed.[25]  In February and March 2012, defendants forwarded two letters to the Niro

Firm, enumerating the weaknesses of plaintiffs' claims and threatening to raise

inequitable conduct and move for attorneys' fees under § 285 unless dismissal with

prejudice followed.[26]  The Niro Firm disputed defendants' position and explained an

alternative interpretation of the record existed.[27]

   In February 2014, this court struck the testimony of Mark T. Hanlon ("Hanlon"),

plaintiffs' expert witness,[28] but allowed the testimony of Pribonic, a lay witness.[29]  This

court also recommended that defendants' motion for summary judgment of invalidity of

the '125 patent be granted; plaintiffs' motion for summary judgment of infringement of

claim 3 be denied; defendants' motion for summary judgment of non-infringement of the

'125 patent be granted as to certain accused amusement park rides; defendants' motion

for summary judgment of invalidity and non-infringement of the '237 patent be denied as

to invalidity and granted as to non-infringement; and plaintiffs' motion for summary

judgment of infringement of the '237 patent be denied.[30]

   Judge Stark adopted the recommendations in October 2014 and invalidated the

'125 patent due to indefiniteness, incorrect inventorship, on-sale bar, and obviousness,

determined most of the accused amusement park rides did not infringe the '125 patent

---

[25] D.I. 211 at 1.  Plaintiffs opposed the motion as contrary to the scheduling order and unduly prejudicial.  D.I. 212 at 1-2.
   [26] D.I. 428, Ex. 18 at 1-5.
   [27] *Id.*, Ex. 5.
   [28] *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 529983, at *12 (D. Del. Feb. 7, 2014).
   [29] *Magnetar*, 2014 WL 530241, at *1.
   [30] *Magnetar*, 2014 WL 547712, at *11.

and found the '237 patent valid and not infringed.[31]

On August 12, 2014, following the court's Memorandum Order adopting the February 7, 2014 R&Rs and entering judgment, defendants moved for an award of attorneys' fees.[32] On July 21, 2015, this court issued a Report and Recommendation (the "Fee Award R&R") finding that, in view of the totality of the circumstances, the case is exceptional based on plaintiffs' objectively unreasonable position on inventorship of the '125 patent and plaintiffs' reliance on Hanlon's expert report with respect to infringement of the '125 patent.[33] This court concluded defendants were entitled to attorneys' fees pursuant to 35 U.S.C. § 285 related to the incorrect inventorship issue since July 29, 2011, and related to Hanlon's expert report since it was served.[34]

On August 7, 2015, plaintiffs filed objections to the Fee Award R&R to the extent it recommended granting defendants' motion for attorneys' fees in any respect ("Objections").[35] On August 24, 2015, defendants filed a response to plaintiffs' Objections ("Response").[36] On September 30, 2015, after a review of the Fee Award R&R, Objections, and Response, the court issued an Memorandum Order denying defendants' motion for attorneys' fees without prejudice to renew, and returned the matter to this judge for further proceedings consistent with the instructions provided in that order.[37] On November 13, 2015, defendants filed a Renewed Motion for Attorneys'

---

[31] *Magnetar*, 2014 WL 3748999, at *1.
[32] D.I. 426.
[33] D.I. 451 at 25.
[34] *Id.* at 26.
[35] D.I. 452.
[36] D.I. 454.
[37] D.I. 457 at 5-7.

Fees ("Renewed Motion").[38]

## III.   LEGAL STANDARDS

Under the principle known as the American Rule, each litigant is responsible for its attorneys' fees and costs.  This principle applies equally to prevailing and losing parties unless a specific statute authorizes the shifting of attorneys' fees.[39]

In patent litigation, 35 U.S.C. § 285 authorizes an award of reasonable attorneys' fees to prevailing parties "in exceptional cases."[40]  "When deciding whether to award attorney[s'] fees under § 285, [the] court engages in a two-step inquiry."[41]  In step one, the court "determines whether the case is exceptional."[42]  If the case is exceptional, step two requires an evaluation of "whether an award of attorneys' fees to the prevailing party is justified."[43]

The United States Supreme Court recently clarified "[a]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."[44]  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their

---

[38] D.I. 463.

[39] *Octane Fitness, LLC v. ICON Health & Fitness, Inc* ., 134 S. Ct. 1749, 1753 (2014) (quoting *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013)) (under the American Rule, each litigant pays "his own attorney[s'] fees, win or lose").

[40] 35 U.S.C. § 285  .

[41] *Gevo, Inc. v. Butamax Advanced Biofuels LLC*, C.A. No. 13–576–SLR, 2014 WL 4247735, at *1 (D. Del. Aug. 26, 2014) (quoting *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012)) (internal quotation marks omitted).

[42] *Id.*

[43] *Id.*

[44] *Octane,* 134 S. Ct. at 1756.

discretion, considering the totality of the circumstances."[45]  Courts may use such non-exclusive factors as frivolousness, motivation, and objective unreasonableness in analyzing the factual or legal components, and the need in particular circumstances to advance considerations of compensation and deterrence.[46]

In step two, courts in the Third Circuit use the "lodestar" approach to calculate attorneys' fees, i.e., they "multiply[] the amount of time reasonably expended by reasonable hourly rates."[47]  A court may reduce hourly rates and/or exclude "unnecessary hours" from the lodestar calculation.[48]

A party must obtain at least some relief on the merits to qualify as "prevailing."[49] This qualification, however, does not entitle prevailing parties to automatically recover attorneys' fees.[50]  A court's inquiry into shifting attorneys' fees is not warranted unless relief on the merits has altered the legal relationship of the parties.[51]

The party seeking attorneys' fees must prove its contentions by a preponderance of evidence,[52] but it is not required to show subjective bad faith.[53]  It also bears the

---

[45] *Id.*

[46] *Id.* n.6.

[47] *Tech. Innovations, LLC v. Amazon.com, Inc.*, C.A. No. 11-690-SLR, 2014 WL 3703582, at *2 (D. Del. July 23, 2014).

[48] *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Homeland Housewares, LLC v. Hastie2Market, LLC*, 2013-1537, 2014 WL 4400184, at *2 (Fed. Cir. Sept. 8, 2014) (affirming both the award of attorneys' fees in connection with the non-infringement defense and the denial to award fees for the defendant's subsequent pursuit of invalidity claims); *Tech. Innovations*, 2014 WL 3703582, at *2 (declining to award fees for hours "expended as part of a reasonable defense effort").

[49] *Inland Steel Co. v. LTV Steel Co.*, 364 F.3d 1318, 1320 (Fed. Cir. 2004).

[50] *Id.*

[51] *Id.*; *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 605 (2001).

[52] *Octane*, 134 S. Ct. at 1758.

[53] *Id.* at 1757.

burden of establishing the reasonableness of its fees.[54]

## IV.   DISCUSSION

On review of the Fee Award R&R, the court returned the matter to this judge for clarification and to address certain additional issues.[55]  The court directed that it be made clear whether an order is being entered or is instead proposing findings of fact and/or conclusions of law.[56]  An error in the Fee Award R&R is also to be addressed. That report states plaintiff obtained an assignment of the rights of the unidentified inventor,[57] where the parties agree it was a former defendant who obtained the assignment of this inventor's rights during the course of the litigation.[58]  Finally, a conclusion on three points is required:

First, are attorney fees warranted here because certain of Plaintiffs' litigation conduct is conduct the court should be trying to deter?  Second, are attorneys fees warranted here because Defendants are deserving of compensation?  Third, and most importantly, in light of the "totality of the circumstances," after giving appropriate weight to all of the pertinent factors, is this case *as a whole* "exceptional" under § 285 in light of the specific instances of behavior deemed to be objectively unreasonable or otherwise improper?[59]

The court first addresses whether it is issuing an order or, instead, proposing findings of fact and/or conclusions of law.  The order returning the matter of attorneys' fees under § 285 for further proceedings instructed the parties to "make clear whether they request that the Magistrate Judge enter an Order . . . or instead they request that she again provide a report and recommendation."[60]  Only plaintiffs addressed the issue,

---

[54] *See Hensley*, 461 U.S. at 433.
[55] D.I. 457 at 5-7.
[56] *Id.* at 5.
[57] D.I. 451 at 13, 20.
[58] D.I. 457 at 6 & 6 n.8.
[59] *Id.* at 7 (emphasis in original).
[60] *Id.* at 5-6.

asserting defendants' motion falls under Rule 72(b).[61]

Federal Rule of Civil Procedure 54(d)(2) applies to a request for attorneys' fees.[62]

Pursuant to FED. R. CIV. P. 54(d)(2)(D), "the court . . . may refer a motion for attorney's

fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter."[63]

The advisory committee's note explains:

> The district judge . . . may refer a motion for attorneys' fees to a
> magistrate judge for proposed findings and recommendations under Rule
> 72(b).  This authorization eliminates any controversy as to . . . whether
> motions for attorneys' fees can be treated as the equivalent of a
> dispositive pretrial matter that can be referred to a magistrate judge.[64]

"[I]t would seem that posttrial awards of attorneys' fees, where authorized by a statute

or pursuant to an agreement, represent a claim for relief.  Accordingly, . . . they should

be considered dispositive, a categorization confirmed by the 1993 adoption of Rule

54(d)(2)(D)."[65]

The court's determination of defendants' motion, therefore, will be in form of a

report and recommendation pursuant to FED. R. CIV. P. 72(b)(1).[66]

---

[61] D.I. 468 at 1.  The court stated that in plaintiffs' Objections to the Fee Award
R&R, and defendants' Response to those Objections, the parties all agreed the
standard of review the court should apply to plaintiffs' Objections is *de novo* review but
that "[n]either side . . . explains why it believes this is the applicable standard of review,
nor do they cite any pertinent authority."  D.I. 457 at 5.

[62] *IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1286 (Fed. Cir.
2005) ("[A]ny claim to attorney fees must be processed in compliance with Rule
54(d)(2)(B).  No provision in section 285 exempts requests for attorney fees thereunder
from compliance with Rule 54(d)(2)(B).").

[63] FED. R. CIV. P. 54(d)(2)(D).

[64] FED. R. CIV. P. 54 advisory committee's note, 1993 amendment (footnotes
omitted).

[65] 12 CHARLES ALAN WRIGHT, et al., FEDERAL PRACTICE AND PROCEDURE § 3068.2
(2d ed. 2016) (footnotes omitted).

[66] Also, pursuant to Rule 72(b)(3), this court has previously conducted a *de novo*
review of a magistrate judge's recommendations concerning a motion for attorneys' fees

Defendants' Renewed Motion again requests the court find the case "exceptional" and exercise its discretion to award the defendants their reasonable attorneys' fees pursuant to 35 U.S.C. § 285[67] which provides that "in exceptional cases [the court] may award reasonable attorney fees to the prevailing party."[68]   Therefore, a party requesting fees under § 285 must show (1) that it is a prevailing party, and (2) that the case is "exceptional."[69]

Federal Circuit law governs the determination of which party has prevailed.[70]   To be a "prevailing party," that party must have received at least some relief on the merits and that relief must materially alter the legal relationship between the parties by modifying one party's behavior in a way that "directly benefits" the opposing party.[71] Defendants are the prevailing party in this case.   This court entered judgment in defendants' favor on July 29, 2014 and the Federal Circuit affirmed that judgment on April 17, 2015.   Therefore, defendants received some relief on the merits that materially altered the legal relationship between the parties that directly benefitted defendants.[72]

---

in a patent case .   *See, e.g., Bayer Cropscience AG v. Dow AgroScience LLC*, C.A. No. 12-256 (RMB/JS), 2015 WL 108415 (D. Del. Jan. 5, 2015) (Amended Report and Recommendation Regarding Defendant's Motion for Fees and Costs as Prevailing Party); *Bayer Cropscience AG v. Dow AgroScience LLC*, C.A. No. 12-256 (RMB/JS), 2015 WL 1197436 (D. Del. Mar. 13, 2015) (performing a *de novo* review of the Report and Recommendation and adopting the recommendation to grant defendant's motion).

[67] D.I. 463, D.I. 464 at 1.

[68] 35 U.S.C. § 285.

[69] *See, e.g., Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1360 (Fed. Cir. 2013).

[70] *SSL Servs., LLC v. Citrix Sys, Inc.*, 769 F.3d 1073, 1086 (Fed. Cir. 2014).

[71] *Id.*; *see also* D. Del. LR 54.1(c) ("The defendant is the prevailing party upon a dismissal or summary judgment or other termination of the case without judgment for the plaintiff on the merits.").

[72] Plaintiffs do not dispute defendants are the prevailing party.

11

"An 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."[73]  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."[74]

Defendants assert this case is exceptional in because plaintiffs were objectively unreasonable:  (1) in their position on inventorship; (2) their reliance on Hanlon's expert report; (3) as a result of discovery misconduct and spoliation; (4) their position on the indefiniteness of the '125 patent; (5) their position on the obviousness of the '125 patent; and (6) their continued litigation after the "kiss of death" email.[75]

The losing party's litigation position is objectively unreasonable if it proffers arguments so inadequate that success likely will not occur under any circumstance.[76]  A party's handling of litigation may be unreasonable if the party "shift[s] its theories of infringement late in the litigation and without following the proper procedures for amendment of contentions"[77] or submits unsolicited court filings.[78]  An unsuccessful argument on summary judgment does not necessarily demonstrate objective baselessness.[79]  *Octane* obviated the need to show bad faith, and good faith arguments

---

[73] *Octane,* 134 S. Ct. at 1756.

[74] *Id.*

[75] D.I. 464 at 11-20.

[76] *See Gevo*, 2014 WL 4247735, at *2; *Small*, 2014 WL 5463621, at *3.

[77] *Kilopass Tech. Inc. v. Sidense Corp.*, CA. No. 10-2066 SI, 2014 WL 3956703, at *14 (N.D. Ca. Aug. 12, 2014).

[78] *Homeland*, 2014 WL 4400184, at *1, 3 (affirming a case may be exceptional if a plaintiff files unsolicited briefs and meritless motions for reconsideration).

[79] *See MarcTec*, 664 F.3d at 918; *see also H-W Tech.*, 2014 WL 4378750, at *7 (denying attorneys' fees where the losing party did not prevail on weak legal

12

are not unreasonable.[80]

## A.    Step One

In determining whether a case is "exceptional," factors such as frivolousness, motivation, and objective unreasonableness may be considered.[81]  The court should also consider the need in particular circumstances to advance considerations of compensation and deterrence.[82]  In their current motion, defendants rely solely on plaintiffs' alleged objective unreasonableness.[83]

### 1.    Objective Unreasonableness

Defendants' argument that this case is exceptional rests on their contentions that plaintiffs were objectively unreasonable in continued litigation after they should have realized the '125 patent did not properly identify an inventor and reliance on Hanlon's expert report.

Defendants contend plaintiffs were objectively unreasonable because they had no colorable basis for proceeding with the case since the evidence establishes that

---

arguments); *Wiley,* 2014 WL 4929447, at *7 (dismissal of a motion for summary judgment does not mean the losing party's claim was objectively unreasonable).

[80] *See, e.g., EON Corp. IP Holdings LLC v. Cisco Sys. Inc.*, C.A. No. 12-1011-JST, 2014 WL 3726170, at *5 (N.D. Cal. July 25, 2014) (even where plaintiff's argument was "quite stretched" and its conduct "difficult to explain," the court could not "quite conclude that no reasonable patentee could see an opening . . . through which the argument could be squeezed") (emphasis omitted); *Gametek LLC v. Zynga, Inc.*, C.A. No. 13-2546 RS, 2014 WL 4351414, at *3 (N.D. Cal. Sept. 2, 2014) (finding plaintiff's briefing, which "consisted of granular parsing of the claimed steps rather than any substantive explanation of how [the invention] differed from the underlying abstract idea," was inadequate but "did not . . . descend to the level of frivolous argument or objective unreasonableness").

[81] *Octane,* 134 S. Ct. at 1756 n.6.

[82] *Id.*

[83] D.I. 464 at 11-20.

Kwangho Chung's idea was the improvement over the prior art that was being claimed in the '125 patent.[84]

The Federal Circuit has explained that:

All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well known concepts and/or the current state of the art.[85]

At deposition, Chung testified it was his idea to use the double-sided motor, the primary inventive concept of the claimed invention, and he had to persuade the company to accept the idea:

Q.  Whose idea was it to use the double-sided motor in the Denver project?

A.  I have.  It was carryover from the–the prototypes that we set up for demonstration in–on behalf of American.  So American has double-sided, the prototype and stuff.  We just–transferring the double-sided after seeing how it works and all that.  So we went on ahead with the Denver.  But still somebody has to stick neck out that double-sided works.  And in my opinion, that's–that's my neck.

* * *

Q.  And so where did you get the idea to use the double-sided motor?

A.  Well, it's in the books in here and there, I guess.  So I cannot pin down exactly who is my–who is my source of information on that, but I assume that all along it's more of a prior art–prior art, nothing more than that.  I don't claim I invented it, but what I did was to commit myself to–to go to double sided. . . .  So it is–it is my decision to–to go use double-sided.  And then also prove that you can live with double-sided as I presented.  So you don't have to worry about excess heat. . . .

---

[84] *Id.* at 12.
[85] *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (citing *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997)).

Q.  Did you have to persuade the company to use the double-sided approach?

A.  Oh, yeah.  That was my–that was–wasn't my opinion.  That was a huge decision.  Can you imagine that you make about a thousand or so linear motors and then go ahead and get the contract and started, find that everything is getting very hot and burning up and all this stuff.  That's going to be a huge mess.  And I'm the only guy advocated, and then–not only advocated but proved, showed by testing any other means at the time, this is doable. . . .   Somebody says, Well, how do you know it will do the job?  I said, You just said to trust me.[86]

Joel Staehs, the only living named inventor of the '125 patent, corroborated

Chung's testimony:

Q.  Stepping back to the prototype in the warehouse, did that have the same structural set up as the–

A.  No, it was completely–

Q.  How did that differ from the other systems?

A.  Well, the–the chassis–the chassis was a steel–steel frame.  And the big–the–well, in order to run that many cars, 60 cars a minute, the motors–the motors would overheat.  So we just–we–we talked about it.  What are we going to do about this and that?  Mr. Chung come [sic] up with the idea.  He said, look, if you put two stators in there–he had done this once before in the–way back in the '60's, as a test.  He ran a test for it.  You put two stators in facing like this (indicates) with a small gap between them, you don't have to turn the motors off.  They won't burn up that way, so therefore, we can eliminate the switches.  Oh, that's a great idea. . . .

Q. Do you know where Mr. Chung got that idea originally?

A.  No, I have no idea where he got it.  I know he used it, though.  I know he tried it many years ago, back in the '60's, when they were running thrust test.  In other words, design a motor, see how much thrust you can get and they think they can get this much.  You know, they were just running tests, experimenting, see how much they can get out of a motor.

---

[86] D.I. 465, Ex. F (Chung Dep., July 28, 2011) at 42:12-46:1.

And he ran face-to-face with the vertical slider unit on their test bed.[87]

Chung's "great idea" was then claimed by BAE in the '125 patent:

Q.  Well, if you look at Claim 1 for example, on–in Column 6, down on line 6 it says "linear induction motors mounted between said rails in an opposed configuration."

A.  Yes.

Q.  So that's–that was Mr. Chung's idea?

[objection]

A.  Was it?  I don't–I–he–he was the one that suggested we do that, yes. Or he said that would be the advantage of doing that.[88]

In the Fee Award R&R, the court found this testimony was sufficient to establish plaintiffs were objectively unreasonable in continuing to litigate the '125 patent due to the inventorship problem.

Defendants, however, also direct the court to the first document produced in this case by defendant Busch Entertainment ("Busch") on November 18, 2008, the transcript of a June 7, 2007 interview of Staehs who testified as to Chung's involvement in the invention:

Q.  (By Mr. King) Who came up with the idea of going from flat to–

A.  Well Mr. Chung said that we wouldn't have–we wouldn't burn up the motors if we left them on.  That was the big key because you had to get a solid state switch to turn the motors off and turn the motors back on every time a car came by, and as many cars was going by, a regular switch would have worn out in maybe two months.

So it had to be–it had to be a solid state switch, which we did use in San Francisco, solid state switches; and they're expensive, and they didn't

---

[87] *Id.*, Ex. D (Staehs Dep., July 29, 2011) at 38:21-40:3.
[88] *Id.*, Ex. D at 62:18-63:2.

16

even think that even that would save the motors because it would be so hot.  So he said, well, now, if we put them face to face, we won't have to do that.  We said, Bingo, that's the answer.  Let's do that.

Q.  Tell me his name again.

A.  Kwang[h]o Chung.[89]

Based on Staehs' testimony, defendants argue plaintiffs had no excuse for ignorance of the inventorship problem as early as 2008, when the transcript was produced, thereby extending the period damages should be awarded to that date rather than the date of the 2011 depositions.[90]  The court disagrees and finds that testimony does not provide sufficient evidence regarding Chung's testing, which demonstrated the efficacy of his idea, or that he was the only advocate for the use of double-sided motors, "sticking [his] neck out" in support of the "huge decision" to proceed with that use which, along with Staehs' 2011 corroborating testimony, clearly demonstrates his inventorship.

The Federal Circuit also commented on Staehs' deposition testimony.  During oral argument before that court Federal Circuit Judge Lourie observed, before affirming this court's decision, "Mr. Chung . . . obviously contributed something; the only living inventor testified that Mr. Chung was the inventor of–was a co-inventor, because of the double-side–double sided motor."[91]

The court, therefore, reaffirms its conclusion that plaintiffs' position on the issue of inventorship was objectively unreasonable and defendants are entitled to fees

---

[89] *Id.*, Ex. B (Sworn Statement of Joel Staehs, June 7, 2007) at 23:15-24:6.
[90] D.I. 464 at 4.
[91] D.I. 465, Ex. A (Tr. of Oral Argument before the Federal Circuit, April 10, 2015) at 4:5-9.

incurred following the depositions in late July 2011.[92]

Defendants contend plaintiffs were objectively unreasonable in relying on the Hanlon's expert report.[93]  Plaintiffs contend the court should reconsider its previous conclusion that the excluded Hanlon expert report on infringement provides support for an award of fees because defendants did not raise that issue in either their previous opening or reply briefs in support of their fee request.[94]  Plaintiffs argue the flaws in Hanlon's report were already punished by exclusion of Hanlon's infringement opinions.[95]

Under *Octane Fitness*, when exercising its discretion in determining whether a case is "exceptional" the court is to consider the "totality of the circumstances" of the case.[96]  Following the Federal Circuit's guidance, the court again considers whether continued litigation following service of Hanlon's report in determining whether reliance on that report makes this case "one that stands out from others with respect to the substantive strength of a party's litigation position . . . or the unreasonable manner in which the case was litigated."[97]  The court also finds plaintiffs' argument that they had already been punished unpersuasive as they continued the '125 patent litigation after

---

[92] In the Fee Award R&R, the court erroneously stated plaintiffs acquired Chung's rights to the '125 patent.  In fact, it was defendant Busch that acquired those rights.  *See* D.I. 465, Ex. J (Quitclaim Deed and Assignment of Rights).  Ultimately, however, that error does not change the court's determination.  The identity of the party that discovered the inventorship error does not affect the court's conclusion that it was objectively unreasonable to continue litigating the '125 patent after the depositions of Chung and Staehs made clear the inventorship error.

[93] D.I. 464 at 15.

[94] D.I. 468 at 6.

[95] *Id.*

[96] *Octane Fitness*, 134 S. Ct. 1756.

[97] *Id.*

serving Hanlon's completely inadequate report.[98]   For the reasons set forth in the Fee

Award R&R,[99] the court again finds plaintiffs' reliance on Hanlon's expert report was

objectively unreasonable.[100]

Defendants also contend additional circumstances support a finding of objective

unreasonableness:  discovery misconduct and spoliation; plaintiffs' position on the

indefiniteness of the '125 patent; plaintiffs' position on the obviousness of the '125

patent; and plaintiffs' continued litigation after the "kiss of death" email.[101]   Although

defendants acknowledge the Fee Award R&R found these additional circumstances did

not support a fee award, they request the court take each of them into account in

considering the totality of the circumstances in coming to its decision.[102]

Defendants argue plaintiffs' purported discovery misconduct and spoliation

---

[98] Indeed, during oral argument before the Federal Circuit, Judge O'Malley characterized Hanlon's infringement report as "a joke.  It violated every rule of civil procedure."  D.I. 465, Ex. A at 39:11-12.  Judge O'Malley also stated "You have the burden of proof.  You have zero evidence; you have no expert.  It has been excluded." *Id.*, Ex. A at 37:13-14.

[99] D.I. 451 at 21-22.

[100] The court also rejects plaintiffs' contention that the "inadequacies of the Hanlon Report were not a big part of this case, and were not the subject of any improper conduct by the plaintiffs."  D.I. 468 at 7.  With the exclusion of Hanlon's report, plaintiffs had "zero evidence" in support of the core issue in a patent case, infringement, for which plaintiffs had the burden of proof.  Although the Federal Circuit has stated "exclusion of expert testimony under *Daubert* does not *automatically* trigger a finding of litigation misconduct, and *in most cases likely would not do so*," *MarcTec LLC v. Johnson & Johnson*, 664 F.3d 907, 920 (Fed. Cir. 2012) (emphasis added), the court finds reliance on an expert report so utterly inadequate to have been called "a joke [that] . . . violated every rule of civil procedure" by the Federal Circuit was objectively unreasonable.

[101] D.I. 464 at 15-20.

[102] D.I. 472 at 8 (citing *Octane*, 134 S. Ct. at 1756)).  The court notes that after rejecting each of these issues as a basis for a fee award in the Fee Award R&R, defendants did not file objections to any of the court's recommendations.  *See* D.I. 457 at 1.

support a finding of plaintiffs' objective unreasonableness.[103]  Defendants contend that even though plaintiffs discovered the activity that would form the basis for the on-sale bar when Zelley visited G&T shortly after the suit was filed, they withheld the factual information he had uncovered, just one week later, in response to an interrogatory specifically asking for information about conception and reduction to practice, confidential and non-confidential disclosures, and public uses, disclosures, and offers for sale.[104]  Defendants maintain the failure to disclose such information prevented them from pursuing that issue earlier, and likely contributed to loss of additional evidence due to the destruction of documents by G&T.[105]

In the Fee Award R&R, the court concluded "[t]he primary evidence resulting in the finding of on-sale bar was a video tape dated before the '125 patent's critical date" and that "[t]he record is devoid of any evidence that plaintiffs knew of this tape before Pockrus's deposition."[106]  Defendants argue, however, that the issue is not whether they knew of the tape, but instead, whether plaintiffs conducted a proper pre-filing investigation and whether they made appropriate efforts to prevent the loss of documents relevant to the claims they were bringing.[107]

The court previously found a basic pre-trial investigation would not have confirmed the invalidity of the '125 patent:

---

[103] D.I. 464 at 15.
[104] *Id.*
[105] *Id.*
[106] *Id.* at 16 (quoting D.I. 451 at 12-13).
[107] *Id.* (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure preservation of relevant documents.")).

Here, despite the subsequent invalidation of the '125 patent, plaintiffs' claims were not frivolous.  Plaintiffs had reason to rely on the prima facie evidence of the patent's validity arising from the grant by the U.S. Patent and Trademark Office ("PTO").  A basic pre-trial investigation would not have confirmed that claim 3 was indefinite or the subject matter of the '125 patent obvious.  Those findings of invalidity by the court occurred after seven years of the litigation, following extensive discovery, depositions, claim construction, and expert testimony.  That defendants were successful in their arguments does not constitute frivolousness.[108]

The court also previously addressed production of the video tape:

The record is devoid of any evidence plaintiffs knew of this tape before Pockrus's deposition.  Contrary to defendants' argument, the requisite knowledge cannot be inferred from G&T's failure to halt the routine disposal of BAE's archives.  BAE deposited its archives with a disposal facility and designated disposal dates before it went out of business. G&T's e-mails to the disposal facility show it never attempted to accelerate the destruction of records potentially relevant to this action.  When defendants deposed Pockrus, who supervised the disposal of BAE's archives, he denied G&T intentionally "went through the archive and . . . thinned it out."[109]

Nevertheless, this court previously found plaintiffs liable for negligent spoliation of archival records relating to the prosecution of the '125 patent and sanctioned them by finding factual parts of the Zelley Memorandum and certain other documents discoverable.[110]  The court, therefore, finds defendants' contentions regarding a pre-filing investigation and plaintiffs' efforts to prevent the loss of documents relevant to the claims they were bringing do not support an award of fees.

The evidence also does not support defendants' assertion that a litigation hold

---

[108] D.I. 451 at 11-12.

[109] *Id.*

[110] *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 491-92 (D. Del. 2012), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014).

was not put in place.[111]

In a March 5, 2007 email from Frank DiGiovanni, an attorney at Connolly

Bove–plaintiffs' original counsel, DiGiovanni wrote:

> I will follow up with Darrin Ramsey of G&T and try to get the relevant BAE
> documents.  We have an obligation to preserve the docs if they are in
> control of G&T.[112]

When writing to Ramsey, DiGiovanni advised:

> In addition we need to make sure there is a "DOCUMENT HOLD" in place
> at G&T such that any documents (including electronic documents) relating
> to the above or otherwise relating to the case are preserved, and are not
> destroyed, while this litigation is pending.[113]

DiGiovanni also wrote to the original counsel for defendants stating:

> All three plaintiffs have been informed of their duty to preserve potentially
> discoverable and relevant documents, including electronic documents.[114]

DiGiovanni identified Bruce Page as the custodian of discoverable documents for

G&T.[115]  Page forwarded documents to DiGiovanni on June 13, 2007 and promised to

forward more as he found them.[116]  Page declared there was no intentional destruction

and that, to the best of his knowledge, no documents pertaining to ongoing litigation

were destroyed.[117]

Based on the forgoing, the court rejects defendants' contention that plaintiffs did

---

[111] D.I. 472 at 8.

[112] D.I. 280, Ex. 27-A.  The court subsequently ordered that email to be produced by plaintiffs.  D.I. 312 at 38.

[113] D.I. 284, Ex. B (June 12, 2007 email from DiGiovanni to Ramsey re "SBC v. Six Flags–Collection of Documents").

[114] *Id.*, Ex. S at 1 (Sept. 13, 2007 letter from DiGiovanni to Amr Aly and Terrell Miller).

[115] *Id.*

[116] *Id.*, Ex. C (June 13, 2007 letter from Page to DiGiovanni).

[117] D.I. 285.

not act to preserve documents and determines that plaintiffs' arguments concerning discovery misconduct and spoliation do not support an award of fees.

Defendants allege indefiniteness is another circumstance that justifies granting their renewed motion.  The court granted defendants' summary judgment that claim 3 of the '125 patent was invalid as indefinite on the grounds there was a clear error in the claim's use of the term "tracks," and it was unclear whether the proper construction was "rails" or "wheels."[118]  Although, in the Fee Award R&R, the court concluded earlier that "[a] basic pre-trial investigation would not have confirmed that claim 3 was indefinite,"[119] defendants disagree and contend a basic pre-suit patent infringement investigation would have involved carefully reviewing the language of the single claim being asserted and comparing it to the accused products.[120]  They argue such a review necessarily would have revealed the error to a competent patent practitioner, as the term "tracks" lacks an antecedent basis in the claim, a basic claim drafting error.[121]

Defendants also note not only did the plaintiffs not identify the error before filing this action, they continued to assert the patent despite being unable to articulate a colorable position in defense of the claim.[122]  According to defendants, plaintiffs sole argument was that one of skill in the art would understand "tracks" to mean "rails."[123] Defendants argue that cannot be correct because since a "track" is two "rails" in the

---

[118] D.I. 407 at 4-9.
[119] D.I. 451 at 11.
[120] D.I. 464 at 17.
[121] *Id.*
[122] *Id.* at 17-18.
[123] *Id.* at 18.

23

patent,[124] "tracks" is necessarily at least four "rails."[125]   At the time, the governing test

was whether the error was susceptible to more than one plausible correction.[126]

Defendants identified two that were supported in the specification; plaintiffs did not

argue there was only one way the error could be fixed.[127]

     The court is not persuaded that defendants' argument on this issue supports their

motion.  As noted above, the court previously determined:

> Here, despite the subsequent invalidation of the '125 patent, plaintiffs'
> claims were not frivolous.  Plaintiffs had reason to rely on the *prima facie*
> evidence of the '125 patent's validity arising from the patent grant by the
> U.S. Patent and Trademark Office ("PTO").  A basic pre-trial investigation
> would not have confirmed that claim 3 was indefinite or the subject matter
> of the '125 patent obvious.  Those findings of invalidity by the court
> occurred after seven years of the litigation, following extensive discovery,
> depositions, claim construction, and expert testimony.  That defendants
> were successful in their arguments does not constitute frivolousness.[128]

Although that portion of the Fee Award R&R analyzed whether plaintiffs' claims were

frivolous, the determination they were not frivolous also supports a determination that

plaintiffs' position on indefiniteness was not objectively unreasonable.

     The court also stated:

> Defendants also contend plaintiffs unreasonably refused to address
> indefiniteness during the Markman proceedings.  This argument is
> misplaced.  During claim construction, defendants filed an emergency
> motion to add the new term "between" to the list of disputed terms, which
> plaintiffs opposed.  The motion was denied.  The subsequent finding of
> indefiniteness related to the term "tracks" not "between," and was first
> raised by defendants during case dispositive motions, long after the
> Markman proceedings.  In light of the denials of defendants' emergency

---

[124] '125 patent, 2:23-34 ("a track having two parallel rails").
[125] D.I. 464 at 18.
[126] *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed. Cir. 2003).
[127] D.I. 407 at 5-6, 9.
[128] D.I. 451 at 11.

24

motion, plaintiffs' opposition was not unreasonable.  Plaintiffs also raised a plausible argument that the term "tracks" in the '125 patent was a correctable error as evidenced from the intrinsic evidence and the prior art cited and relied on by defendants' expert.[129]

The court remains unconvinced that plaintiffs' positions with regard to indefiniteness was objectively unreasonable.

Defendants also allege plaintiffs' positions on the issue of obviousness support granting their fee request.  The court granted summary judgment that claim 3 of the '125 patent was invalid as obvious.[130]  Defendants maintain plaintiffs made objectively unreasonable arguments in opposition to the motion.[131]

First, defendants contend the argument that the patent examiner was presumed to have done his job was frivolous because the examiner did not have the prior art defendants relied on in their motion for summary judgment.[132]  Defendants maintain for that argument to make sense plaintiffs had to establish the prior art they were citing was no different than the art that was before the examiner.[133]  Because plaintiffs' expert did not address the issue, their entire position was unsupported attorney argument.[134]

Second, defendants contend the argument there was no motivation to combine because magnetic brakes could only slow, not stop a car was based on the false premise that the combination would only be made if magnetic brakes could bring a car

---

[129] *Id.* at 18 (footnotes omitted).
[130] D.I. 407 at 29-38.
[131] D.I. 464 at 18.
[132] *Id.*
[133] *Id.*
[134] *Id.*; D.I. 472 at 8 (Plaintiffs "could not rebut certain obviousness arguments, instead relying on the patent examiner rather than their own expert.").

to a stop.[135] Defendants state plaintiffs' primary attack on the combination was explicitly contradicted by the prior art itself, noting the court observed the Miller prior art described using breaks to slow, rather than fully stop a car.[136]

In the Fee Award R&R, the court rejected defendants' contention that plaintiffs "unreasonably failed to address obviousness":

> In their opposition to defendants' motion for summary judgment of invalidity of the '125 patent, they argued Kirtley ignored the prosecution history and relied on dramatically different prior art references including an assembly with mechanical friction brakes. Since undermining Kirtley's expert opinion may have resulted in a denial of defendants' motion, plaintiffs' approach was not unreasonable.[137]

The court also finds that plaintiffs' arguments regarding the Miller reference, for instance, do not support the award of attorneys' fees. Here, that the court ultimately rejected plaintiffs' position does not support a finding that this case "stands out from others." The court, therefore, determines plaintiffs' positions on obviousness were not objectively unreasonable.

Defendants also contend it was objectively unreasonable to continue the litigation after the "kiss of death" email. A February 24, 2008 e-mail correspondence between Edward Pribonic, Magnetar's President, and Paul Ryan, a former CEO of Acacia,

---

[135] D.I. 464 at 19

[136] *Id.* (citing D.I. 407 at 33).

[137] D.I. 451 at 22-23 (footnote omitted). In response to defendants' argument that reliance on a presumption that the examiner did his job was frivolous, the court notes the Federal Circuit has stated "[t]he clear and convincing evidence standard in the litigation context stems from our suggestion that the party challenging a patent in court bears the added burden of overcoming the deference that is due to a qualified government agency *presumed to have done its job.*" *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1379 (Fed. Cir. 2015) (emphasis added) (internal quotation marks and citation omitted). Although perhaps not the strongest argument to make, it was not frivolous or objectively unreasonable.

Pribonic, confirms Acacia had informed him of witness recollections of the on-sale bar, due to the possible display of a prototype prior to filing of the '125 patent, were the "'kiss of death' to our [patent] portfolio and the litigation."[138]   Earlier, in a December 12, 2007 email, David White of Acacia informed Pribonic that "[g]iven all of the developments in this case, we have determined the enforcement of your patents is no longer commercially reasonable or practicable."[139]   SBC then terminated its agreement with Magnetar and exited the case.[140]

Defendants maintain it was objectively unreasonable for plaintiff to continue to litigate after they became aware of the "kiss of death" email, particularly as the evidence purportedly showed they made no effort to get to the bottom of the issue.[141]   Moreover, defendants argued plaintiffs should have at least timely divulged, in response to pending discovery requests, that there were "'witnesses' that think there may have been a prototype of the '125 patent displayed before patent filing."[142]

The court determines continuing to litigate after the "kiss of death" e-mail was not objectively unreasonable.  That e-mail does not suggest Pribonic believed his patents were invalid.  In his e-mail, Pribonic complained to Acacia's CEO about the handling of the litigation.[143]   One of his complaints was that White dismissed the idea of SBC putting the referenced "witnesses" under contract to "investigate the veracity" of the suggestion

---

[138] D.I. 428, Ex. 2 at 3.
[139] *Id.*, Ex. 15.  Defendants speculate that the "developments" White referenced included the discovery of the on-sale bar.  D.I. 427 at 5.
[140] D.I. 428, Ex. 14; D.I. 86.
[141] D.I. 464 at 19.
[142] *Id.* at 19-20.
[143] D.I. 428, Ex. 2.

that a prototype was displayed prior to the filing of the '125 patent.[144]  Also, Pribonic did

not originate the "kiss of death" statement; he was repeating what White said to him:

"White . . . stated that [the witnesses] recollection was the 'kiss of death' to our portfolio

and the litigation."[145]  Pribonic stated "there is no documentation of any such event" and

relayed his belief in the strength of the patents:  "I . . . have some pretty good

patents."[146]  Moreover, the purported display of a prototype would implicate invalidity

due to a public use under 35 U.S.C. § 102(b), but, as plaintiffs point out, defendants

never even asserted a public use defense.[147]  Thus, the evidence does not support a

finding of objective unreasonableness on this issue.

The court has determined that none of the "additional factors" supports a finding

of objective unreasonableness.  Even taking each of those factors into account in the

totality of the circumstances presented in defendants' motion, the court disagrees they

provide further support for a fee award.

## 2.    Considerations of Compensation and Deterrence

In considering defendants' current motion, this court was instructed to articulate

its conclusions as to whether any attorneys' fees are warranted because certain of

plaintiffs' litigation conduct is conduct that the court should be trying to deter, and

whether any attorneys' fees are warranted because defendants are deserving of

compensation.[148]  Defendants maintain fees are warranted for both reasons.[149]

---

[144] *Id.*, Ex. 2 at 3.
[145] *Id.*, Ex. 2 at 3.
[146] *Id.*, Ex. 2 at 1, 3.
[147] D.I. 468 at 14.
[148] D.I. 457 at 7.
[149] D.I. 464 at 20.

The need to compensate and deter arises when the accused party's misconduct unfairly prejudices the opposition and improperly increases litigation expense.[150] Shifting attorneys' fees as a sanction or a penalty for merely being unsuccessful is not warranted.  Courts will decline to assess attorneys' fees against the losing party where the record demonstrates both sides engaged in aggressive litigation conduct.[151]  A plaintiff who is a hyper-litigious, non-practicing entity is not prevented from asserting non-frivolous claims.[152]

The court finds attorneys' fees are warranted to deter parties from continuing to maintain claims based on objectively unreasonable positions.  Here, awarding fees where a party continues litigation when the evidence clearly demonstrates the invalidity of the asserted patent, e.g., for improper inventorship, or continues to litigate while failing to provide sufficient evidence of infringement, e.g., proceeding with a wholly inadequate expert report purporting to show infringement, should deter other parties from continuing to litigate in similar circumstances.

Likewise, the court finds attorneys' fees are also warranted to compensate the defendants in this case for the expenses in defending claims that should not have been maintained.  Plaintiffs' continued litigation of the '125 patent after the Chung and Staehs depositions revealed the inventorship issue with that patent improperly increased defendants' litigation expenses by forcing them to continue to defend against the

---

[150] *Lumen*, 2014 WL 5389215, at *4 (noting the importance of deterring "predatory strateg[ies]" and "threats to make the litigation expensive").

[151] *See CreAgri, Inc. v. Pinnaclife, Inc.*, No. 11-CV-6635-LHK, 2014 WL 2508386, at *13 (N.D. Cal. June 3, 2014) (denying § 285 motion).

[152] *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 13 Civ. 0152 (SAS), 2014 WL 5023354, at *10 (S.D.N.Y. Oct. 7, 2014).

infringement claim and pursuing a ruling that the patent was invalid.

Lastly, this court was also instructed to determine whether, "in light of the 'totality of circumstances,' after giving appropriate weight to all of the pertinent factors, is this case *as a whole* "exceptional" under § 285 in light of the specific instances of behavior deemed to be objectively unreasonable or otherwise improper?"[153]   The court determines the case as a whole is not exceptional under § 285.  No fees should be awarded with regard to defendants' litigation expenses related to the '237 patent as plaintiffs' litigation positions with respect to that patent were not alleged to have been objectively unreasonable.  Also, the court determined it was objectively unreasonable for plaintiffs to continue asserting infringement of the '125 patent after the Chung and Staehs depositions revealed the inventorship issue, defendants' litigation expenses related to the '125 patent prior to that time should not be awarded.

**B.      Step Two**

In step two, district courts analyze whether the amount of attorneys' fees is justified.  District courts have "considerable discretion in determining the amount of reasonable attorney[s'] fees under § 285 . . . [because of their] superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."[154]   The Federal Circuit requires that district courts be "reasonably careful" in calculating the amount of attorneys' fees, independently review the prevailing party's billing entries, and decline an award of fees and costs that were

---

[153] D.I. 457 at 7 (emphasis in original).
[154] *Homeland*, 581 F. App'x at 881.

unnecessary to prevail in a litigation.[155]

Defendants maintain they are entitled to their fees and expenses for the entire case, as it would be inappropriate to parse based on issues.[156]  They calculate those amounts as $1,789,460 in fees and $316,354 of expenses.[157]  In the alternative, defendants suggest if an award is to be made for the portion of the case relating to the '125 patent subsequent to the Chung and Staehs depositions, their best estimate of those amounts is $1,139,366 in fees and $234,283 of expenses.[158]

Plaintiffs contend any award should be severely limited in scope and amount because nothing in the Fee Award R&R, or defendants' papers, merits a finding that this case as a whole is exceptional.[159]  They note the Fee Award R&R stated defendants "are only entitled to reasonable attorneys' [fees] and costs regarding the '125 patent related to incorrect inventorship since July 29, 2011 (when Staehs and Chung's depositions occurred) and Hanlon's expert report when issued."[160]  Plaintiffs maintain, therefore, if there is any award, it should be limited to fees on those issues only, and not all fees from a certain time as argued by defendants.[161]

The court determined, above, defendants are only entitled to a fee award subsequent to the Chung and Staehs depositions at the end of July 2011 that revealed the inventorship issue.  Defendants submitted a chart of their billing records from

---

[155] *Id.*
[156] D.I. 464 at 20.
[157] *Id.*
[158] *Id.*
[159] D.I. 468 at 16.
[160] *Id.* (quoting D.I. 451 at 26).
[161] *Id.*

31

August 2011 until the end of the case.[162]  The chart includes the following columns:

Month; Total Fees; '125 Patent %; '125 Patent Fees; Total Expenses; '125 Patent

Expenses; and Activities.  Plaintiffs do not argue defendants fees and expenses are

unreasonable, nor do they challenge the percentage of the activities defendants aver

was related to the '125 patent.  Rather, they urge the court to limit any award to only

activities related to the issues of the incorrect inventorship and Hanlon's expert report.

Despite the court's statement regarding fees and expenses in the Fee Award

R&R, the court now concludes defendants are entitled to all of their fees and expenses

related to the '125 patent from August 2011 through the end of the case.  The court

reaches this conclusion because defendants would have incurred none of those fees

and expenses had plaintiffs not acted objectively unreasonably in continuing to assert

the '125 patent after the inventorship issue became apparent.  Consequently, the court

recommends defendants be awarded $1,139,366 in fees and $234,283 in expenses.

### RECOMMENDED DISPOSITION

Consistent with the findings contained in the Report and Recommendation,

IT IS RECOMMENDED that defendants' motion (D.I. 463) be GRANTED.


Pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 2(b)(1), and D. DEL. LR

72.1, any objections to the Report and Recommendation shall be filed within fourteen

(14) days limited to ten (10) pages after being served with the same.  Any response

shall be limited to ten (10) pages.

---

[162] D.I. 465 (Moore Declaration), Ex 2.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated November 16, 2009, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Dated:  March 13, 2017          /s/ Mary Pat Thynge_____
                                Chief U.S. Magistrate Judge